# 25-868

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

The Satanic Temple, Inc.,
*Plaintiff - Appellant,*

*vs.*

Newsweek Digital LLC,
*Defendant - Appellee*

Julia Duin
*Defendant.*

---

On appeal from the United States District Court
for the Southern District of New York

District Court case no. 1:22-cv-01343-MKV-SLC

The Honorable Mary Kay Vyskocil, U.S. District Judge, presiding

---

## BRIEF FOR THE SATANIC TEMPLE

---

Matt Kezhaya  matt@kezhaya.law
MN # 0402193 (612) 276-2216

150 S. Fifth Street, Suite 1850, Minneapolis, MN 55402

# CORPORATE DISCLOSURE STATEMENT

1. Plaintiff-Appellant The Satanic Temple, Inc. is a nonprofit religious corporation with no parent corporations and no publicly held corporation owns 10% or more of Plaintiff-Appellant's stock.

2. As a nonprofit religious corporation, Plaintiff-Appellant has neither stock nor owners.

Respectfully submitted on July 28, 2025,

By:  */s/ Matt Kezhaya*
Matt Kezhaya (# 0402193)
KEZHAYA LAW PLC
150 S. Fifth St., Suite 1850
Minneapolis, MN 55402
phone:  (612) 276-2216
email:  matt@kezhaya.law

– 2 –

# TABLE OF CONTENTS

Corporate disclosure statement ............................................................ 2

Table of contents ............................................................................ 3

Table of authorities ......................................................................... 5

Statement regarding oral argument ........................................................ 11

Jurisdictional statement ................................................................... 12

Statement of the issues .................................................................... 14

Statement of the case ...................................................................... 15

    Procedural history ..................................................................... 15

        Duin is dismissed for lack of personal jurisdiction ............................... 15

        Newsweek is granted summary dismissal ........................................... 16

    Factual background ..................................................................... 18

        The charge is included in the original idea for the article and its pitch.... 21

        Duin meets Strange through the "disgruntled former members" ............ 22

        Strange conveys the charge while disclaiming personal knowledge ........ 23

        Duin omits an investigation ................................................... 24

        Cooper edits and contributes to the article ................................... 24

        TST issues notice of falsity, which went ignored ............................. 25

Summary of the argument ................................................................... 27

Argument .................................................................................. 29

    1: Newsweek acted with actual malice ................................................... 29

        Standard of review .............................................................. 30

        1.1: The District Court misapplied relevant legal standards. ................. 30

            1.1.1: The District Court weighed evidence on summary judgment.... 30

            1.1.2: The District Court required direct proof of actual malice.......... 33

            1.1.3: The District Court engaged in a divide-and-conquer approach. 34

            1.1.4: The District Court viewed the record least favorably to TST .... 37

        1.2: The record supports an inference of actual malice. ...................... 39

1.2.1: Newsweek consciously disregarded its own standards. ............. 41

1.2.2: Newsweek solely relied on anonymous internet hearsay. ......... 44

1.2.3: Newsweek consciously avoided inquiry into the truth. ............. 50

1.2.4: Newsweek's personnel were biased and relied on biased sources. ........................................................................................ 58

1.2.5: Newsweek was pre-determined to publish the charge. ............. 67

1.2.6: Newsweek ignored TST's notices that the charge was false. ..... 69

1.2.7: Professions of good faith do not control. ................................. 71

2: The charge was on a matter of private concern. .................................... 72

Standard of review ................................................................................. 73

2.1: The statute retains familiar public vs. private jurisprudence. .......... 74

2.2: The charge was on a matter of private concern. ............................. 75

3: New York had personal jurisdiction over Julia Duin. .......................... 85

Standard of review ................................................................................. 85

3.1: Jurisdiction was proper under New York's long-arm statute. ......... 86

3.1.1: Duin's employment was "transacting business." ..................... 87

3.1.2: The defamatory article "arose from" that business. ................. 90

3.2: Exercising personal jurisdiction would not offend due process. ....... 91

Conclusion / prayer for relief .................................................................... 92

## TABLE OF AUTHORITIES

### Cases

*600 W. 115th St. Corp. v. Von Gutfeld*,
  80 N.Y.2d 130 (1992) ......................................................79, 80

*Alioto v. Cowles Commc'ns, Inc.*,
  430 F. Supp. 1363 (N.D. Cal. 1977) ...................................... 47

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................. 32

*Aristocrat Plastic Surgery, P.C. v. Silva*,
  206 A.D.3d 26 (N.Y. App. Div. 2022) .................................. 74

*Best Van Lines v. Walker*,
  490 F.3d 239 (2d Cir. 2007) ..............................................86, 87

*Biro v. Conde Nast*,
  2012 WL 3262770 (S.D.N.Y. 2012) ...................................... 86

*Bose Corp. v. Consumers Union of U.S., Inc.*,
  466 U.S. 485 (1984) ..........................................................31, 32

*Brimelow v. New York Times Co.*,
  No. 21-66-CV, 2021 WL 4901969 (2d Cir. Oct. 21, 2021)....... 41

*Buckley v. New York Post Corp.*,
  373 F.2d 175 (2d Cir. 1967).................................................. 80

*Calder v. Jones*,
  465 U.S. 783 (1984) .............................................................. 91

*Cayuga Nation v. Tanner*,
  6 F.4th 361 (2d Cir. 2021) .................................................... 37

*Celle v. Filipino Rep. Enters. Inc.*,
  209 F.3d 163 (2d Cir. 2000) ........................................ 33, 58, 72

*Chapadeau v. Utica Observer-Dispatch*,
  38 N.Y.2d 196 (1975) ..................................................... 75, 84

*Chapple v. Levinsky*,
  961 F.2d 372 (2d Cir. 1992) ................................................. 11

*Chloe v. Queen Bee of Beverly Hills, LLC*,
  616 F.3d 158 (2d Cir. 2010) ............................................ 85, 86

*Coleman v. Grand*,
  523 F. Supp. 3d 244 (E.D.N.Y. 2021) ......................... 74, 75, 81

*Covington Specialty Ins. Co. v. Indian Lookout Country Club, Inc.*,
  62 F.4th 748 (2d Cir. 2023) ................................................. 30

*Crane v. Arizona Republic*,
  972 F.2d 1511 (9th Cir. 1992) .............................................. 55

*Curtis Pub. Co. v. Butts*,
  388 U.S. 130 (1967) ....................................................... *passim*

*DiLorenzo v. New York News, Inc.*,
  78 A.D.2d 669 (N.Y. App. Div. 1980) .............................. 53, 63

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
  472 U.S. 749 (1985) ................................................ 77, 78, 79

*Dupree v. Younger*,
  598 U.S. 729 (2023) ........................................................... 12

*Eastwood v. Nat'l Enquirer, Inc.*,
  123 F.3d 1249 (9th Cir. 1997) .............................................. 34

*Eastwood v. National Enquirer, Inc.*,
  123 F.3d 1249 (9th Cir. 1997) .................................................. 71

*Fairley v. Peekskill Star Corp.*,
  83 A.D.2d 294 (N.Y. App. Div. 1981) ............................... 77, 82

*Fed. Hous. Fin. Agency v. UBS Americas Inc.*,
  712 F.3d 136 (2d Cir. 2013) .................................................... 73

*Fisher v. Aetna Life Ins. Co.*,
  32 F.4th 124 (2d Cir. 2022) ..................................................... 73

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) ................................................... 39, 78, 79

*Goldfarb v. Channel One Russia*,
  442 F. Supp. 3d 649 (S.D.N.Y. 2020) ................................ 88, 89

*Goldman v. Reddington*,
  No. 18-CV-3662,
  2021 WL 4099462 (E.D.N.Y. Sept. 9, 2021) .......................... 81

*Hanna v. Plumer*,
  380 U.S. 460 (1965) ................................................................ 73

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
  491 U.S. 657 (1989) ....................................................... *passim*

*Herbert v. Lando*,
  441 U.S. 153 (1979) ......................................................... 40, 72

*Huggins v. Moore*,
  94 N.Y.2d 296 (1999) ................................................ 75, 83, 84

*Hutchinson v. Proxmire*,
  443 U.S. 111 (1979) ......................................................... 38, 71

*Kee v. City of New York*,
    12 F.4th 150 (2d Cir. 2021) ................................................... 71

*Kehoe v. New York Trib.*,
    229 A.D. 220 (App. Div. 1930) ............................................. 69

*King v. Globe Newspaper Co.*,
    400 Mass. 705 (1987) ............................................44, 49, 57, 58

*Kipper v. NYP Holdings Co.*,
    12 N.Y.3d 348 (2009) ........................................................... 31

*Knight v. Standard Chartered Bank*,
    531 F.Supp.3d 755 (S.D.N.Y. 2021) ..................................... 91

*Krauss v. Glove Int'l, Inc.*,
    251 A.D.2d 191 (N.Y. App. Div. 1998) ..................... 76, 77, 84

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    739 F.3d 45 (2d Cir. 2013) ................................................... 74

*Loeb v. New Times Commc'ns Corp.*,
    497 F. Supp. 85 (S.D.N.Y. 1980) .......................................... 39

*Masson v. New Yorker Mag., Inc.*,
    960 F.2d 896 (9th Cir. 1992) ...........................................42, 43

*Meloff v. New York Life Ins. Co.*,
    240 F.3d 138 (2d Cir. 2001) .................................................. 53

*Palin v. New York Times Co.*,
    113 F.4th 245 (2d Cir. 2024) ...........................................12, 13

*Palin v. New York Times Co.*,
    940 F.3d 804 (2d Cir. 2019) ..............................................58, 67

*Patrick v. LeFevre*,
    745 F.2d 153 (2d Cir. 1984) .................................................... 38

*Poller v. Columbia Broad. Sys., Inc.*,
    368 U.S. 464 (1962) ................................................................ 38

*R.B. Ventures, Ltd. v. Shane*,
    112 F.3d 54 (2d Cir. 1997) ..................................................... 31

*Rejent v. Liberation Publications, Inc.*,
    197 A.D.2d 240 (N.Y. App. Div. 1994) ................................. 53

*Rinaldi v. Holt, Rinehart & Winston, Inc.*,
    42 N.Y.2d 369 (1977) ............................................................ 53

*Satanic Temple, Inc. v. Newsweek Mag. LLC*,
    661 F. Supp. 3d 159 (S.D.N.Y. 2023) ................................... 15

*Satanic Temple, Inc. v. Newsweek Mag. LLC*,
    774 F. Supp. 3d 688 (S.D.N.Y. 2025) ................................... 17

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ............................................................... 31

*Sovik v. Healing Network*,
    244 A.D.2d 985 (4th Dep't 1997) ....................................87, 88

*SPCA of Upstate New York, Inc. v. Am. Working Collie Ass'n*,
    18 N.Y.3d 400 (2012) ............................................................ 90

*St. Amant v. Thompson*,
    390 U.S. 727 (1968) ....................................................... *passim*

*Tsamasiros v. Jones*,
    232 A.D.3d 816 (N.Y. App. Div. 2024) ................................. 74

*Watson v. NY Doe 1*,
  No. 19-CV-533,
  2023 WL 6540662 (S.D.N.Y. Oct. 6, 2023) ........................... 81

## Statutes

28 USC § 1291 ......................................................................... 12

28 USC § 1332 ......................................................................... 11

CPLR § 302 .......................................................................85, 86

N.Y. Civ. Rights Law § 76-a.................................................... 74

## Other Authorities

Bromley, David, Anson D. Shupe, and Joseph C. Ventimiglia.
  'Atrocity Tales, the Unification Church and the Social
  Construction of Evil.' *Journal of Communication* 29 (Summer),
  1979: 42-53 ......................................................................... 59

Geoffrey Christopher Rapp, *The Wreckage of Recklessness*, 86 Wash.
  U.L. Rev. 111 (2008) ........................................................... 41

## Rules

FRAP 4 .................................................................................... 12
FRAP 10 .................................................................................. 47

## Treatises

1 *Law of Defamation* § 3:45 (2d ed.) ........................................... 34
1 *Law of Defamation* § 3:59 (2d ed.) ........................................... 65
1 *Law of Defamation* § 3:86 (2d ed.) ........................................... 63
1 *McCormick on Evid.* § 185.2 (9th ed. 2025) .............................. 34
57A *Am. Jur. 2d Negligence* § 265................................................. 41

## STATEMENT REGARDING ORAL ARGUMENT

The Court should entertain oral argument. This is a defamation case which presents the novel question of whether a publisher acts with actual malice when it disregards its own truth-seeking standards. Diligent research has revealed no cases, anywhere, in which an appellate court has confronted a publisher's failure to investigate when its internal policies required one.

There are novel questions of statutory interpretation as well. New York's anti-SLAPP statute imposes the actual malice standard when the charge is on a matter of "public concern." A few district courts have considered posts tagged #MeToo to be on a matter of "public concern." But this charge wasn't part of that conversation, nor was it about the entertainment industry, nor the workplace. Now that "public concern" separates negligence from actual malice, the dividing line must become brighter.

A full hearing would aid the Court in its decision on these topics.

## Jurisdictional statement

For review are orders: (1) granting summary judgment; and (2) entering a partial dismissal at the pleadings stage. The District Court had diversity jurisdiction over the claim because the parties are residents of Massachusetts (Plaintiff), New York (Newsweek Digital LLC) and Washington (Julia Duin), and the damages sought exceeded $75,000. 28 USC § 1332.

On March 8, 2023, an interlocutory order dismissed Julia Duin for lack of personal jurisdiction. (S. Appx. 3). The claim survived against Newsweek Digital LLC. (Id.) The order was not "final" because it did not resolve all claims as against all defendants and did not direct a final judgment of dismissal pursuant to Rule 54(b). *E.g.*, *Chapple v. Levinsky*, 961 F.2d 372, 374 (2d Cir. 1992). As a non-final order, it merged into the final judgment and is subject to appellate review. *Palin v. New York Times Co.*, 113 F.4th 245, 271 (2d Cir. 2024); *see also Dupree v. Younger*, 598 U.S. 729, 734 (2023) (the "general rule is that a party is entitled to a single appeal, to be deferred

until final judgment has been entered, in which claims of district court error at any stage of the litigation may be ventilated") (cleaned up).

On March 26, 2025, the summary judgment order was entered. (S. Appx. 23). That order dismissed the claim against Newsweek Digital LLC. The final judgment issued on March 27. (S. Appx. 50). The deadline to notice an appeal was 30 days later, on April 26. FRAP 4(a). This appeal was timely noticed on April 7. (Appx. 1145).

The summary judgment order fully and finally resolved the dispute. It left no open claims and left no remaining defendants. There were no post-judgment proceedings. Because a notice of appeal was timely filed after a final decision, this Court has appellate jurisdiction under 28 USC § 1291. Because the Court has appellate jurisdiction over the final order, it also has jurisdiction in the interlocutory order of dismissal. *Palin*, 113 F.4th at 271.

# STATEMENT OF THE ISSUES

1. Under both New York and First Amendment law, the actual malice standard permits a plaintiff to prove its case with aggregate circumstantial evidence. Did Newsweek act with actual malice where it published anonymous internet hearsay which was conveyed by a pseudonymous hostile source; omitted an investigation which its own policies required under the circumstances; authored and published the article through its anti-TST personnel; and ignored TST's post-publication notices that the charge was false?

2. Under New York's anti-SLAPP statute, the actual malice standard is not triggered if the charge was on a matter of "private concern," which are those not entitled to special First Amendment protection. The charge was a false accusation of sexual abuse and coverup against a private figure. Was the charge a matter of "private concern?"

3. Under New York's long-arm statute, a non-resident must be "transacting business" in New York and the claim must have "arose from" those transactions. Was Duin subject to personal jurisdiction in New York, where she was employed by a New York publisher; co-authored the article with her New York editor; and submitted the article for publishing by her New York employer, along with 21 other articles within the preceding year?

# STATEMENT OF THE CASE

## Procedural history

*Duin is dismissed for lack of personal jurisdiction*

For review are two orders of dismissal from a defamation case. One is for lack of personal jurisdiction and the other is for summary judgment. Hon. Mary Jay Vyskocil, for the United States District Court for the Southern District of New York, held that New York lacked personal jurisdiction over a Washington reporter over a defamatory article that was published in New York. *Satanic Temple, Inc. v. Newsweek Mag. LLC*, 661 F. Supp. 3d 159, 167 (S.D.N.Y. 2023). The Satanic Temple, Inc. ("**TST**") sued out a defamation complaint against Julia Duin (author) and Newsweek Magazine LLC (publisher). (Appx. 11).[1] The complaint alleged that Duin was an "employee" of Newsweek. (Appx. 12). Duin moved to dismiss for lack of personal jurisdiction supported by a declaration that she

---

[1] Newsweek Magazine LLC was later substituted for Newsweek Digital LLC.

was instead an "independent contractor." (S. Appx. 8). TST responded that the complaint controlled and provided a declaration that Duin had authored 22 articles for Newsweek. (Appx. 138, 148). TST argued that personal jurisdiction was proper because Duin's employment and 22 articles were "transacting business" in New York, that the defamatory article (one of the 22) "arose from" that transaction; and that due process concerns were subsumed within the long-arm statutory analysis. (Appx. 139-143). The District Court held that the dispute over employment status was irrelevant because employment is not enough for the statute. (S. Appx. 8). Duin was dismissed for want of personal jurisdiction. (S. Appx. 8)

*Newsweek is granted summary dismissal*

Two years later, Hon. Mary Jay Vyskocil, for the United States District Court for the Southern District of New York, held although the record would support a finding that the Article Statement is false, the actual malice standard applied under New York's anti-SLAPP statute and the record did not support a finding of actual

malice. *Satanic Temple, Inc. v. Newsweek Mag. LLC*, 774 F. Supp. 3d 688, 696–707 (S.D.N.Y. 2025). After discovery, Newsweek and TST cross-moved for summary judgment. (S. Appx. 28). Newsweek contended that TST could not prove the falsity element, that the actual malice standard applied under New York's anti-SLAPP statute, and TST could not prove actual malice. (S. Appx. 32, 35). TST responded that the article falsely accused TST of sexual abuse and cover-up, that the actual malice standard does not apply under the statute because the charge was of "private concern," but the record showed actual malice. (Id.)

More specifically, TST asserted that the record showed: Newsweek was pre-determined to publish the charge, that it had obvious reasons to doubt anonymous internet hearsay as conveyed by a hostile, pseudonymous source; that Newsweek purposely avoided the truth because its own standards required an investigation which was not done; and that Newsweek ignored post-publication notices that the charge was false. (Appx. 439-441).

The District Court entertained oral argument. (Appx. 1074).

**Factual background**

This is a defamation case which arises from a *Newsweek* article entitled, *Orgies, Harassment, Fraud: Satanic Temple Rocked by Accusations, Lawsuit* (published on October 29, 2021). (Appx. 449-475). The article included a defamatory charge that TST engages in sexual abuse and coverup. In pertinent part, it provides:

> He hadn't been involved long when he came to feel that TST 'appeared to be an inept, rudderless organization that had accidentally risen to prominence through something of a disingenuous prank,' referring to the 2013 filming event in Florida. He soon left the group, then was leaked material about 'leaders posing happily with major alt-right media figures,' he wrote. *'Accounts of sexual abuse being covered up in ways that were more than anecdotal.* Dozens of people kicked out for asking for financial records from this alleged-non-profit organization.'

(S. Appx. 27) (italics indicate the "**Article Statement**").

Newsweek Digital LLC publishes the online news magazine *Newsweek* through its website. (Appx. 1118). Newsweek is formerly one of the "Big Three," the most credible names in news publishing.

– 18 –

(Appx. 666). Nancy Cooper is Newsweek's global editor-in-chief. (Appx. 328). Cooper edited the article. (Appx. 681). Cooper wrote the Editorial Guidelines. (Appx. 694). The Editorial Guidelines open with:

> *Newsweek* is committed to accurate, independent, ethical and responsible journalism. We report fairly; we attribute clearly; we correct mistakes transparently. Our editorial policies and processes are always intended to support those values.

(Appx. 552). Policies salient to this litigation include:

- "When writing about criminal charges or allegations, be specific and complete."

- "If we are accusing a person or company of wrongdoing, we must include fair comment."

- "Use only credible sources."

- "[A]n accusation of covered-up sexual abuse qualif[ies] as one of the[] big questions that should be fact-checked."

(Appx. 553, 552, 553, 665).

Cooper admitted that an accusation of sex abuse connotes

sexually criminal activity. (Appx. 685-687). So did Duin. (Appx. 255). Cooper also admitted that an accusation of sexual abuse and coverup should be fact-checked. (Appx. 665). And Cooper admitted that the role of editor is to ask the "larger questions," like whether fact-checking was done. (Appx. 665).

Julia Duin was Newsweek's religion reporter from September 2021 – February 2023. (Appx. 668, 711-712). Duin wrote the article. (Appx. 734). She was considered a "senior hire," (Appx. 669, 690-691) because she had been a journalist for over 45 years and had received multiple awards for her reporting. (Appx. 708, 742). She has also published six books about religion and served as a professor of journalism at four colleges. (Appx. 708-709).

TST is an atheistic religious corporation which engages in various charitable activities and advocates for the religious rights of its members. (S. Appx. 1-2). Lucien Greaves is its spokesperson and co-founder. (Appx. 891). Of doctrinal significance to TST is the Satanic Panic, a moral panic which reached its height during the years 1987-1989 which consisted of now-debunked conspiracy claims that

a secret Satanic cabal was organizing ritual abuse – including ritual sexual abuse – on a global scale. (Appx. 653). In reaction to the Satanic Panic, TST combats irrational moral panics, particularly as pertains to conspiratorial claims of Satanic ritual abuse. (Appx. 653).

*The charge is included in the original idea for the article and its pitch*

About one month before the article was published, the idea for this article was first provided to Duin by a reporter for the Catholic News Agency. (Appx. 541-543, 716-717). The Catholic News Agency's reporter passed on an unverified claim that there were "some allegations of TST leadership sexually exploiting members or failing to respond to harassment / sex assault allegations against chapter heads." (Appx. 542).

The next day, Duin pitched the article as one that would entail "NDAs being used to hide wrongdoing" and "sexual harassment." (Appx. 496, 715-716). These claims were sourced from "disgruntled

former members." (Appx. 495, 741). As pitched, the article would arrive "Just in time for Halloween." (Appx. 496, 719). Duin considers Halloween to be a Satanic holiday. (Appx. 719). Two of her prior anti-Satanism articles, written during the height of the Satanic Panic, were published around Halloween. (Appx. 502-515, 653). Cooper took special interest in Duin's pitch. (Appx. 547, 679-680). Although Duin ordinarily reported to U.S. Editor Juliana Pignataro (Appx. 737), Duin worked with Cooper for this one. (Appx. 681). Within one week of the pitch, all three of Newsweek's top management greenlit the article. (Appx. 725, 737).

*Duin meets Strange through the "disgruntled former members"*

Shortly later, Duin met with two of the "disgruntled former members," David Alan Johnson and Nathan Sullivan. (Appx. 495, 725, 741). Neither claimed to have any personal knowledge that the Temple engages in sexual abuse and cover-up. (Appx. 765-766, 777-779). Under oath, both affirmatively denied having any personal knowledge of these claims. (Ibid.). After the meeting, Sullivan

provided Duin with contact information for Jinx Strange. (Appx. 776). Jinx Strange is a pseudonym. (Appx. 764, 776, 794).

*Strange conveys the charge while disclaiming personal knowledge*

Five days before publishing, upon Duin's inquiry, Strange wrote a three-page email with his comments about the Temple. (Appx. 560-562). Midway into page two is the Article Statement. (Id.) His email does not suggest that he has personal knowledge of sexual abuse or cover-up. (Id.) Rather, it expressly stated that he was passing on "messages" from "other people." (Appx. 561).

His email opened with an offer to Duin of "information, receipts, screenshots, etc., of things that range from probably-illegal malfeasance to covering up and protecting men accused of sexual misconduct." (Appx. 560) Duin asked no follow-up questions and didn't accept his offer. (Appx. 727, 739-740).

Strange would later deny, under oath, having any personal knowledge of any sexual abuse. (Appx. 795). His "understanding of sexual abuse was secondhand through people basically telling [him]

something over the internet." (Appx. 796).

*Duin omits an investigation*

Four days before publishing, Duin talked with Greaves. (Appx. 575). The next day, she asked Greaves follow-up questions on other topics. (Id.) She never asked him about Strange's rumor. (Appx. 731). Two days before publishing, Duin talked to Dr. Joe Laycock, who she considered to be the "unofficial biographer" of TST. (Appx. 728). She did not ask Dr. Laycock about Strange's rumor. (Appx. 652). She never talked to anyone who claimed to have been subjected to sexual abuse or cover-up. (Appx. 739-740). She did not ask "anyone on the face of the planet what sexual abuse or cover-up means" in context of the Article Statement. (Appx. 735). This was because, to her, the article was not an investigation into sexual abuse. (Appx. 727). She included Strange's rumor because it was a "delicious quote." (Appx. 580).

*Cooper edits and contributes to the article*

Prior to this article, Cooper was unaware of TST. (Appx. 674-

675, 679-680). Cooper did not perform any investigation and did not inquire into Duin's investigation into the article. (Appx. 672, 682-683, 691-692, 697-698). But she still insisted on editorializing in an assertion that the Temple falsifies its religious practices over Duin's objection that Newsweek had no basis to make the claim. (Appx. 596, 480, 587). Cooper approved of the article for publishing and praised it three times. (Appx. 593, 569, 609, 737).

*TST issues notice of falsity, which went ignored*

Upon publishing, Greaves immediately took issue with the Article Statement. (Appx. 612). The next day, TST's general counsel issued a demand for retraction which asserted that the Article Statement was false. (Appx. 626). Newsweek never issued a retraction. (Appx. 852). After publishing, Duin reported to the Catholic News Agency that "The Newsweek folks love it." (Appx. 580).

The article's comment section immediately drew unfavorable comparisons between the Catholic Church and the Temple. (Appx. 470). People canceled their recurring donations because of the

article. (Appx. 630, 819). Others pointed to the article as proof of the truth of the matters asserted within it. (Appx. 630, 819). As a result, the Temple hired out public relations assistance. (Appx. 630-649). TST ultimately expended $43,350 in remediation costs. (Appx. 630-649).

## SUMMARY OF THE ARGUMENT

The District Court reversibly disregarded key circumstantial evidence showing Newsweek's reckless disregard for the truth. Rather than evaluating the evidence in aggregate, as the actual malice standard requires, the District Court iteratively dissected each inference and dismissed each as individually insufficient. It also drew all inferences in Newsweek's, the movant's, favor. This all contradicts summary judgment standards.

Properly viewed, the record supports a finding of actual malice. Newsweek repeatedly violated its own standards. It relied on anonymous internet hearsay from a hostile, pseudonymous source. Despite the seriousness of the charge, Newsweek conducted no investigation in violation of its own policies and New York law. A jury could reasonably infer that these failures and omissions stemmed from bias against TST, that Newsweek was pre-determined to publish the charge based on its inclusion in Duin's original pitch, and its refusal to correct or retract the article after being notified of its

falsity. Instead of this evidence, the District Court credited Duin's and Cooper's self-serving claims of good faith. But professions of good faith do not control, they had to be disregarded at this stage.

Alternatively, actual malice did not attach because this charge was on a matter of private concern. This false accusation of sexual criminality lacks First Amendment value, falls within the realm of "mere gossip and prurient interest," and was directed as a wedge between TST and the "limited, private audience" of its supporters.

Finally, Duin is subject to personal jurisdiction in New York. She co-authored this article (and 21 others) with a New York resident, under editorial control from New York, and submitted it to her New York employer for publishing. This defamation article arose from that course of business, which satisfies both statutory and constitutional requirements.

The Court should reverse and remand for a jury trial.

# ARGUMENT

## 1: Newsweek acted with actual malice.

It was reversible error to find that the record does not support an inference of actual malice. (S. Appx. 27). The District Court reversibly erred when it weighed evidence at the summary judgment stage, required direct proof of actual malice, dissected the evidence piecemeal rather than viewing it in aggregate, and failed to view the record in the light most favorable to TST.

There are six inferential grounds from which an inference of actual malice is drawn. Newsweek disregarded its own truth-seeking standards, had obvious reasons to doubt anonymous internet hearsay, purposely avoided a required investigation, and ignored notices of falsity. This is explainable by proof that Newsweek's personnel were biased against TST and were pre-determined to publish the charge. The charge was not included because Newsweek had any good faith belief in its truth, but because it was a "delicious quote."

The Court should reverse and remand for trial proceedings.

*Standard of review*

For review is a grant of summary judgment, which is reviewed de novo, examining the record in the light most favorable to the non-moving party. *Covington Specialty Ins. Co. v. Indian Lookout Country Club, Inc.*, 62 F.4th 748, 752 (2d Cir. 2023). Likewise, this Court reviews de novo the district court's interpretation and application of state law. *Id.*

### 1.1: The District Court misapplied relevant legal standards.

The District Court's assessment of the cross-motions misapplied four legal standards. The District Court weighed evidence on summary judgment, required direct evidence of actual malice, refused to view the circumstantial evidence in aggregate, and failed to view the record in a light most favorable to TST. These issues will crop up repeatedly as the evidence is discussed in **§1.2**.

### 1.1.1: The District Court weighed evidence on summary judgment.

The District Court reversibly erred by weighing evidence at the summary judgment stage. *See R.B. Ventures, Ltd. v. Shane*, 112 F.3d

54, 59 (2d Cir. 1997) (courts may not "'weigh' the evidence in the same manner as a trier of fact"). As grounds to weigh whether the record supports actual malice *by clear and convincing evidence*, the District Court relied on the rule that courts, as guardians of the First Amendment, must ensure that an adverse judgment does not tread upon the sacred ground of free expression. (S. Appx. 38) (citing *Kipper v. NYP Holdings Co.*, 12 N.Y.3d 348, 354 (2009)).

But that rule only applies when the actual malice standard is imposed by the First Amendment. *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) ("*As in other First Amendment cases*, the court is obligated to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression") (cleaned up, emphasis added); *see also Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 510–11 (1984) ("judges…must exercise such review *in order to preserve the precious liberties established and ordained by the Constitution*.") (emphasis added). Wherever there is a First Amendment privilege, actual malice "is not merely a question for the trier of fact," but is subject

to independent judicial scrutiny to ensure the evidence is sufficient. *Bose*, 466 U.S. at 511.

But the District Court did not find that the First Amendment imposed actual malice, rather, it found that a New York statute imposed it. (S. Appx. 16). Just because the statutory standard copied the definition of a First Amendment privilege, that does not mean that the statutory standard carries the same constitutional significance. *See Bose*, 466 U.S. at 510-511. The District Court correctly refused to find that TST is a public figure (S. Appx. 16 n. 5), so it had no basis to engage in the independent review of the record required by the First Amendment. The normal rules of civil procedure, including the bar against judicial weighing of evidence, applied with full force.

A court improperly weighs evidence on summary judgment when it "fail[s] to credit evidence that contradicted some of its key factual conclusions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). For example, the District Court held that Duin "looked into Strange's claims and 'everything checked out.'" (S. Appx. 46).

This finding was directly undermined by Duin's own testimony–uncredited by the District Court–that Duin did not take the slightest effort to fact-check the charge: she did not accept Strange's offer to provide substantiating information, she did not talk to anyone who claimed to have been subjected to sexual abuse or cover-up, and she did not so much as ask "anyone on the face of the planet what sexual abuse and cover-up means" in context of the charge. (Appx. 564-567, 735).

As it had no First Amendment basis to supplant a jury's assessment with its own, the District Court was bound by normal summary judgment standards to look for competing evidence, not to weigh it.

### 1.1.2: The District Court required direct proof of actual malice.

The summary judgment order reversibly erred by deviating from the rule that actual malice may be inferred from circumstantial evidence because defendants will "rarely" admit to it. *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 183 (2d Cir. 2000); *St. Amant v.*

*Thompson*, 390 U.S. 727, 732 (1968); *Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249, 1253 (9th Cir. 1997) ("[W]e have yet to see a defendant who admits to entertaining serious subjective doubt about the authenticity of an article it published").

Although the order acknowledged this rule, it disregarded all circumstantial evidence, in part, because it did not *directly* show that Newsweek's personnel had a high degree of awareness that the charge was probably false. (S. Appx. 43, 45.) Direct evidence was not required, that fact is inferred from the circumstantial evidence.

### 1.1.3: The District Court engaged in a divide-and-conquer approach.

Relatedly, the order fails to properly apply the rule that circumstantial evidence must be interpreted in the aggregate, "for it is a rare case in which any one fact, standing alone, is enough of a 'smoking gun' to meet the constitutional standard." 1 *Law of Defamation* § 3:45 (2d ed.). Just as "a brick is not a wall," no single item of evidence needs to "prove conclusively the proposition for which it is offered." 1 *McCormick on Evid.* § 185.2 (9th ed. 2025).

– 34 –

The order instead engages in a divide-and-conquer approach. (S. Appx. 38-49). The error of each individual decision will be addressed in § 1.2, below. For now, the focus is on the error of failing to interpret the evidence in aggregate. The District Court sequentially discarded each proffered inferential grounds for actual malice because each alone did not prove the case:

1. Evidence that Newsweek repeatedly breached its own truth-seeking standards was disregarded because violating someone else's standards only shows negligence. (S. Appx. 40) ("without more," that is not enough).

2. Obvious reasons for Cooper to doubt anonymous internet hearsay was discarded as insufficiently obvious, and bias on the part of a source does not "necessarily" prove actual malice. (S. Appx. 43).

3. Evidence of Cooper's bias was discounted because the testimony and emails which show she fabricated an extraneous charge about TST was not about the specific charge at issue. (S. Appx. 44).

4. Purposeful avoidance of the truth was axed because proof to that effect was unaccompanied by direct evidence that Duin harbored "serious doubts" about the charge, so that too was "insufficient" by itself. (S. Appx. 45).

5. Obvious reasons for Duin to doubt anonymous internet hearsay was deemed insufficiently "obvious" and she collected other salacious claims about TST from other biased sources. (S. Appx. 47).

6. And Duin's refusal to inquire of TST's spokesperson was nixed because it was unaccompanied by direct evidence that Duin had subjective doubts. (S. Appx. 47).

After individually discounting each inferential ground, as each insufficient by itself, the District Court disregarded irrefutable evidence of Duin's bias and breaches of Newsweek's own journalistic standards because those were not supported by a "host of other evidence." (S. Appx. 48-49). That "host" was only missing because it was butchered over the preceding pages.

*1.1.4: The District Court viewed the record least favorably to TST*

The District Court reversibly erred by viewing the record in a light least favorable to TST. While that is a justifiable basis to deny TST's summary judgment, it was not a permissible ground to deny TST a trial. *Cayuga Nation v. Tanner*, 6 F.4th 361, 373 (2d Cir. 2021). (cross-motions must be separately evaluated with all inferences in favor of the respective non-movant).

The District Court applied this dual perspective when interpreting the article to address the parties' arguments on falsity. (S. Appx. 33-34). Yet did not employ that same ability just a few pages later, when reviewing the record to evaluate the parties' arguments on actual malice. (S. Appx. 38-49). For example, the District Court refused to find bias when Cooper–who had never heard of TST before and took no part in the factual investigation–fabricated a claim about TST's ritual activity. (S. Appx. 44). And failed to see how an anonymous hearsay claim, passed on by a hostile and pseudonymous source, was cause for "obvious" doubt. (S. Appx. 43, 47).

The District Court's findings are nothing more than views that a

reasonable jury may arguably take, there was no discussion why they are the *only* views it may take. This was reversible error because intent is not so susceptible to summary judgment. *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962) (summary judgment should applied "sparingly…where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot"); *Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir. 1984) ("where subjective issues regarding a litigant's state of mind, motive, sincerity or conscience are squarely implicated, summary judgment would appear to be inappropriate and a trial indispensable"); *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n. 9 (1979) (actual malice "calls a defendant's state of mind into question and does not readily lend itself to summary disposition") (internal citation omitted).

Proper application of the above standards would have resulted in a limited inquiry into competing evidence, would not have held TST to the impossible standard of adducing direct evidence of actual malice, would have been a review of all the circumstantial evidence

in aggregate, and the review would have been done in the light most favorable to TST. As the District Court misapplied these standards, the Court should reverse the below order and remand for a jury trial.

*1.2: The record supports an inference of actual malice.*

It was reversible error to find that a jury cannot find that Newsweek had actual malice. (S. Appx. 27). Actual malice requires a showing that the charge was published with a "reckless disregard for the truth." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 332 (1974). Reckless disregard "cannot be fully encompassed by one infallible definition," and instead requires case-by-case adjudication. *St. Amant*, 390 U.S. at 730-31. It is an inquiry into the good or bad faith of the publisher. *Compare id.*, at 732 ("The finder of fact must determine whether the publication was indeed made in good faith") *with Loeb v. New Times Commc'ns Corp.*, 497 F. Supp. 85, 93 (S.D.N.Y. 1980) (no actual malice where the defendants had a "reasonable concern for the truth.")

To resolve that inquiry, courts consider "any competent

evidence, either direct or circumstantial" and consider "*all* the relevant circumstances surrounding the transaction." *Herbert v. Lando*, 441 U.S. 153, 164 n. 12 (1979) (emphasis added). Illustrative examples include:

> threats, prior or subsequent defamations, subsequent statements of the defendant, circumstances indicating the existence of rivalry, ill will, or hostility between the parties, facts tending to show a reckless disregard of the plaintiff's rights, and, in an action against a newspaper, custom and usage with respect to the treatment of news items of the nature of the one under consideration.

*Id.* Moreover, courts look into the circumstances surrounding the publication, including whether the "defendant had failed to make a proper investigation before publication of the statement in question." *Id.*

The record presents a "host" of inferential grounds which, in aggregate, form an inference that Newsweek published the sexual abuse and coverup charge with reckless disregard as to its falsity. *See Brimelow v. New York Times Co.*, No. 21-66-CV, 2021 WL 4901969,

at *3 (2d Cir. Oct. 21, 2021).

### 1.2.1: Newsweek consciously disregarded its own standards.

The record shows that Newsweek had to repeatedly and consciously depart from its own standards to publish this charge. The District Court refused to consider the Editorial Guidelines in themselves and limited its consideration to the underlying conduct which violated the standards. (S. Appx. 40). As grounds, it cited three cases which hold that the failure to apply someone else's standards is only negligence, which, "without more," is not enough. (S. Appx. 40). That was reversible error because the Editorial Guidelines were not someone else's standards, they were Newsweek's own.

This proof speaks to the difference between recklessness and negligence. Recklessness is the conscious disregard of a risk of harm to the plaintiff, whereas negligence is the failure to act in objective conformity with that risk. *See* Geoffrey Christopher Rapp, *The Wreckage of Recklessness*, 86 Wash. U.L. Rev. 111, 141 (2008)*; 57A *Am. Jur. 2d Negligence* § 265. Recklessness exceeds negligence by adding a

conscious awareness of risk.

The Editorial Guidelines directly spoke to the consciousness of the risk. They represent an internal, subjective understanding that false reporting–especially on matters that connote criminality–carries a serious risk of harm to third parties. (Appx. 553). It was undisputed that a charge of sexual abuse and coverup connotes criminality. (Appx. 255, 685-687). So the Editorial Guidelines go farther than merely showing that the substance of this charge carried an apparent risk of substantial danger, they more specifically show that Newsweek was *conscious* of that risk. *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 157 (1967) (actual malice, where the editors "recognized the need for a thorough investigation of the series charges"). The Editorial Guidelines offered further utility because they were authored by none other than the approver, contributor, editor, and final decisionmaker to publish the article: Cooper. (Appx. 694). These were not just "the employer's" standards, they were the editor's own.

The Ninth Circuit has adopted similar reasoning. *See Masson v. New Yorker Mag., Inc.*, 960 F.2d 896, 901 (9th Cir. 1992). There, it

was held that, although a publisher does not have a general duty to investigate, once it undertakes one it cannot ignore obvious reasons for doubt that arise during it. The *Masson* Court noted that this puts publishers who have a practice to investigate the accuracy of their stories at a disadvantage compared to those that "cannot or will not engage in thorough fact-checking." *Id.*, at 902 n. 5. But that makes "considerable sense" because readers of reputable magazines "are far more likely to trust the verbatim accuracy of the stories they read" in reputable publishers than unreputable ones, so the harm inflicted by a reputable publication can be far more serious. *Id.*

Newsweek's standards offer it credibility. Because of that credibility, it gets to boast "More than 1 in 5 Americans read us" and reap the attendant profits from that market share. (Appx. 74, 667). They hold themselves out as adhering to those standards, so it is only fair to hold them to those standards. When Newsweek's personnel repeatedly departed from their own truth-seeking standards, it strongly suggests they acted with doubts in their mind.

*1.2.2: Newsweek solely relied on anonymous internet hearsay.*

The most damning evidence of actual malice is that Newsweek solely relied on anonymous internet hearsay for the truth of the charge. The District Court shifted focus from the anonymous internet hearsay at the heart of the charge to Strange, who conveyed the charge. (S. Appx. 46). That was error because "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or accuracy of his reports," such as when "based wholly on an unverified anonymous telephone call." *St. Amant*, 390 U.S. at 732. Strange's email plainly states that he was merely passing on "*Accounts* of" purported sexual abuse and coverup. (Appx. 561) (emphasis added). And he affirmed under oath that his "understanding of sexual abuse was *secondhand* through people basically telling you something over the internet." (Appx. 796) (emphasis added). Yet one of Newsweek's Editorial Guidelines is to "Use only credible sources." (Appx. 553, 693-694).

To illustrate this point, TST cited *King v. Globe Newspaper Co.*, 400 Mass. 705, 721–22 (1987). (Appx. 970). There, a publication was

reckless as to the falsity of a charged conversation which was supported only by a source who "was not purporting to have personally witnessed the reported conversation, and that he was only repeating what he had been told." *Id.*, at 721. That 35-year journalist did not ask the source who the informant had been, his source never told him, he never spoke to either party of the alleged conversation, and he never asked anyone else to. *Id.* Those facts founded an inference of actual malice: "the only information he had was hearsay, perhaps multi-level," and the charge "was as likely to have been fabrication or speculation as to have been the truth." *Id.*, at 721-22.

*King* is indistinguishable from the facts at bar. Just as the *King* source was only "repeating what he had been told," Strange's email expressly stated that he was passing on his characterization of "messages" he received from "other people." (Appx. 561). No less so than the 35-year journalist in *King* who was not entrusted with instilling journalistic ethics in pupils, Duin was a 45-year journalist who served as a professor of journalism at four colleges (Appx. 708, 742). And Cooper is the global editor in chief of *Newsweek*, once one

of the "Big Three," a news publication which boasts "More than 1 in 5 Americans read us." (Appx. 662-663); (Appx. 666); (Appx. 74, 667). If the *King* journalist had the requisite credentials to doubt when a source only passes on an anonymous rumor, so did Duin and Cooper.

This argument was raised below. Quoting *St. Amant*, TST argued that the evidence showed Duin had "obvious reasons to doubt" a rumor when she "took a pseudonymous email at face value that the underlying anonymous hearsay declarant must be telling the whole truth." (Appx. 439). But when disposing of that point, the District Court addressed neither *King* nor the point that Newsweek uncritically accepted anonymous internet hearsay. Instead, the District Court solely focused on the fact that Strange was only "semi-anonymous." (S. Appx. 46). The *King* Court disposed of that very argument: the journalist "had obvious reasons to doubt the veracity and accuracy, not of Crane [who passed on the rumor], but of Crane's undisclosed informant and any other informants in the chain of communication." *King*, 400 Mass. at 722; *see also Alioto v. Cowles*

*Commc'ns, Inc.*, 430 F. Supp. 1363, 1370 (N.D. Cal. 1977), *aff'd,* 623 F.2d 616 (9th Cir. 1980) ("obvious reasons" to doubt a charge included "its hearsay nature"). It was error to shift the focus from the anonymous internet hearsay declarant to Strange because there were obvious reasons to doubt the charge when Strange disclaimed personal knowledge. *Ibid.*

The District Court justified Newsweek's reliance on this anonymous internet hearsay because "Duin spoke with multiple other individuals, conducted her own research, including reviewing articles, books, and internet sources, and interviewed other individuals, including non-anonymous sources, which all supported her decision to include the Article Statement." (S. Appx. 47) (citing Duin. Depo. Tr. at 186:15–15[*sic*]; 188:1-6), *i.e.*, (Appx. 263).[2] But the cited testimony does not support any good faith basis to believe in the truth of this charge. The former citation generally suggests that

---

[2] Neither party attached Page 188 of Duin's deposition. The appellate record is limited to the public filings. FRAP 10(a)(1).

permutations of the same charge was prolific among "disgruntled former members" of TST (phrasing hers). (Ibid.); (Appx. 495, 741) ("disgruntled former members"). Along those lines, Dr. Laycock heard permutations of rumored sexual *harassment*, not sexual abuse, yet nobody could identify someone with personal experience (Appx. 650-651). The latter citation didn't even support the proffered point. It was just evasion of the inquiry why Duin would ask for explanatory details about rumored murder but not rumored sexual abuse and coverup. (See id.)

The former citation only further proves that Newsweek solely relied on anonymous internet hearsay to prove the truth of the charge. Underlying Duin's characterization of the rumor is the email in which the rumor is transmitted. (Appx. 295-296). As with the rumor passed on by Strange, Scott Malphas's email expressly conveyed a third party's "account." (Id.) Moreover, a publisher's characterization of what third parties *say* about key evidence does not preclude the inference of actual malice from the publisher's failure to inspect it. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 684

n. 32 (1989) (publisher's refusal to review key evidence was not justifiable by statements "from several sources…that there was no mention of things we were exploring at this time.")

The District Court also relied on Duin's "research" on other charges as grounds to believe the sexual abuse and cover-up charge. (S. Appx. 46). Yet two pages earlier, the District Court held that the actual malice inquiry is constrained to the charge at issue. (S. Appx. 44) (evidence that Cooper fabricated a different charge did not prove she "had serious reservations about the accuracy of the Article Statement"). Duin's "research" into other charges does not undermine a finding that she had subjective doubts about this one. *See Harte-Hanks*, 491 U.S. at 691-692 (reporters could not have missed grounds for doubt "simply because he [the plaintiff] confirmed certain aspects of Thompson's story.") At most, that justified denying TST's motion. It was not a basis to deny TST its right to trial by jury.

Newsweek only had anonymous internet hearsay, "perhaps multi-level," as truth of the charge. *King*, 400 Mass. at 721-22. That

was an "obvious reason" to doubt its truth. *St. Amant*, 390 U.S. at 732. The jury could infer that when two veteran reporters ignored that obvious reason for doubt, they did so in reckless disregard of the truth.

### 1.2.3: Newsweek consciously avoided inquiry into the truth.

The next inferential ground lies in the fact that Newsweek consciously avoided inquiry into the truth of the charge. *Harte-Hanks*, 491 U.S. at 692 ("purposeful avoidance of the truth" as actual malice). The District Court refused to accept the point that Newsweek consciously avoided an inquiry into the truth because, it found, TST did not put forward *direct* evidence that Newsweek's personnel subjectively doubted the charge. (S. Appx. 43, 45). That was reversible error because there were four separate sources of that purportedly missing proof: (1) both the Editorial Guidelines and New York law required the missing investigation; (2) Cooper admitted that the charge had to be fact-checked; (3) Duin admitted she would have investigated a charge that TST murders children and refused to

explain the distinction between "murder" and "sexual abuse and coverup"; and (4) both Cooper and Duin had an obvious reason to doubt anonymous internet hearsay.

A similar fact pattern is found in *Butts*, 388 U.S. at 157. There, a publisher acted with actual malice because the story was not "hot news" and, although the institution consciously "recognized the need for a thorough investigation of the serious charges," the most "[e]lementary precautions" were ignored. *Id.* Likewise, the *Harte-Hanks* Court specially noted its factual similarity with *Butts* because of those publishers' failure to interview key witnesses and consult easily available information that would confirm or foreclose the truth of the charge. 491 U.S. at 693 n. 38.

Just as in *Butts*, this story was not "hot news." The Catholic News Agency provided Duin the idea on September 29, 2021, and it was greenlit for writing about one week later. (Appx. 542, 716-717, 725). It was not published until the end of October. (Appx. 449). Nothing about the article was time-sensitive, other than Duin's desire to target TST for public contempt and ridicule on

Halloween. (Appx. 496, 719) (the article would be "just in time for Halloween").

As in *Butts*, Newsweek's editor recognized the need for fact-checking. *Butts*, 388 U.S. at 157. The Editorial Guidelines, Newsweek's public statement of journalistic ethics, required that charges of criminal misconduct be both specific and fact-checked (Appx. 553). Cooper admitted that this charge connotes sexually criminal activity. (Appx. 685-687). So did Duin. (Appx. 255). Cooper also admitted that the charge should have been fact-checked. (Appx. 665). And Cooper admitted that the role of editor is to ask the "larger questions," like whether fact-checking was done. (Appx. 665). The District Court refused to consider a breach of Editorial Guidelines in itself. But as mentioned in §1.2.1, the Editorial Guidelines represents an organizational awareness of the risk of falsity. When Newsweek violated its own truth-seeking Guidelines, it *consciously* disregarded the risk of falsity.

Not only was Newsweek as an institution subjectively aware of its ethical duty to fact-check charges of criminality, New York law

also imposes a duty to investigate when the charge is a criminal accusation. *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 382 (1977) (no actual malice for accusation of criminal misconduct because there was an investigation); *see also DiLorenzo v. New York News, Inc.*, 78 A.D.2d 669, 671 (N.Y. App. Div. 1980) (substituted opinion) ("serious charges with potential for great harm require investigation"). Obviously, accusing a new religious movement of sexual abuse and coverup is a serious charge with potential for great harm. As contended below, but unaddressed by the District Court, this was charge about sex crimes so it was defamatory *per se*. (Appx. 441, 962, 1108); *Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001); *Rejent v. Liberation Publications, Inc.*, 197 A.D.2d 240, 245 (N.Y. App. Div. 1994). As a matter of law, if not the Editorial Guidelines, an investigation into the truth of the charge was required. *Rinaldi*, *supra*; *DiLorenzo*, *supra*.

Despite the ethical and legal obligation to fact-check the charge, Duin did not ask any follow-up questions about who was "sexually abused" or what was entailed in the "cover up." (Appx. 727). She

did not talk to anyone who claimed to have been subjected to sexual abuse or cover-up. (Appx. 739-740). She did not so much as ask "anyone on the face of the planet what sexual abuse and cover-up means" in context of the charge. (Appx. 735). And despite the internal requirements for the editor to ensure the charge was fact-checked, Cooper performed no oversight into Duin's fact-checking. (Appx. 697) (to Cooper, this was not an "investigative piece," in which reporters "trace[] back the cases" and "talk[] to a million people" to uncover "things that had been covered up"). A reasonable jury could infer Newsweek *purposely* avoided the truth from the fact that it consciously did not perform an investigation, despite that both the law and the Editorial Guidelines required one.

There is also an Editorial Guideline which required that TST be given an opportunity for fair comment. (Appx. 552). Had Duin done so, the basic follow-up questions would have been posed. Yet Duin never asked Greaves about the charge, although she followed up with him about different topics. (Appx. 571-575, 729-732). She "constructed the article" to *appear* as if Greaves gave a general

denial, but testified that she did not feel he "had to address every single thing specifically." (Appx. 733). Actual malice may be found where the publisher juxtaposes denials "in reckless disregard[] of the false impression the collocation would produce." *Crane v. Arizona Republic*, 972 F.2d 1511, 1524 (9th Cir. 1992).

And despite the Guideline for specificity, Cooper could not answer who was sexually abused, what the sexual abuse entailed, who engaged in the cover-up, or what the cover-up entailed. (Appx. 695-696.) The District Court handwaved this point as evidence of mere ignorance. (S. Appx. 43). But Cooper's ignorance stood in spite of internal standards which mandate answers to these basic questions. It was her job as editor to pose the "larger questions," like whether the charge is true. (Appx. 665). Cooper's ignorance was not by happenstance, it arose from a conscious decision to not ask for the basic answers mandated by her own standards. It was willful. Willful ignorance does not preclude actual malice, it supports the point. *Butts*, 388 U.S. 157; *Harte-Hanks*, 491 U.S. at 693.

And, as in both *Butts* and *Harte-Hanks*, it is not as if the allegedly

– 55 –

substantiating information was not offered up. Strange's email opened with an offer to provide the "receipts" and closed with an offer to "gather more information on sexual misconduct for you" (Appx. 560, 562). That Duin refused an offer for allegedly substantiating proof strongly suggests that she did not care whether the charge was true.

A reasonable jury could find that Duin's omission of the required investigation was more than a mere failure of journalistic initiative. Duin admitted that if the charge was that TST murders children, she would have asked for explanatory details. (Appx. 742-743). A jury could find that if the thought would occur to Duin to investigate a violent crime, it must also have occurred to Duin to investigate a sexual one. Duin offered no material distinction between the two. She evaded questioning about what, in her mind, delineates between a charge of violent crime and a charge of a sexual one, such that the former merits follow-up inquiry but the latter doesn't. (Appx. 263-264). These facts were argued below. (Appx. 437, 951, 971). But the District Court did not address them.

If the ethical and legal obligation to investigate the charge is not enough, and the evidence that Newsweek's personnel subjectively understood they had to investigate this charge is also insufficient, then Newsweek had an "obvious" cause for doubt which required an investigation. *St. Amant*, 390 U.S. at 732. Strange expressly stated he was passing on nothing more than anonymous internet hearsay. (Appx. 561) (he was passing on nothing more than "messages" from "other people"); *King*, 400 Mass. at 722 (hearsay, "perhaps multi-level," as obvious reasons for doubt).

A reasonable jury could infer that this was more than a negligent failure to investigate the charge, it was a purposeful avoidance of the truth. Newsweek had time to perform that investigation, had policies which required that investigation, had a legal obligation to perform that investigation, had personnel with the subjective understanding they needed to perform that investigation, was offered allegedly substantiating information, and yet its personnel took every effort to avoid confronting any information about the truth or falsity of the charge. Add in the obvious reasons to doubt anonymous

internet hearsay, and the omission of an investigation transforms from inept reporting into purposeful avoidance of the truth. That is actual malice. *Harte-Hanks*, 491 U.S. at 692; *Butts*, 388 U.S. at 157; *King*, 400 Mass. at 722.

### 1.2.4: Newsweek's personnel were biased and relied on biased sources.

The next inferential ground for actual malice lies in the fact that Newsweek's personnel were biased against TST. This is consistent with a throughline of *Palin v. New York Times Co.*, 940 F.3d 804, 814 (2d Cir. 2019); *Celle*, 209 F.3d at 190; *Harte-Hanks*, 491 U.S. at 665 n. 6, 673; and *Butts*, 388 U.S. at 157. In each of those cases, the publisher's hostility toward the plaintiff was circumstantial evidence that the publisher was reckless as to whether the charge was true. Hostility shows that the defendant's purpose is to hurt someone it does not like, not to publish a true statement.

The District Court discounted evidence of bias as to Cooper because it was not directly related to the Article Statement, and underplayed the evidence of bias as to Duin. (S. Appx. 43, 48). That was

an erroneous divide-and-conquer tactic as to Cooper, and an erroneous decision to view the record in a light least favorable to the non-movant as to Duin.

It is a commonly known phenomenon that people knowingly spread false claims of flagrant violations of fundamental values about new religious movements, like TST, because the purpose is to mobilize forces against the movement, not to spread the truth. Bromley, David, Anson D. Shupe, and Joseph C. Ventimiglia. 'Atrocity Tales, the Unification Church and the Social Construction of Evil.' *Journal of Communication* 29 (Summer), 1979: 42-53. A reasonable jury could find that Newsweek's personnel had that invidious motive.

Duin has a documented history of spreading rumors about sexual abuse and cover-up by Satanists, especially around Halloween. (Appx. 501-511) (three of her four prior writings about Satanism were in October). In her Satanic Panic-era article, *Satanism in the United States: a phenomenon on the rise*, she wrote: "Sex is introduced early in the game, as adolescents are fascinated by sexuality and the

occult offers plenty of it," further claiming "gang rapes" and purporting that this is all covered up by Satanists not hesitating to "kill defectors." (Appx. 513-515). And, exactly as this article would be "Just in time for Halloween" (Appx. 496), she similarly spread rumors about Satanism for Halloween on October 31, 1987, and October 28, 1989. (Appx. 502, 509).

Duin's general bias against Satanism specifically applied to TST. In each of her writings about TST, she complains of TST's very existence. (Appx. 517-518, 521-526, 531-537, 720-723). She complains that TST benefits from an equal right to have a physical presence. (Appx. 517-518). She decries its equal right to tax-exempt status. (Appx. 534-536). In an email to Cooper, she intimated that she found it "crazy" that TST is a religion. (Appx. 353). The same email indicates an invidious purpose for the article: "can you *defame* a religion." (Id.) Thus begat the article's taunting lede: "Can you defame a religion, especially one that doesn't believe in God, Satan or the supernatural?" (Appx. 450). Duin's bias has explanatory value for why she would consciously disregard doubt about the charge:

she wanted to harm TST, a new religious movement she reviled.

The District Court discounted the Satanic Panic era articles because they did not specifically mention TST. (S. Appx. 48). But an anti-Muslim bigot is not especially concerned about whether the plaintiff is Shia or Sunni. Duin's hostility against Satanism, generally, applies to all sects of Satanism, which includes TST. Nor was it responsive to hold that Duin was simply spreading rumors from a book she reviewed. (S. Appx. 48). The point is that she *spreads* rumors about Satanists, not that she fabricates them.

Likewise, the District Court refused to find evidence of bias from Duin's anti-TST articles as they "only tangentially mention[] The Satanic Temple." (S. Appx. 48). Not so. One of the articles was entitled ***The Satanic Temple** comes to Salem and the Boston Globe does a puff piece*. (Appx. 517) (emphasis added). Far from being solely a "critique on the state of journalism," it also decries TST's equal access to a physical presence and recasts any positive coverage of TST as "public relations." (Id.). The same can be said for Duin's post-complaint piece mentioning TST, which she tagged as "Evil-Satan."

(Appx. 531). There, she publicly invites any would-be muckrakers to get their "investigative feet wet on the religion beat" by targeting TST for scrutiny. (Appx. 536). The final order conspicuously omits substantiating discussion why no reasonable juror could find that these articles tend to show anti-TST bias, it only provided justification for why a reasonable juror might not take that view. Again, a failure to view the record in the light most favorable to TST.

And while the District Court correctly found that Duin's "crazy" email to be proof of bias, it underplayed the point as just "*some* bias Duin *may* have had." (S. Appx. 48) (emphasis added). Even when acknowledging irrefutable proof in favor of TST, the District Court softened its impact. These failures to apply a dual perspective to the evidence betrays that the District Court viewed the record on actual malice in a light least favorable to TST.

The District Court completely disregarded the import of Duin's "delicious quotes" email. (Appx. 580). Duin reported back to the Catholic News Agency that she "mostly" limited the article to the Washington lawsuit, except for some "delicious quotes ... from

members in other parts of the country." (Id.) The Article Statement was clearly one of those "delicious quotes," Strange was in Wisconsin, not Washington. (Appx. 744). This email shows the twisted satisfaction Duin received from targeting TST for public contempt. This was argued 16 times between briefing and oral argument. (Appx 420-440, 947-954, 963-971,1096-1103). Yet it does not appear once in the final order.

The District Court also failed to consider the hostile tenor of Duin's "investigation." Hostile interviewing by a biased reporter is valid circumstantial evidence of actual malice. 1 *Law of Defamation* § 3:86 (2d ed.) (citing *DiLorenzo*, *supra*). Dr. Laycock's declaration details his experience with Duin. (Appx. 651-652). In it, he explains that Duin principally asked leading questions, remained fixed on her preexisting position even when he negated the implied fact within the leading question, and specifically asked only for evidence that corroborates "all these horrible things" said about TST. (Id.). In his words, it was "the most egregious example of confirmation bias I have ever seen" and that he "got the impression that Duin was

just looking for a quote." (Appx. 652).

Combine Dr. Laycock's testimony with clear proof of Duin's anti-TST bias, and a reasonable jury could find that Duin's "investigation" for the article was nothing more than seeking out quotes which she could use to harm TST, truth notwithstanding.

The District Court disregarded the above key items of evidence which undermined its finding because it was weighing evidence. As mentioned in **§1.1.1**, that'd be arguably permissible if the First Amendment applied, but the District Court declined to make the necessary finding.

The District Court also failed to properly consider the evidence of Cooper's anti-TST bias. Cooper testified that she was unaware of TST before the article and performed none of the factual inquiry into TST. (Appx. 675, 672). Yet she politely instructed Duin to include an assertion that TST falsifies its ritual activity for use in litigation objectives. (Appx. 596). Even Duin pushed back, stating they had no basis to believe it was true. (Appx. 480). Cooper still insisted on its inclusion, with the tweaked language that TST merely

"appears" to defraud the courts. (Appx. 587). Here, we see yet another departure from the Editorial Guidelines: a prohibition against editorialization. (Appx. 552).

A reasonable jury could find that, because Cooper was willing to fabricate lies about TST's ritual activities, Cooper was also willing to ignore doubt about this charge. But the District Court rejected that suggestion because it did not *directly* show that Cooper doubted this charge. (S. Appx. 27). As addressed in §1.1.2, that was an erroneous refusal to consider circumstantial evidence of actual malice. Cooper's willingness to fabricate other charges tends to show that she was willing to ignore the obvious reasons to doubt this charge.

Newsweek's anti-TST bias explains why it uncritically accepted anonymous internet hearsay, despite that Duin received it from a "disgruntled former member" (her words). (Appx. 495, 741). A reasonable jury could find that her own hostility against TST combines with her willingness to overlook her source's hostility against TST to prove that she was willing to publish the charge despite doubting its falsity. 1 *Law of Defamation* § 3:59 (2d ed.) ("When a source

harbors biases or hostilities against a plaintiff, and the defendant is aware of those biases or hostilities, that awareness is probative of the existence of actual malice.") Even a passing review of Strange's email shows that he was hostile to TST. (Appx. 560-562). He opened with his "frustration" with TST's efforts to secure abortion rights for its membership through Free Exercise Clause jurisprudence. (Appx. 560). He disclaimed being "involved" with TST, liberally applying pejoratives like "inept, rudderless organization that had accidentally risen to prominence," a "toddling colossus," and "crapulence." (Appx. 561). He describes his personal activism to undermine TST's mission goals, by creating a "repository" of "accusations and examples of awful behavior" and expressing his misplaced excitement that a journalist of Duin's "echelon" had any "kind of interest" in it. (Appx. 560). These textual clues show hostility which, a reasonable jury could find, prompted Duin to subjectively doubt his characterization of the anonymous internet hearsay she uncritically published as if it were true.

A reasonable jury could find that the reason Newsweek

overlooked Strange's hostility is the same reason they overlooked the obvious reasons to doubt anonymous internet hearsay and the same reason they refrained from an investigation they knew had to be taken: Newsweek was more animated by bias to harm TST more than it was interested in publishing truth. As addressed in **§1.1.3**, the District Court erred by individually discounting each point before the colon before asserting that bias "alone" does not suffice.

### 1.2.5: Newsweek was pre-determined to publish the charge.

The next inferential ground for actual malice lies in the fact that Newsweek was pre-determined to publish the charge. *Palin*, 940 F.3d at 813. A reasonable jury could infer that Duin did not simply happen across Strange's "delicious quote" by happy accident. (Appx. 580). Rather, from Dr. Laycock's testimony, it could find that Duin was fixated on publishing harmful statements about TST. (Appx. 651-652).

She was fixated on publishing this charge from the moment she received the idea for the article from a reporter for the Catholic

News Agency. (Appx. 541-543) ("*allegations of* TST leadership sexually exploiting members or failing to respond to harassment / sex assault allegations against chapter heads") (emphasis added). Duin took those "allegations" and presented them as facts in her pitch to Newsweek's highest level of management. (Appx. 495-496). Although that pitch was one of many, Cooper responded only to the pitch for this article: "do keep on with the Satanic Temple reporting – sounds like a fabulous story!" (Appx. 547, 679-680). Because the charge was pitched as part of the article before Duin got Strange's email, and because Cooper took special interest in that pitch, a jury could reasonably infer that Newsweek was pre-determined to publish the charge. Strange's email just presented the most "delicious quote."

TST raised this all below. (Appx. 440, 954-955, 970). But the District Court did not address why no reasonable jury could find that Newsweek was pre-determined to publish unverified allegations as true to its readership. Again, the District Court disregarded evidence that undermined its decision, which is improper evidence

weighing.

*1.2.6: Newsweek ignored TST's notices that the charge was false.*

The last inferential ground for actual malice lies in the fact that Newsweek ignored TST's notices that the charge was false. *Kehoe v. New York Trib.*, 229 A.D. 220, 225 (App. Div. 1930) (a retraction could have negated actual malice); *Butts*, 388 U.S. at 169–70 (Warren, C.J., concurring) (finding actual malice where "little investigative effort was expended initially, and no additional inquiries were made even after the editors were notified by respondent and his daughter that the account to be published was absolutely untrue.")

Upon publishing, Greaves immediately took issue with the Article Statement. (Appx. 612). The next day, TST's general counsel issued a demand for retraction which asserted that the Article Statement was false. (Appx. 626). Yet Newsweek never issued a retraction. (Appx. 852). Even after discovery, through which Newsweek inspected TST's books and records and took depositions seeking truth of the charge, it *still* never issued a retraction. (Id.).

A reasonable jury could find that Newsweek's ongoing refusal to issue a retraction is some proof of actual malice. The evidence shows more than a purposeful avoidance of truth before publishing, it also shows that Newsweek refused to consider falsity after the charge was published. That tends to show that the truth or falsity of the charge was–and remains–impertinent to Newsweek's purpose for publishing it, which combines with the evidence of bias and the evidence that Newsweek was pre-determined to publish the charge to show that Newsweek's was reckless with regard to its falsity.

This principle of law was put before the District Court at the earliest possible stage of the litigation. (Appx. 131). The fact that Newsweek "did not and, to this day, has not issued any retraction" was put into the briefing. (Appx. 852, 421, 935). The District Court found that the Article Statement could reasonably be interpreted as "false." (S. Appx. 35). Yet it ignores Newsweek's refusal to retract. Again, the District Court weighed evidence.

*1.2.7: Professions of good faith do not control.*

The District Court resisted the above grounds to infer actual malice because Cooper and Duin testified that they believed in the truth of the charge. (S. Appx. 43, 46). That was error as a matter of law because a motion for summary judgment requires the court to disregard "*all* evidence favorable to the moving party that the jury is not required to believe." *Kee v. City of New York*, 12 F.4th 150, 167 (2d Cir. 2021) (emphasis added). Juries are not required to believe professions of good faith. *St. Amant*, 390 U.S. at 732; *see also Eastwood v. National Enquirer, Inc.*, 123 F.3d 1249, 1253 (9th Cir. 1997) ("As we have yet to see a defendant who admits to entertaining serious subjective doubt about the authenticity of an article it published, we must be guided by circumstantial evidence"). Thus, actual malice "does not readily lend itself to summary disposition." *Hutchinson*, 443 U.S. at 120 n. 9 (internal citation omitted).

The inquiry is not foreclosed by professions of good faith, years after publication and in the context of litigation. *Ibid.* The inquiry is into the objective indicia, what the defendant said and did around

the time of publishing. *See Celle*, 209 F.3d at 183; *Herbert*, 441 U.S. at 164 n. 12. The defendants' professions of good faith may have been a sufficient basis to deny TST's motion, but it was not a valid ground to deny TST its day in court.

The District Court reversibly erred by discounting the possibility that the jury might not believe professions of good faith and by holding TST to the impossible standard of providing direct proof that Duin and Cooper doubted the charge. The standard required discounting Duin's and Cooper's testimony, at least when resolving Newsweek's motion, and required permitting TST an opportunity to prove its case to the jury with circumstantial evidence.

## 2: The charge was on a matter of private concern.

If the Court finds that the record does not support an inference of actual malice, it should find that the correct threshold was negligence because the charge was on a matter of private concern. This charge did not take place in a societal conversation with any First Amendment value. It was unabashed, false rumormongering about

private figures' sexual activities.

The District Court held that any accusation of sexual misconduct is an issue of public interest, *per se*. (S. Appx. 37-38). But its only authority arose from a specifically tagged social media conversation about sexual misconduct in the workplace. This charge was not presented in the context of that movement and it was wholly unrelated to the workplace. The District Court reversibly erred when it held that this charge was a matter of public concern.

*Standard of review*

At issue is a question of statutory interpretation, which is reviewed de novo. *Fisher v. Aetna Life Ins. Co.*, 32 F.4th 124, 135 (2d Cir. 2022). When construing a statute, this Court begins with the plain language, giving all undefined terms their ordinary meaning. *Fed. Hous. Fin. Agency v. UBS Americas Inc.*, 712 F.3d 136, 141 (2d Cir. 2013). It is a long-recognized principle that federal courts sitting in diversity "apply state substantive law and federal procedural law." *Hanna v. Plumer*, 380 U.S. 460, 465 (1965). When applying

state substantive law, this Court is bound by the decisions of the state's highest court. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45, 48 (2d Cir. 2013). Although not strictly bound by intermediate appellate decisions, the Court will also look to those unless convinced by other persuasive data that the highest court of the state would decide otherwise. *Id.*

### 2.1: The statute retains familiar public vs. private jurisprudence.

The statute requires a showing of actual malice where the defamatory charge is on a matter of "public interest," which is something "other than a purely private matter." N.Y. Civ. Rights Law § 76-a(1)(d), (2). To address the statutory distinction between a "public interest" and a "purely private matter," courts have applied familiar New York standards on public *vs.* private concern. *Tsamasiros v. Jones*, 232 A.D.3d 816, 819 (N.Y. App. Div. 2024); *Aristocrat Plastic Surgery, P.C. v. Silva*, 206 A.D.3d 26 (N.Y. App. Div. 2022); *see also Coleman v. Grand*, 523 F. Supp. 3d 244, 259 (E.D.N.Y. 2021).

Prior to this statute, New York law had long considered the

distinction of matters of "public concern" from those that were of "private concern." *See Chapadeau v. Utica Observer-Dispatch*, 38 N.Y.2d 196, 199 (1975). A matter of public concern lies "within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition." *Id.* Until the statute, defamation claims over such matters had to show "gross irresponsibility." *Id.* The statute did not change the determination of the matter, it simply "tweak[ed]" applicable plaintiffs' burden of proof to actual malice. *Coleman*, 523 F. Supp. 3d at 259.

Because the statute does not define the words "private matter" to mean something other than it did under longstanding New York jurisprudence, its ordinary meaning continues to control.

*2.2: The charge was on a matter of private concern.*

The charge is on a matter of private concern because it falls within the realm of "mere gossip and prurient interest" and was "directed only to a limited, private audience." *Huggins v. Moore*, 94 N.Y.2d 296, at 302 and 303  (1999). The charge is on a matter of

"mere gossip and prurient interest" because it was rumormongering about the private sexual lives of private people who happened to be associated with TST, a private association; and was directed at the limited class of private people who may support TST and its organizational mission.

This analysis is closely related to the limited public figure question of whether the charge relates to a "public controversy" in which the plaintiff has achieved much attention. *Krauss v. Glove Int'l, Inc.*, 251 A.D.2d 191, 193–94 (N.Y. App. Div. 1998). There, the same considerations that compelled a finding that the plaintiff's sex life is not a "public controversy," precluding the plaintiff from public figure status, also required a determination that a story about the private plaintiff's sex life was one of "private concern." *Id.* That was rooted in the longstanding principle that a "public controversy" is something more than simply newsworthy. *Id.* , at 192. The public controversy "must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Fairley v. Peekskill Star Corp.*, 83 A.D.2d 294, 298 (N.Y. App. Div.

1981). And it must have "received attention *because* its ramifications will be felt by persons who are not direct participants." *Id.* at 298. (emphasis added).

On the public figure point, Newsweek unsuccessfully argued that TST is a public figure by only rote recitation to the elements for the test. (S. Appx. 38). Although the District Court correctly rejected that argument, it failed to take its own decision to its logical conclusion. Because Newsweek failed to show that TST is a public figure, it logically followed that Newsweek also failed to show that TST is connected to a public concern. *See Krauss,* 251 A.D.2d at 193–94.

First Amendment jurisprudence also sheds light on this inquiry. *See id.* (citing *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759 (1985)). At its heart, this inquiry is an effort to delineate those charges which deserve First Amendment protection from those that don't. *Dun & Bradstreet*, at 762-763. Through this inquiry, courts balance the First Amendment interest in "meaningful dialogue of ideas concerning self-government" against the private individual's property interest in compensation for injury to reputation.

*Id.* , at 756, 760. Where there is no threat to "free and robust debate of public issues," the private individual's property interest wins. *Id.*

In *Dun & Bradstreet*, the individual's property interest won because a false credit report was only in furtherance of "the individual interest of the speaker and its specific business audience." *Dun & Bradstreet*, 472 U.S. at 762. The same can be said of Newsweek. It published this hit piece to generate income by baiting clicks. Same as there, Newsweek's profit interest "warrants no special protection," because "the speech is wholly false and clearly damaging to the victim's business reputation." *Id.* That reasoning is particularly compelling here because Newsweek fancies itself a serious publication with serious journalistic ethics. (Appx. 666) (10-15 years ago, Newsweek was one of the "Big Three" newspapers, the biggest and most credible names in the news industry); (Appx. 552) ("*Newsweek* is committed to accurate, independent, ethical and responsible journalism").

It is a longstanding principle of the First Amendment that false statements of fact have "no constitutional value." *Gertz*, 418 U.S. at

340. "They belong to that category of utterances which 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Id.* *Gertz* teaches that the First Amendment only incidentally protects defamatory speech when the speech belongs to a broader class that warrants special protection.

There is no First Amendment utility in granting Newsweek's hit piece with the protection of serious public discourse. In the news world, as in the credit reporting world, the market already incentivizes accuracy, since false news is of no more use to the news consuming public than false credit reporting is to creditors. *Dun & Bradstreet*, 472 U.S. at 762*; see also 600 W. 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 142 (1992). The *Von Gutfeld* Court rightly noted that a newspaper column, like *Newsweek*, is the product of "some deliberation," which "passes through the hands of professional editors and thus carries with it the cloak of credibility and authority of the particular newspaper and profession;" that credibility encourages

readers "to be less skeptical and more willing to conclude that the report is stating or implying facts garnered by a professional news gatherer and reporter." *Id.* By having standards and enjoying credibility in the field, Newsweek benefits. It gets to boast: "More than one in five Americans read us" and reap the attendant profits from its vast market share. (Appx. 74, 667). But profits and status do not come without responsibility. No less so than any other industry which inflicts damage while "performing a service highly useful to the public," purveyors of the news "must pay the freight; and injured persons should not be relegated to remedies which make collection of their claims difficult or impossible unless strong policy considerations demand." *Butts*, 388 U.S. at 147 (quoting *Buckley v. New York Post Corp.*, 373 F.2d 175, 182 (2d Cir. 1967)). Because the Fourth Estate already has built-in incentives to act reasonably with regard to the truth, there is no incremental speech-chilling effect of holding the news publishers to account when they act unreasonably to defame private parties, like TST. The requisite serious discourse is missing.

The District Court did not perform any First Amendment analysis or apply the New York jurisprudence on the public *vs.* private concern. It instead drew a false comparison to the #MeToo movement. (S. Appx. 37) (citing *Watson v. NY Doe 1*, No. 19-CV-533, 2023 WL 6540662, at *3 (S.D.N.Y. Oct. 6, 2023); *Coleman*, 523 F. Supp. 3d at 259; *Goldman v. Reddington*, No. 18-CV-3662, 2021 WL 4099462, at *4 (E.D.N.Y. Sept. 9, 2021)).

Each case arose from social media posts tagged #MeToo, a movement which the *Goldman* plaintiff described as a "rising tide of public concern over *workplace* sexual harassment." *Goldman*, 2021 WL 4099462 at *4 (emphasis added); *see also Watson*, 2023 WL 6540662, at *3 (another #MeToo charge of sexual misconduct in the workplace). The *Coleman* charge was also a #MeToo post, and was about "sexual impropriety and power dynamics in the *music* industry." *Coleman*, 523 F. Supp. 3d at 259 (emphasis added). The *Coleman* Court limited its holding to the music industry five times.

It was error to apply these cases to TST because this charge did not arise in context of the #MeToo movement. Unlike the #MeToo

– 81 –

movement, in which the victims came forward with their own stories about sexual misconduct, this was nothing more than the spreading of anonymous internet rumors supplied by an incredible third party. And unlike each of the #MeToo cases, TST is not part of the music industry, nor of the entertainment industry, nor even the workplace. As the District Court correctly found, TST is a religious organization which engages in charitable activities and advocates for the rights of its membership. (S. Appx. 1-2).

As addressed below, but ignored in the final order, sexual misconduct at the workplace carries with it an element of economic coercion which is entirely lacking in a volunteer-based association like the TST. (Appx. 948-949). That element of economic coercion creates a sensitive power dynamic which, given the widespread economic reality of needing to work, creates "a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Fairley*, 83 A.D.2d at 298. But that element of economic necessity is missing for an organization of volunteers. Members are free to come and go as they please.

There are no "strong policy considerations" furthered by holding TST to the actual malice standard. *Butts*, 388 U.S. at 147. To Newsweek, this wasn't an "investigative piece." (Appx. 697). It just frivolously threw a charge of sex abuse and coverup as if were a hacky sack instead of a hand grenade. Organizations like the Catholic Church and the entertainment industry do engage in sexual abuse and coverup. Women do come forward, and their true claims do get discounted, because their true claims have to compete with false ones. When bad faith actors copy these women's words like they are meaningless, society reacts by treating those words with less meaning. Punishing false charges promotes the discussion by ensuring that true charges are taken seriously. The District Court did the opposite.

The District Court reversibly erred when it failed to apply the principles that a matter is of private concern when it falls within the realm of "mere gossip and prurient interest" and is "directed only to a limited, private audience." *Huggins*, 94 N.Y.2d at 302, 303. This point was squarely raised below. (Appx. 435, 949). Yet the District

Court did not explain why this charge was not governed by either principle. The charge was plainly designed to appeal to the prurient interest. It falsely asserts that there is a secret cabal of sexual abuse and coverup operating under the name "The Satanic Temple." No matter how "fabulous" this fiction may be for driving web traffic, it still didn't "warrant[] public exposition" such that an innocent private plaintiff should have an enhanced burden of proof. (Appx. 547, 679-680); *Huggins*, 94 N.Y.2d at 303; *see also Krauss*, 251 A.D.2d 192. And the charge was included to serve as wedge between TST and its "limited, private audience." *Chapadeau*, 38 N.Y.2d at 199; *Huggins*, 94 N.Y.2d at 303. Duin did not include this "delicious quote" just because it was salacious, she included it because it would hurt a private figure that she despised. (Appx. 580).

The charge was on a matter of a private concern. The applicable standard of fault was negligence. Even if the record does not show actual malice, the Court should reverse and remand for a jury trial.

### 3: New York had personal jurisdiction over Julia Duin.

The District Court also reversibly erred by dismissing Julia Duin for lack of personal jurisdiction. The District Court had specific personal jurisdiction under New York's long-arm statute. See CPLR § 302 (a)(1). The District Court reversibly erred in its interpretation of the words "transacting business" by assuming, without any supporting authority, that Duin's employment relationship could not suffice. The Court should reverse and remand for a jury trial with Duin as a co-defendant.

*Standard of review*

At issue is the dismissal of a defendant for lack of personal jurisdiction, which is reviewed de novo. *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010). This entails a two-step approach: first, apply the forum's long-arm statute; second, analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution. *Id.*, at 164.

Plaintiffs need only make a prima facie showing of personal

jurisdiction. *Id.* , at 163. The Court construes the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubt in their favor. *Id.*

*3.1: Jurisdiction was proper under New York's long-arm statute.*

The District Court erred in its interpretation of New York's long-arm statute. The statute provides jurisdiction where the defendant "transacts any business within the state or contracts anywhere to supply goods or services in the state." CPLR § 302 (a)(1). In a defamation case, the "transacting business" is interpreted more narrowly than in a typical commercial case, such that more than just the defamatory statement is needed to establish jurisdiction. *Best Van Lines v. Walker*, 490 F.3d 239, 248 (2d Cir. 2007). Courts look for facts that the defendant "engaged in some purposeful activity within New York that was directly related to the creation of the allegedly defamatory statement." *Biro v. Conde Nast*, 2012 WL3262770, * 10 (S.D.N.Y. 2012).

The District Court had personal jurisdiction over Duin because

Duin's employment was "transacting business," and the defamatory charge "arose from" that transaction.

### 3.1.1: Duin's employment was "transacting business."

The District Court erred by finding, without citation, that Duin's employment by Newsweek is not "transacting business." (S. Appx. 7). The complaint alleged that Duin was an employee of Newsweek, which was organized under the laws of New York. (Appx. 2). And supplemented the pleadings with a declaration that Newsweek's website showed that, as of the time of the motion, Newsweek had published 22 articles authored by Duin. (Appx. 148).

This was not a case in which only the defamatory statement had been uttered in New York. *See Walker*, 490 F.3d at 248. It was a case in which Duin transmitted the defamatory statement along with 21 other articles (as of the time of the motion) into New York, each for editing and publishing. *See Sovik v. Healing Network*, 244 A.D.2d 985, 987 (4th Dep't 1997). There, New York's long-arm statute attached to a defamatory letter which was co-authored by non-residents and

a resident. *Id.*, at 986. New York jurisdiction attached because the non-residents were "transacting business" by soliciting funds in the letter, and they had "active involvement and personal control over the writing and distribution" of the charge in New York. *Id.* , at 987.

The "transacting business" prong is satisfied "when at least part of the defamatory content was created, researched, written, developed or produced in New York." *Goldfarb v. Channel One Russia*, 442 F. Supp. 3d 649, 662 (S.D.N.Y. 2020). Part of the writing, development, and production took place in New York. Cooper approved the article, edited it, wrote the headline, and contributed the lede. (Appx. 495, 480, 589, 593). Duin and Cooper worked together to produce this article as co-agents for Newsweek, their shared New York principal. (Appx. 822). And Duin was subject to the control of Juliana Pignataro, her New York supervisor. (Appx. 827, 495). While these specific facts were not pleaded in the complaint, they were embedded in the allegation that Duin was an "employee of Newsweek." (Appx. 12). The District Court erred by failing to apply the reasonable inference that Duin's New York employer exercised

supervisory and editorial control over her before publishing her article out of its New York office. (Appx. 609).

The District Court distinguished *Goldfarb* by noting that the foreign defendant had a studio in New York. But *Goldfarb* had similar factors, too. The foreign defendant, like Duin, contracted "to distribute its programming through platforms…to subscribers throughout New York." *Id.*, at 662. But Duin did not just project defamatory statements "into" New York, she sent the statements into New York for broadcasting "from" New York. The *Goldfarb* defendant also interviewed the plaintiff in New York. *Goldfarb*, 442 F.Supp.3d at 662. Likewise, Duin coordinated with Cooper to decide whether the article with this charge would be written (Appx. 495), its editing (Appx. 593), and its ultimate publishing (Appx. 609).

The District Court's order upends the common understanding of "transacting business." If a full-time economic relationship with a New York resident, subject to the New York resident's control, is not a "business transaction" then it is difficult to imagine what business activities do meet the standard. In *Sovik*, it was sufficient that

– 89 –

the defamatory letter sought donations. Presumably, that single so-licitation was not a full-time job.

The District Court cited no authority for the proposition that full-time employment is not "transacting business." As the District Court's opinion is unsupported by authority, the Court should re-verse that part of the decision.

### 3.1.2: The defamatory article "arose from" that business.

Although the District Court did not take issue with the "arose from" prong of the analysis, it still bears noting that it was met. Courts look for a "direct" relationship between the business trans-action and the defamatory statement. *SPCA of Upstate New York, Inc. v. Am. Working Collie Ass'n*, 18 N.Y.3d 400, 404-05 (2012). The de-famatory article–along with its 21 cohorts–was written in the course and scope of Duin's employment, was subject to the editorial con-trol of Newsweek, and then Newsweek published it. (Appx. 609). Clearly, the defamation "arose from" Duin's employment.

*3.2: Exercising personal jurisdiction would not offend due process.*

Nor can it be said that exercising personal jurisdiction would offend due process. Because New York's long-arm statute is narrower than the due process test, satisfying the statute also satisfies the traditional notions of fair play and substantial justice found in the due process clause. *See Knight v. Standard Chartered Bank*, 531 F.Supp.3d 755, 763 (S.D.N.Y. 2021). It also makes intuitive sense that Duin would be haled into court to answer for a defamatory article she co-authored with a New York resident, subject to editorial control in New York, and then sent it to New York for publishing worldwide. *See Calder v. Jones*, 465 U.S. 783, 789 (1984) (employees of a publication are not jurisdictionally insulated from suits about defamation they published by virtue of their employment). The District Court's order does not contend otherwise. (S. Appx. 7). The Court should find that due process was not offended for the same reasons that the long-arm statute applied.

## CONCLUSION / PRAYER FOR RELIEF

**WHEREFORE** the Court should reverse the order of summary judgment and remand for a jury trial, with Julia Duin serving as co-defendant.

Respectfully submitted on July 28, 2025,

By: _____

Matt Kezhaya (#0402193)

**KEZHAYA LAW PLC**
150 S. Fifth St., Suite 1850
Minneapolis, MN 55402
phone:  (612) 276-2216
email:  matt@kezhaya.law

## CERTIFICATE OF SERVICE

NOTICE IS GIVEN that I, Matt Kezhaya, efiled the foregoing document by uploading it to the Court's efiling system on July 28, 2025, which sends service to registered users, including all other counsel of record in this cause. Paper copies to follow based on the Clerk's instructions. *s/ Matt Kezhaya*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Local Rule 32.1 (an opening brief may not exceed 14,000 words) because, excluding the parts of the document exempted by FRAP 32(f), this document contains **13,866** words.

This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because this document has been prepared in a proportionally spaced typeface using MS Office 365 in 14pt "Calisto MT" font. Headers are in 15pt "Calisto MT" font.

The electronic version of the brief has been scanned for viruses and is virus-free. *s/ Matt Kezhaya*