# 25-868

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

The Satanic Temple, Inc.,
*Plaintiff - Appellant,*

*vs.*

Newsweek Digital LLC,
*Defendant - Appellee*

Julia Duin
*Defendant.*

---

On appeal from the United States District Court
for the Southern District of New York

District Court case no. 1:22-cv-01343-MKV-SLC

The Honorable Mary Kay Vyskocil, U.S. District Judge, presiding

---

## APPENDIX FOR THE SATANIC TEMPLE

## VOLUME III OF IV (PAGES 598-870)

---

**Matt Kezhaya**
MN # 0402193



matt@kezhaya.law
(612) 276-2216

150 S. Fifth Street, Suite 1850, Minneapolis, MN 55402

**Appendix 598**

| | | VOLUME I | |
|---|---|---|---|
| **Date** | **ECF** | **Title** | **Page** |
| 02/16/2022 | 1 | TST's Complaint with Jury Demand | 11 |
| 02/16/2022 | 1-1 | Subject Newsweek Article - Ex. 1 to Complaint | 44 |
| 02/16/2022 | 1-2 | Newsweek's Press Kit - Ex. 2 to Complaint | 71 |
| 02/16/2022 | 1-3 | Newsweek's Editorial Guidelines - Ex. 3 to Complaint | 93 |
| 02/16/2022 | 1-4 | Fuller's Removal Letter - Ex. 4 to Complaint | 101 |
| 02/16/2022 | 1-5 | TST's Demand for Retraction - Ex. 5 to Complaint | 103 |
| 02/16/2022 | 1-6 | Newsweek's Response to Retraction Demand - Ex. 6 to Complaint | 114 |
| 02/16/2022 | 1-7 | PACER Search Return for Calavera - Ex. 7 to Complaint | 117 |
| 02/16/2022 | 1-8 | PACER Search Return for Meeham - Ex. 8 to Complaint | 118 |
| 02/16/2022 | 1-9 | Greaves/Duin Email Exchanges - Ex. 9 to Complaint | 119 |
| 02/16/2022 | 1-10 | Laycock/Duin Email Exchanges - Ex. 10 to Complaint | 127 |
| 05/24/2022 | 14 | TST's Response Letter on Proposed MTD | 129 |
| 08/15/2022 | 22 | TST's Response in Opposition to Duin's MTD | 133 |
| 08/15/2022 | 23 | Decl. of Matthew Sheppe | 148 |
| 03/08/2023 | 27 | Opinion and Order on MTD | 150 |
| 05/17/2024 | 101 | Decl. Cameron Stracher | 170 |
| 05/17/2024 | 101-1 | Decl. Stracher Ex. 1 - Greaves Depo. Excerpts, dated November 6, 2023 | 175 |
| 05/17/2024 | 101-2 | Decl. Stracher Ex. 2 - Stevens Depo. Excerpts, dated November 3, 2023 | 190 |

| | | VOLUME I (CONT'D) | |
|---|---|---|---|
| **Date** | **ECF** | **Title** | **Page** |
| 05/17/2024 | 101-3 | Decl. Stracher Ex. 3 - Duin Depo. Excerpts, dated November 16, 2023 | 226 |
| 05/17/2024 | 101-4 | Decl. Stracher Ex. 4 - Sullivan Depo. Excerpts, dated November 17, 2023 | 265 |
| 05/17/2024 | 101-5 | Decl. Stracher Ex. 5 - Email sent from Kevin Jones on September 29, 2021 | 273 |
| 05/17/2024 | 101-6 | Decl. Stracher Ex. 6 - Social Media Messages between Duin and the social media account @queersatanic | 277 |
| 05/17/2024 | 101-7 | Decl. Stracher Ex. 7 - Portion of transcript of audio recording of Duin's interview with Queer Satanic | 285 |
| 05/17/2024 | 101-8 | Decl. Stracher Ex. 8 - Johnson Depo. Excerpts, dated November 17, 2023 | 287 |
| 05/17/2024 | 101-9 | Decl. Stracher Ex. 9 - Email exchange between Duin and Malphas in October of 2021 | 293 |

[*intentionally left blank*]

| VOLUME II | | | |
|---|---|---|---|
| **Date** | **ECF** | **Title** | **Page** |
| 05/17/2024 | 101-10 | Decl. Stracher Ex. 10 - Email exchange between Duin and Strange in October of 2021 | 309 |
| 05/17/2024 | 101-11 | Decl. Stracher Ex. 11 - Millirons (aka Jinx Strange) Depo. Excerpts, dated December 7, 2023 | 313 |
| 05/17/2024 | 101-12 | Decl. Stracher Ex. 12 - Email exchange between Duin and Greaves in October of 2021 | 320 |
| 05/17/2024 | 101-13 | Decl. Stracher Ex. 13 - Nancy Cooper Depo. Excerpts, dated November 7, 2023 | 326 |
| 05/17/2024 | 101-14 | Decl. Stracher Ex. 14 - Email sent from Duin to Cooper on October 28, 2021 | 352 |
| 05/17/2024 | 101-15 | Decl. Stracher Ex. 15 - "The Struggle for Justice is Ongoing" by Jex Blackmore | 356 |
| 05/17/2024 | 101-16 | Decl. Stracher Ex. 16 - Dr. Joseph Laycock's book Speak of the Devil: How The Satanic Temple is Changing the Way We Talk about Religion, excerpts | 372 |
| 05/17/2024 | 101-17 | Decl. Stracher Ex. 17 - Depo. notes prepared by Gregory Stevens | 377 |
| 05/17/2024 | 101-18 | Decl. Stracher Ex. 18 - Social media posts by Rumor Solanine dated May 2, 2021 | 381 |
| 05/17/2024 | 101-19 | Decl. Stracher Ex. 19 - Facebook posts by D.E.M. dated March 8, 2020 | 398 |
| 05/17/2024 | 101-20 | Decl. Stracher Ex. 20 - Reddit thread pertaining to former members of The Satanic Temple dated February 15, 2020 | 402 |
| 05/17/2024 | 101-21 | Decl. Stracher Ex. 21 - Facebook post dated September 11, 2020 produced by Plaintiff | 410 |
| 05/17/2024 | 103 | TST's Brief in Support of MSJ | 412 |

**Appendix 601**

| | | VOLUME II (cont'd) | |
|---|---|---|---|
| **Date** | **ECF** | **Title** | **Page** |
| 05/17/2024 | 105 | Decl. Matt Kezhaya | 443 |
| 05/17/2024 | 105-1 | Decl. Matt Kezhaya Ex. 1 - Subject article (Compl. Ex. 1) | 448 |
| 05/17/2024 | 105-2 | Decl. Matt Kezhaya Ex. 2 - Email exchange ending October 29, 2021, 11:04 AM between Nancy Cooper and Julia Duin (Cooper26-27) | 476 |
| 05/17/2024 | 105-3 | Decl. Matt Kezhaya Ex. 3 - Email exchange ending October 29, 2021, 12:24 PM between Nancy Cooper and Julia Duin (Cooper37-39) | 479 |
| 05/17/2024 | 105-4 | Decl. Matt Kezhaya Ex. 4 - Email exchange ending October 29, 2021, 12:54 PM between Nancy Cooper and Julia Duin (Cooper28-30) | 483 |
| 05/17/2024 | 105-5 | Decl. Matt Kezhaya Ex. 5 - Email exchange ending October 29, 2021, 8:31 AM between Nancy Cooper and Julia Duin (Cooper31-32) | 487 |
| 05/17/2024 | 105-6 | Decl. Matt Kezhaya Ex. 6 - Email exchange ending October 28, 2021, 2:31 PM between Nancy Cooper and Julia Duin (Cooper48-50) | 490 |
| 05/17/2024 | 105-7 | Decl. Matt Kezhaya Ex. 7 - Email dated October 25, 2021, 12:22 PM from Juliana Pignataro to Julia Duin, Dayan Candappa, and Nancy Cooper (DUIN15-001-002) | 494 |
| 05/17/2024 | 105-8 | Decl. Matt Kezhaya Ex. 8 - Email exchange ending October 15, 2021, 1:08 PM between Juliana Pignataro and Julia Duin (NEWSWEEK442-443) | 498 |

| | | **VOLUME II (cont'd)** | |
|---|---|---|---|
| **Date** | **ECF** | **Title** | **Page** |
| 05/17/2024 | 105-9 | Decl. Matt Kezhaya Ex. 9 - Four articles by Julia Duin for the Houston Chronicle: Halloween: The sinister and the saintly/Occult practices embrace a variety of beliefs, rituals, (October 31, 1987); Police unable to link crime with Satanism (October 12, 1989); DEMONS & DARKNESS/Experts on evil shed light on things that go bump in the night (October 28, 1989); Satanism in the United States: a phenomenon on the rise Houston Chronicle (December 24, 1989), Houston Chronicle (JDUIN004-017) | 501 |
| 05/17/2024 | 105-10 | Decl. Matt Kezhaya Ex. 10 - Julia Duin, The Satanic Temple comes to Salem and the Boston Globe does a puff piece (September 22, 2016) (Duin Depo. Ex. 3) | 516 |
| 05/17/2024 | 105-11 | Decl. Matt Kezhaya Ex. 11 - Julia Duin, Young Satan worshippers foiled in Florida – but there's a deeper story here somewhere, (October 26, 2018) (Duin Depo. Ex. 4) | 520 |
| 05/17/2024 | 105-12 | Decl. Matt Kezhaya Ex. 12 - Julia Duin, ProPublica punts when digging into why the Family Research Council calls itself a church (August 18, 2022) (Duin Depo. Ex. 5) | 530 |
| 05/17/2024 | 105-13 | Decl. Matt Kezhaya Ex. 13 - Email exchange ending September 29, 2021, 10:08 AM between Julia Duin and Kevin J. Jones of the Catholic News Agency (JDUIN001-003) | 540 |
| 05/17/2024 | 105-14 | Decl. Matt Kezhaya Ex. 14 - Email dated September 30, 2021, 12:02 PM from Julia Duin to Juliana Pignataro, Dayan Candappa, and Nancy Cooper (NEWSWEEK025) | 544 |
| 05/17/2024 | 105-15 | Decl. Matt Kezhaya Ex. 15 - Email exchange ending October 25, 2021, 1:04 PM between Nancy Cooper, Julia Duin, Dayan Candappa, and Juliana Pignataro (Cooper51-53) | 546 |

| | | VOLUME II (cont'd) | |
|---|---|---|---|
| **Date** | **ECF** | **Title** | **Page** |
| 05/17/2024 | 105-16 | Decl. Matt Kezhaya Ex. 16 - Newsweek's editorial guidelines (Compl. Ex. 3) | 550 |
| 05/17/2024 | 105-17 | Decl. Matt Kezhaya Ex. 17 - Email exchange ending October 24, 2021, 4:02 PM between Jinx Strange and Julia Duin (NEWSWEEK015-017) | 559 |
| 05/17/2024 | 105-18 | Decl. Matt Kezhaya Ex. 18 - Email exchange ending October 29, 2021, 8:05 PM between Jinx Strange and Julia Duin (DUIN45-001-006) | 563 |
| 05/17/2024 | 105-19 | Decl. Matt Kezhaya Ex. 19 - Email exchange ending October 29, 2021, 7:02 PM between Lucien Greaves and Julia Duin (Compl. Ex. 9) | 570 |
| 05/17/2024 | 105-20 | Decl. Matt Kezhaya Ex. 20 - Email exchange ending October 29, 2021, 8:02 PM between Julia Duin and Kevin J. Jones of the Catholic News Agency (NEWSWEEK 465) | 579 |
| 05/17/2024 | 105-21 | Decl. Matt Kezhaya Ex. 21 - Defendant's Revised Initial Disclosures | 581 |
| 05/17/2024 | 105-22 | Decl. Matt Kezhaya Ex. 22 - Email exchange ending October 29, 2021, 2:54 PM between Nancy Cooper and Julia Duin (Cooper19-23) | 586 |
| 05/17/2024 | 105-23 | Decl. Matt Kezhaya Ex. 23 - Email exchange ending October 28, 2021, 1:01 PM between Nancy Cooper and Julia Duin (Cooper45-46) | 592 |
| 05/17/2024 | 105-24 | Decl. Matt Kezhaya Ex. 24 - Email exchange ending October 29, 2021, 8:28 AM between Nancy Cooper and Julia Duin (Cooper 40-41) | 595 |

| | | VOLUME III | |
|---|---|---|---|
| **Date** | **ECF** | **Title** | **Page** |
| 05/17/2024 | 105-25 | Decl. Matt Kezhaya Ex. 25 - Email exchange ending October 29, 2021, 3:19 PM between Cooper and Duin | 608 |
| 05/17/2024 | 105-26 | Decl. Matt Kezhaya Ex. 26 - Email exchange ending October 29, 2021, 5:41 PM between Greaves and Duin | 611 |
| 05/17/2024 | 105-27 | Decl. Matt Kezhaya Ex. 27 - TST's demand letter to Newsweek (October 30, 2021) (Compl. Ex. 5) | 618 |
| 05/17/2024 | 106 | Decl. Malcolm Jarry with Invoice Exhibits (Exs. 28-36) | 630 |
| 05/17/2024 | 107 | Decl. Dr. Laycock | 650 |
| 05/17/2024 | 108 | Decl. Greaves | 653 |
| 05/17/2025 | 110 | Decl. Sonia Kezhaya | 655 |
| 05/17/2026 | 110-1 | Decl. Sonia Kezhaya Ex. 37 - Excerpts from deposition of Nancy Cooper, dated November 7, 2023 | 657 |
| 05/17/2027 | 110-2 | Decl. Sonia Kezhaya Ex. 38 - Excerpts from deposition of Julia Duin, dated November 16, 2023 | 701 |
| 05/17/2028 | 110-3 | Decl. Sonia Kezhaya Ex. 39 - Excerpts from deposition of Lucien Greaves, dated November 6, 2023 | 751 |
| 05/17/2029 | 110-4 | Decl. Sonia Kezhaya Ex. 40 - Excerpts from deposition of David Alan Johnson, dated November 17, 2023 | 760 |
| 05/17/2030 | 110-5 | Decl. Sonia Kezhaya Ex. 41 - Excerpts from deposition of Nathan Sullivan, dated November 17, 2023 | 769 |
| 05/17/2031 | 110-6 | Decl. Sonia Kezhaya Ex. 42 - Excerpts from deposition of Jinx Strange, dated December 7, 2023 | 786 |
| 05/17/2032 | 110-7 | Decl. Sonia Kezhaya Ex. 43 - Excerpts from deposition of Greg Stevens (TST's 30(b)(6) deponent), dated November 3, 2023 | 798 |
| 05/31/2024 | 113 | Newsweek's Response to TST's 56.1 Statement | 822 |

| VOLUME IV | | | |
|---|---|---|---|
| **Date** | **ECF** | **Title** | **Page** |
| 05/31/2024 | 116 | TST's Response to Newsweek's 56.1 Statement | 881 |
| 05/31/2024 | 117 | Decl. Matt Kezhaya | 912 |
| 05/31/2024 | 117-1 | Decl. Matt Kezhaya Ex. 44 - Screenshot of search results for "tossatanicacc" | 915 |
| 05/31/2024 | 117-2 | Decl. Matt Kezhaya Ex. 45 - Stevens Depo. Exhibit 9, Enid Cooper's December 11, 2017 complaint | 917 |
| 05/31/2024 | 117-3 | Decl. Matt Kezhaya Ex. 46 - Stevens Depo. Exhibit 8, TST's January 8, 2018 resolution of Enid Cooper's complaint | 921 |
| 05/31/2024 | 118 | Decl. Hollow Axis | 924 |
| 05/31/2024 | 119 | TST's Response to Newsweek's MSJ (corrected brief) | 927 |
| 06/07/2024 | 122 | TST's Reply on MSJ | 958 |
| 06/07/2024 | 124 | Decl. Sonia Kezhaya | 973 |
| 06/07/2024 | 124-2 | Decl. Sonia Kezhaya 48 - Excerpts from deposition of Nancy Cooper, dated November 7, 2023 | 975 |
| 06/07/2024 | 124-3 | Decl. Sonia Kezhaya 49 - Excerpts from deposition of David Alan Johnson, dated November 3, 2023 | 1003 |
| 06/07/2024 | 124-4 | Decl. Sonia Kezhaya 50 - Excerpts from deposition of Gregory Stevens (TST's 30(b)(6) deponent), dated November 3, 2023 | 1012 |
| 06/07/2024 | 124-5 | Decl. Sonia Kezhaya 51 - Excerpts from deposition of Lucien Greaves, dated November 6, 2023 | 1025 |
| 06/12/2024 | 125 | TST's Letter to Seal Deposition Testimony | 1040 |
| 08/21/2024 | 127 | Depo. Excerpts of Duin (Redacted) | 1042 |
| 02/18/2025 | 132 | MSJ Oral Argument Transcript - February 4, 2025 | 1074 |

| | | **VOLUME IV (cont'd)** | |
|---|---|---|---|
| **Date** | **ECF** | **Title** | **Page** |
| 03/26/2025 | 134 | Opinion and Order Granting Newsweek's MSJ, Denying TST's MSJ | 1117 |
| 03/27/2025 | 135 | Judgement on MSJ | 1144 |
| 04/07/2025 | 136 | Notice of Appeal | 1145 |
| 07/22/2025 | -- | N.Y. Civ. Rights Law § 76-a(1), (2) - Actions involving public petition and participation; when actual malice to be proven | 1147 |
| 07/22/2025 | -- | CPLR § 302(a)(1) - Personal jurisdiction by acts of non-domiciliaries | 1149 |

# Exhibit 25

Email exchange ending October 29, 2021, 3:19 PM
between Nancy Cooper and Julia Duin
(NEWSWEEK377-378)

**From:** Nancy Cooper n.cooper@newsweek.com
**Subject:** Re: Photos, video for Satanic Temple story
**Date:** October 29, 2021 at 3:19 PM
**To:** Julia Duin j.duin@newsweek.com



published:

https://www.newsweek.com/orgies-harassment-fraud-satanic-temple-rocked-accusations-lawsuit-1644042

Thanks again for terrific story!

N.

On Fri, Oct 29, 2021 at 2:59 PM Julia Duin <j.duin@newsweek.com> wrote:
> Sorry, been in a meeting. Yes, the black/red logo is theirs and we have permission to use it.
>
> One of my sources also sent me a photo of some TST officials in front of a Scottsdale courthouse if they are looking for more art.
>
> On Fri, Oct 29, 2021 at 11:30 AM Nancy Cooper <n.cooper@newsweek.com> wrote:
>> thats the Queer Satan logo?
>>
>>
>> On Thu, Oct 28, 2021 at 4:14 AM Julia Duin <j.duin@newsweek.com> wrote:
>>> Folks - this is the one video TST definitely has rights to -
>>> https://www.youtube.com/watch?v=9kkUSRU45hM
>>> Email Lucien Greaves (lucien@thesatanictemple.com) for permission.
>>>
>>> My best 2 photos for this story are attached. Cutline is: These former members of the Seattle chapter of The Satanic Temple are being sued for at least $143,000 by the national organization. From left, they are Nathan Sullivan, David Johnson and Leah Fishbaugh.
>>> Julia Duin photo
>>>
>>> And I attached the logo atop their Twitter page which they told me we have permission to use.
>>> --
>>> **Julia Duin | Contributing editor/religion**
>>> **NEWSWEEK**
>>>
>>> T **|** +1 425 677 7783
>>> C **|** + 202 374 4782
>>> E **|** j.duin@newsweek.com
>>> W **|** newsweek.com

## Newsweek

> *This e-mail and any attached files are intended solely for the use of the individual or entity to which this e-mail is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system.*

--

Nancy Cooper | Global Editor in Chief
**NEWSWEEK**

E  **|**  n.cooper@newsweek.com
A **|** 1 World Trade Center, 72nd Floor, New York, NY, 10007

**Newsweek**

*This e-mail and any attached files are intended solely for the use of the individual or entity to which this e-mail is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system.*

--
**Julia Duin | Contributing editor/religion**
**NEWSWEEK**

**T | +1 425 677 7783**
**C | + 202 374 4782**
**E | j.duin@newsweek.com**
**W | newsweek.com**

**Newsweek**

*This e-mail and any attached files are intended solely for the use of the individual or entity to which this e-mail is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system.*

--
**Nancy Cooper | Global Editor in Chief**
**NEWSWEEK**

**E | n.cooper@newsweek.com**
**A | 1 World Trade Center, 72nd Floor, New York, NY, 10007**

**Newsweek**

*This e-mail and any attached files are intended solely for the use of the individual or entity to which this e-mail is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system.*

# Exhibit 26

Email exchange ending October 29, 2021, 5:41 PM
between Lucien Greaves and Julia Duin
(NEWSWEEK032-037)

**From:** **Lucien Greaves** lucien@thesatanictemple.com
**Subject:** Re: some questions
**Date:** October 29, 2021 at 5:41 PM
**To:** Julia Duin j.duin@newsweek.com



I find it remarkable that you post this comment without seeking any justification. We have never kicked anybody out for asking for financial disclosures, nor is there any truth to the claim that we've covered up sexual abuse. I should like to contact your editor, if you'd be so good as to give the proper contact info

"leaders posing happily with major alt-right media figures," he wrote. "Accounts of sexual abuse being covered up in ways that were more than anecdotal. Dozens of people kicked out for asking for financial records from this alleged-non-profit organization."

-------- Original message --------
From: Julia Duin <j.duin@newsweek.com>
Date: 10/29/21 5:18 PM (GMT-05:00)
To: Lucien Greaves <lucien@thesatanictemple.com>
Subject: Re: some questions

Thanks for getting back to me so quickly. The complainant felt just allowing these activities was opening up TST to liability; that instead of guidelines, there should be no-go areas. It wasn't that he thought guidelines were too restrictive.
Anyway, the piece is out: https://www.newsweek.com/orgies-harassment-fraud-satanic-temple-rocked-accusations-lawsuit-1644042

On Fri, Oct 29, 2021 at 10:39 AM Lucien Greaves <lucien@thesatanictemple.com> wrote:
Nobody mocked him for bringing it up. He was told that the guidelines weren't encouragement toward anything, nor did anybody have to be involved in such things. Such guidelines are the product of the fact that TST tries to allow the maximum autonomy for congregations while making sure that restrictions are imposed by necessity to make sure that everybody is reasonably safe and comfortable. Sex positivity guidelines are a merely a matter of placing the least amount of restriction while accounting for those concerns. If I remember correctly, he had no real complaint about any actual events that occurred. He simply did not like that there were guidelines for such things at all.

-------- Original message --------
From: Julia Duin <j.duin@newsweek.com>
Date: 10/29/21 1:27 PM (GMT-05:00)
To: Lucien Greaves <lucien@thesatanictemple.com>
Subject: Re: some questions

Thanks for the correction - your voice mail is full btw! Re the complaint, it was filed in February 2020 by a "Scott Malphas" out of the Arizona chapter. He took it to the IC (International Council?) whose members, he said, mainly mocked him for bringing it up.

On Fri, Oct 29, 2021 at 9:58 AM Lucien Greaves <lucien@thesatanictemple.com> wrote:
Sorry. Twice my phone placed "of" in my reply where I meant "if"

-------- Original message --------
From: Lucien Greaves <lucien@thesatanictemple.com>
Date: 10/29/21 12:50 PM (GMT-05:00)
To: Julia Duin <j.duin@newsweek.com>
Subject: Re: some questions

Again, I would ask if there's an actual complaint here. Did the alleged former member actually witness anything of the type? What was the complaint? That there were guidelines at all? That the member simply didn't like the idea of such activities taking place? No events are compulsory to continued membership within TST. Some members are sex workers, others are in fetish scenes, etc. The guidelines are merely meant to set parameters in which of these things are incorporated into any TST events, they are done in a way that is safe, sane, and consensual, and that nobody feels uncomfortable or coerced. The document does not ask that such events must take place, but sets limits on such behavior, of engaged in. I really don't know what this alleged complaint is.

-------- Original message --------
From: Julia Duin <j.duin@newsweek.com>

From: Julia Duin <juin@newsweek.com>
Date: 10/29/21 12:32 PM (GMT-05:00)
To: Lucien Greaves <lucien@thesatanictemple.com>
Subject: Re: some questions

Hey Lucien - one more question (hopefully) - a former member brought to my attention a memo of "sex positive" guidelines for TST gatherings that suggests, among other things <span style="color:red">"orgies, BDSM, fetish balls...ritual flogging, live ritual sex, burlesque show..."</span> as legit activities. How often does this go on? The member said he filed a complaint about such activities but never got much of a response. Can you comment?

On Thu, Oct 28, 2021 at 1:18 PM Lucien Greaves <lucien@thesatanictemple.com> wrote:

Hello Julia,

I have cced Malcolm, as he has membership numbers and budgeting information. We're at over 500k now, but again, membership is free. There are no dues.

We rolled out our ordination program in 2020. Here is a link that might be helpful: https://ordained.satanicministry.com/pages/about

Yes, in 2019 we were recognized as a Church by the IRS which gave us cause to create TST, inc.

I would say that the claims that there is something nefarious about our corporate structure is a conspiracy theory, but I don't think it even rises to that level, because as far as I can see there is no theory; only some complaints that it is confusing. I have yet to understand how it is we are supposed to be inappropriately benefiting from this corporate structure, or, if one considers our history and the evolution of the organization, how it is that we should be structured differently? I would hope that before anybody suggests that there is something wrong, they would have a clear, well-defined claim of what exactly is wrong, as well as a vision of what is right. If there actually is a theory here, if there is some type of tangible suspicion of wrong-doing, I could better direct you to whomever might be able to address it -- whether that be a lawyer who helped set it up, and accountant, or whatever best helps to address the issue. I won't object to whatever you use age-wise. I'm not trying to be difficult, I just have never participated in a profile piece!

Thank you



## About Satanic Ordination | The Satanic Temple Ministry

Become an ordained priest with The Satanic Temple. The Satanic Temple launched the Satanic Ordination program in 2020 as a way to recognize qualified members who have demonstrated a deep and passionate

ordained.satanicministry.com

**From:** Julia Duin <j.duin@newsweek.com>
**Sent:** Thursday, October 28, 2021 3:58 PM
**To:** Lucien Greaves <lucien@thesatanictemple.com>
**Subject:** Re: some questions

Hi again - folks are asking about exact membership figures. You told me your mailing list went from 300,000 to close to 500,000. Does the latter constitute your membership figures? If not, how many members do you have?

Julia

On Thu, Oct 28, 2021 at 12:37 AM Julia Duin <j.duin@newsweek.com> wrote:
I thought that was the year TST became a 501c3. Am I correct?
Also, I see you didn't deny you're 45 years old or that the Seattle Times was right or wrong, so I'll use that as your age, OK? And...I'd asked about an annual budget for the LLC and TST. Did you get those figures?
Took your suggestion to engage Joseph Laycock, which was most helpful.
Exactly when did TST change to this ministry set-up?
  Hopefully, those are all my questions!
Julia

On Tue, Oct 26, 2021 at 12:59 PM Lucien Greaves <lucien@thesatanictemple.com> wrote:
Hello Julia --
I would say that at the time, the idea of Satanists being around was something that people had a lot of hesitation towards because people were far less aware of who we are and what we stand for, so I would change "likes" to a past tense of "liked." Today, there are people who want us around as a reassurance that religious liberty is being respected by viewpoint-neutral office-holders.
There were 2 Medium pieces written by the same member. The second one deals more directly with the question of what happened with the Seattle chapter:

https://medium.com/@viceovervirtue666/that-which-can-be-destroyed-by-the-truth-should-never-be-spared-its-demise-814b882e4454

https://medium.com/@viceovervirtue666/part-iii-is-tst-an-abusive-mind-controlling-cult-that-limits-its-members-ability-to-speak-while-9c8280108d04

Also, it occurs to me that I shouldn't assume you know anything that we didn't discuss, so I'll mention that there is a documentary about us that premiered at Sundance a few years ago, now streaming on Hulu. It's called "Hail Satan?" and it was made by a neutral director who knew of the controversy in 2018 and the chapters that left, but she did not feel that that particular subplot was meaningful to the overall story.
There is also a book about us published by Oxford University Press (peer reviewed publication process) called "Speak of the Devil" by a Texas professor of religions, Joseph Laycock. He did, in fact, talk about the events of 2018 and some of the criticisms that we supposedly harbor secret alt-right sympathies, but after years of actual research, he saw no credibility in that point of view. Prof Laycock might also be of interest for you to speak to because he is an unbiased source (a Catholic, even) who would probably be willing to tell you about the campaign of harassment that the Seattle people who are writing about launched against him which compelled him to block them on social media.
joe.laycock@gmail.com
There are many other people that they harass incessantly while trying to paint our defense of our Intellectual Property as a "SLAPP suit" (which it objectively isn't), but those that I can think of are members of TST, and so probably can't be considered unbiased for your purposes.
Membership comes and membership goes. Some that go say rotten things about us. The lawsuit in Seattle is about defending our Intellectual Property, which is a duty we have to our congregations and membership, so that they may know that we, as an organization, will not allow our community to be publicly misrepresented in our own name. Who could feel comfortable identifying with us were we to do anything less?
The fact of the matter is, though, they have reached out to a large number of journalists, Podcasters, and any influential person who they think might be willing to believe their story of victimization at the hands of TST, and upon investigation, none of them found them credible, and for good reason.
As I may have mentioned yesterday, they claim we are a "pyramid scheme" and that we're running some type of financial scam. We willingly pitch ourselves into litigation where questions of our intent bring scrutiny upon our corporate structure and finances, and we've survived such scrutiny with ease. I think that a good question for them would be, "how much money did you lose and how? When were you ever required to pay money for anything at all?" There is nothing on our end that ever required their financial buy-in.
This might be deeper than your piece is meant to go, but Modern Satanism as defined by Anton LaVey was premised on a de-racialized Social Darwinist philosophy that made sense to me decades ago. By the time that we founded The Satanic Temple, however, I had broken with that philosophy entirely, and had come to believe it erroneous. TST was founded on principles that explicitly broke with LaVeyan philosophy and advocates for altruism and compassion. That evolution of thought was never concealed, and was openly a part of TST as the beginning of a Satanic Reformation. Now, however, people like the conspiracy theorists who decry us in Seattle take comments of mine from 20 years ago and attempt to make people believe that they are leaked insights into my current, yet publicly hidden, state of mind. Here is an essay I wrote regarding the differences between The Satanic Temple and the Church of Satan, and my previous point of view could be categorized as the liberal assimilation of LaVeyanism that I describe in the essay. I was never sympathetic to

racist or Nazi thought.
https://thesatanictemple.com/pages/what-is-the-difference-between-the-satanic-temple-and-the-church-of-satan
When you ask what happened in 2019, to what are you referring?
Thank you

-------- Original message --------
From: Julia Duin <j.duin@newsweek.com>
Date: 10/26/21 2:56 PM (GMT-05:00)
To: lucien@thesatanictemple.com
Subject: some questions

Dear Lucien:
    Thanks for yesterday's interview and just a reminder for you to send me that Medium link. Got a message from Matthew, your lawyer, so I'm trying to reconnect with him.

A few things: The Seattle Times mentioned you in a piece this year, saying you're 45 years old. Is that accurate?


Also, did I get this quote correct while asking you about the switch to an LLC? "No one likes to have Satanists around, so we hoped to have a more neutral entity name to work across denominations," said Greaves. "We wanted a central brand name to fall back on to be more inclusive and not as abrasive as the Satanic Temple."

Also, was TST founded in 2012 or 2013? The LLC was founded in 2014...so what happened in 2019?

Sincerely,

--
**Julia Duin I Contributing editor/religion**
**NEWSWEEK**

T I +1 425 677 7783
C I + 202 374 4782
E I j.duin@newsweek.com
W I newsweek.com


# Newsweek

*This e-mail and any attached files are intended solely for the use of the individual or entity to which this e-mail is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system.*


--
**Julia Duin I Contributing editor/religion**
**NEWSWEEK**

T I +1 425 677 7783
C I + 202 374 4782
E I j.duin@newsweek.com
W I newsweek.com

# Newsweek

*This e-mail and any attached files are intended solely for the use of the individual or entity to which this e-mail is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system.*

--
**Julia Duin I** Contributing editor/religion
**NEWSWEEK**

**T I** +1 425 677 7783
**C I** + 202 374 4782
**E I** j.duin@newsweek.com
**W I** newsweek.com

# Newsweek

*This e-mail and any attached files are intended solely for the use of the individual or entity to which this e-mail is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system.*

--
**Julia Duin I** Contributing editor/religion
**NEWSWEEK**

**T I** +1 425 677 7783
**C I** + 202 374 4782
**E I** j.duin@newsweek.com
**W I** newsweek.com

# Newsweek

*This e-mail and any attached files are intended solely for the use of the individual or entity to which this e-mail is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system.*

--
**Julia Duin I** Contributing editor/religion

**NEWSWEEK**

T **I** +1 425 677 7783
C **I** + 202 374 4782
E **I** j.duin@newsweek.com
W **I** newsweek.com

# Newsweek.

*This e-mail and any attached files are intended solely for the use of the individual or entity to which this e-mail is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system.*

--
Julia Duin **I** Contributing editor/religion
**NEWSWEEK**

T **I** +1 425 677 7783
C **I** + 202 374 4782
E **I** j.duin@newsweek.com
W **I** newsweek.com

# Newsweek.

*This e-mail and any attached files are intended solely for the use of the individual or entity to which this e-mail is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system.*

# Exhibit 27

TST's demand letter to Newsweek (October 30, 2021)
(Compl. Ex. 5)



# KEZHAYA LAW PLC

**MATTHEW A. KEZHAYA**
1202 NE MCCLAIN RD
BENTONVILLE, AR 72712

P: (479) 431-6112
F: (479) 282-2892
MATT@KEZHAYA.LAW

October 30, 2021

Newsweek Magazine LLC
ATTN: Ms. Nancy Cooper, editor in chief
1 World Trade Ctr
Floor 72
New York, NY 10007

Newsweek Magazine LLC
c/o Allstate Corporate Services Corp., registered
99 Washington Ave.
Suite 1008
Albany, NY 12260

Newsweek Magazine LLC
ATTN: Corrections Team
      **By email only to**: support@newsweek.com

Re: <u>Satanic Temple v. Newsweek LLC</u> – demand for retraction

Ms. Cooper and Corrections Team:

    I serve as general counsel for The Satanic Temple, Inc. ("**TST**"), a Massachusetts religious corporation which was recently the subject of a *Newsweek* article by Ms. Julia Duin: "Orgies, Harassment, Fraud: Satanic Temple Rocked by Accusations, Lawsuit" (available at https://www.newsweek.com/orgies-harassment-fraud-satanic-temple-rocked-accusations-lawsuit-1644042) (published on October 29, 2021).

    Ms. Duin "reported," as if there was any factual merit, on anonymous rumors devoid of any factual detail, naked editorialization, and provably false allegations. She failed to engage in any basic fact-checking. She provably failed to provide my client an opportunity to respond to the statements detailed below. By this letter, I demand that *Newsweek* promptly retract the article and issue a correction statement; or, failing that, remove all of the offending material along with a correction statement. Please do so by **November 1, 2021 at 12:00 pm**, Central Time.

    Initially, TST was excited at the prospect of being the subject of an article by your fine publication. *Newsweek* enjoys a reputation for credible journalism, which can be fairly credited to its robust editorial policy that supports the values of "accurate, independent, ethical and responsible journalism." "Editorial Guidelines" (available at https://www.newsweek.com/editorial-guidelines). My client expected that your reporter would follow your Guidelines. This did not pan out.

    The Guidelines instruct your reporters to: (1) "Check every single fact that you include;" (2) "Weigh the data and evidence impartially;" (3) "Reach out for comment and give parties time to



# KEZHAYA LAW PLC

MATTHEW A. KEZHAYA
1202 NE McCLAIN RD
BENTONVILLE, AR 72712

P: (479) 431-6112
F: (479) 282-2892
MATT@KEZHAYA.LAW

respond" and more particularly "If we are accusing a person or company of wrongdoing, we must include fair comment;" (4) "With very rare exception, do not aggregate stories that rely on anonymous sources;" and (5) "If in any doubt about the source of material, don't do the story." Id. The policy additionally advises: "We make any needed corrections promptly and transparently." Id.

Despite these standards, the article is riddled with offending material which can only be explained as a failure to follow the Guidelines. The numerosity and severity of the offending material suggests that Ms. Duin had an improper purpose in publishing the article. The idea is bolstered by the fact that the assertions in the piece inconsistently suggest that TST is simultaneously "inept" and "rudderless," yet also so totalitarian that no dissenters are allowed; both cozy with the alt-right yet also just an "SJW poly social club." The only consistent thread in the article is that it disparages TST. The repeated editorialization further supports that disparagement is the point. The article even ends in a call to action to raise money for people who proudly stole TST's Facebook and directed defamatory content at TST's own hard-won audience. The proof of actual malice is unavoidable.

Moreover, to the meager extent she offered TST an opportunity to comment, she abandoned the half-baked questions about TST's tax and corporate structure (they are the product of an evolving organization and based upon the advice of competent professional advisors), or that it is a "pyramid scheme" (members are neither required no pressured to donate funds to TST). So she knew how to ask questions and invite commentary, but she stopped asking about matters she wanted to include in the article.

By publishing these defamatory statements, *Newsweek* has tied its reputation to the credibility of the Defendants and other disgruntled former members. This would be defensible if Ms. Duin provided TST an opportunity to comment on the below allegations, or if she engaged in a fact-checking process, or if she evaluated the evidence impartially, or if she avoided the use of anonymous sources. She did none of this. As further detailed below, the article unashamedly presents rumor and intrigue as if it were credible reporting. Ms. Duin failed to meet your Guidelines. I am hopeful that you will adhere to your Guidelines, by making the needed corrections, "promptly and transparently."

My client takes issue with the following enumerated quotes, in order of appearance in the article as it appeared on October 29, 2021. The indented paragraph below each quote is TST's response.

1. Orgies, Harassment, Fraud: Satanic Temple Rocked by Accusations, Lawsuit

   The name of the article is misleading. In our headline-driven world, this clickbait has a tendency to harm TST by falsely implying that TST is being sued about allegations of orgies, harassment, and fraud. In fact, TST brought the lawsuit and it asserts a property dispute with an attendant defamation issue. See United Federation of Churches LLC v. Johnson et al., case no. 2:20-cv-509, doc. 26 (W.D. Wa. 2020). Nothing in the piece even addresses fraud, neither by TST nor against TST.

2. The four members say they posted only links to news articles and other material already in the public sphere.



# KEZHAYA LAW PLC

MATTHEW A. KEZHAYA
1202 NE MCCLAIN RD
BENTONVILLE, AR 72712

P: (479) 431-6112
F: (479) 282-2892
MATT@KEZHAYA.LAW

I could have explained some basic law to Ms. Duin, had she invited comment on this. It is universally held that there is no defense to defamation for "only" reposting defamatory matter which was already in the public sphere. 53 C.J.S. Libel and Slander; Injurious Falsehood § 99 ("The maker of a republication or repetition of a defamatory matter, although not liable for the results of the primary publication unless the republisher or repeater makes or participates in making it is, however, liable for the consequences of a subsequent publication which the republisher or repeater makes or participates in making.")

3. They [Defendants] feel responsible for disclosing that TST . . . has plenty of its own skeletons

"Disclosing" is editorialization. It presumes that the proffered information is true, i.e. that TST really does have "plenty of its own skeletons." As further addressed below, each of Defendants' claims are false (to the extent they are discrete enough to even address), and Ms. Duin would have discovered this had she engaged in a basic fact-checking process before simply parroting salacious and cryptic accusations of wrongdoing from biased sources. Minimally, she should have given TST a fair comment on the Defendants' assertions before reporting them as if they were fact.

4. In 2018, TST sued Twitter for temporarily suspending the account of co-founder Lucien Greaves

This is materially false on at least three fronts.

First, TST did not "sue" Twitter. To say that TST "sued" Twitter falsely suggests that TST engaged in a formal judicial complaint process, which any layman knows to be very costly. A reasonable reader of this sentence would expect that the "suit" cost TST a lot of money. In truth, TST invited an administrative mediation process. The matter was covered *pro bono* by Marc (not "Mark") Randazza. No TST money was expended.

Second, TST did not begin this process because Twitter "temporarily" suspended Greaves's account. Instead, it was because Twitter *permanently* suspended Greaves's account. And it did so in retaliation for Greaves taking issue with a tweet, which was beginning to go viral, that invited the general public to burn down TST's headquarters.

Third, the sentence falsely implies that, by TST raising this issue against Twitter, it inured to the sole personal benefit of Greaves. This is missing necessary context. Twitter suspended TST's account at the same time as Greaves's account. Social media is critical to TST's ability to propagate its messaging, so TST had an obvious organizational interest in maintaining its own account. The same is true for Greaves's account. Greaves is TST's primary spokesperson. If he no longer has a Twitter account, his ability to perform his role for TST is diminished, causing harm to the

---

Demand for retraction

Page 3 of 11

**Appendix 621**



# KEZHAYA LAW PLC

MATTHEW A. KEZHAYA
1202 NE McCLAIN RD
BENTONVILLE, AR 72712

P: (479) 431-6112
F: (479) 282-2892
MATT@KEZHAYA.LAW

organization.

TST wasn't even notified that Duin was looking to report on the Twitter issue. Had Duin extended an opportunity to comment, per the Guidelines, this could have been explained and documentary evidence provided.

5.  Lucien Greaves (also known as … )

This is an egregious affront. Mr. Greaves is the regular recipient of death threats, a point he made clear to Ms. Duin in writing. On multiple occasions, he specifically asked that his legal name be omitted from this article. His name can be used to cause him harm. His legal name can be used to cause harm to those he cares about. To protect himself and those around him, he uses a pseudonym. Including his name is not only rude and harassing, it jeopardizes innocent lives.

This was plainly malicious. Your reporter had the good decency to use the pseudonyms for Scott Malphas, Jinx Strange, and Salome DeMeur throughout the piece. So, what, a source's identity need not be put to public scrutiny, but Greaves's does? This issue also ties into the false accusation, below, that TST threatened to dox a former member. If Duin is satisfied to use pseudonymous sources, "Greaves" should be satisfactory, as well.

6.  (It's not clear whether TST actually practices abortion as a religious ritual; the claim may be a legal tactic or political theatre.)

This is editorialization. It is also false. In fact, it *is* clear that TST "actually practices abortion as a religious ritual." This is a matter of public record. See <u>Satanic Temple v. Young</u>, case no. 4:21-cv-387, doc. 26 at ¶¶ 47-58 (S.D. Tx. 2021). Had Ms. Duin invited comment on the issue, we could have explained this or provided sufficient proof for her satisfaction. Instead, she made a veiled accusation that TST raised a false claim to a federal court. This is far too serious a charge to be made flippantly.

7.  Bit by bit, items critical of TST showed up on its Seattle chapter's Facebook page.

TST has no idea what this sentence is talking about. No items "critical of TST" were posted on the Chapter page until after the hacking. Instead, Defendants were posting inane material on TST's Facebook page, not critical of TST, but which endorsed leftist politics as opposed to Satanism. See <u>United Federation of Churches LLC v. Johnson et al.</u>, case no. 2:20-cv-509, doc. 26 at ¶¶ 33-42 (W.D. Wa. 2020). The Defendants' inane material created a false impression that TST is a leftist political organization. That dissuades membership from every other political walk of life. TST is a religious institution, not a political one. We invite participation and membership from all across the political spectrum.



# KEZHAYA LAW PLC

MATTHEW A. KEZHAYA
1202 NE MCCLAIN RD
BENTONVILLE, AR 72712

P: (479) 431-6112
F: (479) 282-2892
MATT@KEZHAYA.LAW

The statement also falsely implies that "items critical of TST" had something to do with the removal of Defendants from their positions on the advisory council. In fact, they were removed because: (1) they were inflaming interpersonal conflicts within the advisory council; (2) they were repeatedly operating TST's social media to endorse leftist politics as opposed to Satanism, despite repeated reminders that this was unacceptable; (3) they failed to attend a particular meeting to address the issue of appropriate content to post on TST's social media; and (4) they failed to participate in publicity efforts on a matter of organizational significance. Id. at ¶¶ 41-43. Ms. Duin should have invited comment if she did not understand the allegations of the complaint.

8.  A more recent page, "Evergreen Memes for Queer Satanic Fiends," had 500 followers

The article misquotes the complaint. The complaint says that the page was called "TST WA Allies" until Defendants stole and renamed it. See United Federation of Churches LLC v. Johnson et al., case no. 2:20-cv-509, doc. 26 at ¶ 32 (W.D. Wa. 2020). The theft took place after Defendants were removed from their advisory council positions.

We provided the Facebook page history which proves this. Id. at Exhibit 3. There is absolutely no justification for the article to claim that the complaint says the page "was" (past tense) named "Evergreen Memes for Queer Satanic Fiends."

9.  The defendants denied all charges, saying the real issue concerned an intra-chapter feud where the four of them were copied on an email about an ethics complaint involving sexual harassment.

The claim that defendants "denied" allegations is misleading in the article's context of discussing litigation pleadings. An answer is the first document in which a defendant denies any allegations of the complaint. Defendants have not filed an answer. At no point have they ever formally denied any of the allegations of the complaint.

The remainder of the sentence does not meet the allegations of the complaint. Defendants can cry foul about being removed from their advisory positions all they like, but that isn't what this case is about. This case is about their decision, after being removed, to take property which does not belong to them and then use that property to harm the property's true owner. They have never denied that. Nor can they. Sullivan contemporaneously bragged that "we [Defendants] have a meme page here that we *stole* from TST." Id. at Exhibit 5, p. 3 (emphasis added). They knew full-well that they were "stealing" property that did not belong to them.

10. Meanwhile some members wondered why an organization like TST would go after four Seattleites with very modest means while it had bigger fish to fry elsewhere.



# KEZHAYA LAW PLC

MATTHEW A. KEZHAYA
1202 NE MCCLAIN RD
BENTONVILLE, AR 72712

P: (479) 431-6112
F: (479) 282-2892
MATT@KEZHAYA.LAW

These "some members" are either anonymous sources prohibited by the Guidelines, or fabrications which should have been discovered through fact-checking.

TST was never "going after" Defendants. That is editorialization. "Going after" implies that TST started this dispute. Defendants could have exited the organization with grace. Instead, they chose to steal TST's property. This lawsuit is the only lawful means for TST to seek a remedy for the harm.

As for their "modest" means, that is no defense to a lawsuit. The law expects them to think about the legal consequences of causing financial harm *before* they cause it.

As for the "bigger fish to fry elsewhere" comment, this is false. If every exiting member had free reign to take the product of years of investment as a souvenir, TST would not last very long as an organization. Ms. Duin should have invited comment on these assertions.

11. "You have no allegations of fraudulent activity by myself, by Leah or even by Joshua"

The complaint does not assert fraud against anyone. Each of the Defendants share liability for all of the actions taken pursuant to their wrongful agreement. This is a basic doctrine, called civil conspiracy, and I could have explained it to Ms. Duin if she had invited comment on this point.

12. In a withering 14-page judgment, U.S. District Judge Richard A. Jones dismissed the lawsuit on Feb. 26, 2021, saying the plaintiffs got their facts wrong on the actual domain name of the Facebook page and that other claims made by TST were "implausible."

"Withering" is editorialization. It falsely ascribes intent to the Judge. Contra. Editorial Guidelines ("Don't imply motive.") The opinion (doc. 20) found some material facts were missing from the complaint and gave us an opportunity to correct them. This is normal, not "withering."

As for the comment that "plaintiffs got their facts wrong on the actual domain name of the Facebook page," this is simply false. On a motion to dismiss, the facts of the complaint are deemed true; there is no basis for a judge to find that a plaintiff "got their facts wrong." Instead, the order held that the Anticybersquatting Consumer Protection Act of 1999 ("**ACPA**") (which prohibits trademark infringements in a statutorily-defined "domain name") does not apply to Facebook pages. This was a legal issue, and a technical one at that. It was not a factual issue. I explained this in TST's motion to reconsider, doc. 21 at pp. 1-5, a copy of which I gave to Ms. Duin for discussion about defamation. She should have invited comment about the ACPA claim if she did not understand its legal posture.

As for the comment that "other claims made by TST were 'implausible,'" the word

Demand for retraction

Page 6 of 11

**Appendix 624**



# KEZHAYA LAW PLC

MATTHEW A. KEZHAYA
1202 NE MCCLAIN RD
BENTONVILLE, AR 72712

P: (479) 431-6112
F: (479) 282-2892
MATT@KEZHAYA.LAW

"implausible" does not appear anywhere in the order. Again, the facts of the complaint are deemed true at this stage of the proceedings. The Judge could not (and did not) find that the facts asserted were "implausible." This falsely attributes a quote. It is also editorialization.

13. "It was tossed out because they [TST] claim to be a religion and you are allowed to criticize religions," Johnson said. "They like to say they are a business when it comes to competitor organizations forming or when someone is using their intellectual property. Otherwise, they claim to be a religion."

First, TST has never asserted a right to be immune from criticism. Criticism is both constitutionally protected and is held sacred by TST's tenets. But criticism isn't defamation. Defamation is an injurious falsehood. There is no First Amendment right to falsely claim that TST's ideologies support ableism, misogyny, racism, fascism, transphobia, and endorsement of police brutality (Doc. 26 at p. 11, ¶ 46) or to falsely claim that TST affiliates with Neo-Nazis (Exhibit 6 at p. 2). When that falsehood causes an injury–which it did–TST accrues a right to sue.

Second, the article presents a false dichotomy by claiming that TST is "a business when it comes to competitor organizations . . . Otherwise, they claim to be a religion." Religious organizations have an equal entitlement as secular organizations to protect their property rights. This point was explained to Ms. Duin, in writing. It is unjustifiable for her to continue parroting this false claim, as if there is something untoward about a religious organization objecting to people stealing its website and then using that website to direct harm at the organization.

14. Of all the defendants, Johnson is the one who has spent the most time digging into TST's background. "Every time I think I've hit the bottom, there's another terrible thing comes out," he said. "People send us things we can't talk about because we can't substantiate them."

"Digging" is editorialization. "Digging" implies that Johnson is talking to witnesses with personal knowledge, looking at primary sources, or otherwise performing some reliable investigation. Instead, Johnson is cherrypicking scandalous rumors he finds on the internet, and offers them up to anyone who will listen as if there was any factual merit to them. It's lazy, shoddy, and biased. TST expected a *Newsweek* reporter to recognize that.

The claim that "there's another terrible thing comes out" should have been fact-checked. The Editorial Guidelines require a fair opportunity to comment when accusing a company of wrongdoing for good reason. What proof is there of this "terrible thing?" What even is it? This is naked rumor milling.

The comment that "People send us things we can't talk about because we can't



# KEZHAYA LAW PLC

MATTHEW A. KEZHAYA
1202 NE MCCLAIN RD
BENTONVILLE, AR 72712

P: (479) 431-6112
F: (479) 282-2892
MATT@KEZHAYA.LAW

substantiate them" should have raised red flags.  The source explicitly stated that there is some unspeakably heinous allegation, *but the allegation cannot be substantiated.*  Ms. Duin should have heeded the instruction in the Editorial Guidelines: "don't do the story."

15. He [Jinx Strange] soon left the group, then was leaked material about "leaders posing happily with major alt-right media figures," he wrote.

> "Leaked" is editorialization.  It presupposes that the "material" exists outside of a fabrication.  The requirement of fact-checking protects *Newsweek*'s reputation by requiring reporters to ensure that there actually is material about "leaders posing happily with major alt-right media figures."  Who allegedly "leaked" this material?  Did she try talking with the leak?  Did she even look at this "leaked" material?  How does this source square the claim that "leaders [are] posing happily with major alt-right media figures" with Malphas's inconsistent claim that TST is nothing more than a "SJW poly social club?"  This quote plainly runs afoul of the bar against relying on anonymous sources.  She should have invited comment on this point.

16. "Accounts of sexual abuse being covered up in ways that were more than anecdotal.  Dozens of people kicked out for asking for financial records from this alleged-non-profit organization."

> This quote repeats the above breaches of *Newsweek*'s Editorial Guidelines.  Who, ostensibly, was sexually abused?  What, exactly, was done?  What did TST allegedly do to "cover up" the alleged abuse?  Who are these "dozens of people" who were purportedly "kicked out for asking for financial records?"  Did Ms. Duin even attempt to talk to any of these anonymous sources?

> There is no truth to the claims that TST covered up sexual abuse or kicked anybody out for asking for financial disclosures.  This is not journalism, it is gossip-mongering.

17. TST has driven off its best people and lowered itself to has-been status since then, Strange concluded. "Actual activists, and even creatives, want nothing to do with them anymore."

> This quote repeats the above breaches of the Editorial Guidelines.  The source makes no effort to disguise its bias.  Far from being a "has-been," TST's membership has grown steadily and significantly over the years.  Ms. Duin should have inquired into other sources to see if this claim withstands scrutiny.  Editorial Guidelines ("try to fact-check your story by using as many sources as possible.")

18. Salome DeMeur, a pseudonym for a former member based in Pensacola, Fla., said she got sidelined after asking Greaves why "he was going to sue Twitter like it was personal vendetta, but then using TST money to do so."

> This is materially false on at least four fronts.  First, Greaves denies that the specific



# KEZHAYA LAW PLC

MATTHEW A. KEZHAYA
1202 NE McCLAIN RD
BENTONVILLE, AR 72712

P: (479) 431-6112
F: (479) 282-2892
MATT@KEZHAYA.LAW

claimed discussion ever took place, and more generally denies that any member was ever retaliated against for asking about the Twitter dispute.

Second, TST never "sued" Twitter, TST invited an administrative mediation process. This point was addressed under Point 4, above.

Third, TST's dispute with Twitter was not a "personal vendetta" because Twitter canceled TST's main account along with Greaves's account. This point was also addressed under Point 4, above.

Fourth, no TST money was expended on the Twitter dispute. This point was also addressed under Point 4, above.

19. Once she [Salome DeMeur] became known as a dissenter, she said, members of TST's national council threatened to out her to the Marine Corps, her employer, despite the Corps already being aware of DeMeur's religious activities.

   Again, this is false. TST prohibits doxing because it invites dangerous elements of society to cause harm to the subject. We find it incredible that Ms. Duin would write an article that publicly disparages TST of doxing while, in the very same article, Ms. Duin went about doxing Greaves.

   Beyond that, this allegation is nonspecific. Who threatened to "out" her to the Marine Corps? Did Ms. Duin try to talk to the mystery threatener? What constitutes the "threat?" Was it in writing? If so, did Ms. Duin look at the written documents? If she engaged in a basic fact-checking process, these questions should all have answers.

20. "After leaving, it was basically Scientology-lite," she told *Newsweek* in an email. "People were told not to talk to us. Members were trying to break up my relationship with my boyfriend. Several people were legally threatened. I know quite a few people who have refused to speak out at all because they fear legal action from TST. A few of us have been in mental health treatment since."

   This is just more of the same nonspecific allegations of wrongdoing. At no point did anyone on behalf of TST try to break up this former member's relationship or issue any legal threats to former members. Ms. Duin should have fact-checked these claims or, failing that, at least given TST an opportunity for fair comment.

21. The Satanic Temple recently made some significant structural changes, apparently in an effort to appear more like a mainstream church.

   "Apparently" is editorialization. It falsely ascribes intent as to the organizational changes. In fact, the organizational changes were made to decentralize decision making processes, provide a formal mechanism for congregations to share knowledge



# KEZHAYA LAW PLC

MATTHEW A. KEZHAYA
1202 NE MCCLAIN RD
BENTONVILLE, AR 72712

P: (479) 431-6112
F: (479) 282-2892
MATT@KEZHAYA.LAW

and decision-making authority, and increase inter-congregational cohesion. If Ms. Duin was interested in reporting on TST's organizational changes, she should have invited comment. Instead, she drew nefarious assumptions and reported them as facts.

22. The defendants say the case has devolved to a meritless S.L.A.P.P. (Strategic Lawsuit Against Public Participation) lawsuit as a way to bankrupt them for speaking out.

Ms. Duin should have invited comment on this. A SLAPP is a particular kind of lawsuit, which punishes a defendant for engaging in protected speech. Washington provides for anti-SLAPP motions, which is a mechanism to deal with a SLAPP. See RCW §§ 4.24.500-525. Defendants are represented by capable counsel. If the case was even arguably a SLAPP, their attorney would have filed the appropriate moving papers. This is not a SLAPP. Defendants can say whatever they like on their own website, to their own audience, which they can develop without stealing TST's efforts. Had they done so, we would not be in litigation. Instead, they "stole" TST's Facebook pages to make their points to TST's audience, which TST developed through no shortage of effort over several years.

23. "I [Johnson] can't really get press coverage, get attorneys general to audit [TST] but what I can do is work. I can find everything public that I possibly can; tie it together as best as I can and hope that someone looks at it and picks it up."

The primary source for this article told your reporter that he is playing internet detective for the specific purpose of causing harm to TST. The primary source told your reporter that no reputable publication would give him attention. He told your reporter that no attorney general would open an investigation on the facts provided.

This is because the claims are either provably false, or so nebulous that there is no discrete claim to investigate. Rather than engage in even cursory fact-checking, Ms. Duin took this all at face value and tied your reputation to this amalgam of biased sources who were nakedly relying on anonymous rumors.

24. They continue to post their findings about TST on a website. "We would appreciate any support you can offer," they write in a concluding statement, "as we struggle to survive this pursuit of justice in the worst year of our lives so far."

This is a naked call to action for the readership of *Newsweek* to financially support the Defendants. The bias is palpable. Contra. Editorial Guidelines ("We report fairly.")

As for Defendants' "pursuit of justice," we demand fair attribution. They are referencing TST's Second Tenet ("The struggle for justice is an ongoing and necessary pursuit that should prevail over laws and institutions.") Defendants were not content to steal our Facebook pages, they must also steal our doctrinal concepts. Report on the facts and let your readership decide who holds the moral high ground.



# KEZHAYA LAW PLC

MATTHEW A. KEZHAYA
1202 NE MCCLAIN RD
BENTONVILLE, AR 72712

P: (479) 431-6112
F: (479) 282-2892
MATT@KEZHAYA.LAW

Defendants excommunicated themselves from TST because, rather than share fellowship with a group of like-minded people, they preferred to throw a temper tantrum over losing the opportunity to falsely attribute their personal politics onto the wider group. They do not get to take TST's Facebook pages as a consolation prize. They do not get to take TST's Seven Tenets as a consolation prize. They prefer cry-bullying over resolving a property dispute. And none of their empty shouting had any tendency to harm TST until Ms. Duin offered an opportunity for Defendants to defame my client's organization under the false guise of *Newsweek*'s credibility. Now we have a problem.

This was no *Newsweek* article. It was a hit piece. My client demands that you correct these mistakes, promptly and transparently. I propose that you take the article down immediately to preclude any further harm to TST, then determine what efforts (if any) Ms. Duin took to fact-check the claims asserted in the article. Given your wide circulation, time is a critical factor on this matter. Please advise me when you receive this request and a timeline on the next steps to correct this.

I ask for an update on or before **November 1, 2021 at 12:00 pm**, Central Time. If my client is dissatisfied with your corrective efforts by then, I am instructed to begin taking legal actions. Please let me know if I can provide anything further.

Sincerely,

Matthew A. Kezhaya

CC:

Julia Duin (**by email only to**: j.Duin@newsweek.com)

Demand for retraction

Page 11 of 11

**Appendix 629**

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| The Satanic Temple, Inc. | |
| *Plaintiff* | 1:22-cv-1343 (MKV) |
| *v.* | **DECLARATION OF** |
| | **MALCOLM JARRY** |
| Newsweek Digital LLC | |
| *Defendant.* | |

    **COMES NOW** Malcolm Jarry, who states as follows under penalty of perjury of the laws of the United States of America.

1.    **Purpose**. This declaration is made in support of The Satanic Temple's motion for summary judgment in the above cause.

2.    **Identity and qualifications**. I am Malcolm Jarry, a co-founder and co-director of The Satanic Temple, Inc. I am an adult of sound mind with no felonies. I base the following statements on my own personal knowledge and under penalty of perjury.

3.    **Background**. In my role for The Satanic Temple, my responsibilities include financial accounting and tracking donation trends.

4.    **General reputational damages**. People have cancelled their recurring donations to the Temple because of the article. We received feedback from people that they believe the subject article statement to be true because *Newsweek* published it. We have also been unfavorably compared to the Catholic Church because of the article statement.

5.    **Remediation expenses**. To combat the ill effects of the article, I hired a public relations firm and a public relations professional to assess and mitigate damage done to the Temple from the subject article statement. The sum of our remediation expenses was $43,350. True

– 1 –

**Appendix 630**

and correct copies of invoices I received and paid in connection with this effort are attached to the motion, in order of appearance:

28: Invoice no. 7204 (June 15, 2022)

29: Invoice no. 1001 (July 31, 2022)

30: Invoice no. 1017 (October 5, 2022)

31: Invoice no. 1019 (November 11, 2022)

32: Invoice no. 1023 (December 13, 2022)

33: Invoice no. 1027 (February 27, 2023)

34: Invoice no. 1032 (May 3, 2023)

35: Invoice no. 1034 (May 30, 2024)

36: Invoice no. 1039

FURTHER AFFIANT SAYETH NOT.

Pursuant to 28 USC § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. *s/Malcolm Jarry*
Executed on May 17, 2024.

– 2 –

**Appendix 631**

# Exhibit 28

Invoice no. 7204 (June 15, 2022)

# LEVICK

FIXING THE IMPOSSIBLE™

**INVOICE**

| | |
|---|---|
| Invoice Date: | 6/15/22 |
| Due Date: | 6/15/22 |
| Number: | 7204 |
| Terms: | Due on receipt |

**LEVICK Strategic Communications, LP**
1900 M Street, NW
Washington, DC 20036
202-973-1300
levick.com

**The Satanic Temple**
Malcolm Jarry
Director/Co-Founder
64 Bridge Street
Salem, MA 01970

---

## INVOICE SUMMARY

---

| **Professional Services** | **Amount** |
|---|---|
| Advance Retainer | $25,000.00 |
| **TOTAL AMOUNT DUE** | **$25,000.00** |

Please send ACH or Wire Transfer payments to:
Bank Name: PNC Bank, N.A.
Bank Address: 249 Fifth Avenue, Pittsburgh, PA 15222
Account Name: Levick Strategic Communications, LP
Account Number: 5303684115
ACH Routing Number: 054000030
Wire Routing Number: 031000053
SWIFT Code: PNCCUS33

Bank Transfer and Credit Card payments are also accepted:
Please contact accounting@levick.com for a secure portal link.

We appreciate your business and thank you for your prompt payment of this invoice. Interest
of 1.5% per month will be charged on all past due balances

**Appendix 633**

# Exhibit 29

Invoice no. 1001 (July 31, 2022)

# INVOICE

**Karen Campbell PR**

4703 Regalwood Terrace
Burtonsville, MD 20866

karen@karenelizabethcampbell.com
(667) 206-0208



## The Satanic Temple

**Bill to**

The Satanic Temple

**Invoice details**

Invoice no. : 1001
Invoice date : 7/31/22
Due date : 8/30/22

| Product or service | Amount |
|---|---|
| 1.  **Public Relations** | $2,500.00 |

| | **Total** | **$2,500.00** |
|---|---|---|

## Note to customer

Thank you for your business.

# Exhibit 30

Invoice no. 1017 (October 5, 2022)

# INVOICE



**Karen E. Campbell**
4703 Regalwood Terrace
Burtonsville, MD 20866

karenelizabethcampbellpr@gmail.com
(667) 206-0208

## The Satanic Temple

**Bill to**
The Satanic Temple

**Invoice details**
Invoice date : 10/5/22

| | Product or service | Amount |
|---|---|---|
| 1. | **Public Relations** | $2,100.00 |

### Ways to pay

  

| | |
|---|---|
| **Total** | **$2,100.00** |

## Note to customer

Thank you for letting me work with TST. It's an honor.

# Exhibit 31

Invoice no. 1019 (November 11, 2022)

# INVOICE



**Karen E. Campbell**
4307 regalwood terrace
Burtonsville, MD 20866

karenelizabethcampbellpr@gmail.com
+1 6672060208

## The Satanic Temple

**Bill to**
The Satanic Temple

**Invoice details**
Invoice date : 11/6/22

| Product or service | Amount |
|---|---|
| 1. **Public Relations** | $2,000.00 |

| | |
|---|---|
| **Total** | **$2,000.00** |

### Ways to pay

 Pay   VISA   mastercard   DISCOVER   AMEX   BANK

Note to customer

Thank you

# Exhibit 32

Invoice no. 1023 (December 13, 2022)

# INVOICE



**Karen E. Campbell**
4307 regalwood terrace
Burtonsville, MD 20866

karenelizabethcampbellpr@gmail.com
+1 6672060208

## TST

**Bill to**
TST

**Invoice details**
Invoice date : 12/13/22

| | Product or service | Amount |
|---|---|---|
| 1. | **Public Relations** | $1,900.00 |

| | |
|---|---|
| **Total** | **$1,900.00** |

### Ways to pay

Apple Pay · VISA · Mastercard · Discover · AMEX · BANK

## Note to customer
Thank you for your business.

**Appendix 641**

# Exhibit 33

Invoice no. 1027 (February 27, 2023)

# INVOICE



**Karen E. Campbell**
4307 regalwood terrace
Burtonsville, MD 20866

karenelizabethcampbellpr@gmail.com
+1 6672060208

## TST

**Bill to**
TST

**Invoice details**
Invoice date: 2/27/23

| Product or service | Amount |
|---|---|
| 1. **Karen Elizabeth Campbell PR**<br>Public Relations | $2,100.00 |

| | Total | **$2,100.00** |
|---|---|---|

## Ways to pay

   

Note to customer
Thank you for your business.

**Appendix 643**

# Exhibit 34

Invoice no. 1032 (May 3, 2023)

# INVOICE



**Karen E. Campbell**
4307 regalwood terrace
Burtonsville, MD 20866

karen@oliverandginger.com
+1 (667) 206-0208

## TST

**Bill to**
TST

**Invoice details**
Invoice no.: 1032
Invoice date: 05/03/2023

| Product or service | Amount |
| --- | --- |
| 1. **Public Relations** | $2,750.00 |



## Ways to pay

| | Total | **$2,750.00** |

[ Apple Pay ] [ Visa ] [ Mastercard ] [ Discover ] [ Amex ] [ BANK ]

## Note to customer

Hi Malcolm! I switched the name of my business to Oliver & Ginger.
People were confusing me with two other PR people whose names
are Karen E. Campbell.

Oliver is my cat, Ginger is my dog.

Take care,
Karen

# Exhibit 35

Invoice no. 1034 (May 30, 2024)

# INVOICE



**Karen E. Campbell**

4307 regalwood terrace
Burtonsville, MD 20866

karen@oliverandginger.com

+1 (667) 206-0208

## The Satanic Temple

**Bill to**

The Satanic Temple

**Invoice details**

Invoice no.: 1034

Invoice date: 05/30/2023

| Product or service | | Amount |
|---|---|---|
| 1. Public Relations | | $2,400.00 |
| 2. Editorial and Book Review Pitching | 6 hrs × $100.00 | $600.00 |

| | Total | **$3,000.00** |
|---|---|---|

## Ways to pay

Apple Pay   VISA   mastercard   DISCOVER   AMEX   BANK

### Note to customer

I'm concerned about Pam at the New York Times. It's been four
months and the story hasn't run. We are missing other national
opportunities, including a Texas NY Times editor who wants the story.
Maybe we should meet this week.

**Appendix 647**

# Exhibit 36

Invoice no. 1039

# INVOICE



**Karen E. Campbell**

4307 Regalwood Terrace
Burtonsville, MD 20866

karen@oliverandginger.com

+1 (667) 206-0208

## The Satanic Temple

**Bill to**

The Satanic Temple

**Invoice details**

Invoice no.: 1039

| Product or service | | Amount |
|---|---|---|
| 1. | **Editorial and Book Review Pitching** | 6 hrs × $100.00 | $600.00 |
| 2. | **Public Relations** | 14 hrs × $100.00 | $1,400.00 |

| | **Total** | **$2,000.00** |
|---|---|---|

## Ways to pay



## Note to customer

Thank you for your business.

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>The Satanic Temple, Inc.<br><br><i>Plaintiff</i><br><br>v.<br><br>Newsweek Digital LLC<br><br><i>Defendant.</i></td><td>1:22-cv-1343 (MKV)<br><br>DECLARATION OF<br>DR. JOSEPH LAYCOCK</td></tr>
</table>

**COMES NOW** Dr. Joseph Laycock, who states as follows under penalty of perjury of the laws of the United States of America.

1.     **Purpose**. This declaration is made in support of The Satanic Temple's motion for summary judgment in the above cause.

2.     **Identity and qualifications**. I am Dr. Joseph Laycock, an adult of sound mind with no felonies. I base the following statements on my own personal knowledge and under penalty of perjury.

3.     **Background**. In connection with my career as a scholar of new religious movements, I wrote a book-length study on The Satanic Temple entitled *Speak of the Devil: How the Satanic Temple is Changing the Way We Talk about Religion*. Oxford University Press (2020).

4.     **Foundation**. From 2013 – 2019, I interviewed over 50 people in connection with writing my book. I've talked with members, ex-members, attorneys, and critics of The Satanic Temple's campaigns. I extensively interviewed The Satanic Temple's central decisionmakers.

5.     **Rumors of sexual harassment**. Ex-members shared rumors of sexual harassment, but I never heard any firsthand claims. These rumors were always nebulous, *e.g.*, "Women are flocking around Lucien Greaves and I think it's creepy."

6.    **No first-hand accounts**. Nobody I interviewed could point me to an individual who personally claimed to have been sexually harassed.

7.    **No cover-up**. I never heard any rumormongering about coverup of any sexual harassment.

8.    **Context**. Ex-members usually shared a rumor attended by a complaint, largely surrounding the permissible scope of protest within The Satanic Temple, *e.g.*, being prohibited from throwing smoke bombs at Milo Yiannapolous (a far-right political commentator). To illustrate: "I left months ago because of a political issue; and, by the way, I heard some scandalous stuff happened."

9.    **Fieldwork**. From 2013 – 2019, I also did fieldwork in aid of writing my book. In August 2018, I visited Little Rock, Arkansas to attend The Satanic Temple's "Rally for Religious Freedom." I also attended various meetups and events. I saw enough to personally testify about the culture within The Satanic Temple.

10.   **No sexual abuse or cover up**. I never saw or heard anything that would cause me to believe there was any permutation of sexual abuse or cover-up within The Satanic Temple.

11.   **Conversation with Duin**. I talked with Julia Duin on October 27, 2021. The conversation lasted for at least half an hour. For most of which she mistook me for my father, *Doug* Laycock. About halfway into the conversation, I told her I think we should restart this interview because she didn't even know who she was talking to.

12.   **Experience with tabloids**. I have been interviewed by many sensationalist publications. I have never had my identity mistaken by an interviewer, not before talking with Duin and not since.

**Appendix 651**

13. **Leading questions**. Duin's interview mostly entailed leading questions. When I negated the assumed fact within the question, it didn't get any traction.

14. **Request for confirmation**. During the interview, Duin indicated that she had interviewed QueerSatanic (the defendants in *United Federation of Churches LLC v. Johnson et al.*) and they had said all these horrible things about The Satanic Temple asked if I knew anything that would support their claims.

15. **No inquiry into sexual abuse or cover-up**. Duin did not ask me about sexual abuse or cover-up.

16. **Duin understood her sources' credibility issues**. Toward the end of the conversation, she said "I don't think this is just four disgruntled ex-members. I think this is really big." I responded, "I'm not sure this is more than four disgruntled ex-members." This didn't seem to register.

17. **Same-day deadline**. At some point during the conversation, Duin informed me that her deadline to provide the story to her editor was in one hour.

18. **Impression**. The conversation was the most egregious example of confirmation bias I have ever seen. I got the impression that Duin was just looking for a quote from me.

FURTHER AFFIANT SAYETH NOT.

Pursuant to 28 USC § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. *s/Joseph Laycock*
Executed on May 16, 2024.

– 3 –

**Appendix 652**

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| The Satanic Temple, Inc. | 1:22-cv-1343 (MKV) |
| *Plaintiff* | |
| *v.* | **DECLARATION OF LUCIEN GREAVES** |
| Newsweek Digital LLC | |
| *Defendant.* | |

**COMES NOW** Lucien Greaves, who states as follows under penalty of perjury of the laws of the United States of America.

1.     **Purpose**. This declaration is made in support of The Satanic Temple's motion for summary judgment in the above cause.

2.     **Identity and qualifications**. I am Lucien Greaves, co-founder of The Satanic Temple, Inc. I am an adult of sound mind with no felonies. I base the following statements on my own personal knowledge and under penalty of perjury.

3.     **Background**. I have studied the Satanic Panic which was at its height during the years 1987-1989. I am aware that the Satanic Panic was a moral panic which consisted of now-debunked conspiracy claims that a secret Satanic cabal was organizing ritual abuse – including ritual sexual abuse – on a global scale. One of the now-debunked claims I observed was Geraldo Rivera's widely-published two-hour exposé, entitled *Devil Worship: Exposing Satan's Underground*. In 1995, Geraldo Rivera famously retracted his endorsement of the claims he spread during the Satanic Panic. Through its Grey Faction Campaign, The Satanic Temple combats irrational moral panics, particularly as pertains to conspiratorial claims of Satanic ritual abuse.

– 1 –

**Appendix 653**

4.     **No sexual abuse or cover up**. I have neither seen nor heard anything that would cause me to believe there was any permutation of sexual abuse or cover-up within The Satanic Temple.

FURTHER AFFIANT SAYETH NOT.

Pursuant to 28 USC § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. *s/Lucien Greaves*
Executed on May 17, 2024.

– 2 –

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| The Satanic Temple, Inc. | 1:22-cv-1343 (MKV) |
| *Plaintiff* | |
| *v.* | **DECLARATION OF** |
| | **SONIA KEZHAYA** |
| Newsweek Digital LLC | |
| *Defendant.* | |

    **COMES NOW** Sonia Kezhaya, who states as follows under penalty of perjury of the laws of the United States of America.

1.    **Purpose**. This declaration is made in support of The Satanic Temple's motion for summary judgment in the above cause.

2.    **Identity and qualifications**. I am Sonia Kezhaya, law partner to Matt Kezhaya. I am an adult of sound mind with no felonies. I base the following statements on my own personal knowledge and under penalty of perjury.

3.    **Foundation**. I personally attended all depositions in this cause. The depositions attached hereto truly and correctly reflect what was said under oath. I personally compiled the excerpts of depositions in support of the motion. True and correct copies of the excerpts follow, in order of appearance:

        37: Excerpts from deposition of Nancy Cooper

        38: Excerpts from deposition of Julia Duin

39: Excerpts from deposition of Lucien Greaves

40: Excerpts from deposition of David Alan Johnson

41: Excerpts from deposition of Nathan Sullivan

42: Excerpts from deposition of Jinx Strange

43: Excerpts from deposition of Greg Stevens (as 30(b)(6) deponent)

**FURTHER AFFIANT SAYETH NOT.**

Pursuant to 28 USC § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. *s/Sonia Kezhaya*

Executed on May 17, 2024.

– 2 –

**Appendix 656**

# Exhibit 37

Excerpts of deposition of Nancy Cooper
(November 7, 2023)

**In the Matter Of:**

THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL

1:22-cv-01343-MKV

**NANCY COOPER**

*November 07, 2023*

*30b6*



NANCY COOPER 30b6                                    November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                        1

1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   -----------------------------------x

4   THE SATANIC TEMPLE, INC.,

5                          Plaintiff,

6              -against-                Case No.
                                        1:22-cv-01343-MKV
7   NEWSWEEK DIGITAL, LLC,

8                          Defendant.

9   -----------------------------------x

10                         November 7, 2023
                           10:03 a.m.

11

12

13          Videotaped 30(b)(6) Deposition of

14   Defendant by NANCY COOPER, and NANCY COOPER

15   Individually, taken by Plaintiff, pursuant

16   to Notice, held at 425 Madison Avenue, New

17   York, New York, before Joseph R. Danyo, a

18   Shorthand Reporter and Notary Public within

19   and for the State of New York.

20

21

22

23

24

25



(63 of 273), Page 63 of 273  Case: 25-868, 07/28/2025, DktEntry: 49.1, Page 63 of 273
Case 1:22-cv-01343-MKV-SLC  Document 110-1  Filed 05/17/24  Page 4 of 44

1

2    A P P E A R A N C E S :

3

4        KEZHAYA LAW PLC
         Attorneys for Plaintiff and the Witness
5            150 S. Fifth Street
             Suite 1850
6            Minneapolis, Minnesota 55401

7        By:  MATT KEZHAYA, ESQ.
                  SONIA KEZHAYA, ESQ.
8

9

10       LAW OFFICES OF CAMERON STRACHER PLLC
         Attorneys for Defendant and the Witness
11           51 Astor Place
             9th Floor
12           New York, New York 10003

13       By:  CAMERON STRACHER, ESQ.
                  SARA TESORIERO, ESQ. (Via Zoom)
14

15

16   Also Present:

17       LAURA HENRIQUE, ESQ., Newsweek (Via Zoom)

18       ELIZABETH GONZALEZ, Videographer

19                    ~oOo~

20

21

22

23

24

25



NANCY COOPER 30b6                              November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                    3

```
 1                       Cooper
 2            THE VIDEOGRAPHER:  Good morning.
 3       This is the beginning of media 1 of the
 4       deposition of Nancy Cooper in the matter
 5       of The Satanic Temple, Incorporated versus    10:03
 6       Newsweek Digital, LLC, case number
 7       1:22-cv-01343-MKV.  Today's date is
 8       November 7, 2023, and the time on the
 9       monitor is 10:03.  My name is Elizabeth
10       Gonzalez, and I am the videographer.  The    10:03
11       court reporter is Joe Danyo.
12            Would counsel please introduce
13       themselves for the record after which the
14       court reporter will swear in the witness.
15            MR. KEZHAYA:  This is Matt Kezhaya     10:04
16       appearing on behalf of the Plaintiff.  I
17       am joined by Sonia Kezhaya.
18            MR. STRACHER:  Cameron Stracher on
19       behalf of the defendant and the witness,
20       and with us by Zoom is Sara Tesoriero from   10:04
21       my office and Laura Henrique from
22       Newsweek.  She is in-house counsel at
23       Newsweek.
24  N A N C Y   C O O P E R, having been first duly
25  sworn by Joseph R. Danyo, a Notary Public, was   10:04
```



NANCY COOPER 30b6                                    November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                    4

```
 1                        Cooper
 2    called as a witness and testified as follows:
 3    EXAMINATION BY MR. KEZHAYA:
 4         Q.   Please state your name for the
 5    record.                                              10:04
 6         A.   Nancy Cooper.
 7         Q.   Nancy, have you ever been deposed
 8    before?
 9         A.   About six or seven years ago.
10         Q.   Okay.  What was that attendant to?     10:04
11         A.   It was something in which we were not
12    a direct something or another, We were a witness,
13    and it was literally about some bracelets that we
14    had written about.
15         Q.   Okay.  Was it a defamation lawsuit?    10:05
16         A.   I don't remember.
17         Q.   Okay.  Have you ever been a witness
18    or a defendant in a defamation lawsuit before?
19         A.   No.
20         Q.   Okay.  What is your current role at    10:05
21    Newsweek?
22         A.   I'm the global editor-in-chief.
23         Q.   What does that entail?
24         A.   I set the standard for what Newsweek
25    does or doesn't do.  I'm in meetings to discuss,   10:05
```



NANCY COOPER 30b6                                    November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                      5

1                          Cooper

2    you know, very granular stuff what story today,

3    but also like what are we going to do next year.

4           Q.   You said what story today?

5           A.   Yeah.                                       10:05

6           Q.   What does that mean?

7           A.   Like, you know, what's happening with

8    Mike Johnson, what's happening in Congress,

9    what's happening with the economy.

10          Q.   What are the newsworthy events then      10:05

11   of the day?

12          A.   Yeah.

13          Q.   Okay.  What qualifications are

14   required for that role?

15               MR. STRACHER:  I object to the form.      10:05

16               You can answer.

17          A.   You know, it's whatever, different

18   sets of qualifications.  I'm a very experienced

19   editor, so I would say that's the qualification.

20          Q.   What did you do before Newsweek,        10:06

21   immediately before?

22          A.   Immediately before I was at IB Times.

23   International Business Times, IBT, different

24   publications, and before that, MSNBC, and before

25   that, New York Public Radio, and before that,        10:06



NANCY COOPER 30b6                           November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL              11

```
 1                        Cooper
 2          Q.   So the 60 number encompasses editors,
 3    writers?
 4          A.   It's a guess.  It's an estimate.
 5          Q.   60-ish?                                  10:12
 6          A.   Yes.
 7          Q.   Editors, writers, pretty much
 8    everyone.  Do you run Newsweek?  Are you
 9    functionally the CEO of Newsweek?
10          A.   No.  There is a CEO.                     10:12
11          Q.   Okay.  So then you have people above
12    you.  Is that correct?
13          A.   Yes.
14          Q.   Okay.  How many layers is it from you
15    to the CEO?                                         10:12
16          A.   One.
17          Q.   So who do you report to?
18          A.   Dev Pragad.  Dev, new word
19    P-r-a-g-a-d.
20          Q.   What is Dev's title?                     10:13
21          A.   He's the CEO and president.
22          Q.   Okay.  So you are immediately below
23    the CEO and president.  Is that correct?
24          A.   Yes.
25          Q.   Does Dev have an active role in the      10:13
```



NANCY COOPER  30b6                               November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                    38

```
 1                         Cooper
 2           A.   No, I don't say to Google it.
 3           Q.   Okay.  Do you require them,
 4      specifically we're talking about the desk, to
 5      engage in any level of fact-checking efforts?      10:41
 6           A.   Yes.
 7           Q.   Okay.  What are those fact-checking
 8      efforts that they shall engage in?
 9           A.   It's a spectrum.  There's
10      straightforward stuff where you can see that this  10:42
11      is a mistake.  This is a typo.  This is just a
12      transcription error, and then there are larger
13      questions, and their job is to make sure that our
14      stories are accurate and fair.  I don't dictate
15      you have to Google the words.                      10:42
16           Q.   How does one delineate whether a fact
17      question is big enough that it should be looked
18      into?
19           A.   Experience.
20           Q.   In your experience, would an          10:42
21      accusation of covered-up sexual abuse qualify as
22      one of these big questions that should be
23      fact-checked?
24                MR. STRACHER:  Objection to the form.
25           A.   Yes.                                     10:42
```



NANCY COOPER  30b6                                    November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                    55

```
 1                          Cooper
 2     there's different reputations I guess is what I'm
 3     trying to say.
 4            Q.   Well, I'm specifically asking about
 5     reputation for honest, fair reporting.              11:05
 6            A.   I can't speak to that.  We made -- I
 7     felt strongly that we should not be saying trust
 8     us.  That it was our job to say we make every
 9     effort to be trustworthy.
10            Q.   In the industry, has there been a big   11:05
11     3 nomenclature?
12            A.   More than ten years ago.  Maybe 15,
13     20 years ago.
14            Q.   What was the big 3?
15            A.   Time, Newsweek and U.S. News.           11:05
16            Q.   So Newsweek was among the big 3?
17            A.   Yes.
18            Q.   And the big 3, what did that refer
19     to?  Not just the organizations obviously.
20            A.   Just a news mag.  I mean I don't know   11:05
21     how to say.  The news magazines, the key, the
22     biggest news magazines.
23            Q.   Would it be fair to say most
24     credible?
25            A.   Yes.                                    11:06
```



NANCY COOPER  30b6                              November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                    56

```
 1                       Cooper
 2        Q.   Is it true that "More than one in
 3   five Americans read us"?
 4             MR. STRACHER:  Objection to form.
 5        Who is "us"?                                    11:06
 6             MR. KEZHAYA:  Newsweek.
 7        A.   I believe that's the number.  You
 8   know, I believe that to be the number.
 9        Q.   Is that a yes then?
10        A.   It is as far as I know.  I don't know   11:06
11   exactly.  As far as I know, yes, that is correct.
12        Q.   Are you familiar with the media kit
13   that was attached to the complaint as an exhibit?
14        A.   No.
15        Q.   Does Newsweek have a media kit?         11:07
16        A.   As far as I know, yes.
17        Q.   What is a media kit?
18        A.   Pardon me?
19        Q.   What is a media kit?
20        A.   What they go to market with, but I      11:07
21   have nothing to do with that side of the
22   business.
23        Q.   You say they go to the market?
24        A.   Yeah.
25        Q.   What does it mean -- first of all,      11:07
```



NANCY COOPER  30b6                              November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL              71

```
 1                        Cooper
 2          Q.   Do you remember approximately when
 3    that was?
 4          A.   No.
 5          Q.   Relative to her first article on        11:20
 6    Newsweek, do you have any estimate about when
 7    that would have been?
 8          A.   I really don't.  I'm sorry.  It was
 9    all phone relationship, and it's all, I don't
10    remember any dates.                                11:20
11          Q.   Did you offer Duin a job as an
12    employee at Newsweek?
13          A.   I don't know.
14          Q.   Do you recall whether the job
15    negotiations -- strike that.  Tell me as best as   11:20
16    you can recall the story from how she became an
17    independent contractor of Newsweek?
18          A.   I think that we had posted the job
19    for a religion reporter, and she had applied, and
20    I interviewed her along with another editor, and   11:21
21    we hired her.
22          Q.   Was the decision to hire her
23    solely -- I say solely -- dually between the two
24    of you?
25          A.   Yes.                                    11:21
```



NANCY COOPER  30b6                                    November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                      73

```
 1                       Cooper
 2          Q.   Did you meet with Duin on any regular
 3   cadence?
 4          A.   I think we talked once a week, but I
 5   don't remember for sure.  She and Juliana and I      11:22
 6   it would have been.
 7          Q.   Did you meet with -- strike that.
 8   Are there levels of reporter at Newsweek?
 9          A.   Yes.
10          Q.   How did Duin rank in that?                11:22
11          A.   I don't remember her title, but she
12   was one of the senior-ish people.  I mean she
13   wasn't expected to do, you know, breaking news
14   stories all day.  She was a subject matter
15   expert.                                               11:23
16          Q.   Okay.  This time frame that you
17   posted the RFP, for lack of a better word,
18   request for proposal, the job.
19          A.   Yes.
20          Q.   Strike that.  Let's start over.  You      11:23
21   posted a job?
22          A.   I believe so.  I don't know for sure.
23          Q.   Do you remember about when that was
24   posted?
25          A.   No.                                       11:23
```



NANCY COOPER  30b6                                     November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                        97

```
 1                     Cooper
 2        A.   Yes.
 3        Q.   Do you sit on all discussions of all
 4   articles, or is that managed by lower employees?
 5        A.   No.  I don't sit in on every          11:57
 6   discussion.
 7        Q.   Okay.  What delineates the
 8   discussions that you do versus don't?
 9        A.   Timing, importance of the story,
10   questions about the story.                      11:57
11        Q.   Earlier you mentioned that you met
12   with Duin on a weekly basis.  Is that correct?
13        A.   As I remember.
14        Q.   Did you meet with all reporters on a
15   weekly basis?                                   11:57
16        A.   No, not all.  I believe there were
17   others that Juliana and I spoke with once a week,
18   but I don't remember.
19        Q.   Was Juliana in charge of Duin because
20   of the seniority of Duin?                       11:58
21        A.   It was just the topic I think.  It
22   was that she was a U.S. reporter, and Juliana was
23   the U.S. editor.
24        Q.   Okay.  Under what circumstances might
25   a dispute get escalated to you as to whether or  11:58
```



NANCY COOPER  30b6                                    November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                    133

```
 1                        Cooper
 2   that she published is dated January 1 of 2023.
 3        A.   She probably had, yeah, written that,
 4   if it's dated January 1st, she had written it, so
 5   it would have been the end of 2022.                    12:55
 6             MR. KEZHAYA:  I pass the witness.
 7             MR. STRACHER:  Thank you.
 8   EXAMINATION BY MR. STRACHER:
 9        Q.   Just a couple of follow-up questions.
10   Was the publishing desk in existence in the           12:55
11   spring of 2021?
12        A.   No.  I don't believe so.
13        Q.   Was there a -- were there
14   independent -- withdrawn.  Were there people
15   whose job it was to fact-check articles in the        12:56
16   spring of 2021?
17        A.   I don't believe so.  No.
18        Q.   Were there people whose job it was to
19   copy-edit articles in the spring of 2021?
20        A.   I believe there were, yes, but we've        12:56
21   had a copy desk, got rid of a copy desk, rebuilt
22   the copy desk, so I don't remember the dates.
23        Q.   Oh, apologies.  I'm reminded that the
24   article was in the fall of 2021.  So was there,
25   was the publishing desk in existence in the fall      12:56
```



NANCY COOPER  30b6                              November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                140

```
 1                          Cooper

 2          Q.   I'll rephrase the question.

 3          A.   Yes.

 4          Q.   Julia Duin wrote articles for

 5   Newsweek, correct?                                    01:05

 6          A.   Yes.

 7          Q.   Did you fact-check anything in the

 8   articles?

 9          A.   No.  I raised questions to her, but I

10   didn't personally fact-check things.                  01:05

11          Q.   Did Juliana fact-check anything?

12          A.   I don't believe so.

13          Q.   And we're not talking just this

14   article.  We're talking overall.

15          A.   As I recall, yes, to what you're       01:05

16   saying.

17          Q.   Did anyone else over Julia Duin's

18   entire career at Newsweek fact-check any of her

19   articles?

20          A.   I don't believe so.                      01:05

21          Q.   Okay.  So you relied, you Newsweek,

22   relied on Julia Duin to fact-check her articles,

23   correct?

24          A.   Yes.

25          Q.   And if something slipped through the    01:05
```



NANCY COOPER  30b6                                    November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                    142

```
 1                        Cooper
 2    it got in, correct?
 3           A.   If.
 4                MR. STRACHER:  Same objection.
 5           Q.   Correct.  It's all under if.  Yes.      01:06
 6    You can still answer the question.
 7           A.   It could explain it.
 8           Q.   Okay, and as the global editor in
 9    chief, you are the best positioned person to
10    ascertain whether a factually accurate or          01:07
11    inaccurate statement has been made in a
12    Newsweek published statement before it goes out,
13    correct?
14                MR. STRACHER:  Objection to the form
15           of the question.                            01:07
16           Q.   Correct or incorrect?
17           A.   Incorrect.
18           Q.   Okay.  Does Newsweek have any more
19    particular policies, standards, customs or
20    practices to teach someone how to go about         01:07
21    fact-checking?
22           A.   There's onboarding.  You know,
23    there's orientation lectures, which I believe
24    explain, you know, how we do things, what our
25    policies are, what our practices are.              01:07
```



NANCY COOPER  30b6                           November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                145

1                        Cooper

2                    Afternoon Session

3                        1:47 p.m.

4            THE VIDEOGRAPHER:  We are back on the

5        record.  The time is 1:47 p.m.              01:47

6    N A N C Y   C O O P E R, having been previously

7    duly sworn, was examined and testified further as

8    follows:

9    EXAMINATION (Continued)

10   BY MR. KEZHAYA:

11           Q.   Please state your name for the

12   record.

13           A.   Oh.  It's Nancy Cooper.

14           MR. KEZHAYA:  Actually can we go off

15       the record.                                  01:47

16           THE VIDEOGRAPHER:  We are off the

17       record.  The time is 1:47 p.m.

18           (Recess taken)

19           THE VIDEOGRAPHER:  We are back on the

20       record at 1:48 p.m.                          01:48

21   BY MR. KEZHAYA:

22           Q.   What did you know about TST before

23   Duin pitched this particular article?

24           A.   Nothing.

25           Q.   Did you know about TST?             01:48



NANCY COOPER  30b6                          November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                146

```
 1                          Cooper
 2          A.    No.
 3          Q.    Were you aware of TST's existence in
 4     the first place?
 5          A.    No.                                      01:49
 6          Q.    Do you remember when Duin pitched the
 7     article?
 8          A.    I don't remember, but I saw the
 9     e-mail where it was among the stories she
10     pitched.                                            01:49
11          Q.    Were those the first stories that she
12     pitched?
13          A.    I'm not sure.  I don't know.
14          Q.    Prior to that e-mail, was there a
15     meeting between you and Duin about this article?    01:49
16          A.    No.
17          Q.    After the e-mail, was there a meeting
18     of the participants including you and Duin about
19     this article?
20          A.    A meeting?  No.  No.                     01:49
21          Q.    Okay.
22          A.    I mean --
23          Q.    Let's draw your attention to the
24     confidential Exhibit Cooper 52, which we are
25     marking as Plaintiff's 9.                           01:49
```



NANCY COOPER  30b6                              November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                148

```
 1                          Cooper
 2           A.    Right.
 3           Q.    Did you receive this e-mail?
 4           A.    I believe so, yes.
 5           Q.    Did anyone else receive this e-mail?    01:51
 6           A.    I can't tell from this one.
 7           Q.    Okay.  Returning back to our front
 8   page, we see the cc line.  You e-mailed Julia at
 9   1:04 p.m., and there are two people on the cc
10   line.  Do you see that?                               01:51
11           A.    No.
12                 MR. STRACHER:  On the first page.
13           Q.    At the very top.
14           A.    Oh, yes.  Got you.
15           Q.    And I recall you mentioned this        01:51
16   person earlier, but I don't recall their role.
17   Who is the first person that is cc'd on this?
18           A.    Dayan is the chief strategy and
19   content officer.
20           Q.    So you were the chief editor?          01:51
21           A.    Yes.
22           Q.    He is the chief strategy officer.
23   It's from you to Julia, and also cc'd is Juliana.
24           A.    Yes.
25           Q.    Is that correct?                        01:52
```



NANCY COOPER  30b6                                  November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                    149

| | |
|---|---|
| 1 | Cooper |
| 2 | A.   Yes. |
| 3 | Q.   And remind me who Juliana is? |
| 4 | A.   She would be Julia's manager. |
| 5 | Q.   Okay.  So Julia directly reports to |
| 6 | Juliana? |
| 7 | A.   Yes. |
| 8 | Q.   Who in turn reports to you, is that |
| 9 | correct? |
| 10 | A.   Yes. |
| 11 | Q.   And then, in terms of the |
| 12 | organizational chart, you and -- |
| 13 | A.   Dayan. |
| 14 | Q.   Dayan. |
| 15 | A.   Report to Dev.  Yes. |
| 16 | Q.   Meaning you don't report to Dayan, |
| 17 | and Dayan does not report to you, correct? |
| 18 | A.   Correct. |
| 19 | Q.   Okay.  Turning your attention back to |
| 20 | this October 25 e-mail on page 2, Julia writes, |
| 21 | "Are we meeting today at 2 your time, 11 my |
| 22 | time?"  Do you see that? |
| 23 | A.   Yes. |
| 24 | Q.   Do you have any reason to believe |
| 25 | that Dayan and Juliana were not copied on this |

01:52
01:52
01:52
01:52
01:52



```
 1                      Cooper

 2   e-mail?

 3           A.   I have no reason to believe one way

 4   or another.

 5           Q.   Okay, and the next more recent e-mail     01:52

 6   is Juliana writing to Julia.  Do you see that on

 7   page 1?

 8           A.   On page 1?

 9           Q.   Correct.

10           A.   Yes.                                       01:53

11           Q.   That's correct, right?

12           A.   Yes.

13           Q.   And then after Juliana writes, you

14   write, "I look forward to our meeting at your

15   convenience."  Do you see that?                         01:53

16           A.   Yes.

17           Q.   Okay.  Was Dayan at that meeting?

18           A.   No, I don't know.  I don't think so,

19   but I don't know.

20           Q.   Was Juliana at that meeting?               01:53

21           A.   I think so, but I don't know.

22           Q.   Were you at that meeting?

23           A.   Yes.

24           Q.   Was there a meeting?

25           A.   I believe so.                              01:53
```



NANCY COOPER  30b6                           November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL              153

1                        Cooper

2        that question?

3            MR. KEZHAYA:  It's a predicate

4        question to my next question.

5            MR. STRACHER:  Okay.                      01:56

6        A.   They were story suggestions.

7        Q.   That's what I was going to ask.

8    Okay.  So, returning back to the first page,

9    these other story suggestions are not something

10   that you commented on, is that correct?         01:56

11       A.   I don't appear to have.  I didn't

12   look into whether we did or didn't do them.

13       Q.   In your earlier testimony, it was on

14   October 25, 2021, prior to receiving this e-mail

15   on Cooper 52, you had never heard of The Satanic   01:56

16   Temple, correct?

17       A.   Correct.

18       Q.   What was it about this article that

19   drew your attention to The Satanic Temple article

20   as distinguished from the other pitches?        01:56

21       A.   Because it's, if you read her pitch

22   there, at the bottom, just in time for Halloween.

23   As she says, it's quite a story, and we have

24   something called a -- that calls itself a Satanic

25   Temple and that then says it's being defamed and   01:56



NANCY COOPER  30b6                                    November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                    154

```
 1                        Cooper
 2   has a lawsuit.  That's just a good story.
 3          Q.   And your testimony here is that you
 4   had never heard of The Satanic Temple before this
 5   date, correct?                                    01:57
 6          A.   Correct.
 7          Q.   As you sit here today, can you
 8   testify whether or not Newsweek has ever written
 9   about The Satanic Temple before October 25, 2021?
10          A.   Can I testify about that?             01:57
11          Q.   Yeah, do you recall, or are you
12   familiar with?
13          A.   No.  I don't know of any, but I
14   certainly didn't do -- I didn't search the
15   archive.  I don't know.                           01:57
16          Q.   To clarify my understanding of your
17   testimony, you do not know whether Newsweek
18   published any stories about The Satanic Temple
19   before October 25, 2021, correct?
20          A.   Correct.                              01:57
21          Q.   On Cooper 52, Julia Duin described
22   her contacts as disgruntled members.  Do you see
23   that?  Correct?
24          A.   Yes.
25          Q.   What is your understanding of that    01:58
```



NANCY COOPER  30b6                              November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                158

```
 1                       Cooper
 2    yourself or, you know, your reporter spots
 3    something.  You say that's a great idea, or you
 4    listen to your reporter, and you go I don't think
 5    this is a great idea, but this other thing you        02:02
 6    said is a great idea, and you talk to them about
 7    how you would shape the story and how you see the
 8    story, and, you know, these are sometimes split
 9    into different jobs, but overall then you read it
10    and you think about it and talk to the reporter      02:02
11    and you suggest fixes, and sometimes you overrule
12    people and make fixes, and then it gets
13    published.
14          Q.   What are the nature of the fixes that
15    you would make?                                       02:02
16          A.   Would make?
17          Q.   Um-hum, as an editor.
18          A.   It could be anything from a typo to
19    like, no, the person is not a suspect.  They're a
20    person of interest, you know, catching something     02:02
21    like that.
22          Q.   Okay.  Why wasn't Juliana the editor
23    on this particular article?
24          A.   Because I'm a much more experienced
25    editor, and she was probably swamped with her        02:02
```



NANCY COOPER  30b6                          November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                    160

```
 1                       Cooper
 2    sources used in the article prior to it being
 3    published?
 4           A.   No.
 5           Q.   Did you review any of the          02:04
 6    communications between Julia Duin and Lucien
 7    Greaves prior to the article being published?
 8           A.   I don't believe so.  No.
 9           Q.   What was the purpose of you editing
10    this article?                                   02:04
11           A.   Everybody needs an editor.
12           Q.   Why is that?
13           A.   Because you can't see your own
14    mistakes, because you can't catch your own typos,
15    because you can't, you're so close to the story  02:04
16    sometimes, you're not a good judge of what is
17    confusing to the reader, what is boring to the
18    reader.  You always need an outside person.
19           Q.   Did you have any telephone
20    conversations with Duin about this article?      02:04
21           A.   I don't believe so.
22           Q.   What about this meeting on October
23    25th?
24           A.   That's where we were on the phone.
25    We were never in person I don't think ever.      02:05
```



NANCY COOPER  30b6                          November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL          161

1                          Cooper

2     That's where we were on the phone, and I guess I

3     said great story.  Let's do it.

4          Q.   Did you say that on the phone?

5          A.   I don't recall, but judging from the          02:05

6     e-mails at some point I said maybe, you know.

7     Yeah.

8          Q.   How involved were you in the drafting

9     and editing of this article?

10              MR. STRACHER:  Objection to the form.          02:05

11              I mean you can answer.

12         Q.   To the best of your ability.  If you

13    don't understand a particular aspect of the

14    question.

15         A.   No, you know, I looked back at the             02:05

16    e-mails, and then I had some questions.  I asked

17    her questions.

18         Q.   Which e-mails did you look back to?

19         A.   The e-mails in the document pile.

20    Whatever you call this.                                  02:05

21         Q.   When you say you looked at the

22    e-mails, when did you look at these e-mails?

23              MR. STRACHER:  You can answer.

24         A.   Yesterday.

25         Q.   Okay.  Drawing your attention back to          02:06



NANCY COOPER  30b6                          November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                166

1                          Cooper

2          Q.   Correct or incorrect?

3          A.   No.

4          Q.   Please help me understand where you

5    are coming from then in resolving that The          02:09

6    Satanic Temple does not actually have --

7          A.   You did --

8               MR. STRACHER:  I object to form.  Let

9          him ask his question.  Go.

10         Q.   The statement here, "They don't          02:09

11   actually have an abortion ritual," you see that

12   statement from your in box, correct?

13         A.   Um-hum.

14         Q.   You wrote that statement, correct?

15         A.   Um-hum.                                   02:10

16         Q.   You did no fact-checking as to

17   whether The Satanic Temple has an abortion

18   ritual, correct?

19         A.   Um-hum.

20         Q.   You did no interviews of witnesses?      02:10

21         A.   Um-hum.

22         Q.   Correct?

23         A.   Um-hum.

24              MR. STRACHER:  You have to speak your

25         answer.                                        02:10



1                       Cooper

2          Q.   Would you agree with me that the

3    assertion that there are accounts of sexual abuse

4    being covered up in ways that are more than

5    anecdotal is an accusation of wrongdoing?          02:41

6          A.   Yes.

7          Q.   So, throughout these e-mails, we see

8    that you included language in this article.  Do

9    you remember including language in the article?

10         A.   Not particularly.                        02:41

11         Q.   Do you remember whether you included

12   language in the article?

13         A.   No.

14         Q.   Do you recall the e-mail in which you

15   said that the blue insertions are yours?           02:42

16         A.   I see the line.  I see the e-mail,

17   but do I remember it?  No.

18         Q.   I draw your attention to Plaintiff's

19   13.

20             (Plaintiff's Exhibit 13, Document        02:42

21         Bates stamped Cooper 31 and Cooper 32, was

22         so marked for identification, as of this

23         date.)

24         Q.   Would you agree with me that covering

25   up sexual abuse would be a criminal act?           02:42



NANCY COOPER  30b6                          November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                187

| 1 | Cooper |
|---|---|

2              MR. STRACHER:  I object to the form

3         of the question.  Speculative.

4         Q.   For purposes of the editorial

5    guidelines --                                          02:43

6         A.   Yes.

7         Q.   -- would you agree with me that this

8    is an accusation of a criminal act?

9              MR. STRACHER:  I object to the form.

10        A.    Of a possibly criminal act.              02:43

11        Q.   What about the sexual abuse in the

12   first place?

13             MR. STRACHER:  Objection to form.

14        What's the question?  Your question is

15        "What about the sexual abuse in the first     02:43

16        place?"

17        A.    What's the question?

18        Q.   My preceding statement was, within

19   the meaning of the editorial guidelines, is

20   covering up sexual abuse a criminal act to which   02:43

21   you respond yes.

22        A.    Yes.

23        Q.   Follow-up.  What about the sexual

24   abuse in the first place, within the meaning of

25   the editorial guidelines, is accusing someone of   02:43



NANCY COOPER 30b6                                November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                    188

```
 1                      Cooper
 2    having a systemic sexual abuse problem --
 3          A.   Yes.
 4          Q.   -- would that not also be a criminal
 5    act?                                                02:43
 6          A.   It could be.
 7               MR. STRACHER:  Objection to the form
 8          of the question.
 9          Q.   I believe the witness said yes,
10    correct?                                            02:44
11               MR. STRACHER:  No, I thought she
12          said, I believe she said it could be.
13          A.   It could be.
14               MR. STRACHER:  This is why you should
15          wait until the question is finished so I      02:44
16          can object and so that you can answer.
17               THE WITNESS:  Okay.  I'm sorry.  I'm
18          sorry.
19               MR. STRACHER:  That's okay.
20          Q.   When is sexual abuse of a systemic       02:44
21    nature not potentially criminal?
22               MR. STRACHER:  We're getting far
23          afield here now from like what the article
24          actually says.
25               So, if you want to get into this         02:44
```



NANCY COOPER  30b6                          November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                 189

1                        Cooper

2          area, I'm going to object, but I'm not

3          going to prevent the witness from

4          answering, but let me just note we're

5          getting pretty far afield.                    02:44

6               MR. KEZHAYA:  I'm delineating the

7          difference as pertains to the editorial

8          guidelines as to the difference between

9          criminal sexual abuse and non-criminal

10         sexual abuse.  She said it could be.        02:44

11              MR. STRACHER:  Okay.

12              MR. KEZHAYA:  I would like you to

13         answer the delineating question.

14              MR. STRACHER:  But the word you used

15         was "systemic sexual abuse."  Where do you   02:45

16         find that phrase?

17         Q.   Nancy, you edited this article,

18    correct?

19         A.   Yeah.

20         Q.   Was this article not about TST as an   02:45

21    organization?

22         A.   It was about a lawsuit about TST.

23         Q.   Was the subject of this article TST?

24         A.   The subject of the article was this

25    lawsuit.  We didn't just like say here's the     02:45



NANCY COOPER  30b6                                November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                190

```
 1                         Cooper
 2    thing, TST.  We said here is this interesting
 3    suit.  That's a different story.
 4         Q.   Your testimony today is that your
 5    understanding of this article was that it's about    02:45
 6    the lawsuit, not about the organization, correct?
 7         A.   Yes.
 8         Q.   Please read the first line of the
 9    article.
10         A.   "Can you defame a religion,               02:45
11    especially one that doesn't believe in God, Satan
12    or the supernatural?"
13         Q.   Is this what's known as a lead in the
14    industry?
15         A.   Yeah.                                      02:46
16         Q.   What is a lead?
17         A.   It's how you get into a story, the
18    top, the first sentence of this paragraph.
19         Q.   Who wrote the lead?
20         A.   Probably she did.  It's possible that     02:46
21    I did.
22         Q.   Is it your best recollection today
23    that she wrote the lead?
24         A.   I don't know.
25         Q.   You must have knowledge as to your        02:46
```



NANCY COOPER  30b6                              November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                191

```
 1                          Cooper
 2    best recollection?
 3            A.   No, I don't.
 4            Q.   Try.
 5            MR. STRACHER:  I object to the form.      02:46
 6       You don't have to try anything that you
 7       don't recall.
 8            A.   I don't recall.
 9            MR. STRACHER:  Just say you don't
10       recall.                                        02:46
11            MR. KEZHAYA:  I object to the
12       coaching.  She didn't say "I don't
13       recall."
14            MR. STRACHER:  I'm not coaching her.
15       I'm just telling her that she doesn't have     02:46
16       to like invent an answer.
17            A.   I don't know.  That's the answer.
18            Q.   Who came up with the headline for
19    this article?
20            A.   I believe I did.                      02:46
21            Q.   Is it normal for Newsweek to have its
22    global editor in chief drafting leads and
23    headlines for articles?
24            A.   For some articles, yes.
25            Q.   What made this article special?       02:47
```



NANCY COOPER  30b6                          November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                 192

 1                        Cooper
 2          A.   Because she's one of our senior
 3   reporters, as I said.
 4          Q.   Did you write headlines and leads for
 5   all of the senior reporters?                          02:47
 6          A.   For many of them.  I didn't write
 7   heads and leads for every one of her stories
 8   either, I don't think.  It's just.
 9          Q.   Your earlier testimony is that this
10   article is about the litigation.                      02:47
11          A.   Yes.
12          Q.   And your earlier testimony also was
13   the lead is how you go about introducing the
14   concept of the article, correct?
15          A.   Um-hum.                                   02:47
16          Q.   Please help me understand how this
17   lead ties to the litigation when it makes no
18   reference to the litigation?
19          A.   The litigation is about defaming a
20   religion.  So it's exactly about that.                02:47
21          Q.   Please say that again.
22          A.   The lead is about can you defame a
23   religion.  So it's about the lawsuit.
24          Q.   Did you ever look at the complaint in
25   this case?                                            02:48



NANCY COOPER  30b6                          November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                193

```
 1                        Cooper
 2         A.   The complaint meaning what?  The
 3    original lawsuit?
 4         Q.   Correct.  The Johnson lawsuit.
 5         A.   I don't believe so.                      02:48
 6         Q.   Did Julia Duin ever look at the
 7    complaint?
 8         A.   I'm sure she did.
 9         Q.   Do you have any personal knowledge
10    whether she did?                                   02:48
11         A.   I think she quotes from it in her
12    e-mails or in the story.
13         Q.   Is that why you are sure?
14         A.   Yes.
15         Q.   Turning your attention to our earlier   02:49
16    bullet point, "Reach out for comment and give
17    parties time to respond," how much time is
18    reasonable for a response?
19         A.   Again, it depends on the story.  If
20    it's just saying Mike Johnson got elected, and    02:49
21    his priority will be this, you know, you don't
22    have to wait forever for a response.
23              If you say, Mike Johnson, you know,
24    beat his previous wife, you have to wait for a
25    response.                                          02:49
```



NANCY COOPER  30b6                                       November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                       205

```
 1                        Cooper
 2   BY MR. KEZHAYA:
 3        Q.   I draw your attention back to Exhibit
 4   5.  Earlier you testified that it's normal for
 5   Newsweek to make use of anonymous sources.  Do        03:14
 6   you remember that?
 7        A.   Yes.
 8        Q.   I want to draw your attention more
 9   particularly to page 3, first full bullet point.
10   Please read that into the record.                     03:14
11        A.   "Newsweek reporters should use
12   anonymous sources only rarely, in consultation
13   with their editors, at least one of whom must
14   know the identity of the source."
15        Q.   Do you know the true identity of the        03:14
16   source Jinx Strange?
17        A.   No.
18        Q.   Do you have Jinx Strange's phone
19   number?
20        A.   No.                                         03:14
21        Q.   Do you have Jinx Strange's
22   residential address?
23        A.   No.
24        Q.   Do you have Jinx Strange's work
25   address?                                              03:14
```



NANCY COOPER 30b6                        November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL              206

```
 1                      Cooper
 2         A.   No.
 3         Q.   Did you have any communication of any
 4    sort with Jinx Strange?
 5         A.   Not that I know of.                        03:14
 6         Q.   Did Julia Duin know the true identity
 7    of Jinx Strange?
 8         A.   I don't know.  I believe so, but I
 9    don't know.
10         Q.   You personally wrote these?  The          03:15
11    editorial guidelines, you personally either wrote
12    or oversaw them, correct?
13         A.   Yes.
14         Q.   Did Julia Duin indicate to you at any
15    point whether she knew the true identity of Jinx    03:15
16    Strange?
17         A.   Not that I recall.
18         Q.   I want to turn your attention to the
19    same page, second to last bullet point above
20    Questions of Taste.  Please read the first full     03:15
21    sentence.
22              MR. STRACHER:  Page?  Sorry.
23         Q.   Page 3, second to last bullet point
24    above Questions of Taste.
25         A.   "When writing about criminal charges      03:15
```



NANCY COOPER  30b6                          November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL          207

```
 1                        Cooper
 2    or allegations, be specific and complete."
 3           Q.   Is it your opinion as Newsweek's
 4    editor in chief that the article statement is
 5    both specific and complete?                        03:16
 6              MR. STRACHER:  Objection to the form
 7         of the question.
 8         A.   Yes.
 9         Q.   Okay.  Please describe the specifics.
10         A.   That there were allegations of sexual    03:16
11    abuse and that they had not been dealt with.
12         Q.   Okay.  Who was sexually abused?
13         A.   We don't know.  Members.
14         Q.   Okay.  What was entailed in the
15    coverup?                                           03:16
16         A.   I don't know.
17         Q.   And it's your testimony today that
18    these are -- withdrawn.  Who engaged in the
19    sexual abuse?
20         A.   I don't know.                            03:16
21         Q.   Who engaged in the coverup?
22         A.   I don't know.  Officials of the
23    church, but I don't know.
24         Q.   You are presuming, correct?
25         A.   Yes.                                     03:16
```



NANCY COOPER 30b6                                    November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                    208

```
 1                          Cooper

 2          Q.   What was the sexual abuse?

 3          A.   I don't know.  Sorry.

 4          Q.   What was the coverup?

 5          A.   Again, I don't know.                    03:17

 6          Q.   And, once again, it's your testimony

 7     as the person in charge of enforcing these

 8     guidelines and the person --

 9               MR. STRACHER:  I object to the form.

10          She did not say enforcing.  Right?  She      03:17

11          didn't use the word "enforcing."

12          Q.   Were you in charge of enforcing these

13     guidelines?

14          A.   Yes.

15          Q.   Okay.  As the person who was in         03:17

16     charge of enforcing these guidelines, as the

17     global editor in chief, and as the person who

18     edited this particular article, it's your

19     testimony that this statement is complete,

20     correct?                                          03:17

21          A.   Yes.

22          Q.   And specific as well, correct?

23          A.   Yes.

24          Q.   Please read the last sentence in the

25     same bullet point.                                03:17
```



NANCY COOPER 30b6                                    November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                    223

```
 1                        Cooper
 2    this is an investigative story and this isn't.
 3    I'm just saying in my mind this was a pretty
 4    straightforward story.
 5           Q.   How would you describe the story if      03:54
 6    not an investigative piece?
 7           A.   It's a reported piece.  A report.
 8           Q.   What would an investigation look like
 9    in an investigative piece?
10           A.   I'm trying to think of an example.      03:54
11    If you look at what The New York Times did about
12    Harvey Weinstein.  They traced back all the
13    cases.  They talked to a million people.  They
14    uncovered things that had been covered up.  They
15    didn't just write about, oh, there's this suit,      03:55
16    which is what ours could be.
17           Q.   And is it your understanding that the
18    Johnson lawsuit involved allegations in which The
19    Satanic Temple sexually abused and then covered
20    up its membership?                                  03:55
21              MR. STRACHER:  I object to the form.
22           Q.   Is that your understanding?
23           A.   No, I don't have an understanding of
24    what the Johnson lawsuit is.  That's the suit
25    here in the case?                                   03:55
```



(101 of 273), Page 101 of 273

NANCY COOPER  30b6                                    November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                     224

```
 1                       Cooper
 2        Q.   It's my understanding of your
 3   testimony that the article is about the Johnson
 4   lawsuit.
 5        A.   Oh, I just think of it as a lawsuit.      03:55
 6   Yeah.
 7        Q.   So is that a yes?
 8        A.   Yes.
 9        Q.   That is your testimony?
10        A.   Yeah.                                     03:55
11        Q.   What is the basis of this belief?
12        MR. STRACHER:  I'm sorry.  What is
13        the question?  What is the basis of this
14        belief?
15        MR. KEZHAYA:  She just testified,             03:55
16        yes, it is my belief that this statement
17        is about the Johnson, an allegation.
18        MR. STRACHER:  No.  No, it is not.
19        Your question was, "It is my understanding
20        that your testimony is that the article is   03:56
21        about the Johnson lawsuit."
22        A.   Right.
23        Q.   Correct.
24        MR. STRACHER:  And then you said,
25        "What is the basis of that belief?"           03:56
```



NANCY COOPER  30b6                              November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL              233

```
 1                        Cooper

 2        of the statement.

 3        Q.   Yes or no?

 4        A.   I have faith in Julia's reporting,

 5   yes.                                            04:04

 6        Q.   You have faith in that, correct?

 7        A.   Yes.

 8             MR. KEZHAYA:  I pass the witness.

 9             MR. STRACHER:  No questions.

10             MR. KEZHAYA:  Okay.                   04:05

11             THE WITNESS:  Are we done?

12             MR. KEZHAYA:  We are done.

13             THE WITNESS:  Okay.  Thank you.

14             THE VIDEOGRAPHER:  This is the end of

15        the deposition of Nancy Cooper.  The time  04:05

16        is 4:05 p.m.  Thank you.

17             THE WITNESS:  Thank you.

18             MR. STRACHER:  Thank you.

19             (Time noted:  4:05 p.m.)

20                              _____

21

22   Subscribed and sworn to

23   before me this____day of_____, 2023.

24   _____

25
```



```
 1
 2                    C E R T I F I C A T I O N
 3
 4          I, JOSEPH R. DANYO, a Shorthand Reporter
 5   and Notary Public, within and for the State of New
 6   York, do hereby certify:
 7              That I reported the proceedings in the
 8   within entitled matter, and that the within transcript
 9   is a true record of such proceedings.
10              I further certify that I am not related, by
11   blood or marriage, to any of the parties in this
12   matter and that I am in no way interested in the
13   outcome of this matter.
14              IN WITNESS WHEREOF, I have hereunto set my
15   hand this 16th day of November, 2023.
16
17         _____
18              JOSEPH R. DANYO
19              STATE OF NEW YORK
20              My Commission Expires 2/20/2027
21
22
23
24
25
```



# Exhibit 38

Excerpts of deposition of Julia Duin
(November 16, 2023)

**In the Matter Of:**

THE SATANIC TEMPLE

vs

NEWSWEEK DIGITAL

---

**JULIA DUIN**

November 16, 2023

---



**Moburg Reporting**

33400 9th Ave. South, Suite 207

Federal Way, WA 98003

(206) 622-3110

www.MoburgReporting.com

**Appendix 702**

```
 1              UNITED STATES DISTRICT COURT

 2            SOUTHERN DISTRICT OF NEW YORK

 3    --------------------------------------------------------
                                              )
 4    THE SATANIC TEMPLE, INC.,               )
                                              )
 5              Plaintiff,                    )
                                              )
 6         vs.                                )NO. 1:22-CV-01343-MKV
                                              )
 7    NEWSWEEK DIGITAL, LLC,                  )
                                              )
 8              Defendant.                    )
                                              )
 9    --------------------------------------------------------

10       Videotaped Deposition Upon Oral Examination

11                         of

12                    JULIA DUIN

13    --------------------------------------------------------

14            Thursday, November 16, 2023

15                    9:37 a.m.

16            7900 Southeast 28th Street

17            Mercer Island, Washington

18

19

20

21

22

23

24    Cheryl Macdonald, CRR, RMR
      Court Reporter
25    License No. 2498
```

COPY

Page 2

```
 1                    A P P E A R A N C E S

 2


 3    FOR THE PLAINTIFF:

 4                   MATT KEZHAYA
                     SONIA KEZHAYA
 5                   Attorneys at Law
                     KEZHAYA LAW PLC
 6                   150 South Fifth Street
                     Suite 1850
 7                   Minneapolis, Minnesota 55402
                     matt@kezhaya.law
 8                   sonia@kezhaya.law

 9

10    FOR THE DEFENDANT and THE WITNESS:

11                   SARA TESORIERO
                     CAMERON STRACHER (via Zoom)
12                   Attorneys at Law
                     STRACHER LAW
13                   51 Astor Place
                     9th Floor
14                   New York, New York 10003
                     sara@stracherlaw.com
15                   cam@stracherlaw.com

16

17    THE COURT REPORTER and VIDEOGRAPHER:

18                   CHERYL MACDONALD
                     KALIA HENDRICKS
19                   MOBURG REPORTING
                     33400 9th Avenue South
20                   Suite 207
                     Federal Way, Washington 98003
21                   info@moburgreporting.com

22

23    ALSO PRESENT:  LUCIAN GREAVES (via Zoom)

24


25
```

Moburg Reporting     MOBURG REPORTING     33400 9th Ave. South, Suite 207
206-622-3110     Federal Way, WA 98003
Appendix 704

Page 3

1                          I N D E X

2

3     EXAMINATION                                            PAGE

4     BY MR. KEZHAYA:   .........................       5

5

6     EXHIBITS MARKED                                      PAGE

7     No. 1          Bates-stamped Newsweek 025...      34

8     No. 2          Bates-stamped Newsweek 015,
                     16 and 17...................      59
9
      No. 3          Boston Globe "puff piece"...      74
10
      No. 4          GetReligion podcast 2018....      75
11
      No. 5          GetReligion podcast 2022....      75
12
      No. 6          GetReligion podcast
13                   referring to Boston Globe...      79

14    No. 7          Editorial guidelines........      80

15    No. 8          Newsweek article re orgies,
                     harassment, et cetera.......     100
16
      No. 9          E-mail string Bates-stamped
17                   Duin04-001 - 003............     112

18    No. 10         E-mail string Bates-stamped
                     Duin48-001 - 005............     117
19
      No. 11         E-mail string Bates-stamped
20                   Newsweek 032................     136

21    No. 12         E-mail string Bates-stamped
                     Newsweek 065 - 66..........     136
22
      No. 13         E-mail string Bates-stamped
23                   Cooper 51 - 53..............     177

24    Conference before Magistrate Judge Sarah L. Cave:

25    Pages 60 - 66



Page 4

```
 1                    THE VIDEOGRAPHER:  Good morning.  We are

 2     now on the record.  This is a Zoom -- this is an

 3     in-person deposition of Julia Duin.  My name is Kalia

 4     Hendricks.  I'm the videographer for Moburg Reporting,

 5     located at 33400 9th Avenue South, Suite 207, Federal

 6     Way, Washington 98003.  The court reporter today is

 7     Cheryl Macdonald from Moburg Reporting.

 8                    This deposition is being recorded this 16th

 9     day of November 2023, and the time is now 9:37 a.m.

10     We are in the law offices of Lybeck, Pedreira &

11     Justus, located at 7900 Southeast 28th Street, Suite

12     500, in Mercer Island, Washington.

13                    This deposition is being recorded in the

14     matter of The Satanic Temple, Incorporated, vs.

15     Newsweek Digital, LLC, No. 1:22-CV-01343-MKV, in the

16     United States District Court for the Southern District

17     of New York.  This deposition was noticed by Matthew

18     Kezhaya.  Counsel and all present, please identify

19     yourselves for the record, and then the witness may be

20     sworn.

21                    MR. KEZHAYA:  Matt Kezhaya, appearing on

22     behalf of plaintiff.  I'm joined by Sonia Kezhaya.

23                    MS. TESORIERO:  Sara Tesoriero, appearing

24     on behalf of the witness and on behalf of the

25     defendant, Newsweek, and appearing remotely with me is
```

Page 5

```
 1    Cameron Stracher.

 2              THE VIDEOGRAPHER:  The court reporter may

 3    now swear in the witness.

 4              THE WITNESS:  I'm Julia Duin.

 5    JULIA DUIN,   the witness herein, having been
                    placed under oath by the
 6                  Certified Court Reporter,
                    deposed and said as follows:
 7

 8              MS. TESORIERO:  Matt, before we start, can

 9    I ask that if I make an objection to form that it be

10    considered preserved for the defendant as well as the

11    witness so we don't mess up the record?

12              MR. KEZHAYA:  So stipulated.

13              MS. TESORIERO:  Thank you.

14

15                       EXAMINATION

16    BY MR. KEZHAYA:

17         Q.    Please state your full name for the record.

18         A.    Julia Duin.

19         Q.    Have you ever been deposed before?

20         A.    No.

21         Q.    What did you do in preparation for today's

22    deposition?

23         A.    I consulted with counsel.

24         Q.    And when did that happen?

25         A.    This week.
```

Moburg Reporting
206-622-3110

MOBURG REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003
Appendix 707

November 16, 2023

THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                                   Julia Duin

Page 15

```
 1    the state of America's clergy.  Let's see.  I think

 2    the next one was 2015, about a Lutheran clergy woman.

 3    And then there was the 2018 award that I talk about on

 4    this blog.

 5        Q.    I see also that you've published seven

 6    books; is that correct?

 7        A.    Mm-hmm.  Yes, there would be seven.  That

 8    should be listed on my blog.

 9        Q.    The text of the blog states you've

10    published seven books, the latest being "Finding Joy:

11    A Mongolian Woman's Journey to Christ," the biography

12    -- well, a biography.  Before that you've published

13    "In the house of the Serpent Handler:  A Story of

14    Faith and Fleeting Fame in the Age of Social Media."

15            These are two books that you've written; is

16    that correct?

17        A.    Mm-hmm.

18        Q.    You've written five other books, I deduced,

19    from the text.  Were they all about religion?

20        A.    One was not all.  One was a collection of

21    Victorian fairy-tales.

22        Q.    Okay.  And I see that you have served as a

23    visiting journalism professor at the University of

24    Alaska at Fairbanks; is that correct?

25        A.    Mm-hmm.
```

Moburg Reporting
206-622-3110

MOBURG REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003
**Appendix 708**

1        Q.     Have you served as professor at any other

2     universities?

3        A.     I was at Union University in Jackson,

4     Tennessee.

5        Q.     Any others?

6        A.     I was an adjunct professor for one semester

7     at University of Maryland.  Also an adjunct -- oh, my

8     goodness.  What's the name of the place?  Patrick

9     Henry University in -- oh, my -- it's in Virginia,

10    Purcellville, Virginia.  P-U-R-C-E-L-L-V-I-L-L-E,

11    Purcellville, Virginia.

12       Q.     Have you served as professor or teacher of

13    journalism anywhere else?

14       A.     No.  This is my only -- those are the only

15    four places.

16       Q.     Excellent.  For how long did you serve as a

17    professor, cumulatively?

18       A.     Let's see.  Well, let's see.  Well, if you

19    count up, I guess, the adjunct, two and a half years.

20    I guess if you count up the adjunct and the full-time

21    experiences, about two and a half years.

22       Q.     Okay.  And in your role as professor, were

23    these all journalism professor roles or --

24       A.     Yes.

25       Q.     In the course of your teaching as

Moburg Reporting
206-622-3110

MOBURG REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003
Appendix 709

```
 1    professor, were these basic classes or more advanced?

 2         A.    First one was basic.  The second one was

 3    specialty -- religion reporting specialty class.

 4    Third one was more basic journalism.  Several feature

 5    writing, basic journalism classes.  Overseeing school

 6    yearbook-type and school newspaper classes.  And the

 7    fourth one were religion reporting and political

 8    reporting.

 9         Q.    What is the -- what are some of the

10    distinctions between religion reporting and other

11    reporting?

12         A.    Religion reporting is reporting on a

13    specific religious group.  People who believe in a --

14    who have defined beliefs, usually in some kind of --

15    usually a supreme being of some sort, religious dogma.

16         Q.    I'm asking more about the techniques.  Are

17    there special techniques?

18         A.    How I teach it?

19         Q.    Correct.

20         A.    I would have -- I would tell students the

21    basis of each religious group.  I would have a

22    practitioner of that religion come in and often tell

23    them from their point of view.  I thought it was best

24    to hear from the actual person rather than just me.  I

25    would also have them visit a house of worship
```

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                          Julia Duin

Page 25

1    knowledgeable reporting about certain groups.  So we

2    can -- we can have an educated opinion to the general

3    public.

4        **Q.    And more particularly, is it true that the**

5    **general public needs these fairly stated pieces**

6    **because that's a large part of how they perceive the**

7    **particular religion?**

8            MS. TESORIERO:  Objection to form.

9        A.    The general public needs objective and

10   knowledgeable pieces about religion.  Okay?  I'll

11   state it that way.

12       **Q.    Why?**

13           MS. TESORIERO:  Objection to form.

14       A.    Well, that's going to be my -- that's my

15   answer.

16       **Q.    I understand that's your answer.  I'm**

17   **asking a different question, which is, why?**

18           MS. TESORIERO:  Objection to form.

19       A.    Religion is really the -- it's really at

20   the base of our civilization, and it is important that

21   people understand it.

22       **Q.    When did you begin work at Newsweek?**

23       A.    September 2021.

24       **Q.    Early or late?**

25       A.    Sorry?

```
 1         Q.     Early September or late September?

 2         A.     September 1st.

 3         Q.     When was the hiring process?

 4         A.     Just before that.

 5         Q.     How long?

 6         A.     A few weeks.

 7         Q.     The hiring process was a few weeks before

 8   September 1st?

 9         A.     Mm-hmm.

10         Q.     How did you come to apply for the job at

11   Newsweek?

12         A.     I heard they were looking for someone.

13         Q.     How did you hear that?

14         A.     Through a mutual friend.

15         Q.     Whose?  Wait.  Mutual with --

16         A.     Someone who knew that there was an opening.

17         Q.     Okay, but who was that?

18                MS. TESORIERO:  Objection to form.

19         A.     Just a friend.  I don't have to reveal his

20   name.

21         Q.     I'm not asking for the name.  I'm asking

22   for the connection.

23         A.     A friend who knew one of the editors.

24         Q.     Okay.  Which editor did he know?

25         A.     He knew Dayan.
```

Page 27

```
 1        Q.    You said that Dayan was an editor?

 2        A.    Oh, yeah.  Dayan is the same person that I

 3   mentioned his name before.  Dayan is the same person

 4   that -- yeah, Dayan Candappa.

 5        Q.    That was one of your supervisors; correct?

 6        A.    Yes, that's right.

 7        Q.    Do you recognize the name Nancy Cooper?

 8        A.    Yes.

 9        Q.    Was Nancy Cooper one of your supervisors?

10        A.    Yes.

11        Q.    Was this mutual friend a friend of Nancy

12   Cooper's?

13        A.    I have no idea.

14        Q.    So this mutual friend of yours was mutual

15   between you and Dayan; correct?

16        A.    Yes.

17        Q.    Was this a publicly posted job opportunity?

18              MS. TESORIERO:  Objection.  Calls for

19   speculation.

20        A.    I don't know.

21        Q.    Well, did you -- how did you go about

22   applying?

23        A.    I contacted Dayan.

24        Q.    So this mutual friend of yours gave you

25   Dayan's information directly; is that correct?
```

```
 1        A.    Mm-hmm, mm-hmm.

 2        Q.    And this was when?

 3        A.    Let's see.  It was summer of 2021.

 4        Q.    Was it in August of 2021?

 5        A.    I'm trying to remember.  Might have been.

 6   I think I -- when did I contact Dayan?  If I remember,

 7   July.  It might have been July.

 8        Q.    When did you hear about the job posting

 9   relative to you contacting Dayan?

10        A.    I think it was -- I might have heard it in

11   -- when did I hear?  June maybe.  Might have heard in

12   June.

13        Q.    So you heard about this job opportunity and

14   then a month later reached out to Dayan?

15        A.    I think so.

16        Q.    And then that was approximately July that

17   you reached out to Dayan; is that correct?

18        A.    I believe so.

19        Q.    And then the interview process began in

20   August; is that correct?

21        A.    I don't remember the exact date when it

22   began.

23        Q.    I'm not asking --

24        A.    It was July/August sometime.

25        Q.    Was there a lengthy delay between the
```

Page 35

```
 1          A.      [As read] "A major rift in an organization
 2     called The Satanic Temple:  Defamation lawsuits,
 3     anti-Semitic stuff, mismanagement of funds, NDAs being
 4     used to hide wrongdoing, sexual harassment, shell
 5     corporations, harassment of internal critics.  Sounds
 6     like quite a brew.  Am diving into it to see if I can
 7     glean anything new of how much of the story this is.
 8     More to come."
 9          Q.      Was this the first pitch for the subject
10     article that you wrote?
11          A.      I believe so.
12          Q.      When did you begin working on this article?
13          A.      Well, it would have been at the beginning
14     of October.
15          Q.      I see that the date would be September
16     30th, so you clearly formulated the idea of the
17     article at some point before September 30th; correct?
18          A.      Let's see.  Well, remember, I have to pitch
19     it first to make sure they approve it before I start
20     major work on a piece.
21          Q.      I understand that that might be before you
22     start major work.  My question posed is when did you
23     start working on it, including minor work.
24          A.      I don't remember.
25          Q.      Was it before September 1st, 2020?
```

Page 37

```
 1    Correct or incorrect?

 2              MS. TESORIERO:  Objection to form.

 3        A.    This pitch was the -- this would have been,

 4    really, the beginning of my work on this article.

 5        Q.    This pitch was the very beginning of your

 6    work on this article; correct?

 7              MS. TESORIERO:  Objection.

 8        A.    I would say yes.

 9        Q.    That's your testimony?

10              MS. TESORIERO:  Objection.

11        A.    Just a moment.  It depends on what you call

12    "work."

13        Q.    What was entailed in drafting this pitch?

14        A.    I had gotten -- I had gotten an idea for

15    this article and I drafted the pitch.

16        Q.    Where did the idea come from?

17        A.    I had -- someone suggested it to me.

18        Q.    Who suggested it to you?

19        A.    I had a -- another journalist.

20        Q.    Another journalist suggested it to you?

21        A.    Mm-hmm.

22        Q.    Who was this journalist?

23        A.    His name is Kevin.

24        Q.    What is Kevin's last name?

25        A.    Trying to remember.  My mind is blank right
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003
**Appendix 716**

```
 1    now.  I can't remember.

 2         Q.    How did you know Kevin?

 3         A.    Actually, I really didn't know him.

 4    Somehow he had heard of me.  I really didn't -- I

 5    really hardly knew the man.  I mean, I really didn't

 6    know him, actually.

 7         Q.    How did Kevin convey this idea for this

 8    article?

 9         A.    E-mail.

10         Q.    Did he write this pitch for you?

11         A.    Did he write the pitch?

12         Q.    Correct.

13         A.    I wrote the pitch.  He had some -- some of

14    this is -- some of this is pitch is taken from what he

15    wrote me.

16         Q.    When did he write you that?  Before or

17    after September 1st, 2021?

18         A.    When did he send me that e-mail?  Let's

19    see.  I'm trying to remember.  I know I had gotten an

20    e-mail, and I'm just trying to remember when.  Trying

21    to remember when he sent it to me.  And I -- I don't

22    remember.  I don't remember.  I really don't remember

23    when he sent it to me.

24         Q.    Did you provide your counsel approximately

25    26 pages of e-mails in the course of preparing for
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003
Appendix 717

Page 48

```
 1   with religion.
 2        Q.    Your job title was "Contributing Editor."
 3        A.    Yes.
 4        Q.    Is that correct?
 5        A.    That was the title they gave me.
 6        Q.    What is a contributing editor?
 7        A.    I was -- how would you explain?  That was
 8   their choice of title, not mine.
 9        Q.    I'm asking for a job description.
10        A.    I know.  I mean, it's the same as a --
11   basically, it's the same thing as a religion reporter,
12   in my mind.
13        Q.    How would you describe religion reporter in
14   terms of job description?
15        A.    This is -- let's see.  I would say covering
16   different religious groups.  I was not usually -- not
17   -- let's see.  Phrase.  Sometimes Supreme Court
18   decisions on various religious groups, trends.
19   Usually not breaking news.  Do you know what I mean by
20   "breaking news"?
21        Q.    Not really.
22        A.    Okay.  There were -- breaking news is
23   something that happened right away that I would have
24   to jump on within the hour.  I usually didn't do that
25   because I lived on the West Coast.  It's too much
```

Page 53

1     Q.    What I'm trying to get at is did you pitch

2   this article because it sounded like it was within the

3   contours of what they were looking for?

4     A.    Well, the major reason I pitched it is

5   because Halloween was coming.

6     Q.    I don't understand the connection.

7     A.    Halloween.

8     Q.    I know what Halloween is.

9     A.    Satanism, you know, Halloween.  Satanism

10   has a lot to do with Halloween.

11     Q.    It does?

12     A.    Yeah.

13     Q.    Please expand.

14     A.    Halloween is a Satanic holiday.

15     Q.    Let's back up a little bit.  You are

16   studied in religion; correct?

17     A.    Yeah.

18     Q.    It's my understanding that Halloween comes

19   from a Celtic tradition; is that correct?  Samhain?

20     A.    Allhallows Eve.  The actual name is from

21   Allhallows Eve.

22     Q.    What is Allhallows Eve?

23     A.    Allhallows Eve came before All Saints' Day.

24   The first holiday was All Saints' Day; Allhallows Eve

25   was the one before that.  Allhallows Eve is when the

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003
Appendix 719

(123 of 273), Page 123 of 273
Case: 25-868, 07/28/2025, DktEntry: 49.1, Page 123 of 273
Case 1:22-cv-01343-MKV-SLC   Document 110-2   Filed 05/17/24   Page 20 of 50

Page 73

1    an actual -- more of a belief system, and a -- so with

2    -- TST was different.  When you're asking my

3    understanding of Satanism, so there was before I met

4    TST, TST, and then after I met TST.

5         Q.    When you say you met TST, when did you

6    first meet TST?

7         A.    Well, when I -- when I began researching

8    this article I was not familiar with TST.

9         Q.    In terms of month and year, when was that?

10        A.    You know, so I would say October of 2021.

11        Q.    So your research into this article began in

12   October of 2021?

13        A.    Right.

14        Q.    And it's my understanding of your testimony

15   that you were not familiar with The Satanic Temple

16   before October of 2021; is that correct?

17        A.    Exactly, yes.

18        Q.    Had you ever written about TST before this

19   article?

20        A.    No, I had not.

21        Q.    You had never written about TST before this

22   article?

23        A.    Except I had in passing for some

24   GetReligion pieces.

25        Q.    How many times had you written about The

 1    Satanic Temple before this article?

 2         A.    I had mentioned them in a 2016 GetReligion

 3    piece, in another -- I think 2018, but I'm not --

 4    2016, there was another one after that.  I think those

 5    were the only two times I had mentioned them before

 6    2021.

 7         Q.    What about after the subject article?

 8         A.    And then there was a 2022 GetReligion

 9    piece.

10         Q.    Let's mark -- you said 2016?

11         A.    I think the first one was 2016.

12               MR. KEZHAYA:  Okay.  Let's mark this as

13    Exhibit 3, please.  Puff piece, Satanic Temple puff

14    piece, that's going to be No. 3.

15               MS. TESORIERO:  The satanic Temple comes to

16    Boston?

17               MR. KEZHAYA:  I believe so, correct.  These

18    appear to be three different ones.

19               MS. TESORIERO:  And for the record, are

20    these highlights your own?

21               MR. KEZHAYA:  Correct.

22               (Exhibit No. 3 was marked for

23               identification.)

24         Q.    Okay.  Please review what we have marked as

25    Exhibit 3.  Is that the 2016 piece that you were

Page 75

1    referring to?

2         A.    Yes.

3         Q.    And there was a 2018 piece you mentioned as

4    well?

5         A.    I think it was 2018.  It was the Florida

6    one?

7               MR. KEZHAYA:  Let's see here.  We're going

8    to mark this as Exhibit 4.

9               (Exhibit No. 4 was marked for

10              identification.)

11              MS. TESORIERO:  Exhibit 5?

12              MR. KEZHAYA:  Yes.  That's going to be 5.

13              (Exhibit No. 5 was marked for

14              identification.)

15        Q.    Is that the approximately 2018 piece that

16   you had mentioned earlier?

17        A.    I think so.  Is that the one in Florida?

18        Q.    I believe so.

19        A.    Yeah.

20        Q.    And we have Exhibit 5.  I believe this is

21   your 2022 piece that you mentioned as well.  And that

22   would be your -- Julia?

23        A.    Mm-hmm?

24        Q.    This Exhibit 5, could you please review it

25   and confirm that that's your 2022 piece you mentioned

(126 of 273), Page 126 of 273
Case 1:22-cv-01343-MKV-SLC   Document 110-2   Filed 05/17/24   Page 23 of 50
Case: 25-868, 07/28/2025, DktEntry: 49.1, Page 126 of 273

Page 76

  1    earlier as well.

  2         A.    Yes.

  3         Q.    Okay.  So those two pieces in 2016 and 2018

  4    predate the article at issue.

  5               Did you tell anyone at Newsweek that you

  6    had written about The Satanic Temple before?

  7               MS. TESORIERO:  Objection to form.

  8         A.    These weren't -- okay.  I did not consider

  9    these about The Satanic Temple.

 10         Q.    What would you consider them?

 11         A.    These are media critique pieces.

 12         Q.    Could you please read the title of the 2016

 13    piece?

 14         A.    "The Satanic Temple comes to Salem and the

 15    Boston Globe Does a Puff Piece."

 16         Q.    And it's your testimony that this is not

 17    about The Satanic Temple?

 18         A.    It's about the Boston Globe.

 19         Q.    Are you still at Newsweek?

 20         A.    No.

 21         Q.    Why not?

 22               MS. TESORIERO:  Objection to form.

 23         A.    Excuse me?

 24         Q.    Why are you still not employed by

 25    Newsweek?

Page 80

```
 1          Q.    Does it say tag?  There should be a list of

 2     tags on there.

 3          A.    Oh, tags?

 4          Q.    Yes.

 5          A.    Oh, okay.  Tags.

 6          Q.    Thank you.  Going back to your hiring

 7     process at Newsweek, were you ever trained on

 8     editorial guidelines?

 9          A.    No.

10          Q.    Were you ever provided a copy of what we're

11     marking as Exhibit 7?

12                (Exhibit No. 7 was marked for

13                identification.)

14          A.    No.

15          Q.    You were never provided that?

16          A.    No.

17          Q.    And you were never trained on that?

18          A.    No.

19          Q.    Did anyone ever tell you that your pieces

20     were subject to the editorial guidelines?

21          A.    No.

22          Q.    Have you, prior to today, ever even heard

23     of these editorial guidelines?

24                MS. TESORIERO:  Objection to form.

25          A.    Yes.
```

Moburg Reporting
206-622-3110

MOBURG REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003
Appendix 724

Page 92

```
 1        Q.    How long after that pitch did you get the
 2   green light to start pursuing this article?
 3        A.    Well, let me think.  I'm trying to
 4   remember.  I can't remember.  I don't think it was
 5   long after that.  However -- I don't think it was long
 6   after that.
 7        Q.    In terms of days?  Weeks?
 8        A.    Probably within a week.
 9        Q.    And to clarify, that was when you got the
10   green light to pursue the article; correct?
11        A.    Sure.  However -- yeah, I would say within
12   a week.
13        Q.    Okay.  And then how long after the green
14   light did you talk to the QueerSatanic?
15        A.    Well, I had to find them first.  Let's see.
16   It took some -- yeah.  I had to find them.  Talk them
17   into doing the interview.  That took a little while.
18   So that was at least another week.
19        Q.    You had to talk them into doing an
20   interview?
21        A.    Well, yeah.
22        Q.    What did that entail?
23        A.    Numerous -- a lot of messaging back and
24   forth.
25        Q.    There was a lot of messaging back and
```

November 16, 2023

```
 1   forth?

 2        A.    Well, yeah.

 3        Q.    How did these messages take place?

 4        A.    We messaged -- let's see.  Messaged each

 5   other on Twitter.

 6        Q.    Is that all of the messaging that took

 7   place --

 8        A.    Yes.

 9        Q.    -- which constituted talking them into

10   doing the interview?

11        A.    Mm-hmm, mm-hmm.

12        Q.    During what time period did you have these

13   discussions?

14        A.    It would have been early to mid October, up

15   until the time we met.

16        Q.    Did you interface with personal Twitter

17   accounts or the QueerSatanic account?

18        A.    I think QueerSatanic.  I believe it was

19   QueerSatanic.

20        Q.    Was it only QueerSatanic, or did you also

21   interface with personal accounts?

22        A.    I think it was only QueerSatanic -- I'm

23   trying to remember.  I don't remember.

24        Q.    Would it refresh your --

25        A.    I'm trying -- I just cannot.  What were you
```

1    photos.

2        A.    All right.  No.  That was -- no, I did not.

3        Q.    **Did Jinx Strange ever give you any names of**

4    **individuals who have allegedly been sexually abused by**

5    **anyone in the course of TST services and then covered**

6    **up?**

7              MS. TESORIERO:  Objection to form.

8        A.    He said he was willing to, but I didn't ask

9    him.

10       Q.    **You did not ask him.  Why didn't you ask**

11   **him?**

12       A.    Because the article was mainly on the

13   lawsuit, and it was not on the -- it was not an

14   investigation into the sexual abuse or the finances or

15   the alt-right figures.  It wasn't on these various

16   permutations.  The article was on the QueerSatanic

17   people.

18       Q.    **Well, I mean, the article was about the**

19   **sexual abuse and cover-up plan, was it not?**

20             MS. TESORIERO:  Objection to form.

21       A.    No.  The article was on the lawsuit.

22       Q.    **Then why did you include the statement?**

23       A.    I included a lot of statements.

24       Q.    **Why didn't you include the subject**

25   **statement for which we are here today?**

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003
**Appendix 727**

Page 103

1    know, is TST a religion?  Can you criticize it?

2    That's in the middle.  I quote "you" talking about the

3    defendants.  Then quote Johnson talking about the

4    background.  And so, okay, so what are people saying

5    about The Satanic Temple.  So, okay, what are people

6    saying.

7            So then I start asking other people, okay,

8    what are people saying.  I talked to the unofficial

9    biographer, Mr. Laycock.  Talked to him.  Talked to

10   Mr. Strange.  Talked to Ms. DeMeur.  Talked to Scott

11   Malphas.  These are the other two -- you know, we have

12   -- are not their true names, I know that.  Talked to

13   you.  Of course talked to Lucien.  And by that time it

14   was -- the article is running long enough.

15           So I wanted to kind of give a general

16   picture of what was more of a -- I wanted to give more

17   of a background of what was going on with The Satanic

18   Temple.  Kind of how it started.  The whole

19   mocumentary.  So I had to throw in a bit more details

20   about The Satanic Temple other than the lawsuit.  So

21   does that answer your question?

22       **Q.    How did you ascertain who you would talk to**

23   **and what degree of fact checking you were going to get**

24   **into?**

25           MS. TESORIERO:  Objection to form.

Page 110

```
 1                   MS. TESORIERO:  Can we go back off the

 2    record for a second?

 3                   MR. KEZHAYA:  Yes.

 4                   THE VIDEOGRAPHER:  We are now going off the

 5    record.  The time is now 1:25 p.m.

 6                   (Recess.)

 7                   THE VIDEOGRAPHER:  We are now back on the

 8    record.  The time is now 1:26 p.m.

 9        Q.    Did all of your communications with regard

10    to this article take place through your Newsweek

11    e-mail address?

12        A.    The interviews with you and with Lucien

13    were on the phone.  Some of the -- well, they were

14    e-mail and on the phone.  I mean, the other ones were

15    e-mail interviews.  I mean -- yeah.  I did not -- I

16    was not on the phone.  I did not talk to the

17    Jinx/Scott/Salome on the phone.

18        Q.    Let's back up a little bit.  You did not

19    talk to Scott Malphas on the phone; correct?

20        A.    No.

21        Q.    You did not talk to Jinx Strange on the

22    phone; correct?

23        A.    No.

24        Q.    You did not talk to Salome DeMeur on the

25    phone; correct?
```

```
 1        A.    No.

 2        Q.    You did talk to Lucien Greaves on the

 3    phone; correct?

 4        A.    Yes.

 5        Q.    You did talk to me on the phone; correct?

 6        A.    Right.

 7        Q.    You did talk in person with the

 8    QueerSatanic group; correct?

 9        A.    Yes.  And I talked with Mr. Laycock on the

10    phone.

11        Q.    Did you talk to anyone else on the phone?

12        A.    I'm trying to think who I talked with.  I

13    don't recall anyone else.

14        Q.    Of the e-mail interviews, were they all

15    done through your Newsweek e-mail address?

16        A.    Yes, they were.

17        Q.    Did you receive this complaint through your

18    Newsweek e-mail address?

19        A.    When you say "this complaint" --

20        Q.    The Scott Malphas complaint that you

21    (inaudible) --

22        A.    Yes.  It would have been through -- yes.  I

23    just thought if it's not in the documents that --

24    again, in the huge amount of documents submitted for

25    this case, then I -- then my memory is erroneous.  I
```

Page 123

1            In terms of there were -- I knew there were

2    complaints about finances.  Even Doug Laycock -- we're

3    talking about the sentence afterwards.  Doug Laycock

4    went into that for his book.  So, you know, Jinx had

5    given kind of a general -- it was a general read of

6    The Satanic Temple.  And it was his -- it was how he

7    saw the state of the religion.  And from my other

8    interviews with people, I found it plausible he was

9    correct.

10       Q.    Did you ask Lucien Greaves about coerced

11   sexual activity and cover-up within The Satanic

12   Temple?

13       A.    I asked him -- I certainly asked him in

14   connection with the orgies, yes.

15       Q.    Not in connection with the orgies.  Did you

16   ask him specifically about Jinx Strange's comment?

17       A.    No.  I did not ask him about Jinx Strange's

18   comment.

19       Q.    Why not?

20       A.    Why not?  I didn't -- I felt I had asked

21   Lucien plenty of questions.  And right below that, I

22   had a quote from Lucien that basically denied all

23   these accusations.

24       Q.    Did you confront Lucien Greaves with the

25   allegation that there are accounts of sexual abuse and

1    cover-up within The Satanic Temple?

2              MS. TESORIERO:  Objection.  Asked and

3    answered.

4        A.    Did I confront him?  Did I confront him?

5    Trying to remember.  I don't believe I did.

6        Q.    So Lucien Greaves's comment in his e-mails

7    could not possibly have related to something that you

8    did not confront him with.  You would agree with me

9    there; correct?

10             MS. TESORIERO:  Objection to form.

11       A.    I disagree.

12       Q.    You disagree?

13       A.    I disagree.

14       Q.    Please explain your basis for disagreeing.

15       A.    His quote here -- his quote underneath, it

16   covered the -- all of Jinx's accusations.  He says,

17   "We are accused of all sorts of nefarious things."  I

18   covered it.  I covered what Jinx was saying.

19       Q.    Did you ever even mention the word Jinx

20   Strange -- the name "Jinx Strange" to Lucien Greaves?

21       A.    I believe I talked to -- I may have talked

22   to Jinx maybe after I talked to Lucien.

23       Q.    So you didn't even talk to Jinx Strange and

24   then talk to Lucien, and yet you're telling me that

25   Lucien's comment pertains to Jinx Strange's

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                           Julia Duin

Page 126

```
 1    Strange or the allegations to Lucien Greaves, I find

 2    it very difficult to understand how Lucien Greaves's

 3    comment could have any pertinence to Jinx Strange's

 4    allegations.

 5         A.    I don't see how --

 6               THE REPORTER:  Please.  I need to hear the

 7    end of the question.

 8               MR. KEZHAYA:  Jinx Strange or Jinx

 9    Strange's allegation.

10               MS. TESORIERO:  Are you asking her a

11    question?

12               MR. KEZHAYA:  I'm asking her to explain

13    what she's -- where she's coming from with her

14    testimony.

15               MS. TESORIERO:  Objection.  Asked and

16    answered.

17         A.    The way -- the way I constructed the

18    article is that the -- okay.  Jinx gave -- Jinx had

19    several things to say about the organization, the

20    alt-right, the sexual abuse, the finances.  And I had

21    Lucien giving a general denial about -- a general

22    denial.  I did not feel he -- Lucien's general

23    statement had to address every single thing

24    specifically.

25         Q.    Why did you have him address anything in
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003
Appendix 733

 1   TST was engaging in criminal activity?

 **2        Q.    As a matter of fact, you did.  You wrote**

 **3   the article, did you not?**

 4            MS. TESORIERO:  Objection.

 5   Mischaracterizes the article statement.

 6        A.    I did not say that.

 **7        Q.    Oh, you did not write the article?**

 8            MS. TESORIERO:  Objection.

 9        A.    I did write the article.

 **10       Q.    You didn't include the quote in the**

 **11   article?**

 12           MS. TESORIERO:  Objection to form.  Give me

 13   a second to object and then you can answer.

 **14       Q.    The subject quote.**

 15           MR. KEZHAYA:  You can just say "Object to

 16   form" and it's taken subject to that.

 17           MS. TESORIERO:  I understand, but even

 18   "object to form" was getting it mixed in between.  I

 19   just want to let the court reporter get "objection to

 20   form."

 21           I believe the last question was did -- you

 22   state the last question.

 **23       Q.    Please go to page 8.**

 24       A.    Okay.

 **25       Q.    First line, "He wrote," quote -- read the**

Page 136

```
 1  question.

 2      Q.    Julia, I know things are getting heated,

 3  but you need to led me finish the question.

 4            MS. TESORIERO:  You need to let her finish

 5  her answers, too.

 6            MR. KEZHAYA:  Fair.

 7      A.    Did I ask anyone?  Anyone to be 7 billion

 8  people?  I mean --

 9      Q.    Well, did you ask anyone on the face of the

10  planet what sexual abuse and cover-up means in the

11  context of this here quote?

12            MS. TESORIERO:  Objection to form.

13      A.    Okay.  I'll say no to that one.  All right?

14      Q.    Thank you.

15            (Exhibit Nos. 11 and 12 were marked for

16            identification.)

17      A.    There's two here.

18      Q.    There's two, Exhibit 11 and Exhibit 12.

19      A.    Is one of them 10?

20      Q.    I believe 10 was previously introduced.

21            MS. TESORIERO:  I think 10 might have been

22  just sitting in front of you.

23            THE WITNESS:  All right.

24      Q.    Do you have Exhibit 11 in front of you?

25      A.    Yes, I do.
```

Page 150

1      Q.    But you don't recall when you used it

2   otherwise.   That's your testimony; right?

3            MS. TESORIERO:   Objection to form.

4      A.    God in heaven.  No.  I don't recall.  I

5   mean, I rarely used it.  And I told you, it was like

6   -- I mean, no.  I'm just going to say I don't recall.

7   I'm sick and tired of this.  I mean, it is harassing

8   me.

9      Q.    This is not harassment.

10     A.    Yes, it is.

11     Q.    You-all can take it to the judge if you

12  think this is harassment, but when you I definitely

13  did not and also "I don't recall," I'm just telling

14  you right now this is (inaudible) --

15           MS. TESORIERO:   Please don't talk to my

16  witness.  Ask her a question and let's move on.

17           MR. KEZHAYA:   Fair.

18     Q.    Earlier you testified that you had how many

19  supervisors?

20     A.    Juliana was my direct supervisor at the

21  time.

22     Q.    How many supervisors did you testify you

23  had before?

24     A.    Well, there was a direct one, and then

25  there was one over her and then one over him.  So

Page 151

1    there was a direct one.  Add them all up, I guess.

2    You could call -- you know, there was one direct one.

3    There were three -- I guess you could say three were

4    involved with me.

5         **Q.    And those three were Nancy Cooper, Dayan,**

6    **and Juliana; correct?**

7         A.    Nancy, Dayan, and Juliana, right.

8         **Q.    Juliana was your direct supervisor;**

9    **correct?**

10        A.    Yes.

11        **Q.    Did she have any involvement in the writing**

12   **of this article?**

13        A.    She was listening -- no, not really.  No.

14   She was involved in the e-mails in the first week or

15   two, but then she did not do any of the editing.

16        **Q.    Was she involved in the pitching of this**

17   **article?**

18        A.    Well, yeah.  I mean, she received my pitch.

19        **Q.    Did she green light this article?**

20        A.    Let's see.  The article was discussed in a

21   meeting, and she would have been one of three people.

22   All three people would have green lighted it.  I'm

23   trying to remember.  I mean, it was a four-way

24   discussion.  I cannot remember what Juliana personally

25   said during those discussions.  She did not really say

Page 152

1    much.

2         Q.    You had a weekly meeting with your three

3    supervisors --

4               Correct?

5         A.    Right.

6         Q.    -- about --

7         A.    Various things.

8         Q.    -- the course of your employment

9    activities; correct?

10        A.    Mm-hmm.

11        Q.    Juliana was in these meetings; correct?

12        A.    Right.

13        Q.    And these meetings were weekly; right?

14        A.    That's correct.

15        Q.    They were on Mondays, if I remember

16   correctly?

17        A.    Usually.

18        Q.    And when did those meetings start relative

19   to September 30?  Before or after?

20        A.    Let's see.  Because I was overseas up until

21   about -- let me think.  It took a little while to get

22   them started.  I mean, I don't have a calendar in

23   front of me.  I don't know.  Okay.  It was either the

24   first or second Monday in October.  It was whenever

25   that day was.  I think -- and I think you have one of

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                                    Julia Duin

Page 173

1  asking me if I circled back after this hour-long --

2  hour-and-a-half-long interview and asked them about

3  something, this particular statement, who the "they"

4  was?

5      Q.    I'm trying to ascertain if you performed

6  any form of fact investigation on anything that these

7  people had to say.

8            MS. TESORIERO:  Objection to form.

9      A.    I performed -- look, yes, I did check out

10  stuff, but you're asking about one sentence.

11      Q.    When you say you checked out stuff, did you

12  find any individuals who was actually sexually

13  harassed in TST?

14            MS. TESORIERO:  Objection to form.

15      A.    Shall we say -- okay.  I found people who

16  said they knew people who were sexually harassed.  How

17  about that?

18      Q.    No, not how about that.  Did you actually

19  talk to any individuals who were actually sexually

20  harassed by TST?

21            MS. TESORIERO:  Objection to form.

22      Q.    Yes or no.

23      A.    Did I talk to -- no, I did not.

24      Q.    Of the people who claim that they know

25  people who were sexually harassed by TST, did you ask

(143 of 273), Page 143 of 273
Case: 25-868, 07/28/2025, DktEntry: 49.1, Page 143 of 273
Case 1:22-cv-01343-MKV-SLC   Document 110-2   Filed 05/17/24   Page 40 of 50

```
 1    even names or contact information who theoretically

 2    could be followed up with?

 3        A.    No.

 4        Q.    You have been a journalist for 45 years;

 5    correct?

 6        A.    Yes.

 7        Q.    You have been a professor of journalism for

 8    approximately two and a half years; correct?

 9        A.    Mm-hmm.

10        Q.    Do you consider yourself a serious

11    journalist?

12              MS. TESORIERO:  Objection to form.

13        A.    Yes, I do.

14        Q.    Did you consider this piece of work to be a

15    credible, serious, and fair statement about sexual

16    abuse and cover-up?

17        A.    My article was fair, yes.

18        Q.    I'm asking you about the statement.

19        A.    About your statement?

20        Q.    Your statement.  The one that you put in

21    the article.

22        A.    Yes, I did.  It was fair.  And, yes, if I

23    hadn't believed that there wasn't sexual abuse going

24    on, I would not have put that into the article.

25        Q.    And what was your basis to believe there
```

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                     Julia Duin

Page 178

1    the future article ideas we discussed.  And there's

2    one story I am working on re The Satanic Temple that

3    is really taking off.  I am having a ton of

4    disgruntled members contact me, and what started out

5    as a TST lawsuit against four former Seattle-based

6    members has turned into a much bigger story.  More

7    below."

8        **Q.    These are disgruntled former members who**

9    **were your sole sources for the claim that there was**

10   **actually sexual abuse and cover-up.  Correct?**

11           MS. TESORIERO:  Objection to form.

12       A.    That's what I call them here.

13       **Q.    That's what you called them; correct?**

14       A.    There.

15       **Q.    And they are, in fact, disgruntled former**

16   **members; correct?**

17           MS. TESORIERO:  Objection to form.

18       A.    Yes.

19       **Q.    Do you feel you have an ethical obligation**

20   **to convey both sides of a serious allegation?**

21       A.    I did.

22       **Q.    Did you?**

23       A.    Yes.

24       **Q.    Where did you ask Lucien Greaves about**

25   **sexual abuse and cover-up?**

Page 183

```
 1    going to eventually have to answer the question.

 2                MS. KEZHAYA:  Well, we can move on from

 3    that.

 4                MR. KEZHAYA:  Moving on.  Withdrawn.

 5         Q.    Julia, you've been a professor of religious

 6    journalism; correct?

 7         A.    Journalism.  A journalism professor, not

 8    just religion.  Not just a -- I've taught general

 9    journalism and religion reporting.

10         Q.    Okay.  You've been serving as a journalist

11    for 45 years; correct?

12         A.    Right.

13         Q.    You don't know your own ethical

14    obligations?

15                MS. TESORIERO:  Objection to form.

16         A.    Of course I know my own ethical

17    obligations.

18         Q.    Do your ethical obligations include a

19    requirement that you convey both sides of a serious

20    allegation?

21                MS. TESORIERO:  Objection to form, but

22    answer.

23                THE WITNESS:  Right.

24         A.    I -- yes, of course.

25         Q.    Would you have felt comfortable publishing
```

1    a claim that TST kills children?

2              MS. TESORIERO:  Objection to form.

3        A.    No.

4        Q.    **Why not?**

5        A.    Why not?

6        Q.    **Mm-hmm.**

7              MS. TESORIERO:  Objection to form.

8        A.    Where do you start on this one?  Because

9    it's obviously not true.

10       Q.    **Okay.  What causes you to say it is**

11   **obviously not true?**

12       A.    Okay.  I don't know -- no one has told me

13   that TSt is killing children.

14       Q.    **Hypothetically, if the same sources told**

15   **you that TST kills children, would you have felt**

16   **comfortable publishing that claim?**

17             MS. TESORIERO:  Objection to form.

18       A.    I would have asked them to prove that.  I

19   would have asked them to offer some -- okay.  I would

20   have asked them to prove it.  Prove that TST was

21   killing children.

22       Q.    **And yet you didn't ask for any proof about**

23   **this serious allegation; correct?**

24             MS. TESORIERO:  Objection to form.

25       A.    Okay.  You're saying on the part of Jinx or

(147 of 273), Page 147 of 273
Case: 25-868, 07/28/2025, DktEntry: 49.1, Page 147 of 273
Case 1:22-cv-01343-MKV-SLC Document 110-2 Filed 05/17/24 Page 44 of 50

Page 193

```
 1   to believe it's not his true name.  He did not say it
 2   was -- his name was a pseudonym.
 3        Q.    Did you ask?
 4        A.    No.
 5        Q.    If you were to go about trying to find Jinx
 6   Strange and he ignored your e-mail, how would you go
 7   about finding him?
 8        A.    Fly to Wisconsin and walk into his tea
 9   shop.
10        Q.    I'm sorry.  What?
11        A.    He's got a tea shop, yeah.
12        Q.    What is the name of this tea shop?
13        A.    It's the -- you would ask.  Okay.  Go to
14   his Facebook page.  Okay.  It's like "The Dirge."  I
15   think it's called the -- wait a minute, because I know
16   you're trying to find him.  "The Dirge."
17        Q.    The Dirge?
18        A.    I think it's called -- look on his Facebook
19   page.
20        Q.    Well --
21        A.    Okay.  I think -- don't take me to court on
22   this.  I think it's called -- he has it on his actual
23   Facebook page.  It's part of his shop.
24        Q.    Did you look at his Facebook page?
25        A.    Yes, I did.
```

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                                    Julia Duin

Page 200

```
 1                 C E R T I F I C A T E

 2

 3    STATE OF WASHINGTON        )

 4                               ) ss.

 5    COUNTY OF KING             )

 6

 7          I, the undersigned Washington Certified Court

 8    Reporter, pursuant to RCW 5.28.010, authorized to

 9    administer oaths and affirmations in and for the State

10    of Washington, do hereby certify:

11          That the annexed and foregoing deposition

12    consisting of Page 1 through 199 was taken

13    stenographically before me and reduced to a typed

14    format under my direction;

15          I further certify that according to CR 30(e) the

16    witness was given the opportunity to examine, read and

17    sign after the same was transcribed, unless indicated

18    in the record that the review was waived;

19          I further certify that all objections made at the

20    time of said examination to my qualifications or the

21    manner of taking the deposition, or to the conduct of

22    any party, have been noted by me upon said deposition;

23          I further certify that I am not a relative or

24    employee of any such attorney or counsel, and that I

25    am not financially interested in said action or the
```

Page 201

```
 1   outcome thereof;

 2        I further certify that the witness before

 3   examination was by me duly sworn to testify to the

 4   truth, the whole truth, and nothing but the truth;

 5        I further certify that the deposition, as

 6   transcribed, is a full, true and correct transcript of

 7   the testimony, including questions and answers, and

 8   all objections, motions, and exceptions of counsel

 9   made and taken at the time of foregoing examination

10   and was prepared pursuant to Washington Administrative

11   Code 308-14-135, the transcript preparation format

12   guideline;

13        I further certify that I am sealing the

14   deposition in an envelope with the title of the above

15   cause and the name of the witness visible, and I am

16   delivering the same to the appropriate authority;

17

18        IN WITNESS WHEREOF, I have hereunto set my hand,

19   and affixed my official seal this 22nd day of

20   November 2023.

21                          _____

22                          Cheryl Macdonald, CCR

23                          Washington State Certified

24                          Court Reporter

25                          License No. 2498
```

Page 202

```
 1                   D E C L A R A T I O N

 2

 3

 4

 5          I declare under penalty of perjury that I

 6     have read my within deposition, and the same is true

 7     and accurate, save and except for changes and/or

 8     corrections, if any, as indicated by me on the

 9     correction sheet hereof.

10

11

12                                  _____

13                                  JULIA DUIN

14

15

16

17

18

19          Dated this_____day of_____,

20     2023.

21

22

23

24

25     CHERYL MACDONALD, Court Reporter
```

Page 203

 1

     MOBURG REPORTING
 2   COURT REPORTERS & LEGAL VIDEO
     33400 9th Avenue South
 3   Suite 207
     Federal Way, WA 98003
 4   206-622-3110


 5   _____
     PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS SHEET,
 6   SHOWING PAGE, LINE, AND REASON, IF ANY.  SIGN THIS
     SHEET, SIGN THE ACCOMPANYING SIGNATURE SHEET AND
 7   RETURN AS PER INSTRUCTIONS IN COVER LETTER.

 8   _____
     PAGE          LINE              CORRECTION AND REASON
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                                  _____
                                    (SIGNATURE)
24

25

     REPORTER: CHERYL MACDONALD

Page 204

1
                        MOBURG REPORTING
2               Court Reporters & Legal Video
             33400 9th Avenue South, Suite 207
3                    Federal Way, WA 98003
             (206) 622-3110   FAX (206) 343-2272
4              E-mail: info@moburgreporting.com

5

6    TO:   Sara Tesoriero              November 22, 2023
           51 Astor Place
7          New York, New York 10003

8

     IN RE:  The Satanic Temple v. Newsweek
9
     DEPOSITION(S) OF: Julia Duin
10
     DATE OF DEPOSITION: November 16, 2023
11

12   A copy of the deposition transcript of the above-named
     is provided via E-transcript.  Please have the
13   deponent read the deposition, sign the correction
     sheet and declaration.  The signed correction sheet
14   and declaration should then, within 30 (thirty) days,
     be forwarded to:
15
                        CHERYL MACDONALD
16
                        33400 9th Ave. So.  #207
17
                        Federal Way, Washington 98003
18
     who will then enclose them in the original transcript,
19   seal it, and forward it to Mr. Kezhaya for retention
     until the time of trial.
20
          If you have any questions, feel free to contact
21   me at the number listed above.

22
     Sincerely,
23

24   CHERYL MACDONALD, CCR

25   CC: M. Kezhaya

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                              Julia Duin

Page 205

```
 1
            Certification of Court Rule and WAC Compliance
 2
                   The Satanic Temple v. Newsweek
 3
          I, VALERIE SEATON, am an authorized representative of
 4   MOBURG REPORTING and do hereby, under penalty of perjury,
     certify that Moburg Reporting and all court reporters
 5   providing services in the above-captioned case on MOBURG
     REPORTING'S behalf will fully comply with all applicable
 6   rules and regulations governing the provision of court
     reporting services, including, where applicable,
 7   Washington Superior Court Rule 28(c)-(e) and WAC
     308-14-130(1).*
 8
                                         11/22/23
 9   _____     _____
     Valerie L. Seaton                      Date
10   President
     Moburg Reporting
11

12        *28(c)  Disqualification for Interest.  No deposition
     shall be taken before a person who is a relative or
13   employee or attorney or counsel of any of the parties, or
     is a relative or employee of such attorney or counsel, or
14   is financially interested in the action.
     28(d)  Equal Terms Required.  Any arrangement concerning
15   court reporting services or fees in a case shall be
     offered to all parties on equal terms.  This rule applies
16   to any arrangement or agreement between the person before
     whom a deposition is taken or a court reporting firm,
17   consortium, or other organization providing a court
     reporter, and any party or any person arranging or paying
18   for court reporting services in the case, including any
     attorney, law firm, person or entity with a financial
19   interest in the outcome of the litigation, or person or
     entity paying for court reporting services in the case.
20   28(e)  Final Certification of the Transcript.  The court
     reporter reporting a deposition shall not certify the
21   deposition transcript until after he or she has reviewed
     the final version of the formatted transcript.  A court
22   reporting firm, consortium, or other organization
     transmitting a court reporter's certified transcript
23   shall not alter the format, layout, or content of the
     transcript after it has been certified.
24        *308-14-130(1)  Offer arrangements on a case
     concerning court reporting services or fees to all parties
25   on equal terms.
```



# Exhibit 39

Excerpts of deposition of Lucien Greaves
(November 6, 2023)

**In the Matter Of:**

SATANIC TEMPLE vs NEWSWEEK DIGITAL

1:22-cv-01343-MKV

---

**LUCIEN GREAVES**

*November 06, 2023*

---



LUCIEN GREAVES
SATANIC TEMPLE vs NEWSWEEK DIGITAL

November 06, 2023
1

```
 1

 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    -----------------------------------x

 4    THE SATANIC TEMPLE, INC.,

 5                         Plaintiff,

 6              -against-                Case No.
                                        1:22-cv-01343-MKV
 7    NEWSWEEK DIGITAL, LLC,

 8                         Defendant.

 9    -----------------------------------x

10                         November 6, 2023
                           9:32 a.m.
11

12

13         Deposition of LUCIEN GREAVES, taken by

14    Defendant, held at 30 Rockefeller Plaza, New

15    York, New York, before Joseph R. Danyo, a

16    Shorthand Reporter and Notary Public within

17    and for the State of New York.

18

19

20

21

22

23

24

25
```



LUCIEN GREAVES                                         November 06, 2023
SATANIC TEMPLE vs NEWSWEEK DIGITAL                                     2

```
 1

 2    A P P E A R A N C E S :

 3


 4       KEZHAYA LAW PLC
         Attorneys for Plaintiff and the Witness
 5          150 S. Fifth Street
            Suite 1850
 6          Minneapolis, Minnesota 55401

 7       By:   MATT KEZHAYA, ESQ.
               SONIA KEZHAYA, ESQ.
 8

 9

10       LAW OFFICES OF CAMERON STRACHER PLLC
         Attorneys for Defendant
11          51 Astor Place
            9th Floor
12          New York, New York 10003

13       By:   CAMERON STRACHER, ESQ.
               SARA TESORIERO, ESQ. (Via Zoom)
14

15

16    Also Present:

17       LAURA HENRIQUE, ESQ., Newsweek (Via Zoom)

18                    ~oOo~

19

20

21

22

23

24

25
```



LUCIEN GREAVES                                      November 06, 2023
SATANIC TEMPLE vs NEWSWEEK DIGITAL                              3

```
 1                    Greaves
 2   L U C I E N   G R E A V E S, having been first
 3   duly sworn by Joseph R. Danyo, a Notary Public,
 4   was called as a witness and testified as follows:
 5   EXAMINATION BY MR. STRACHER:
 6           Q.   Good morning, Mr. Greaves.  My name
 7   is Cameron Stracher.  I am the attorney for
 8   Newsweek in this lawsuit brought by The Satanic
 9   Temple against Newsweek, and we're here today to
10   take your deposition.  Have you ever been deposed
11   before?
12           A.   I have.
13           Q.   How many times?
14           A.   I would say around five ,I think.
15   Thereabouts.
16           Q.   Were those all in civil lawsuits?
17           A.   Yeah.
18           Q.   And as best as you recall, were you a
19   plaintiff or a defendant in those lawsuits?
20           A.   Plaintiff.
21           Q.   So you know then that in a deposition
22   I will ask you questions relating to the case,
23   and I will ask that you listen carefully and then
24   answer the question to the best of your ability.
25   Will you do that?
```



LUCIEN GREAVES                                    November 06, 2023
SATANIC TEMPLE vs NEWSWEEK DIGITAL                              9

1                          Greaves

2    introduction to Satanism?

3          A.    I think my initial interest was

4    piqued, I grew up in what they call a Satanic

5    panic, which you may have some awareness of, a

6    sociological phenomenon recognized now as a moral

7    panic, and in the 80's and 90's there was this

8    mythology, rumors of Satanic cults, secretive

9    cults committing all kinds of atrocious acts, and

10   of course that idea didn't appeal to me, do these

11   anti-human cruel acts, but later on I began to

12   wonder why this happened, why were they saying

13   these things on television shows, why were these

14   ridiculous tales being told, and then they

15   suddenly seemed to disappear.

16              If there was really this huge

17   conspiracy then, there must have been something

18   deeper to it, and I also was growing very

19   skeptical of traditional religion, but I had been

20   taught, and that seemed to be a confluence of

21   when I recognized what people who self-identified

22   as Satanists actually held as a common thread in

23   their thinking as opposed to what was presented,

24   I think seeing the injustice of how that was

25   presented, and this moral panic had a lot to do



```
 1                      Greaves
 2    with my affinity for it.
 3           Q.   Where did you grow up?
 4           A.   Michigan.
 5           Q.   Which town or city?
 6           A.   I moved around a bit outside of
 7    Detroit.  So Mount Clemens, Sterling Heights,
 8    Detroit, and I mean I rented so many places it's
 9    hard to even be sure I can go through the whole
10    list.
11           Q.   That's okay.  I'm just asking
12    generally.  And by the way, if you don't recall
13    specifically, it's perfectly fine to say you
14    don't recall.
15                So tell me about leaving Hachette to
16    be involved with The Satanic Temple.  That
17    occurred in 2017, is that right?
18           A.   Probably earlier than that then,
19    given that I would say that I think I quit
20    Hachette not long after our Pink Mass, which, you
21    know, you can find a specific date for news
22    reports and things like that.
23           Q.   At the time you quit Hachette, did
24    you then take on a paying role with the Satanic
25    Temple?
```



```
 1                        Greaves
 2           Q.   So the decision to pursue a lawsuit,
 3     for example, on behalf of The Satanic Temple,
 4     that would be something that would come to you,
 5     is that right?
 6           A.   Yeah.
 7           Q.   The decision to adopt a certain
 8     advocacy perspective, that would also come to
 9     you?
10           A.   Yeah.  Correct.
11           Q.   But a complaint of sexual harassment
12     would not necessarily come to you?
13           A.   That is correct.  Yeah.
14           Q.   Or a complaint from a member in a
15     congregation that he or she felt as if they were
16     being sexually abused would not necessarily go to
17     you?
18           A.   Yeah.  I know that might sound
19     strange and maybe irresponsible, but after a few
20     years we felt really we should separate ourselves
21     from that, because we feel people try to attack
22     the founders of the organization as a means of
23     attacking the organization, and, like I said, any
24     arbitrary attachment we might have to an issue
25     people can try to exploit to make it seem a
```



```
 1
 2                      C E R T I F I C A T I O N
 3
 4              I, JOSEPH R. DANYO, a Shorthand Reporter
 5      and Notary Public, within and for the State of New
 6      York, do hereby certify:
 7              That I reported the proceedings in the
 8      within entitled matter, and that the within transcript
 9      is a true record of such proceedings.
10              I further certify that I am not related, by
11      blood or marriage, to any of the parties in this
12      matter and that I am in no way interested in the
13      outcome of this matter.
14              IN WITNESS WHEREOF, I have hereunto set my
15      hand this 12th day of November, 2023.
16
17              _____
18                      JOSEPH R. DANYO
19                      STATE OF NEW YORK
20                      My Commission Expires 2/20/2027
21
22
23
24
25
```



# Exhibit 40

Excerpts of deposition of David Alan Johnson
(November 17, 2023)

(164 of 273), Page 164 of 273
Case: 25-868, 07/28/2025, DktEntry: 49.1, Page 164 of 273
Case 1:22-cv-01343-MKV-SLC Document 116-4 Filed 05/17/24 Page 2 of 9

**In the Matter Of:**

THE SATANIC TEMPLE

vs

NEWSWEEK DIGITAL

---

**DAVID JOHNSON**

November 17, 2023

---



**Moburg Reporting**
33400 9th Ave. South, Suite 207
Federal Way, WA 98003
(206) 622-3110
www.MoburgReporting.com

**Appendix 761**

```
 1                UNITED STATES DISTRICT COURT

 2               SOUTHERN DISTRICT OF NEW YORK

 3       --------------------------------------------------
                                         )
 4       THE SATANIC TEMPLE, INC.,       )
                                         )     COPY
 5                 Plaintiff,            )
                                         )
 6          vs.                          )NO. 1:22-CV-01343-MKV
                                         )
 7       NEWSWEEK DIGITAL, LLC,          )
                                         )
 8                 Defendant.            )
                                         )
 9       --------------------------------------------------

10          Videotaped Deposition Upon Oral Examination

11                           of

12                  DAVID ALAN JOHNSON

13       --------------------------------------------------

14                  Friday, November 17, 2023

15                       9:36 a.m.

16                  7900 Southeast 28th Street

17                  Mercer Island, Washington

18

19

20

21

22

23

24       Cheryl Macdonald, CRR, RMR
         Court Reporter
25       License No. 2498
```

November 17, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                    David Johnson

---

Page 2

```
 1          A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
 4          MATT KEZHAYA
            SONIA KEZHAYA
 5          Attorneys at Law
            KEZHAYA LAW PLC
 6          150 South Fifth Street
            Suite 1850
 7          Minneapolis, Minnesota 55402
            matt@kezhaya.law
 8          sonia@kezhaya.law
 9
     FOR THE DEFENDANT:
10
            SARA TESORIERO
11          Attorney at Law
            STRACHER LAW
12          51 Astor Place
            9th Floor
13          New York, New York 10003
            sara@stracherlaw.com
14
15   FOR THE WITNESS:
16          JEREMY E. ROLLER
            Attorney at Law
17          ARETE LAW GROUP
            1218 Third Avenue
18          Suite 2100
            Seattle, Washington 98101
19          roller@aretelaw.com
20
     THE COURT REPORTER and VIDEOGRAPHER:
21
            CHERYL MACDONALD
22          KALIA HENDRICKS
            MOBURG REPORTING
23          33400 9th Avenue South
            Suite 207
24          Federal Way, Washington 98003
            info@moburgreporting.com
25
```

---

Page 3

```
 1              I N D E X
 2
 3   EXAMINATION                          PAGE
 4   BY MR. KEZHAYA:  .........................   4
 5   BY MS. TESORIERO:  .......................  23
 6
 7   EXHIBITS MARKED                       PAGE
 8   (No exhibits marked.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 4

1     THE VIDEOGRAPHER:  Good morning.  We are
2  now on the record.  This is the deposition of David
3  Alan Johnson.  This deposition is being recorded this
4  17th day of November 2023, and the time is now 9:36
5  a.m.  Counsel and all present, please identify
6  yourselves for the record, and then the witness may be
7  sworn in.
8     MR. KEZHAYA:  This is Matt Kezhaya.  I'm
9  joined by Sonia Kezhaya.  Appearing on behalf of the
10  plaintiff.
11     MS. TESORIERO:  Sara Tesoriero on behalf of
12  defendant Newsweek.
13     MR. ROLLER:  Jeremy Roller for nonparty
14  witness David Alan Johnson.
15  DAVID JOHNSON, the witness herein, having been
          placed under oath by the
16          Certified Court Reporter,
          deposed and said as follows:
17
18          EXAMINATION
19  BY MR. KEZHAYA:
20     Q.   Please state your full name for the record.
21     A.   David Alan Johnson.
22     Q.   David, are you familiar with the Newsweek
23  article for which we are here today?
24     A.   I am.
25     Q.   Do you understand the sole remaining

---

Page 5

1  statement that is at issue in this article -- go
2  ahead.
3     A.   I am not sure.
4     Q.   Let's -- we are not going to be introducing
5  any paper exhibits, or at least we're not anticipating
6  doing so.  Give me just a second to find it.
7     MR. ROLLER:  Can I just put something on
8  the record that I think is going to be
9  noncontroversial?  I read the protective order that's
10  in place in this case, and we do anticipate reviewing
11  the transcript for confidentiality designations, and
12  ask that it be kept confidential until that review is
13  completed.
14     MR. KEZHAYA:  Yes.  There's a 14-day period
15  after the transcript comes out.  No objection.
16     MS. TESORIERO:  No objection.
17     Q.   All right.  So throughout the course of
18  this deposition, I'm going to refer to the subject
19  article as the Newsweek article that we're here for
20  today, and I'm going to periodically refer to the
21  "article statement."  The statement is as follows:
22     "Accounts of sexual abuse being covered up
23  in ways that were more than anecdotal."
24     Will you agree with me that that's what the
25  article statement is?

---

Moburg Reporting
206-622-3110


MOBURG REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003
Appendix 763

November 17, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                     David Johnson

Page 6

1          MR. ROLLER:  Object to the form of the
2  question, but you can answer.
3     A.   If you read it just now, I guess that's
4  what it says.
5     Q.   Okay.  But in terms of what you understand
6  that when I say "article statement," that's what the
7  article statement is; right?
8     A.   Sure.
9     Q.   You did not write the article statement;
10  correct?
11     A.   Correct.
12     Q.   Jinx Strange wrote that article statement.
13  Also correct?
14          MS. TESORIERO:  Object to the form.
15     A.   I'm not sure.  I thought this was about the
16  Newsweek article.
17     Q.   Yes.  So the quote that I quoted from is
18  from the Newsweek article, but nestled within the
19  Newsweek article is a quote of Jinx Strange.  Do you
20  recall that?
21     A.   I recall that Jinx Strange was quoted, but
22  I don't recall what part of it he said versus someone
23  else.
24     Q.   Okay.  Do you know whether Jinx Strange is
25  a pseudonym?

Page 7

1     A.   I believe that's a pseudonym, yes.
2     Q.   Do you know where Jinx Strange is?
3     A.   I am not sure, no.
4     Q.   Beyond the e-mail address that Julia Duin
5  e-mailed, do you have any contact information --
6          MR. ROLLER:  Object to the form of the
7  question, but you can answer.
8     Q.   -- for Jinx Strange?
9     A.   I'm not sure.  I may have a way to contact
10  Jinx Strange.
11     Q.   How would you go about contacting Jinx
12  Strange if not through e-mail?
13     A.   I could Facebook message him.  I think
14  that's probably what I would do.
15     Q.   Do you have a phone number for Jinx
16  Strange?
17     A.   I do not.
18     Q.   Do you have a residential address for Jinx
19  Strange?
20     A.   I do not.
21     Q.   Do you have a work address for Jinx
22  Strange?
23     A.   I do not.
24     Q.   Returning your attention back to the
25  article statement, at issue is an allegation that

Page 8

1  TST engages in sexual abuse and cover-up.  How would
2  you define sexual abuse?
3          MS. TESORIERO:  Objection to form.
4          MR. ROLLER:  Same objection.  You can
5  answer.
6     A.   I guess I would define it as things like
7  sexual assault, things like inappropriate sexual
8  relationships.  I'm not sure.  I don't really define
9  terms like that.
10     Q.   When you say "inappropriate sexual
11  relationships," does that, in your mind, carry a
12  connotation of criminal activity?
13          MS. TESORIERO:  Objection to form.
14          MR. ROLLER:  Can we just have an
15  understanding that an objection by Sara or me is an
16  objection of both?
17          MR. KEZHAYA:  Yes.  Y'all don't have to
18  both -- do we want to take a break?
19          MR. ROLLER:  No.
20     Q.   The question posed is whether, in your
21  mind, an inappropriate sexual relationship connotes
22  criminal activity.
23     A.   I would say, not necessarily.
24     Q.   How about cover-up?  How would you define
25  cover-up?

Page 9

1          MS. TESORIERO:  Objection to form.
2     A.   Within the context of The Satanic Temple?
3     Q.   Correct.  More particularly within the
4  context of the statement, so also nested therein
5  within the context of TST.
6          MR. ROLLER:  Object to the form.  You can
7  answer.
8     A.   I would say things like hearing about
9  something that happens, and choosing not to address
10  the root problem but to address the complaint, and to
11  make the -- to treat the complaints as more of an
12  issue than any underlying sexual abuse or harassment.
13     Q.   Would removing the offending member exclude
14  a cover-up?
15          MR. ROLLER:  Object to the form.
16     A.   Sir, could you restate the question?
17     Q.   So within the context of this statement,
18  there is sexual abuse and cover-up.  That's the
19  allegation.  If the offending member or the person
20  about whom the complaint is made is no longer a member
21  of TST, is that a cover-up in your opinion?
22          MS. TESORIERO:  Objection.
23          MR. ROLLER:  Objection to form.
24     A.   I think it would depend on the
25  circumstances, especially if a person was removed far

Moburg Reporting
206-622-3110


MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003
**Appendix 764**

November 17, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                    David Johnson

Page 10

1  after a complaint was made.  It could be incidental.
2  They could be removed for some other reason besides
3  that.
4      Q.   So if they were removed because of the
5  complaint, though, then that's not a cover-up, in your
6  opinion; is that correct?
7          MS. TESORIERO:  Objection to form.
8      A.   I think it depends on the particulars of
9  the situation.
10     Q.   Okay.  Have you personally witnessed any
11 sexual abuse within The Satanic Temple?
12     A.   I have not.
13     Q.   You gave an interview to Julia Duin at some
14 point previously; is that correct?
15     A.   That is correct.
16     Q.   During that interview you indicated --
17 well, let's back up.  I believe during that interview
18 you indicated that you were a witness to a sexual
19 harassment complaint.  Do you recall that?
20     A.   That sounds correct, yes.
21     Q.   And when I say "I believe," I'm not sure if
22 it was you or if it was someone else.  So unpacking it
23 slightly, did you indicate to Julia Duin that you were
24 a witness to a sexual harassment complaint?
25     A.   I believe that is correct, yes.

Page 11

1      Q.   Okay.  In your definition of sexual abuse,
2  whatever the sexual harassment complaint was, was that
3  sexual abuse?
4      A.   I don't know that I feel qualified to say.
5      Q.   Okay.  Well, what was the sexual harassment
6  complaint?
7      A.   There was a former member of the local
8  TST group who had been, from my understanding,
9  repeatedly made to feel uncomfortable by a much older
10 member.  I think -- I think this was in a period of
11 2017 to 2018.  So it was before I was a member.  They
12 left because it was nonaddressed for months, and then
13 I found out about it in 2020.
14     Q.   Let's unpack that slightly.  You indicated
15 that you were a listed witness on a complaint;
16 correct?
17         MR. ROLLER:  Object to the form.  I think
18 it misstates prior testimony.
19     Q.   Let me rephrase.  You indicated to Duin
20 that you were a listed witness on a sexual harassment
21 complaint; correct?
22     A.   I'm not -- I'm not sure.  There was a
23 complaint by a person who is no longer a member.  We
24 found out about it in 2020, and then that was brought
25 up.  That's when I was made aware of it.

Page 12

1      Q.   You say when "that was brought up."  What
2  was brought up?
3      A.   In 2020, when the former member, who was
4  unhappy about the way their sexual harassment had been
5  treated, talked publicly about it as, their
6  unhappiness with their treatment in the organization.
7      Q.   Was this a written complaint or an
8  unwritten complaint?
9      A.   I believe it was a Facebook post.
10     Q.   So this was -- backing up slightly, are you
11 familiar with the concept of National Council or
12 International Council?
13     A.   Within the context of The Satanic Temple?
14     Q.   Correct.
15     A.   My understanding is that the National
16 Council and International Council were a leadership
17 committee directly below Doug Misicko and Cevin
18 Soling, the executive committee.
19     Q.   But the question posed is whether you're
20 familiar with them in the first place.  So that's a
21 yes, correct?
22     A.   If what I just said was accurate, then yes.
23     Q.   Within your understanding, did
24 International Council or National Council investigate
25 matters of claims of sexual harassment?

Page 13

1          MS. TESORIERO:  Objection to form.
2          MR. ROLLER:  Object to form.
3      A.   Sorry.  Could you restate the question?
4      Q.   In your understanding, did national -- I'm
5  just going to call it the National Council.  In your
6  understanding, did National Council investigate claims
7  of sexual harassment?
8      A.   I am not sure.  I have heard that that's
9  so.
10     Q.   Okay.  But you lack personal knowledge;
11 correct?
12     A.   That's correct.
13     Q.   Okay.  Do you have any personal knowledge
14 whether the person who claimed sexual harassment ever
15 raised a complaint to national council?
16     A.   I do not know that, no.
17     Q.   You indicated that you were a witness.  I'm
18 having trouble understanding how you are a witness in
19 this complaint.
20         MR. ROLLER:  Object to the form.
21     Q.   Please help me understand that.  You
22 indicated to Duin, "We were a witness", correct?
23     A.   I'm not sure what the -- that's what we
24 said.  If that's what the transcript is, then that's
25 what we said.



November 17, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                     David Johnson

Page 18

1     A.   I did not witness the sexual harassment
2  before I was a member, that's correct.
3     Q.   And have you seen any other sexual abuse of
4  any sort within The Satanic Temple?
5        MS. TESORIERO:  Objection to form.
6     A.   When you say that, do you mean have I
7  witnessed with my own eyes?
8     Q.   Correct, yeah.  You personally.
9     A.   No, I don't believe so.
10     Q.   Okay.  So any knowledge you have would be
11  based on hearsay; is that correct?
12        MR. ROLLER:  Object to the form.
13     A.   Knowledge I have comes from other people
14  who experienced things, yes.
15     Q.   And the information that you received from
16  other people who experienced things, did they give you
17  this information under penalty of perjury?
18        MS. TESORIERO:  Objection to form.
19     A.   No.
20     Q.   This complaint in 2020, did you raise any
21  criminal complaints on the matter?
22     A.   I did not.
23     Q.   To your knowledge, were any criminal
24  complaints ever raised?
25     A.   To my knowledge, no.

Page 19

1     Q.   To your knowledge, were there ever any
2  criminal charges on the matter?
3     A.   To my knowledge, no.
4        MR. KEZHAYA:  I think we're at a good place
5  to take a break.
6        THE VIDEOGRAPHER:  We're now going off the
7  record.  The time is now 9:56 a.m.
8        (Recess.)
9        THE VIDEOGRAPHER:  We are now back on the
10  record.  The time is now 10:02 a.m.
11     Q.   Do you recall the name of the person about
12  whom this 2017 sexual harassment claim was raised?
13     A.   I believe I know their pseudonym.
14     Q.   What is their pseudonym?
15     A.   Dice Marlow.
16     Q.   How do I spell Dice?
17     A.   D-I-C-E, and then Marlow, I believe, is
18  M-A-R-L-O-W.
19     Q.   Do you recall the name or pseudonym of the
20  person who allegedly sexually harassed Dice Marlow?
21     A.   To my recollection, the pseudonym was John
22  Milton.
23     Q.   Do you know whether John Milton, as of
24  2020, was still a member of TST Washington?
25     A.   To my knowledge he was not.

Page 20

1     Q.   So to be more particular, you personally
2  know that he was not a member of TST Washington in
3  2020; correct?
4        MR. ROLLER:  Object to the form, but you
5  can answer.
6     A.   That's a somewhat complicated question
7  because membership was not kept up in a particularly
8  organized way.  So, to my knowledge, he was not a
9  member anymore.
10     Q.   But I'm trying to ascertain -- you say to
11  your knowledge, meaning you affirmatively know that he
12  was not; is that correct?
13     A.   I do not know that he was not.
14     Q.   Okay.
15     A.   Yeah.
16     Q.   And how do you know that or -- strike that.
17        What would constitute him being a member or
18  not a member of TST Washington, in your opinion?
19     A.   In my mind?
20     Q.   Mm-hmm.
21     A.   There were lists of people who were
22  members.  However, those lists were not up to date.
23  So sometimes people who were supposedly expelled were
24  not actually, like, officially expelled, if that makes
25  sense.

Page 21

1     Q.   Yeah, meaning their name was not struck
2  from some list; correct?
3     A.   No.  There were lists of active members and
4  supposedly expelled members, but this was not kept up
5  to date in any sort of accurate way, in my experience
6  with the organization.
7     Q.   Did TST Washington have in-person events?
8     A.   They did, yes.
9     Q.   If John Milton showed up at one of those
10  in-person events, would he have been removed?
11     A.   I am not sure.
12     Q.   Would he have been welcomed?
13     A.   I am not sure.
14     Q.   Did you ever tell Duin that you personally
15  witnessed any form of sexual abuse?
16     A.   Not to my knowledge, no.
17     Q.   Did you ever tell Duin that you personally
18  witnessed any form of cover-up?
19     A.   Not to my recollection, no.
20     Q.   Did Duin ever ask you for any clarifying
21  details as to the ethics complaint?
22        MS. TESORIERO:  Objection to form.
23     A.   Not to my recollection, but if you have the
24  interview, then that would -- that should say that.
25     Q.   So, in other words, if it's not in the

November 17, 2023

THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                                    David Johnson

Page 34

1 questions.
2        THE VIDEOGRAPHER:  We are now going off the
3 record.  This marks the end of the deposition of David
4 Alan Johnson.  The time is now 10:27 a.m.
5        THE REPORTER:  Signature?
6        MR. ROLLING:  Yes.  We want to read it.
7        MR. KEZHAYA:  We'll need the transcript.
8        MS. TESORIERO:  Copy, please.
9            (Deposition concluded at 10:27 a.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 36

1 outcome thereof;
2     I further certify that the witness before
3 examination was by me duly sworn to testify to the
4 truth, the whole truth, and nothing but the truth;
5     I further certify that the deposition, as
6 transcribed, is a full, true and correct transcript of
7 the testimony, including questions and answers, and
8 all objections, motions, and exceptions of counsel
9 made and taken at the time of foregoing examination
10 and was prepared pursuant to Washington Administrative
11 Code 308-14-135, the transcript preparation format
12 guideline;
13     I further certify that I am sealing the
14 deposition in an envelope with the title of the above
15 cause and the name of the witness visible, and I am
16 delivering the same to the appropriate authority;
17
18     IN WITNESS WHEREOF, I have hereunto set my hand,
19 and affixed my official seal this 30th day of
20 NOvember 2023.
21            _____
22            Cheryl Macdonald, CCR
23            Washington State Certified
24            Court Reporter
25            License No. 2498

Page 35

1          C E R T I F I C A T E
2
3 STATE OF WASHINGTON    )
4                        ) ss.
5 COUNTY OF KING         )
6
7     I, the undersigned Washington Certified Court
8 Reporter, pursuant to RCW 5.28.010, authorized to
9 administer oaths and affirmations in and for the State
10 of Washington, do hereby certify:
11     That the annexed and foregoing deposition
12 consisting of Page 1 through 34 was taken
13 stenographically before me and reduced to a typed
14 format under my direction;
15     I further certify that according to CR 30(e) the
16 witness was given the opportunity to examine, read and
17 sign after the same was transcribed, unless indicated
18 in the record that the review was waived;
19     I further certify that all objections made at the
20 time of said examination to my qualifications or the
21 manner of taking the deposition, or to the conduct of
22 any party, have been noted by me upon said deposition;
23     I further certify that I am not a relative or
24 employee of any such attorney or counsel, and that I
25 am not financially interested in said action or the

Page 37

1          D E C L A R A T I O N
2
3
4
5     I declare under penalty of perjury that I
6 have read my within deposition, and the same is true
7 and accurate, save and except for changes and/or
8 corrections, if any, as indicated by me on the
9 correction sheet hereof.
10
11
12            _____
13            DAVID ALAN JOHNSON
14
15
16
17
18
19     Dated this_____day of_____,
20 2023.
21
22
23
24
25 CHERYL MACDONALD, Court Reporter

Moburg Reporting
206-622-3110


MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003
**Appendix 767**

November 17, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                          David Johnson

Page 38

```
1
    MOBURG REPORTING
2   COURT REPORTERS & LEGAL VIDEO
    33400 9th Avenue South
3   Suite 207
    Federal Way, WA 98003
4   206-622-3110
5
    PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS SHEET,
6   SHOWING PAGE, LINE, AND REASON, IF ANY.  SIGN THIS
    SHEET, SIGN THE ACCOMPANYING SIGNATURE SHEET AND
7   RETURN AS PER INSTRUCTIONS IN COVER LETTER.
8
    PAGE    LINE      CORRECTION AND REASON
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
                    (SIGNATURE)
24
25
    REPORTER: CHERYL MACDONALD
```

Page 39

```
1
2               MOBURG REPORTING
            Court Reporters & Legal Video
3         33400 9th Avenue South, Suite 207
              Federal Way, WA 98003
4          (206) 622-3110  FAX (206) 343-2272
           E-mail: info@moburgreporting.com
5
6   TO:   Jeremy E. Roller          November 30, 2023
          Arete Law Group
7         1218 3rd Avenue
          Suite 2100
8         Seattle, WA 98101
9
    IN RE:  The Satanic Temple v. Newsweek
10
    DEPOSITION(S) OF: David Alan Johnson
11
    DATE OF DEPOSITION: November 17, 2023
12
13  A copy of the deposition transcript of the above-named
    is provided via E-transcript.  Please have the
14  deponent read the deposition, sign the correction
    sheet and declaration.  The signed correction sheet
15  and declaration should then, within 30 (thirty) days,
    be forwarded to:
16
                 CHERYL MACDONALD
17
               33400 9th Ave. So.  #207
18
               Federal Way, Washington 98003
19
    who will then enclose them in the original transcript,
20  seal it, and forward it to Mr. Kezhaya for retention
    until the time of trial.
21
        If you have any questions, feel free to contact
22  me at the number listed above.
23  Sincerely,
24
    CHERYL MACDONALD, CCR
25
    CC: S. Tesoriero  M. Kezhaya
```

Page 40

```
1
2    Certification of Court Rule and WAC Compliance
             The Satanic Temple v. Newsweek
3
4        I, VALERIE SEATON, am an authorized representative of
     MOBURG REPORTING and do hereby, under penalty of perjury,
5    certify that Moburg Reporting and all court reporters
     providing services in the above-captioned case on MOBURG
6    REPORTING'S behalf will fully comply with all applicable
     rules and regulations governing the provision of court
7    reporting services, including, where applicable,
     Washington Superior Court Rule 28(c)-(e) and WAC
8    308-14-130(1).*
9                                 11/30/23
     _____      _____
10   Valerie L. Seaton              Date
     President
11   Moburg Reporting
12       *28(c)  Disqualification for Interest.  No deposition
     shall be taken before a person who is a relative or
13   employee or attorney or counsel of any of the parties, or
     is a relative or employee of such attorney or counsel, or
14   is financially interested in the action.
     28(d)  Equal Terms Required.  Any arrangement concerning
15   court reporting services or fees in a case shall be
     offered to all parties on equal terms.  This rule applies
16   to any arrangement or agreement between the person before
     whom a deposition is taken or a court reporting firm,
17   consortium, or other organization providing a court
     reporter, and any party or any person arranging or paying
18   for court reporting services in a case, including any
     attorney, law firm, person or entity with a financial
19   interest in the outcome of the litigation, or person or
     entity paying for court reporting services in the case.
20   28(e)  Final Certification of the Transcript.  The court
     reporter reporting a deposition shall not certify the
21   deposition transcript until after he or she has reviewed
     the final version of the formatted transcript.  A court
22   reporting firm, consortium, or other organization
     transmitting a court reporter's certified transcript
23   shall not alter the format, layout, or content of the
     transcript after it has been certified.
24       *308-14-130(1)  Offer arrangements on a case
     concerning court reporting services or fees to all parties
25   on equal terms.
```

Moburg Reporting
206-622-3110

MOBURG REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

# Exhibit 41

Excerpts of deposition of Nathan Sullivan
(November 17, 2023)

(173 of 273), Page 173 of 273
Case: 25-868, 07/28/2025, DktEntry: 49.1, Page 173 of 273
Case 1:22-cv-01343-MKV-SLC    Document 110-3    Filed 03/17/24    Page 2 of 17

**In the Matter Of:**

# THE SATANIC TEMPLE

## vs

# NEWSWEEK DIGITAL

# **NATHAN SULLIVAN**

## November 17, 2023



**Moburg Reporting**
33400 9th Ave. South, Suite 207
Federal Way, WA 98003
(206) 622-3110
www.MoburgReporting.com

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF NEW YORK

 3    --------------------------------------------------------
                                          )
 4    THE SATANIC TEMPLE, INC.,           )
                                          )      COPY
 5              Plaintiff,                )
                                          )
 6        vs.                             )NO. 1:22-CV-01343-MKV
                                          )
 7    NEWSWEEK DIGITAL, LLC,              )
                                          )
 8              Defendant.                )
                                          )
 9    --------------------------------------------------------

10        Videotaped Deposition Upon Oral Examination

11                           of

12                    NATHAN SULLIVAN
      --------------------------------------------------------
13
                  Friday, November 17, 2023
14
                       11:41 a.m.
15
                7900 Southeast 28th Street
16
                Mercer Island, Washington
17

18

19

20

21

22

23
      Cheryl Macdonald, CRR, RMR
24    Court Reporter
      License No. 2498
25
```

November 17, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                        Nathan Sullivan

Page 2

```
 1                 A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4                  MATT KEZHAYA
                    SONIA KEZHAYA
 5                  Attorneys at Law
                    KEZHAYA LAW PLC
 6                  150 South Fifth Street
                    Suite 1850
 7                  Minneapolis, Minnesota 55402
                    matt@kezhaya.law
 8                  sonia@kezhaya.law

 9

10    FOR THE DEFENDANT:

11                  SARA TESORIERO
                    Attorney at Law
12                  STRACHER LAW
                    51 Astor Place
13                  9th Floor
                    New York, New York 10003
                    sara@stracherlaw.com
14

15    FOR THE WITNESS:

16                  JEREMY E. ROLLER
                    Attorney at Law
17                  ARETE LAW GROUP
                    1218 Third Avenue
18                  Suite 2100
                    Seattle, Washington 98101
19                  roller@aretelaw.com

20

21    THE COURT REPORTER and VIDEOGRAPHER:

22                  CHERYL MACDONALD
                    KALIA HENDRICKS
23                  MOBURG REPORTING
                    33400 9th Avenue South
24                  Suite 207
                    Federal Way, Washington 98003
                    info@moburgreporting.com
25
```



November 17, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                                        Nathan Sullivan

Page 3

```
 1                          I N D E X

 2

 3   EXAMINATION                                          PAGE

 4   BY MR. KEZHAYA:   ..........................        5

 5

 6

 7   EXHIBITS MARKED                                      PAGE

 8   (No exhibits marked.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Page 4

```
 1                    THE VIDEOGRAPHER:  Good afternoon.  Good

 2     late morning.  We are now on the record.  This is the

 3     deposition of Nathan Sullivan.  This deposition is

 4     being recorded the 17th day of November 2023, and the

 5     time is now 11:41 a.m.  Counsel and all present,

 6     please identify yourselves for the record, and then

 7     the witness may be sworn in.

 8                    MR. KEZHAYA:  This is Matt Kezhaya.  I'm

 9     joined by Sonia Kezhaya.  Both of us are appearing on

10     behalf of the plaintiff.

11                    MS. TESORIERO:  This is Sara Tesoriero,

12     appearing on behalf of the defendant Newsweek.

13                    MR. ROLLER:  Jeremy Roller for the nonparty

14     witness Nathan Sullivan.

15     NATHAN SULLIVAN,   the witness herein, having been
                          placed under oath by the
16                        Certified Court Reporter,
                          deposed and said as follows:
17

18                    MS. TESORIERO:  We're going to make the

19     same stipulation about one objection can apply to both

20     witness counsel and defense counsel.

21                    MR. KEZHAYA:  Yes.

22                    MR. ROLLER:  And we also intend to review

23     and designate anything confidential.

24                    MR. KEZHAYA:  So stipulated.  Any other

25     pre-proceeding matters?
```

Page 5

```
 1              MS. TESORIERO:  No.

 2

 3                      EXAMINATION

 4   BY MR. KEZHAYA:

 5       Q.    Please state your name for the record.

 6       A.    Nathan Sullivan.

 7       Q.    And Nathan, are you familiar with the

 8   Newsweek article for which we are here today?

 9       A.    Yes.

10       Q.    Are you familiar with the particular

11   statement that we are here today?

12       A.    Yes.

13       Q.    Okay.  And just for sake of definitions,

14   the statement is, "Accounts of sexual abuse being

15   covered up in ways that were more than anecdotal."  Do

16   you agree with that understanding?

17              MR. ROLLER:  Object to the form, but you

18   can answer.

19       A.    I agree with that statement being relevant

20   here.

21       Q.    Okay.  Perfect.  Did you personally write

22   that statement?

23       A.    No.

24       Q.    Did a person who goes by the pseudonym Jinx

25   Strange write that statement?
```

Page 6

```
 1        A.    To my recollection, he is the one that
 2   quote is attributed to.
 3        Q.    Okay.  And to put a finer point on it, Jinx
 4   Strange is a pseudonym; correct?
 5        A.    As far as I'm aware, yes.
 6        Q.    Did you personally put Julia Duin in touch
 7   with Jinx Strange?
 8        A.    Yes.
 9        Q.    Okay.  Was that done in writing or was that
10   done orally?
11        A.    To my recollection, it was done in writing.
12        Q.    Okay.  How was this writing transmitted?
13        A.    To my recollection, over -- a direct
14   message over Twitter, now X.
15        Q.    Was this message conveyed through the
16   QueerSatanic Twitter handle?
17        A.    I believe so.
18        Q.    And to be clear, it was not transmitted
19   through a personal Twitter handle of yours; correct?
20        A.    Correct.
21        Q.    The statement at issue asserts covered up
22   sexual abuse.  How would you define sexual abuse?
23              MS. TESORIERO:  Objection to form.
24        Q.    Unless told otherwise, please answer the
25   question.
```

Moburg Reporting
206-622-3110

MOBURG REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003
Appendix 776

November 17, 2023

THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                    Nathan Sullivan

Page 10

```
 1        A.     Yes.

 2        Q.     Okay.  In the clip, I believe it was you

 3   who indicated that "We were expelled for being

 4   witnesses to an ethics complaint."

 5        A.     Mm-hmm.

 6        Q.     Is that a fair characterization of the

 7   clip?

 8        A.     Yes.

 9        Q.     In terms of the ethics complaint, prior

10   testimony has suggested that the ethics complaint was

11   an e-mail dated in or around March of 2020.  Is that

12   something that you dispute?

13        A.     I do not dispute that.

14        Q.     And the subject matter of the ethics

15   complaint were facts that took place in 2017.  Do you

16   agree with that?

17        A.     I was not party to those -- to those

18   events.  The exact timetable, I'm not really clear on.

19        Q.     So the subject matter of that ethics

20   complaint you did not personally see; is that correct?

21               MS. TESORIERO:  Objection to form.

22        A.     Right.

23        Q.     Do you know --

24               THE REPORTER:  I'm sorry.  I don't know if

25   I missed the answer.
```

Page 14

1   I only remember pseudonymously.  And by that time --

2   sorry -- by the time of my expulsion, I don't believe

3   any of them were still there.  I'm not sure if that

4   answers your question.

5        Q.    It -- adequately for my purposes.  Were you

6   ever a chapter head of TST Washington?

7        A.    No.

8             MR. ROLLER:  Matt, this is kind of getting

9   beyond the scope of the deposition that was ordered.

10            MR. KEZHAYA:  Yeah.  I'm trying to

11  establish a timeline here.  I'm actually a little bit

12  surprised that he co-founded the chapter.  I didn't

13  know that.  So I'm just trying to figure out the

14  timeline.

15       Q.    So just to try to expedite the matters.  So

16  you cofound the chapter 2014.  The sexual harassment

17  which underpins this March 2020 ethics complaint, the

18  sexual harassment took place in 2017/2018; correct?

19       A.    Yes.

20       Q.    And you personally did not see any of the

21  sexual harassment; correct?

22       A.    Correct.

23       Q.    And if I remember correctly, you said that

24  you didn't really talk to the subject of the sexual

25  harassment; is that correct?

```
 1        A.    Correct.

 2        Q.    The perpetrator of the sexual harassment,

 3   did you talk to that person?

 4        A.    About those events, no.

 5        Q.    In March of 2020, I recall from earlier

 6   testimony that the subject of the sexual harassment

 7   was not a member; is that correct?

 8        A.    Correct.

 9        Q.    Was -- well, let's just establish it.  Was

10   John Milton the pseudonym of the perpetrator of the

11   sexual harassment alleged?

12        A.    Yes.

13        Q.    Was John Milton a member in March of 2020?

14        A.    I do not believe so, no.

15        Q.    Going back to your definition of sexual

16   abuse, have you personally seen any sexual abuse

17   occurring within The Satanic Temple?

18        A.    No.

19        Q.    Have you personally received -- strike

20   that.

21              Have you personally seen any cover-up of

22   sexual abuse within The Satanic Temple?

23              MS. TESORIERO:  Objection to form.

24        A.    Indirectly.

25        Q.    No.  Directly.  I'm asking you directly.
```

```
 1                 C E R T I F I C A T E

 2

 3    STATE OF WASHINGTON        )

 4                               ) ss.

 5    COUNTY OF KING             )

 6

 7         I, the undersigned Washington Certified Court

 8    Reporter, pursuant to RCW 5.28.010, authorized to

 9    administer oaths and affirmations in and for the State

10    of Washington, do hereby certify:

11         That the annexed and foregoing deposition

12    consisting of Page 1 through 26 was taken

13    stenographically before me and reduced to a typed

14    format under my direction;

15         I further certify that according to CR 30(e) the

16    witness was given the opportunity to examine, read and

17    sign after the same was transcribed, unless indicated

18    in the record that the review was waived;

19         I further certify that all objections made at the

20    time of said examination to my qualifications or the

21    manner of taking the deposition, or to the conduct of

22    any party, have been noted by me upon said deposition;

23         I further certify that I am not a relative or

24    employee of any such attorney or counsel, and that I

25    am not financially interested in said action or the
```

Page 28

```
 1   outcome thereof;

 2       I further certify that the witness before

 3   examination was by me duly sworn to testify to the

 4   truth, the whole truth, and nothing but the truth;

 5       I further certify that the deposition, as

 6   transcribed, is a full, true and correct transcript of

 7   the testimony, including questions and answers, and

 8   all objections, motions, and exceptions of counsel

 9   made and taken at the time of foregoing examination

10   and was prepared pursuant to Washington Administrative

11   Code 308-14-135, the transcript preparation format

12   guideline;

13       I further certify that I am sealing the

14   deposition in an envelope with the title of the above

15   cause and the name of the witness visible, and I am

16   delivering the same to the appropriate authority;

17

18       IN WITNESS WHEREOF, I have hereunto set my hand,

19   and affixed my official seal this 30th day of

20   NOvember 2023.

21                            _____

22                            Cheryl Macdonald, CCR

23                            Washington State Certified

24                            Court Reporter

25                            License No. 2498
```

```
 1                    D E C L A R A T I O N

 2

 3

 4

 5          I declare under penalty of perjury that I

 6    have read my within deposition, and the same is true

 7    and accurate, save and except for changes and/or

 8    corrections, if any, as indicated by me on the

 9    correction sheet hereof.

10

11

12                                 _____

13                                 NATHAN SULLIVAN

14

15

16

17

18

19          Dated this_____day of_____,

20    2023.

21

22

23

24

25    CHERYL MACDONALD, Court Reporter
```

November 17, 2023

Nathan Sullivan

Page 30

```
 1
         MOBURG REPORTING
 2       COURT REPORTERS & LEGAL VIDEO
         33400 9th Avenue South
 3       Suite 207
         Federal Way, WA 98003
 4       206-622-3110

 5       _____
         PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS SHEET,
 6       SHOWING PAGE, LINE, AND REASON, IF ANY.  SIGN THIS
         SHEET, SIGN THE ACCOMPANYING SIGNATURE SHEET AND
 7       RETURN AS PER INSTRUCTIONS IN COVER LETTER.

 8       _____
         PAGE         LINE              CORRECTION AND REASON
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                              _____
                                (SIGNATURE)
24

25
         REPORTER: CHERYL MACDONALD
```



Page 31

```
 1
                    MOBURG REPORTING
 2            Court Reporters & Legal Video
           33400 9th Avenue South, Suite 207
 3               Federal Way, WA 98003
            (206) 622-3110  FAX (206) 343-2272
 4           E-mail: info@moburgreporting.com

 5

 6   TO:   Jeremy E. Roller            November 30, 2023
           Arete Law Group
 7         1218 3rd Avenue
           Suite 2100
 8         Seattle, WA 98101

 9
     IN RE:  The Satanic Temple v. Newsweek
10
     DEPOSITION(S) OF: Nathan Sullivan
11
     DATE OF DEPOSITION: November 17, 2023
12

13   A copy of the deposition transcript of the above-named
     is provided via E-transcript.  Please have the
14   deponent read the deposition, sign the correction
     sheet and declaration.  The signed correction sheet
15   and declaration should then, within 30 (thirty) days,
     be forwarded to:
16
                    CHERYL MACDONALD
17
                    33400 9th Ave. So.  #207
18
                    Federal Way, Washington 98003
19
     who will then enclose them in the original transcript,
20   seal it, and forward it to Mr. Kezhaya for retention
     until the time of trial.
21
         If you have any questions, feel free to contact
22   me at the number listed above.

23   Sincerely,

24
     CHERYL MACDONALD, CCR
25
     CC: S. Tesoriero  M. Kezhaya
```

November 17, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                      Nathan Sullivan

Page 32

```
 1
              Certification of Court Rule and WAC Compliance
 2
                     The Satanic Temple v. Newsweek
 3
          I, VALERIE SEATON, am an authorized representative of
 4    MOBURG REPORTING and do hereby, under penalty of perjury,
      certify that Moburg Reporting and all court reporters
 5    providing services in the above-captioned case on MOBURG
      REPORTING'S behalf will fully comply with all applicable
 6    rules and regulations governing the provision of court
      reporting services, including, where applicable,
 7    Washington Superior Court Rule 28(c)-(e) and WAC
      308-14-130(1).*
 8
                                          11/30/23
 9    _____    _____
      Valerie L. Seaton                         Date
10    President
      Moburg Reporting
11

12        *28(c)  Disqualification for Interest.  No deposition
      shall be taken before a person who is a relative or
13    employee or attorney or counsel of any of the parties, or
      is a relative or employee of such attorney or counsel, or
14    is financially interested in the action.
      28(d)  Equal Terms Required.  Any arrangement concerning
15    court reporting services or fees in a case shall be
      offered to all parties on equal terms.  This rule applies
16    to any arrangement or agreement between the person before
      whom a deposition is taken or a court reporting firm,
17    consortium, or other organization providing a court
      reporter, and any party or any person arranging or paying
18    for court reporting services in the case, including any
      attorney, law firm, person or entity with a financial
19    interest in the outcome of the litigation, or person or
      entity paying for court reporting services in the case.
20    28(e)  Final Certification of the Transcript.  The court
      reporter reporting a deposition shall not certify the
21    deposition transcript until after he or she has reviewed
      the final version of the formatted transcript.  A court
22    reporting firm, consortium, or other organization
      transmitting a court reporter's certified transcript
23    shall not alter the format, layout, or content of the
      transcript after it has been certified.
24        *308-14-130(1)  Offer arrangements on a case
      concerning court reporting services or fees to all parties
25    on equal terms.
```



# Exhibit 42

Excerpts of deposition of Jinx Strange (Paul Millirons)
(December 7, 2023)

Page 1

1                United State District Court

2                Southern District of New York

3        _____

4        The Satanic Temple, Inc.

5                Plaintiff,              1:22-CV-01343-MKV

6            v.

7        Newsweek Digital, LLC,

8                Defendant.

9        _____

10               DEPOSITION OF PAUL MILLIRONS

11                    DECEMBER 7, 2023

12                     10:00 a.m.

13

14       _____

15

16

17                  File # MW 6345272

18

19

20

21

22

23

24

25       COURT REPORTER:  Christina DeGrande

Page 2

1                APPEARANCES:

2                On Behalf of The Satanic Temple, Inc.

3                Matthew Kezhaya, Esq.

4                Sonia Kezhaya, Esq.

5                150 South 5th Street, Suite 1850

6                Minneapolis, Minnesota  55401

7                Matt@kezhaya.law

8                Sonia@kezhaya.law

9

10

11               On Behalf of Newsweek:

12               Sara Tesoriero, Esq.

13               Cameron Stracher

14               51 Astor Place, 9th Floor

15               New York, New York  10003

16               Sara@stracherlaw.com

17

18               On Behalf of Paul Millions:

19               Brian Spahn, Esq.

20               Godfrey and Khan

21               833 E. Michigan Street, Suite 1800

22               Milwaukee, Wisconsin  55302

23               Bspahn@gklaw.com

24

25

Page 3

1           I N D E X

2       WITNESS            EXAMINATION         PAGE

3       PAUL MILLIRONS    DIRECT                8

4                          CROSS               24

5                          REDIRECT            26

6

7               E X H I B I T S

8       NUMBER        DESCRIPTION          MARKED

9       Exhibit 1    Newsweek Article      9

10      Exhibit 2    October 24, Email     12

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1          BE IT REMEMBERED that the deposition upon

2     oral examination of Paul Millirons was taken on

3     December 7, 2023, at 10:00 a.m., via Zoom remote

4     technology before Christina DeGrande, Professional

5     Stenographer, Notary Public in and for the State of

6     Minnesota.

7          Whereupon, the following proceedings were

8     had, to wit:

9          THE VIDEOGRAPHER:  Good morning.  We're

10    going on the record at 10:02 a.m. on

11    December 7th, 2023.  Please note, this

12    deposition is being conducted virtually.

13    Quality of recording depends on camera and

14    internet connection of participants.  What

15    is seen from the witness and heard on the

16    screen is what will be recorded.  Audio and

17    video recording will continue to take place

18    unless all parties agree to go off the

19    record.

20         This is Media Unit 1 of the

21    video-recorded deposition of Paul Millirons

22    taken by counsel for the plaintiffs in the

23    matter of the -- the Satanic Temple,

24    Incorporated versus Newsweek Digital, LLC,

25    filed in the United States District Court,

Page 5

1            Southern District of New York, case

2            1:22-CV-01343-MKV.

3                  My name is Dave Young.  I'm the

4            videographer.  Our court reporter today is

5            Christina DeGrande.  We are both

6            representing Veritext Legal Solutions.  I am

7            not related in -- to any party in this

8            action nor am I financially interested in

9            the outcome.

10                 If there are any objections to this

11           proceeding, please state them at the time of

12           your appearance.  Will counsel now state

13           their appearances and affiliations for the

14           record beginning with the noticing attorney?

15                 MR. KEZHAYA:  Matt Kezhaya joined by

16           Sonia Kezhaya for the plaintiff.

17                 MS. TESORIERO:  This is Sara Tesoriero

18           for the defendant Newsweek.

19                 MR. SPAHN:  This is Brian Spahn for the

20           witness, Paul Millirons.

21                 THE VIDEOGRAPHER:  And will the court

22           reporter please swear in the witness, and

23           then we can proceed?

24                 THE COURT REPORTER:  Counsel, I have a

25           short statement I would like to make first

Page 6

1          to help everything go as smoothly as

2          possible.

3              Because we are all appearing remotely,

4          I would like to ask everyone to be more

5          conscious than ever of not speaking over one

6          another.  If I cannot hear the end of a

7          question or the beginning of an answer, you

8          are going to have a poor record.

9              If the witness could take a pause

10          before answering to allow the attorneys to

11          object, this will be extremely helpful.  I

12          don't want to disrupt the flow of your

13          proceedings and will try to keep

14          interruptions to a minimum, but I will

15          interrupt if I cannot hear or understand

16          something that is said.  If I do interrupt,

17          please be patient and understand my goal is

18          to provide you with a clear record of the

19          proceedings.

20              Before we get started, I would request

21          that you move your papers and/or legal pads

22          away from your phones or microphones to

23          avoid distracting ambient noise.

24              I will swear in the witness, but before

25          doing so, I need a stipulation to allow me

Page 7

1           to swear him remotely.  I will read the

2           stipulation into the record followed by each

3           attorney stating their appearances -- well,

4           you already did that so you don't need to do

5           that again -- and anyone else in the room

6           who is also attending and then note your

7           stipulation allowing me to swear the witness

8           remotely starting with the taking attorney.

9               Due to the need for this proceeding to

10          take place remotely, the parties do

11          stipulate that the court reporter may swear

12          in the witness via Zoom remote technology

13          and that the witness has verified that he

14          is, in fact, Paul Millirons.

15              MR. KEZHAYA:  Yes, so stipulated from

16          plaintiff's end.

17              MS. TESORIERO:  So stipulated for the

18          defendant.

19              MR. SPAHN:  So stipulated for the

20          witness.

21              THE COURT REPORTER:  Please raise your

22          right hand.

23              Do you swear or affirm that the

24          testimony you are about to provide for the

25          cause under consideration will be the truth

Page 8

```
 1              and the whole truth, so help you?

 2                   THE WITNESS:  I do.

 3                   MS. TESORIERO:  Matt, before you begin,

 4              would you agree to the stipulation we did in

 5              other depositions that if I make an

 6              objection, it can be preserved as to

 7              witness's counsel and vice versa?

 8                   MR. KEZHAYA:  Correct.  So stipulated.

 9                   Any other pre-proceeding matters?

10                   MS. TESORIERO:  Not from me.

11                   MR. SPAHN:  Not from me.

12

13                   PAUL MILLIRONS,

14              a witness in the above-entitled action,

15              after having been first duly sworn,

16              testifies and says as follows:

17

18                   DIRECT EXAMINATION

19         BY MR. KEZHAYA:

20    Q.   Okay.  Please state your preferred name for the

21         record?

22    A.   My preferred name is Jinx Strange.

23    Q.   And that's a pseudonym; is that correct?

24    A.   Correct.

25    Q.   Okay.  Are you familiar with the article, "Orgies,
```

Page 11

1        ways that were more than anecdotal"?

2    A.  I'm sorry.  What do you mean?  What about it?

3    Q.  I'm -- I'm asking what that -- what that meant in

4        your mind when you wrote this quote.

5    A.  Okay.

6    Q.  So what did you mean when you --

7    A.  The context was that Julia had asked what were some

8        -- what were -- what were some of the reasons that I

9        was not involved with TST or had -- had left the

10       organization, and that was part of a list of things

11       that concerned me.  When I say, "Covered up in ways

12       that are more anecdotal," I'm referring specifically

13       to observed behavior on social media by people I

14       understand to be leaders in TST.  I think there were

15       chapters at the time.

16   Q.  So is it -- is it accurate to say that you

17       personally witnessed this sexual abuse?

18   A.  No.

19   Q.  Okay.  So you didn't personally witness any sexual

20       abuse?

21   A.  No.

22   Q.  What about this coverup?  You -- is it accurate to

23       say you personally observed the coverup?

24   A.  I observed behavior that I thought would -- it was

25       suspicious in the context of allegations that were

Page 13

```
 1        Q.   Okay.  Is it fair to say that your understanding of

 2             sexual abuse was secondhand through people basically

 3             telling you something over the internet?

 4        A.   Yes.

 5        Q.   Okay.  Your next sentence says, "A lot of times,

 6             those things were anecdotal or unsupported, but

 7             sometimes they were concerning."  Is that accurate

 8             reading of your -- of your email?

 9        A.   Yes.

10        Q.   Okay.  When you say that they were anecdotal or

11             unsupported, what did that mean as -- as the person

12             drafting this statement?

13        A.   That meant that there was no other context or

14             anything I could observe related to the claim that

15             was being made.

16        Q.   So my interpretation of this sentence here is that a

17             lot of times, they were anecdotal or unsupported

18             suggesting that sometimes they were not.  Is that --

19             is that a correct reading?

20        A.   Yes.

21        Q.   Okay.  So I want to turn, now, to what you're

22             getting at with -- with regard to when they are more

23             than anecdotal or they are supported.

24        A.   Okay.

25        Q.   What were -- who were some of the people who made
```

Page 33

1      STATE OF MINNESOTA    )

                            )  ss

2      COUNTY OF ANOKA       )

3           BE IT KNOWN THAT I, Christina M. De Grande,

4      the undersigned professional stenographic court

5      reporter took the proceedings on December 7, 2023.

6           I do hereby certify that I was then and there a

7      notary public in and for the County of Anoka, State

8      of Minnesota, and by virtue thereof, I am duly

9      authorized to administer an oath;

10          That before testifying, the witnesses were

11     first duly sworn under oath by me to testify to the

12     whole truth relative to the cause under

13     consideration.

14          The foregoing 32 pages are a true and accurate

15     copy of my original stenotype notes as transcribed

16     by computer-aided transcription taken relative to

17     the aforementioned matter.

18          I am not related to any of the parties hereto

19     nor am I interested in the outcome of the action.

20

       WITNESS MY HAND AND SEAL this 18th day of

21

       December, 2023.

22

23

       CHRISTINA M. DE GRANDE

24     Professional Stenographic Court Reporter

       And Notary Public

25     Commission expires January 31, 2027

# Exhibit 43

Excerpts of deposition of TST 30(b)(6) (Gregory Stevens)
(November 3, 2023)

**In the Matter Of:**

THE SATANIC TEMPLE V. NEWSWEEK DIGITAL

1:22-cv-01343-MKV

---

# **GREGORY STEVENS**

*November 03, 2023*

---

*30B6*



800.211.DEPO (3376)
EsquireSolutions.com

```
 1

 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    ----------------------------------x

 4    THE SATANIC TEMPLE, INC.,

 5                         Plaintiff,

 6              -against-                    Case No.
                                            1:22-cv-01343-MKV
 7    NEWSWEEK DIGITAL, LLC,

 8                         Defendant.

 9    ----------------------------------x

10                         November 3, 2023
                           9:43 a.m.
11

12

13         30(b)(6) Deposition of Plaintiff by

14    GREGORY STEVENS, taken by Defendant, held at

15    30 Rockefeller Plaza, New York, New York,

16    before Joseph R. Danyo, a Shorthand Reporter

17    and Notary Public within and for the State

18    of New York.

19

20

21

22

23

24

25
```



```
 1

 2    A P P E A R A N C E S :

 3

 4        KEZHAYA LAW PLC
          Attorneys for Plaintiff and the Witness
 5            150 S. Fifth Street
              Suite 1850
 6            Minneapolis, Minnesota 55401

 7        By:   MATT KEZHAYA, ESQ.
                SONIA KEZHAYA, ESQ.
 8

 9

10        LAW OFFICES OF CAMERON STRACHER PLLC
          Attorneys for Defendant
11            51 Astor Place
              9th Floor
12            New York, New York 10003

13        By:   CAMERON STRACHER, ESQ.
                SARA TESORIERO, ESQ. (Via Zoom)
14

15

16    Also Present:

17        LAURA HENRIQUE, ESQ., Newsweek (Via Zoom)

18        RACHELLE PIKE, Paralegal, Cameron Stracher PLLC
                         (Via Zoom)
19

20                       ~oOo~

21

22

23

24

25
```



Stevens

1

2     to work on projects full time for The Satanic

3     Temple, and that was when I started working on

4     the ordination program, which we ended up

5     launching a couple of years later and other

6     miscellaneous projects as well.

7              So then now and ever since 2020 I

8     will say we launched an ordination program, and

9     my role has been the director of ministry and

10    having been central to the creation of the

11    ordination program and sort of launching that,

12    ramping that up and also being the head of the

13    team now that manages the ordination council that

14    manages the ordination of new ministers as well

15    as management, and so, although we officially,

16    our group doesn't decide upon complaints, we have

17    a separate group for that in the organization.

18    It is no longer the national council.  There was

19    a restructuring.

20             So there's an actual group that is

21    dedicated called the Suryan Council that is

22    dedicated to hearing complaints about the

23    violation of code of conduct, which the matters

24    on Schedule A would fall under violations of code

25    of conduct, and there is another group, the



```
1                        Stevens
2   concerns committee, that hears, receives
3   complaints about investigates and adjudicates
4   matters that are not violations of the code of
5   conduct, but still, you know, things when people
6   have a concern about something, whether it's
7   someone in a position with responsibility not
8   doing their job, stuff that is not a violation of
9   code of conduct, but other complaints, so this is
10  all a product of the rapid growth.
11                  There was a point in about 2020 when,
12  2021, when having a single body, the national
13  council, to do all the things we realized wasn't
14  going to work anymore.  So we started a
15  restructuring, and that's when we got the Suryan
16  Council, and then the national council was
17  finally dissolved and replaced with a governing
18  system for the congregations that's basically a
19  collection of committees instead of having a
20  single thing.
21                  Again, this is all in the service of
22  dealing with the rapid growth, and in that
23  committee is the administrative committee,
24  legislative committee and then the concerns
25  committee.  That's the other one, so now the
```



```
 1                          Stevens

 2   ordination council which I as the director of

 3   ministry and the head of we are tasked with

 4   investigating complaints.  Two groups that are

 5   tasked with investigating complaints are the

 6   Suryan Council and the concerns committee, but,

 7   if they get reported a complaint and do an

 8   investigation, anything that concerns a minister,

 9   because that is sort of our, you know, bailiwick

10   as it were, they will let us know like, hey, we

11   have done this investigation, here is the sort of

12   top-level report, and, regardless of their

13   determination of whether some other remedy, you

14   know, is appropriate for the congregations or the

15   administrative side of it they are like here are

16   the facts.

17             So then our council can decide do we

18   think some sort of remedy on the ministerial side

19   of it, because it's possible someone, maybe what

20   they did was not rising to the level of them

21   being removed from leadership position, but maybe

22   we don't want them to be a minister anymore.

23   These are separate determinations.  So they would

24   pass the information to us.

25             So it, as a consequence between me
```



(208 of 273), Page 208 of 273
Case 1:22-cv-01343-MKV-SLC   Document 110-7   Filed 05/17/24   Page 8 of 24
Case: 25-868, 07/28/2025, DktEntry: 49.1, Page 208 of 273

GREGORY STEVENS  30B6                        November 03, 2023
THE SATANIC TEMPLE V. NEWSWEEK DIGITAL                    26

```
 1                       Stevens
 2    congregation and let's say it doesn't involve the
 3    minister, but it involves another member in that
 4    congregation?  How would that get handled and
 5    reported?
 6          A.    Regardless of whether it does or
 7    doesn't involve any of these things, that's
 8    handled by the Suryan Council, and so the Suryan
 9    Council has a form that we put a lot of effort
10    into making sure all of our members are aware of
11    and realize like, hey, anyone, you don't need to
12    be in leadership.  You can use this form.  You
13    don't even need to be an official member of a
14    congregation.  If you had an interaction with
15    someone, like anyone can use this form.
16               We also make a point of if internally
17    if someone reports something to the concerns
18    committee, but like, you know, some of them don't
19    necessarily know, but or they feel like they just
20    remember the concerns committee, they don't
21    remember the other one, if the concerns committee
22    receives a report of something like sexual
23    assault, immediately they refer it over to the
24    Suryan Council.
25               If someone feels very comfortable
```



GREGORY STEVENS  30B6                          November 03, 2023
THE SATANIC TEMPLE V. NEWSWEEK DIGITAL                        27

```
 1                        Stevens
 2   with me as the director of the ordination
 3   council, then so they also like the Suryan
 4   Council, so we make sure that all of that gets
 5   submitted to them, because they're the team that
 6   receives those complaints and investigates and
 7   responds.
 8            Q.   Who is the head of the Suryan Council
 9   at present?
10            A.   So I don't know if he is officially
11   the head.  I know the most senior member of the
12   Suryan Council his name is Steven, I'm not sure
13   how to pronounce his last name.  L-e-n possibly
14   c-z-e-r.  I want to verify that.  Yeah.  He's the
15   most senior person when I'm having communication
16   with the Suryan Council is most often the person
17   I'm speaking to.
18            Q.   How long has he had that position, if
19   you know?
20            A.   Several years.  I don't know exactly.
21            Q.   What happens when a complaint of a
22   sexual nature comes into the Suryan Council?  How
23   is it handled?
24            A.   So I'm not part of the Suryan
25   Council, so I can't speak firsthand, but I can
```



GREGORY STEVENS  30B6                        November 03, 2023
THE SATANIC TEMPLE V. NEWSWEEK DIGITAL                    28

```
 1                       Stevens
 2    tell you what I know their policy is.  Fair?
 3            Q.   Yes.
 4            A.   Their stated policy is that as a
 5    first step they gather from the person who
 6    submitted the complaint gather any clarifying
 7    information.  They will first talk to them and
 8    make sure they have all the information.
 9            If it is sexual assault, they will
10    ask if the person, they will encourage the person
11    to go to the police and file a police report.
12    You know, we try not to pressure people because
13    we understand how people feel and how a lot of
14    people don't want to be sort of re-traumatized,
15    but we would rather in someone like that police
16    have a much much better capacity for
17    investigating things, since it's a crime that
18    should be reported.
19            Q.   Let me interrupt you and I apologize.
20    Let's agree that it's a complaint of a sexual
21    nature that is not a crime that would need to be
22    reported to the police.  More a sexual
23    harassment, inappropriate sexual conduct,
24    something that a member feels was improper.
25            A.   So just to make sure I understand,
```



GREGORY STEVENS 30B6                              November 03, 2023
THE SATANIC TEMPLE V. NEWSWEEK DIGITAL                          29

```
 1                      Stevens
 2    right now we're not talking about sexual assault?
 3          Q.    Correct.
 4          A.    Like I was saying, first, the person
 5    who submitted a report, talk to them, and if
 6    there are other people involved, I believe that
 7    the order is usually to get corroborating
 8    evidence from other people mentioned, and then
 9    the last person that will be interviewed will be
10    the person that the allegation is against, just
11    to sort of get all the ducks in a row ahead of
12    time, and sometimes honestly if there's
13    documented evidence in the form of, you know,
14    screenshots for online harassment and stuff like
15    that, I think there are times when they don't
16    even necessarily need to go that far.  I think
17    they almost always will just to see if they can
18    get the person who was accused to admit what
19    they're going to say about it, they will get to
20    that point, but some of these steps can be
21    shortcut if there is very, very clear evidence,
22    and then there will be the deliberation about
23    what should be done.
24                Most of the time if it's something
25    like what you're describing, what I understand
```



```
 1                        Stevens
 2   you to be describing, that is serious enough that
 3   we are skipping right past the warning, please
 4   don't do it again, and it is removal from a
 5   position of power, and by the way, often the way
 6   that things actually unfold is that, if there is
 7   a problem in a congregation, so congregations
 8   have the power to remove someone from the
 9   congregation.
10             Often what happens in a case that is
11   severe enough that it would be considered
12   something like I think sexual harassment, for the
13   safety and for the safety of the members of the
14   congregation, the congregation will remove them
15   or kick them out of the congregation and still
16   report it to the Suryan Council in case there are
17   other things that need to be done, but will kick
18   them out from the very beginning.
19             That's another thing that I forgot to
20   mention.  Usually the ordination council we don't
21   like, we try to be very cautious and
22   evidence-based, so we don't like acting on
23   accusations, but, if we get a report, a
24   notification from Suryan Council and we have.
25   This happened several times where an accusation
```



(213 of 273), Page 213 of 273
Case: 25-868, 07/28/2025, DktEntry: 49.1, Page 213 of 273
Case 1:22-cv-01343-MKV-SLC  Document 110-7  Filed 05/17/24  Page 13 of 24

|    | Stevens |
|----|---------|
| 1  | |
| 2  | of something has been severe enough, something |
| 3  | like sexual harassment, that even though they |
| 4  | haven't finished their investigation, it is |
| 5  | severe enough that they think something like an |
| 6  | administrative suspension would be recommended. |
| 7  | They will recommend it to us, and we do that. |
| 8  | So we will take away someone's access |
| 9  | as a minister for while the investigation is |
| 10 | taking place if we think that the -- if the |
| 11 | Suryan Council recommends it and usually |
| 12 | recommended if there is evidence that this person |
| 13 | constitutes a potential risk, right.  So that, |
| 14 | sorry, that was a little wandering answer.  I |
| 15 | hope I gave you what you wanted there. |
| 16 | Q.   No, no, no.  That's very helpful. |
| 17 | Thank you.  So we have a bunch of documents that |
| 18 | were produced by your counsel, and we understand |
| 19 | that these documents represent all the |
| 20 | documentation that The Satanic Temple has |
| 21 | regarding and relating to claims of sexual abuse. |
| 22 | Is that your understanding as well? |
| 23 | A.   I believe so.  Yeah. |
| 24 | Q.   As far as you know, there are no |
| 25 | other documents other than the ones that have |



```
 1                    Stevens
 2    knowledge, that indicates that this falls within
 3    that scope, and if you ask me if I know for
 4    absolute certain, I'm not familiar with the
 5    incident, but I also believe that it's outside
 6    the scope, because there's nothing at all to
 7    indicate that this had sexual assault as a
 8    component.
 9         Q.   Got it, but you understand that this
10    was produced in response to our request for all
11    documents reflecting allegations of sexual abuse?
12    Put it this way.  I will represent to you that
13    this was produced in response to our request for
14    all documents reflecting allegations of sexual
15    abuse.
16         A.   Okay.
17         Q.   But your testimony is you don't know
18    whether this is in fact relating to an allegation
19    of sexual abuse?
20         A.   I mean, no, I don't know for certain
21    one way or the other, like I said, but in my
22    review in preparation for this, although I have
23    seen this e-mail thread before, I did not
24    consider it to be within the scope, because it
25    does not have the appearance of anything that
```



(215 of 273), Page 215 of 273
Case: 25-868, 07/28/2025, DktEntry: 49.1, Page 215 of 273
Case 1:22-cv-01343-MKV-SLC   Document 110-7   Filed 05/17/24   Page 15 of 24

GREGORY STEVENS  30B6                        November 03, 2023
THE SATANIC TEMPLE V. NEWSWEEK DIGITAL                      45

```
 1                         Stevens
 2    involves sexual abuse.
 3                Even the language in the announcement
 4    that you called attention to on page 3 that Amber
 5    Saurus wrote along with Sadie, you know, The
 6    Satanic Temple cannot tolerate acts of violence
 7    or abuse at its religious functions.
 8         Q.    Okay.
 9         A.    Yeah.
10         Q.    When did you see this document?
11         A.    It was when I was initially working
12    on trying to help with discovery for this, and I
13    worked with like, as I mentioned before, I was on
14    the groups that review these things for a period
15    of time, but to help cover the gaps a friend of
16    mine who was on during the periods when I wasn't
17    I was working with her, and we were looking
18    through all the e-mails, and the topic actually
19    literally came up like with these e-mails if you
20    just search for certain keywords you're just
21    going to get way more than is actually relevant.
22    So sometimes we were not sure.
23                So the strategy by me that I was
24    like, well, let's give our lawyer everything and
25    leave it at that, but this was not produced, this
```



Case 1:22-cv-01343-MKV-SLC Document 110-7 Filed 05/17/24 Page 16 of 24

GREGORY STEVENS 30B6                          November 03, 2023
THE SATANIC TEMPLE V. NEWSWEEK DIGITAL                      50

```
 1                        Stevens
 2   at least according to this very last e-mail, but
 3   whether that was done, whether she stepped away,
 4   what happened subsequently we don't know.
 5             MR. KEZHAYA:  Objection.  Calls for
 6        speculation.
 7        Q.   Well, do you know?
 8        A.   I only know -- everything I know
 9   about this incident I know from this e-mail
10   thread.  So, yeah.  I'm not sure.
11        Q.   Okay.  By the way, when a decision is
12   made as a result of the adjudication of a
13   complaint, how is it documented?
14        A.    It has changed over time.  I'm trying
15   to think back to 2019.  If you're asking about --
16   because I think that it took some time.
17   Currently and from about 2020 on it became much
18   more formal, especially with the formation of the
19   Suryan Council like there's an actual like this
20   is a report of the outcome of the investigation.
21   Make sure that not only is this person e-mailed,
22   but it's cc'd.  You know, there was a lot more
23   formality from 2020 on.
24             At this time and earlier, so this is
25   2019, 2019 and earlier, I think that there was a
```



GREGORY STEVENS  30B6                              November 03, 2023
THE SATANIC TEMPLE V. NEWSWEEK DIGITAL                        51

```
 1                        Stevens
 2    lot more that was done just via e-mails or via
 3    communications telling people to step down or
 4    asking people to step down and so on as opposed
 5    to like official like statements or whatever.
 6         Q.   Got it.
 7         A.   Again, for this particular one I
 8    don't know, but that's my answer to you
 9    generally.
10         Q.   Is it fair to say, asking you in your
11    official capacity that, if there had been a
12    document reflecting an adjudication, it would
13    have been produced to us?
14         A.   Oh, yeah.  Yeah.  Absolutely.
15         Q.   Let's mark this as Exhibit 5.
16              (Defendant's Exhibit 5, Document
17         Bates stamped TST 86.0001 and 86.0002, was
18         so marked for identification, as of this
19         date.)
20         Q.   Are you familiar with Exhibit 5?
21         A.   I am.
22         Q.   Alright.  What is it?
23         A.   It's an e-mail thread that's about
24    the topic that, if I may, incidentally ties to
25    the first of the listed items on my document,
```



GREGORY STEVENS  30B6                              November 03, 2023
THE SATANIC TEMPLE V. NEWSWEEK DIGITAL                          86

```
 1                    Stevens
 2   the past and in other situations retaliation
 3   comes just spreading gossip on social media.
 4   Yeah.  Like that happens, and it hurts people to
 5   have someone go all out blasting them on social
 6   media, and that's some of the biggest fear that
 7   people have.
 8              So that's what I speculate, but it is
 9   speculation.  Based on the text, I don't know.
10        Q.   So, to summarize then, no action was
11   taken because he voluntarily stepped down.  Is
12   that right?
13        A.   No.  He was pressured to step down.
14   He was talked into stepping down so that no
15   action would need to be taken.  I think that
16   there is a material difference between those two
17   phrasings.
18        Q.   How do you reach that conclusion?
19        A.   How do I reach that conclusion?
20        Q.   That he was convinced to step down or
21   pressured to step down.
22        A.   Apart from the fact that Kym directly
23   says, Kym actually says that that would be the
24   method or okay.  Hang on.  The way I understand
25   Kym's assertion in that paragraph when he says,
```



(219 of 273), Page 219 of 273
Case: 25-868, 07/28/2025, DktEntry: 49.1, Page 219 of 273
Case 1:22-cv-01343-MKV-SLC  Document 110-7  Filed 05/17/24  Page 19 of 24

GREGORY STEVENS  30B6                    November 03, 2023
THE SATANIC TEMPLE V. NEWSWEEK DIGITAL              91

```
 1                     Stevens
 2   step down?
 3        A.   He didn't say the person is going to
 4   step down.  He said that, if we took action, it
 5   would be in everyone's best interest.  This is
 6   the argument that he would make to Fred to try to
 7   convince him to.  I don't think this is -- in my
 8   mind, this isn't that difficult to understand.
 9   Imagine yourself in a room where the person and
10   you feel like you already know and are sure like,
11   yeah, this person has done crappy stuff.  I have
12   seen it.
13             In your mind, you are thinking I'm --
14   like this person is going to be kicked out
15   because I know what has happened, but you can't
16   promise that.  You're behaving properly.  There
17   has to be an investigation first.  So what you do
18   you say, alright, if we take action, then we're
19   going to do everything we can to minimize the
20   chance of retaliation.
21             One way is to try to, instead of
22   bringing down the hammer on him, you know, get
23   him to, convince him that it's in his own best
24   interest to, you know, do as Nixon did, you know
25   what I'm saying?
```



```
 1                      Stevens
 2        Q.   Bow out gracefully.
 3        A.   Yeah, so this was, all I was saying
 4   is to me the motivation and sort of sequence, the
 5   connections here don't seem at all ambiguous.  It
 6   seems very clear what is going on here is there
 7   is a person who feels personally confident that
 8   like, yeah, this person did a crappy thing.  He's
 9   going to be out of here.  I cannot professionally
10   definitively promise that, right?  So what I say
11   instead is, hey, we're going to look into it, and
12   if wink, wink, if we do something, we're going to
13   do it in a way to try to make him less motivated
14   to retaliate.
15        Q.   Okay, but there is no documentation
16   that there was any investigation, correct?
17        A.   I think the only thing that I can
18   think of that would be if there were, yeah, no,
19   as far as I know.  No.
20             (Lunch recess:  12:30 p.m.)
21
22
23
24
25
```



(221 of 273), Page 221 of 273
Case 1:22-cv-01343-MKV-SLC   Document 110-7   Filed 05/17/24   Page 21 of 24
Case: 25-868, 07/28/2025, DktEntry: 49.1, Page 221 of 273

GREGORY STEVENS  30B6                                    November 03, 2023
THE SATANIC TEMPLE V. NEWSWEEK DIGITAL                              93

```
 1                        Stevens
 2                    Afternoon Session
 3                        1:08 p.m.
 4   G R E G O R Y    S T E V E N S, having been
 5   previously duly sworn, was examined and testified
 6   further as follows:
 7                MR. STRACHER:  Let's mark as
 8         Defendant's 12.
 9                (Defendant's Exhibit 12, Document
10         Bates stamped TST 119, was so marked for
11         identification, as of this date.)
12   EXAMINATION (Continued)
13   BY MR. STRACHER:
14        Q.   Take a look at Exhibit 12 and let me
15   know if you recognize it.  While we are at it,
16   let's mark as Exhibit 13 a document that is TST
17   120.
18                (Defendant's Exhibit 13, Document
19         Bates stamped TST 120, was so marked for
20         identification, as of this date.)
21                MR. STRACHER:  I'm marking these all
22         because they relate to the same complaint.
23                THE WITNESS:  Okay.
24                MR. STRACHER:  Exhibit 14.
25                (Defendant's Exhibit 14, Document
```



GREGORY STEVENS  30B6                          November 03, 2023
THE SATANIC TEMPLE V. NEWSWEEK DIGITAL                      153

```
 1                          Stevens
 2    harm, general damages for reputational harm and
 3    punitive damages."
 4              So let me ask you about the special
 5    damages.  Lost donations, lost membership, future
 6    economic losses.  How do you measure those?  How
 7    many lost donations have you suffered?
 8         A.   So I can't give you numbers.  I
 9    didn't come here.  Like I know whatever process
10    was involved in generating the numbers that were
11    presented for the court are the result of
12    research and the calculation.  I can't give you
13    details.  I didn't do that calculation.  What I
14    can say is that we have seen over a period of
15    time since the Newsweek article came out there
16    are people who are not hesitant about messaging
17    us and saying that they're canceling their
18    recurring donation because of this, that or the
19    other, right, so that kind of thing can be tied
20    very, very specifically and also whenever there
21    are people who are actively, whether trying to
22    denigrate TST, now they have this thing that
23    looks very official in their handbook of like,
24    oh, we must be right because look at this thing
25    that was published, which is incredibly harmful,
```



(223 of 273), Page 223 of 273
Case: 25-868, 07/28/2025, DktEntry: 49.1, Page 223 of 273
Case 1:22-cv-01343-MKV-SLC  Document 110-7  Filed 05/17/24  Page 23 of 24

GREGORY STEVENS  30B6                    November 03, 2023
THE SATANIC TEMPLE V. NEWSWEEK DIGITAL              160

```
 1                      Stevens
 2   all the time, and so an accusation of not just
 3   some individual person doing bad things, but an
 4   institutional whatever, you know, coverup is
 5   incredibly harmful to us, because it undermines
 6   our entire, you know, religious beliefs.
 7           Q.   Is the threat of that harm a useful
 8   weapon against TST?
 9           A.   Yes.
10           Q.   Directing your attention to
11   Defendant's Exhibit 10, which pertains to TST
12   Arizona and Wonka, have you been provided any
13   materials today or do you otherwise know about
14   the nature of the accusations against Wonka?
15           A.   No.
16           Q.   So, as you sit here today, you know
17   nothing that could support the notion that Wonka
18   was engaged in any form of sexual misconduct.  Is
19   that right?
20           A.   That's correct.
21           Q.   I would like you to expand a little
22   bit on why does TST not proselytize as a
23   doctrinal position and perhaps begin your answer
24   with, if you can, a definition of proselytizing,
25   if you think it important.
```



```
1

2                    C E R T I F I C A T I O N

3

4            I, JOSEPH R. DANYO, a Shorthand Reporter

5    and Notary Public, within and for the State of New

6    York, do hereby certify:

7            That I reported the proceedings in the

8    within entitled matter, and that the within transcript

9    is a true record of such proceedings.

10           I further certify that I am not related, by

11   blood or marriage, to any of the parties in this

12   matter and that I am in no way interested in the

13   outcome of this matter.

14           IN WITNESS WHEREOF, I have hereunto set my

15   hand this 10th day of November, 2023.

16

17

18                       JOSEPH R. DANYO

19                  STATE OF NEW YORK

20                  My Commission Expires 2/20/2027

21

22

23

24

25
```



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

|  | : |  |
|---|---|---|
| THE SATANIC TEMPLE, INC., | : |  |
|  | : |  |
| Plaintiff, | : | Case No. 1:22-cv-01343-MKV |
| v. | : |  |
|  | : |  |
| NEWSWEEK DIGITAL, LLC | : |  |
|  | : |  |
| Defendant. | : |  |
|  | : |  |
|  | : |  |

------------------------------------------------------------------- x

## DEFENDANT'S RESPONSE TO PLAINTIFF'S RULE 56.1 STATEMENT AND COUNTER-STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendant Newsweek Digital, LLC ("Defendant" or "Newsweek"), by and through undersigned counsel, respectfully submits this Response to Plaintiff's Statement of Undisputed Material Facts and Counter-Statement of Undisputed Material Facts pursuant to Local Rule 56.1.

1.      Plaintiff The Satanic Temple, Inc. is an atheistic religious corporation organized under the laws of Massachusetts with its principal place of business in Salem, MA. Compl. at ¶ 6.

**RESPONSE:**      Defendant admits the statements in Paragraph 1.

2.      Defendant Newsweek Digital LLC is a New York limited liability company whose membership consists of New York residents. Compl. at ¶ 7.

**RESPONSE:**      Defendant admits the statements in Paragraph 2.

3.      Newsweek Digital LLC holds the rights to publish *Newsweek.* Compl. at ¶7.

**RESPONSE:**      Defendant admits that it publishes the online news magazine *Newsweek* through its website at www.newsweek.com.  Compl. ¶¶ 1, 7.

**Appendix 822**

4.      *Newsweek* is read by "more than one in five Americans." Cooper Depo. 56:2-8
(Exhibit 37).

**RESPONSE:**      Defendant admits the statements in Paragraph 4.

5.      Around 10 or 15 years ago, *Newsweek* was one of the "Big Three" newspapers.
Cooper Depo. 55:10-22 (Exhibit 37).

**RESPONSE:**      Defendant objects to this statement because it is not material, or even
relevant, to any claim or defense at issue in this litigation. *See* F. R. Civ. P. 56; L.R. 56.1(a).
Subject to this objection, Defendant states that approximately 15 to 20 years ago Newsweek was
known as one of the "Big Three" news magazines. ECF 110-1 (Deposition of Nancy Cooper,
dated November 7, 2023 ("Cooper Depo."), 55:10–22).

6.      The "Big Three" were the biggest and most credible names in the news industry.
Cooper Depo. 55:18-25 (Exhibit 37).

**RESPONSE:**      Defendant objects to this statement because it is not material, or even
relevant, to any claim or defense at issue in this litigation. *See* F. R. Civ. P. 56; L.R. 56.1(a).
Subject to this objection, Defendant admits the statements in Paragraph 6.

7.      On October 29, 2021, Newsweek published the subject article: *Orgies,
Harassment, Fraud: Satanic Temple Rocked by Accusations, Lawsuit*. Exhibit 1 (Compl. Ex. 1).

**RESPONSE:**      Defendant admits the statements in Paragraph 7.

8.      The article is about Plaintiff. Exhibit 1 (Compl. Ex. 1).

**RESPONSE:**      Defendant denies the statement in Paragraph 8 and because the focus
of the article titled "Orgies, Harassment, Fraud: Satanic Temple Rocked by Accusations,
Lawsuit" (the "Article") was the lawsuit filed by The Satanic Temple against several former
members of its Washington Chapter in the United States District Court for the Western District

1

**Appendix 823**

of Washington (the "Washington Lawsuit"). ECF 101-3 (Deposition of Julia Duin, dated November 16, 2023 ("Duin Depo"), 99:21); ECF 101-13 (Cooper Depo. 189:20–190:7).

9. Within the article is an accusation that The Satanic Temple engages in "sexual abuse" being "covered up in ways that were more than anecdotal." Exhibit 1 (Compl. Ex. 1), at 16.

**RESPONSE:** Defendant denies the statements in Paragraph 9 because it misrepresents the content of the Article, which actually quoted a former member of The Satanic Temple, Jinx Strange, who said that he left The Satanic Temple after hearing "[a]ccounts of sexual abuse being covered up in ways that were more than anecdotal" (the "Article Statement"). Compl. Ex. 1; *see also* ECF 101-3 (Duin Depo. 134:23–135:1 (Duin testifying that she was not accusing The Satanic Temple of any wrongdoing by including the Article Statement)); ECF 101-13 (Cooper Depo. 209:5–14 (Cooper testifying that she understood that Article Statement to be a report of claims people were making, not an accusation of legal guilt)).

10. Nancy Cooper was one of the Newsweek employees who gave approval for Duin to write the article. Duin Depo. at 151:8–22 (Exhibit 38).

**RESPONSE:** Defendant admits the statements in Paragraph 10.

11. Julia Duin wrote the article. Duin Depo. at 131:9 (Exhibit 38).

**RESPONSE:** Defendant admits the statements in Paragraph 11.

12. Nancy Cooper edited the article. Exhibit 2 (Cooper26); Exhibit 3 (Cooper37); Cooper Depo. at 134:13-16, 189:17-22 (Exhibit 37).

**RESPONSE:** Defendant admits the statements in Paragraph 12.

13. Juliana Pignataro did not edit the article. Cooper Depo. at 158:22-25 (Exhibit 37).

**RESPONSE:** Defendant admits the statements in Paragraph 13.

2

**Appendix 824**

14.     Nancy Cooper edited the article because she is "a much more experienced editor." Cooper Depo. at 158:22-25 (Exhibit 37).

**RESPONSE:**     Defendant admits that one reason Cooper edited the Article was because she is a "more experienced editor" than Pignataro but denies that was the only reason. ECF 101-13 (Cooper Depo. 158:22–159:3).

15.     Nancy Cooper wrote the headline. Exhibit 4 (Cooper28); Exhibit 5 (Cooper31); Exhibit 6 (Cooper48); Cooper Depo. at 191:18-20 (Exhibit 37).

**RESPONSE:**     Defendant admits the statements in Paragraph 15.

16.     Nancy Cooper wrote the lede. Exhibit 6 (Cooper48); Cooper Depo. at 190:19-24 (Exhibit 37).

**RESPONSE:**     Defendant denies the allegations in Paragraph 16 because Cooper edited the lede, she did not independently write it.  ECF 101-14 (Cooper48); ECF 101-13 (Cooper Depo. 190:19–24).

17.     Beyond Julia Duin and Nancy Cooper, nobody else at Newsweek had any substantive involvement in the article. Duin Depo at 151:8-22 (Exhibit 38); see also Exhibit 2 (Cooper26), Exhibit 3 (Cooper37), and Cooper Depo. at 189:17-22 (Exhibit 37).

**RESPONSE:**     Defendant admits the statements in Paragraph 17.

18.     On September 1, 2021, Newsweek hired Julia Duin to serve as its religion editor and reporter. Duin Depo. at 25:22-26:9 (Exhibit 38); 48:2-5; Cooper Depo. at 71:18-21 (Exhibit 37).

**RESPONSE:**     Defendant admits that Duin began working for Newsweek as a religion reporter on September 1, 2021 but denies that she was hired as an editor. ECF 101-3 (Duin Depo. 29:3–4, 78:1–16).

3

**Appendix 825**

19.     There is no evidence that the job was publicly posted. See Duin Depo. at 28:17-20 (Exhibit 38) (Duin doesn't know if it was).

**RESPONSE:**     Defendant objects to this statement because it is not material, or even relevant, to any claim or defense at issue in this litigation.  *See* F. R. Civ. P. 56; L.R. 56.1(a). Defendant also objects to this statement because it is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

Subject to these objections, Defendant denies the statements in Paragraph 19 because Cooper, Newsweek's 30(b)(6) deponent, recalled the job being publicly posted. ECF 110-1 (Cooper Depo. 71:15–21).

20.     Julia Duin learned of the job opportunity through a mutual acquaintance of Dayan Candappa. Duin Depo. at 26:10-27:4 (Exhibit 38).

**RESPONSE:**     Defendant objects to this statement because it is not material, or even relevant, to any claim or defense at issue in this litigation.  *See* F. R. Civ. P. 56; L.R. 56.1(a).

Subject to this objection, Defendant admits the statements in Paragraph 20.

21.     Julia Duin went about applying for the job through direct contact to Dayan (Exhibit 38). Duin Depo. at 27:21-23.

**RESPONSE:**     Defendant objects to this statement because it is not material, or even relevant, to any claim or defense at issue in this litigation.  *See* F. R. Civ. P. 56; L.R. 56.1(a).

Subject to this objection, Defendant admits the statements in Paragraph 21.

22.     Dayan Candappa is Newsweek's chief strategy and content officer. Cooper Depo. at 148:18-19 (Exhibit 37).

**RESPONSE:**     Defendant admits the statements in Paragraph 22.

**Appendix 826**

23.     Dayan Candappa reports directly to Newsweek's CEO, Dev Pragad. Cooper Depo. at 149:11-18(Exhibit 37).

**RESPONSE:**     Defendant admits the statements in Paragraph 23.

24.     So does Nancy Cooper. Cooper Depo. at 11:17-21 (Exhibit 37).

**RESPONSE:**     Defendant admits that Cooper reports to Dev Pragad.

25.     Nancy Cooper is Newsweek's global editor in chief. Cooper Depo. at 4:20-22 (Exhibit 37).

**RESPONSE:**     Defendant admits the statements in Paragraph 25.

26.     As global editor in chief, Nancy Cooper sets the standard for what Newsweek does or doesn't do. Cooper Depo. at 4:23-5:3 (Exhibit 37).

**RESPONSE:**     Defendant admits that Nancy Cooper is responsible for the editorial operations at Newsweek.  ECF 110-1 (Cooper Depo. 4:20–5:3).

27.     As global editor in chief, Nancy Cooper determines what is "newsworthy." Cooper Depo. at 4:22-5:12 (Exhibit 37).

**RESPONSE:**     Defendant denies the statements in Paragraph 27 because it misstates Cooper's testimony. *See* ECF 110-1 (Cooper Depo. 4:22–5:12 (testifying that, as Editor-in-Chief, Cooper's role included determining the "story today" i.e. the "newsworthy events of the day")).

28.     Julia Duin directly reported to Juliana Pignataro. Cooper Depo. at 97:19-23 (Exhibit 37); 149:3-7; Duin Depo. at 150:20-21 (Exhibit 38).

**RESPONSE:**     Defendant admits that Juliana Pignataro was Duin's direct supervisor but otherwise denies the statements in Paragraph 28 because Cooper was the editor for the

5

**Appendix 827**

Article.  ECF 110-2 (Duin Depo. 150:20–21); ECF 101-13 (Cooper Depo. 155:17–19, 158:22–159:3).

29.     Juliana Pignataro is either the U.S. News Director or the U.S. Editor. Exhibit 7 (DUIN15-001) ("U.S. News Director"); and Cooper Depo. at 97:21-23 (Exhibit 37) (U.S. Editor).

**RESPONSE:**     Defendant objects to this statement because it is not material, or even relevant, to any claim or defense at issue in this litigation.  *See* F. R. Civ. P. 56; L.R. 56.1(a).

Subject to this objection, Defendant admits that Pignataro is a U.S. Editor with the title "U.S. News Director" and otherwise denies the statements in Paragraph 29. ECF 110-1 (Cooper Depo. 97:21–23); ECF 105-7 (DUIN15-001).

30.     While employed at Newsweek, Julia Duin regularly met with Juliana Pignataro, Nancy Cooper, and Dayan Candappa. Duin Depo. at 152:2-17 (Exhibit 38); Cooper Depo. at 73:2-6 (Exhibit 37); Exhibit 8 (NEWSWEEK442-443).

**RESPONSE:**     Defendant admits the statements in Paragraph 30.

31.     Julia Duin was a senior hire who, in Newsweek's estimation, did not need instruction on the basics of journalism. Cooper Depo. at 143:18-21 (Exhibit 37).

**RESPONSE:**     Defendant admits the statements in Paragraph 31.

32.     Prior to her hiring, Julia Duin had served as a professor of journalism, both on general topics and religion in particular. Duin Depo. at 183:5-9 (Exhibit 38).

**RESPONSE:**     Defendant admits the statements in Paragraph 32.

33.     Julia Duin has taught journalism at four colleges. Duin Depo. at 15:22-17:8 (Exhibit 38).

**RESPONSE:**     Defendant admits the statements in Paragraph 33.

**Appendix 828**

34.     Julia Duin taught her students to hear directly from the religion before writing about them. Duin Depo. at 17:20-18:5 (Exhibit 38).

**RESPONSE:**     Defendant denies the statements in Paragraph 34 because Duin testified that her techniques for teaching religion reporting included "tell[ing] the students the basis of each religious group," having "a practitioner of that religion come in and [speak] . . . from their point of view," and having her students "visit a house of worship."  ECF 110-2 (Duin Depo. 17:16–25).

35.     During 1987-1989, Julia Duin wrote four articles about Satanism. Exhibit 9 (JDUIN 4-17).

**RESPONSE:**     Defendant admits that Duin wrote four articles about satanism in the 1980's but further states that the articles were about The Satanic Temple because it had not yet been founded. ECF 105-9 (JDUIN004-017); ECF 101-1 (Deposition of Lucien Greaves, dated November 6, 2023 ("Greaves Depo."), 6:23–7:2 (testifying that the Satanic Temple was founded in 2013 or 2014)).

36.     The years 1987-1989 were during the height of the Satanic Panic. Greaves Decl. ¶ 3.

**RESPONSE:**     Defendant objects to this statement because it is not material, or even relevant, to any claim or defense at issue in this litigation.  *See* F. R. Civ. P. 56; L.R. 56.1(a). Defendant also objects to this statement because it is hearsay and not supported by any admissible evidence. F.R.E. 801(c); Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

Subject to these objections, Defendant lacks sufficient knowledge to form a belief as to the truth of the statements in Paragraph 36 and therefore denies them.

**Appendix 829**

37.     The Satanic Panic was a moral panic which consisted of now-debunked conspiracy claims that a secret Satanic cabal was organizing ritual abuse – including ritual sexual abuse – on a global scale. Greaves Decl. ¶ 3; see also Greaves Depo. at 9:3-10:2 (Exhibit 39)

**RESPONSE:**     Defendant objects to this statement because it is not material, or even relevant, to any claim or defense at issue in this litigation.  *See* F. R. Civ. P. 56; L.R. 56.1(a). Defendant also objects to this statement because it is hearsay and not supported by any admissible evidence. F.R.E. 801(c); Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

Subject to these objections, Defendant lacks sufficient knowledge to form a belief as to the truth of the statements in Paragraph 37 and therefore denies them.

38.     Through the Grey Faction Campaign, the Satanic Temple combats irrational moral panics, particularly as pertains to conspiratorial claims of Satanic ritual abuse. Greaves Decl. ¶ 3.

**RESPONSE:**     Defendant objects to this statement because it is not material, or even relevant, to any claim or defense at issue in this litigation.  *See* F. R. Civ. P. 56; L.R. 56.1(a).

Subject to this objection, Defendant lacks sufficient knowledge to form a belief as to the truth of the statements in Paragraph 38 and therefore denies them.

39.     Duin's 1989 article approvingly quotes Geraldo Rivera's forward to the book *Satanism in the United States: a phenomenon on the rise*. Exhibit 9 (JDUIN15).

**RESPONSE:**     Defendant objects to this statement because it is not material, or even relevant, to any claim or defense at issue in this litigation.  *See* F. R. Civ. P. 56; L.R. 56.1(a).

Subject to this objection, Defendant admits that Duin's 1989 article quotes from a forward by Geraldo Rivera to a book by Jerry Johnston but denies that the article endorses the quote. ECF 105-9 (JDUIN015).

8

**Appendix 830**

40.     One year prior, in October 1988, Geraldo Rivera had a widely published two-hour exposé, entitled *Devil Worship: Exposing Satan's Underground*, in which he spread now-debunked claims of Satanic ritual abuse. Greaves Decl. ¶ 3.

**RESPONSE:**     Defendant objects to this statement because it is not material, or even relevant, to any claim or defense at issue in this litigation.  *See* F. R. Civ. P. 56; L.R. 56.1(a). Defendant also objects to this statement because it is hearsay and not supported by any admissible evidence. F.R.E. 801(c); Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

Subject to these objections, Defendant lacks sufficient knowledge to form a belief as to the truth of the statements in Paragraph 40 and therefore denies them.

41.     In 1995, Geraldo Rivera famously retracted his endorsement of the claims he spread during the Satanic Panic. Greaves Decl. ¶ 3.

**RESPONSE:**     Defendant objects to this statement because it is not material, or even relevant, to any claim or defense at issue in this litigation.  *See* F. R. Civ. P. 56; L.R. 56.1(a). Defendant also objects to this statement because it is hearsay and not supported by any admissible evidence. F.R.E. 801(c); Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

Subject to these objections, Defendant lacks sufficient knowledge to form a belief as to the truth of the statements in Paragraph 41 and therefore denies them.

42.     Prior to the article, Julia Duin wrote three articles about The Satanic Temple. Exhibits 10, 11, and 12 (Duin Depo. Exhibits 3, 4, and 5); see also Duin Depo. at 73:18-76:15 (Exhibit 38).

**RESPONSE:**     Defendant denies the statements in Paragraph 42 because the articles referenced therein were not about The Satanic Temple.  *See* ECF 110-2 (Duin Depo. 73:18–

9

**Appendix 831**

76:18 (testifying that the articles included as Exhibit 3, 4, and 5 to the deposition were "media critique pieces" that were not about The Satanic Temple)); ECF 110-10, 110-11, 110-12.

43.      All were unfavorable portrayals of the organization. Ibid.

**RESPONSE:**      Defendant objects to this statement because it is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

Subject to these objections, Defendant denies the statement in Paragraph 43. *See* ECF 105-10, 105-11, 105-12.

44.      On September 29, 2021, the idea for this article was brought to Julia Duin by a reporter for the Catholic News Agency named Kevin J. Jones. Exhibit 13 (JDUIN002); see also Duin Depo. at 37:13-38:9 (Exhibit 38).

**RESPONSE:**      Defendant admits that the initial idea for the Article came from an email Duin received from Kevin Jones.

45.      In his email, the Catholic News Agency's reporter prefaced the idea with a disclaimer that he has written "somewhat critically of The Satanic Temple" and has not had time to "factcheck" certain claims raised by an ex-member. Exhibit 13 (JDUIN002).

**RESPONSE:**      Defendant denies the statements in paragraph 45 and directs the Court to the email at issue for the true and correct contents therein. *See* ECF 105-13 (JDUIN001–003).

46.      One of the unverified claims passed on by the Catholic News Agency's reporter was "some allegations of TST leadership sexually exploiting members or failing to respond to harassment / sex assault allegations against chapter heads." Exhibit 13 (JDUIN002).

**RESPONSE:**      Defendant admits that Jones's email to Duin stated, "Some allegations of [The Satanic Temple] leadership sexually exploiting members or failing to respond

10

to harassment/sex assault allegations against chapter heads" but otherwise denies the statements in Paragraph 46. ECF 105-13 (JDUIN002).

47.     On September 30, 2021 – one day after receiving the idea from Kevin J. Jones – Julia Duin pitched it to Juliana Pignataro. Exhibit 14 (NEWSWEEK025); see also Duin Depo. at 35:1-8 (Exhibit 38) and Exhibit 7 (DUIN15-001-002).

**RESPONSE:**     Defendant admits the statements in Paragraph 47.

48.     As pitched by Julia Duin, the article would be "Just in time for Halloween." Exhibit 7 (DUIN15-002); Duin Depo. at 53:1-5 (Exhibit 38).

**RESPONSE:**     Defendant denies the statements in Paragraph 48 because it is an incomplete quote that misrepresents Duin's pitch. Duin's pitch stated: "major rift in an organization called The Satanic Temple: Defamation lawsuits, anti-Semitic stuff, mismanagement of funds, NDAs being used to hide wrongdoing, sexual harassment, shell corporations, [and] harassment of internal critics." ECF 105-7 (DUIN015-002).

49.     Julia Duin identified Halloween as a major reason for pitching the article because she considers Halloween to be a Satanic holiday. Duin Depo. at 53:4-14 (Exhibit 38).

**RESPONSE:**     Defendant objects to this statement because it is not material, or even relevant, to any claim or defense at issue in this litigation. *See* F. R. Civ. P. 56; L.R. 56.1(a).

Subject to this objection, Defendant admits the statements in Paragraph 49.

50.     As pitched by Julia Duin, the article would be about "NDAs being used to hide wrongdoing" and "sexual harassment." Duin Depo. at 35:1-8 (Exhibit 38).

**RESPONSE:**     Defendant denies the statements in Paragraph 50 because it is an incomplete quote that misrepresents Duin's pitch. Duin's pitch stated: "major rift in an organization called The Satanic Temple: Defamation lawsuits, anti-Semitic stuff,

11

**Appendix 833**

mismanagement of funds, NDAs being used to hide wrongdoing, sexual harassment, shell

corporations, [and] harassment of internal critics." ECF 105-7 (DUIN015-002).

51.     Juliana Pignataro indicated that she would be happy to discuss. Exhibit 7

(DUIN15-001).

**RESPONSE:**     Defendant objects to this statement because it is not material, or even

relevant, to any claim or defense at issue in this litigation.  *See* F. R. Civ. P. 56; L.R. 56.1(a).

Subject to this objection, Defendant denies the statements in Paragraph 51 because

Pignataro emailed Duin on October 25, 2021 and indicated she would be "[h]appy to discuss"

several article ideas, including Duin's idea for the Article. ECF 105-7 (DUIN15-001).

52.     Nancy Cooper took special interest in the article. Cooper Depo. at 153:18-154:2

(Exhibit 37); Exhibit 15 (Cooper51).

**RESPONSE:**     Defendant denies the statements in Paragraph 52 because Cooper

merely testified that she thought Duin's pitch for the Article would make a good story. ECF 110-

1 (Cooper Depo. 153:18–154:2); ECF 105-15 (COOPER51).

53.     All three of Newsweek's senior management – Juliana Pignataro, Nancy Cooper,

and Dayan Candappa– greenlit the article. Duin Depo. at 151:8-22 (Exhibit 38).

**RESPONSE:**     Defendant admits the statements in Paragraph 53.

54.     The article was greenlit within one week of the pitch. Duin Depo. 92:1–12

(Exhibit 38).

**RESPONSE:**     Defendant admits the statements in Paragraph 54.

**Appendix 834**

55.    Newsweek publicly admonishes "all Newsweek journalists" to comply with the Editorial Guidelines and purport to set the "highest professional standards." Exhibit 16 (Compl. Ex. 3).

**RESPONSE:**    Defendant denies the statements in Paragraph 55 because the relevant portion of the Newsweek Editorial Guidelines reads: "We expect all Newsweek journalists to comply with these guidelines, but no memo could anticipate every contingency. It is your responsibility as a Newsweek journalist to hold yourself to the highest professional standards." ECF 105-16.

56.    Nancy Cooper wrote the Editorial Guidelines, as aided by either the chief of content or the chief content officer. Cooper Depo. at 206:10-13 (Exhibit 37).

**RESPONSE:**    Defendant admits the statements in Paragraph 56.

57.    The Editorial Guidelines require Newsweek journalists to "Reach out for comment and give parties time to respond," *especially* when "we are accusing a person or company of wrongdoing." Exhibit 16 (Compl. Ex. 3), at 2.

**RESPONSE:**    Defendant denies the statements in Paragraph 57 because the relevant portion of the Newsweek Editorial Guidelines reads: "Reach out for comment and give parties a time to respond . . . If we are accusing a person or company of wrongdoing, we must include fair comment." ECF 105-16.

58.    The Editorial Guidelines require that criminal charges be "specific" and "complete." Exhibit 16 (Compl. Ex. 3), at 2.

**RESPONSE:**    Defendant denies the statements in Paragraph 57 because the relevant portion of the Newsweek Editorial Guidelines reads: "When writing about criminal charges or allegations, be specific and complete." ECF 105-16.

**Appendix 835**

59.     Covering up sexual abuse would be a "possibly criminal act." Cooper Depo. 186:21-187:10 and 187:10-22 (Exhibit 37).

**RESPONSE:**     Defendant objects to this statement because it is not material, or even relevant, to any claim or defense at issue in this litigation.  *See* F. R. Civ. P. 56; L.R. 56.1(a). Defendant also objects to this statement because it is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

Subject to these objections, Defendant denies the statement in Paragraph 59 because it is an inaccurate characterization of Cooper's response, calls for a legal conclusion, and lacks context, foundation, and specificity.  ECF 110-1 (Cooper Depo. 186:24–187:10).

60.     Sexual abuse in the first place could also be a "criminal act." Cooper Depo. 187:23-188:6 (Exhibit 37).

**RESPONSE:**     Defendant objects to this statement because it is not material, or even relevant, to any claim or defense at issue in this litigation.  *See* F. R. Civ. P. 56; L.R. 56.1(a). Defendant also objects to this statement because it is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

Subject to these objections, Defendant denies the statement in Paragraph 60 because it is an inaccurate characterization of Cooper's response, calls for a legal conclusion, and lacks context, foundation, and specificity.  ECF 110-1 (Cooper Depo. 187:11–188:6).  Defendant further states that Nathan Sullivan, David Johnson, and Jinx Strange all testified that they understood "sexual abuse" to include conduct such as "sexual harassment," "inappropriate sexual relationships," or "unwanted sexual advances." Declaration of Sara Tesoriero, dated May 31, 2024 ("Tesoriero Decl."), Ex. 1 (Deposition of Nathan Sullivan, November 17, 2023 ("Sullivan Depo."), 6:21–7:21); ECF 110-4 (Deposition of David Johnson, November 17, 2023 ("Johnson

14

**Appendix 836**

Depo."), 7:24–8:23); ECF 101-11 (Deposition of Paul Millirons, December 7, 2023 ("Strange Depo."), 10:17–20).

61.     The article provides no details as to who was sexually abused. Cooper Depo. at 207:12-13 (Exhibit 37) (Q: "Who was sexually abused" A: "We don't know. Members.").

**RESPONSE:**     Defendant admits that the possible victims of sexual abuse are not identified in the Article, and otherwise denies the statements in Paragraph 61. Compl. Ex. 1.

62.     The article provides no details as to what amounts to sexual abuse. Cooper Depo. at 208:2-3 (Exhibit 37) (Q: "What was the sexual abuse?" A: "I don't know.".)

**RESPONSE:**     Defendant admits that the Article does not provide additional details of "sexual abuse" but otherwise denies the statements in Paragraph 62.  Compl. Ex. 1.

63.     The article provides no details as to what the cover-up entailed. Cooper Depo. at 207:14-16 (Exhibit 37) (Q: "What was entailed in the coverup?" A: "I don't know").

**RESPONSE:**     Defendant admits that the Article does not provide additional details regarding what Jinx Strange considered to be a cover-up, but otherwise denies the statements in Paragraph 63.  Compl. Ex. 1.

64.     The article provides no details as to who was involved in the cover-up. Cooper Depo. at 207:21-25 (Exhibit 37) (Q: "Who engaged in the coverup?" A: "I don't know").

**RESPONSE:**     Defendant admits that the Article does not identify individuals allegedly involved in the cover-ups referred to by Jinx Strange, but otherwise denies the statements in Paragraph 64.  Compl. Ex. 1

65.     The Editorial Guidelines require Newsweek journalists to use "credible" sources. Exhibit 16 (Compl. Ex. 3), at 3; see also Cooper Depo. at 205:11-206:5 (Exhibit 37).

**RESPONSE:**     Defendant admits the statements in Paragraph 65.

15

66.     Under the Editorial Guidelines, an accusation of covered-up sexual abuse should be fact-checked. Cooper Depo. at 38:20-25 (Exhibit 37).

**RESPONSE:**     Defendant denies the statements in Paragraph 66 because the cited testimony does not support the statements. *See* ECF 110-1 (Cooper Depo. 38:20–25 (Cooper agreeing that, in her experience, an accusation of a cover-up of sexual abuse is something that should be fact-checked)).

67.     Newsweek did not train Julia Duin on the Editorial Guidelines. Duin Depo. at 80:6-21 (Exhibit 38); see also Cooper Depo. at 142:22-143:17 and 143:18-21 (Exhibit 37).

**RESPONSE:**     Defendant denies the statement in paragraph 67 because it presumes the Editorial Guidelines are something that Newsweek uses to "train" employees or independent contractors, and because it presumes that an experienced journalist like Julia Duin would have to be "trained" about journalism.  ECF 110-1 (Cooper Depo. 142:18–25).

68.     About one week after the pitch, Julia Duin met with two *Johnson* defendants: David Alan Johnson and Nathan Sullivan. Duin Depo. at 92:9-93:19 (Exhibit 38).

**RESPONSE:**     Defendant admits that Duin met with David Alan Johnson and Nathan Sullivan in mid-October 2021, and otherwise denies the statements in Paragraph 68.  ECF 101-3 (Duin Depo. 91:16–21).

69.     The *Johnson* defendants were the "disgruntled former members" of The Satanic Temple she referenced in the pitch. Cooper52; Duin Depo. at 178:8-18 (Exhibit 38).

**RESPONSE:**     Defendant admits that Duin stated in an email that she was "having a ton of disgruntled members contact [her]" and that such former members were sources for the Article but otherwise denies the statements in Paragraph 69.  ECF 105-15 (COOPER52).

**Appendix 838**

70.     The *Johnson* defendants never claimed to have any personal knowledge that The Satanic Temple engages in sexual abuse and cover-up. Johnson Depo. at 21:14-19 (Exhibit 40).

**RESPONSE:**      Defendant denies the statements in Paragraph 70 because David Johnson testified about three instances of allegations of sexual abuse he was aware of, ECF 101-8 (Johnson Depo. 10:23–11:13, 26:9–27:5), and Nathan Sullivan testified that "[his] expulsion from [The Satanic Temple] was a part of . . . covering up the ethics complaint where the [sexual] harassment was an underpinning factor," ECF 101-4 (Sullivan Depo. 16:3–8).

71.     After Julia Duin met with the Johnson defendants, Nathan Sullivan provided her the contact information for Jinx Strange. Sullivan Depo. at 6:6-17 (Exhibit 41).

**RESPONSE:**      Defendant admits the statements in Paragraph 71.

72.     Jinx Strange is a pseudonym. Strange Depo. at 8:22-24 (Exhibit 42); Johnson Depo. at 6:24-7:1 (Exhibit 40); Sullivan Depo. at 6:3-5 (Exhibit 41).

**RESPONSE:**      Defendant admits the statements in Paragraph 72.

73.     On October 24, 2021, upon Julia Duin's inquiry, Jinx Strange provided a three-page email with his comments about The Satanic Temple. Exhibit 17 (NEWSWEEK015-017).

**RESPONSE:**      Defendant admits the statements in Paragraph 73.

74.     Nowhere within Jinx Strange's email does he suggest that he, personally, suffered "sexual abuse being covered up in ways that were more than anecdotal." Exhibit 17 (NEWSWEEK015-017).

**RESPONSE:**      Defendant admits the statements in Paragraph 74.

75.     Jinx Strange never personally witnessed this sexual abuse. Strange Depo. at 11:19-21 (Exhibit 42).

**RESPONSE:**      Defendant admits the statements in Paragraph 75.

17

**Appendix 839**

76.     Instead, he distanced himself from the accusation by including the words:
"*Accounts of* sexual abuse being covered up in ways that were more than anecdotal." Exhibit 17
(NEWSWEEK016) (emphasis added).

**RESPONSE:**     Defendant denies the statements in Paragraph 76 because Strange
stated that he had left The Satanic Temple after hearing "concerning" stories from other
members, including "Accounts of sexual abuse being covered up in ways that were more than
anecdotal." ECF 105-17 (NEWSWEEK016).

77.     From Jinx Strange's three-page email, Julia Duin selected the statement for
inclusion in the article. Exhibit 18 (DUIN45-001) ("so much to choose from!").

**RESPONSE:**     Defendant denies the statements in Paragraph 77 because Duin
included the Article Statement in the Article along with other quotes from Strange's October 24th
email. Compl. Ex. 1; ECF 105-17 (NEWSWEEK015–017).

78.     Jinx Strange's understanding of "sexual abuse" was secondhand through people
basically telling him something over the internet. Strange Depo. at 13:1-4 (Exhibit 42).

**RESPONSE:**     Defendant denies the statements in Paragraph 78 because Strange
testified that by "sexual abuse" he meant "unwanted sexual advances or contact."  ECF 101-11
(Strange Depo. 10:17–20).

79.     Jinx Strange did not further explain to Julia Duin who suffered "sexual abuse."
Duin Depo. at 99:3-9 (Exhibit 38).

**RESPONSE:**     Defendant admits the statements in Paragraph 79.

**Appendix 840**

80.     Julia Duin did not ask any follow-up questions from Jinx Strange about who was "sexually abused" or what was entailed in the "cover up." Duin Depo. at 99:3-17 (Exhibit 38).

**RESPONSE:**     Defendant admits that Julia Duin did not ask Jinx Strange any additional questions about sexual abuse or cover ups.

81.     On October 25, 2021, one day after receiving Jinx Strange's email, Julia Duin talked to Lucien Greaves. Exhibit 19 (Compl. Ex. 9); see also Duin Depo. at 110:12-17 and 111:2-4 (Exhibit 38).

**RESPONSE:**     Defendant admits the statements in Paragraph 81.

82.     On October 26, 2021, Julia Duin followed up with various questions unrelated to the claim of "sexual abuse being cover-up in ways that were more than anecdotal." Exhibit 19 (Compl. Ex. 9).

**RESPONSE:**     Defendant denies the statements in Paragraph 82 because Duin continued to email Greaves with additional questions following her initial interview with him on October 25, 2021, including questions regarding a complaint that The Satanic Temple's national council had been "approving official events that included orgies." ECF 101-12 (NEWSWEEK027).

83.     Julia Duin never asked Lucien Greaves about the accusation of sexual abuse or cover up. Duin Depo. at 123:10-18 and 123:24-124:5 (Exhibit 38).

**RESPONSE:**     Defendant admits that Duin did not ask Greaves about Strange's statement regarding accounts of sexual abuse because she felt Greaves's general denial of allegations against The Satanic Temple, and his response to questions about "official orgies," was a "fair rebuttal" to Strange's statement as well, and otherwise denies the statements in Paragraph 83. ECF 101-3 (Duin Depo. 125:19–21, 127:5–18).

**Appendix 841**

84.     On October 27, 2021, Julia Duin talked to Dr. Joe Laycock. Laycock Decl. ¶ 11.

**RESPONSE:**     Defendant admits the statements in Paragraph 84.

85.     Julia Duin considered Dr. Layock the "unofficial biographer" of The Satanic Temple. Duin Depo. at 103:8-9 (Exhibit 38).

**RESPONSE:**     Defendant admits the statements in Paragraph 85.

86.     Julia Duin did not ask Dr. Laycock about sexual abuse or cover up. Laycock Decl. ¶ 15.; see also Duin Depo. at 136:9-13 (Exhibit 38).

**RESPONSE:**     Defendant admits the statements in Paragraph 86.

87.     Julia Duin did not ask "anyone on the face of the planet what sexual abuse and cover-up means" in context of the article statement. Duin Depo. at 136:9-13 (Exhibit 38).

**RESPONSE:**     Defendant denies the statements in Paragraph 87 because it takes Duin's statement out of context and disregards her repeated testimony that the Article Statement was corroborated by multiple sources. *See* ECF 101-3 (Duin Depo. 121:23–123:9 (testifying she "found what [Strange] said to be inherently plausible" because it was consistent with other statements made by members); 186:19–23 (testifying that "there [were] multiple reports among . . . former members [of The Satanic Temple], of sexual abuse/harassment")).

88.     Julia Duin did not talk to a single individual who claimed to have been subjected to sexual abuse or coverup. Duin Depo. at 173:18-174:3 (Exhibit 38).

**RESPONSE:**     Defendant denies the statements in Paragraph 88 because Duin spoke with Sullivan, who claims his removal from The Satanic Temple constituted a cover-up of a sexual abuse claim.  ECF 101-4 (Sullivan Depo. 16:3–8).

**Appendix 842**

89.     In Julia Duin's view, this article was not an investigation into sexual abuse. Duin Depo. at 99:8-17 (Exhibit 38).

**RESPONSE:**     Defendant admits the statements in Paragraph 89.

90.     Once Julia Duin "realized how much stuff was out there" she had to "limit it to the Seattle story mostly." Exhibit 20 (NEWSWEEK 465).

**RESPONSE:**     Defendant admits the statements in Paragraph 90.

91.     But this limitation on the scope of the article did not stop Julia Duin from including some "delicious quotes near the bottom from members in other parts of the country." Exhibit 20 (NEWSWEEK 465).

**RESPONSE:**     Defendant denies the statements in Paragraph 91 because the cited document does not indicate that Duin included quotes in spite of the Article's focus.  ECF 105-20 (NEWSWEEK465).

92.     Jinx Strange is in Wisconsin, not Seattle. Duin Depo. at 193:5-9 (Exhibit 38).

**RESPONSE:**     Defendant objects to this statement because it is not material, or even relevant, to any claim or defense at issue in this litigation.  *See* F. R. Civ. P. 56; L.R. 56.1(a).

Subject to this objection, Defendant admits the statements in Paragraph 92.

93.     Had Strange accused The Satanic Temple of child murder, it would have occurred to Julia Duin to ask follow-up questions. Duin Depo. at 183:25-184:21 (Exhibit 38).

**RESPONSE:**     Defendant objects to this statement because it is not material, or even relevant, to any claim or defense at issue in this litigation.  *See* F. R. Civ. P. 56; L.R. 56.1(a). Defendant also objects to this statement because it is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

**Appendix 843**

Subject to these objections, Defendant denies the statements in Paragraph 93 because it misstates the cited testimony. ECF 110-2 (Duin Depo. 183:25–184:21).

94.     Newsweek has identified a total of six witnesses upon whose testimony it intends to rely to prove "Allegations of sexual abuse within The Satanic Temple and the response, or lack thereof, to those claims by members of The Satanic Temple." Exhibit 21 (Defendant's Revised Initial Disclosures), at 2.

**RESPONSE:**     Defendant admits that it identified six individuals in its initial disclosures as likely to have discoverable information regarding allegations of sexual abuse within The Satanic Temple and the response, or lack thereof, to those claims, and otherwise denies the allegations in Paragraph 94.  ECF 105-21 (Defendant's Revised Initial Disclosures, 2).

95.     Those six people are: Jinx Strange, David Alan Johnson, Nathan Sullivan, Dr. Joseph Laycock, Lucien Greaves, and Matthew Kezhaya. Exhibit 21 (Defendant's Revised Initial Disclosures), at 2.

**RESPONSE:**     Defendant admits that the six people listed in Paragraph 95 are identified in Defendant's Initial Disclosures and otherwise denies the allegations in Paragraph 95.  ECF 105-21 (Defendant's Revised Initial Disclosures, 2).

96.     Jinx Strange has no personal knowledge of sexual abuse or cover-up. Strange Depo. at 11:16-18 (Exhibit 42).

**RESPONSE:**     Defendant denies the statements in Paragraph 96 because Strange testified regarding three instances of sexual abuse within The Satanic Temple that he had knowledge of, ECF 101-11 (Strange Depo. 25:1–16), and Strange also testified that he had observed behavior that he "would not consider to be ethical or responsible . . . in response to

**Appendix 844**

these sort of [sexual abuse] allegations" and that "lent more credibility to those claims" *id.* 14:13–18.

97.     David Alan Johnson has no personal knowledge of sexual abuse or cover-up. Johnson Depo. at 18:3-14, 21:14-19, 13:4-16, 10:10-12 (Exhibit 40).

**RESPONSE:**     Defendant denies the statements in Paragraph 97 because Johnson testified about three instances of allegations of sexual abuse he was aware of.  ECF 101-8 (Johnson Depo. 10:23–11:13, 26:9–27:5).

98.     Nathan Sullivan has no personal knowledge of sexual abuse or cover-up. Sullivan Depo. at 10:14-22, 14:15-15:4, 15:15-24 (Exhibit 41).

**RESPONSE:**     Defendant denies the statements in Paragraph 98 because Sullivan testified that "[his] expulsion from [The Satanic Temple] was a part of . . . covering up the ethics complaint where the [sexual] harassment was an underpinning factor," ECF 101-4 (Sullivan Depo. 16:3–8).

99.     Lucien Greaves has no personal knowledge of sexual abuse or cover-up. Greaves Decl. ¶ 4; see also Greaves Depo. 18:14-19:15 (Exhibit 39).

**RESPONSE:**     Defendant denies the statements in Paragraph 99 because Greaves admitted that he was aware of an article written by former Satanic Temple member Jex Blackmore, in which she claims she "experienced harassment and abuse from members who have now left the organization" and admitted that The Satanic Temple did not conduct any investigation into Blackmore's claims.  ECF 101-15; ECF 101-1 (Greaves Depo. 74:4–8).

**Appendix 845**

100.    Dr. Joe Laycock has no personal knowledge of sexual abuse or cover-up. Laycock Decl. ¶¶ 6-7.

**RESPONSE:**    Defendant denies the statements in Paragraph 100 because Dr. Laycock's book about The Satanic Temple, *Speak of the Devil*, references Blackmore's article and states that, "[Blackmore] reported experiencing harassment and abuse while in [The Satanic Temple]."  ECF 101-16 (NEWSWEEK191). Dr. Laycock's book also indicates that he interviewed Blackmore for his book.  Tesoriero Decl. Ex. 2 (NEWSWEEK121).

101.    Matthew Kezhaya has no personal knowledge of sexual abuse or cover-up. Kezhaya Decl. ¶ 6.

**RESPONSE:**    Defendant lacks sufficient knowledge to form a belief as to the truth of the statements in Paragraph 101 and therefore denies them.

102.    From 2013 – 2019, Dr. Laycock interviewed over 50 people in connection with his book: *Speak of the Devil: How The Satanic Temple is Changing the Way We Talk about Religion* (Oxford Press, 2020). Laycock Decl. ¶¶ 3-4.

**RESPONSE:**    Defendant lacks sufficient knowledge to form a belief as to the truth of the statements in Paragraph 101 and therefore denies them.

103.    Among the people interviewed by Dr. Laycock were ex-members. Laycock Decl. ¶ 4.

**RESPONSE:**    Defendant admits the statements in Paragraph 103.

104.    Dr. Laycock heard rumors about sexual harassment, but never from anyone firsthand. Laycock Decl. ¶ 5.

**RESPONSE:**    Defendant admits that Dr. Laycock heard rumors about sexual harassment but otherwise denies the statements in Paragraph 104 because Dr. Laycock's book

24

**Appendix 846**

about The Satanic Temple, *Speak of the Devil*, references Blackmore's article and states that, "[Blackmore] reported experiencing harassment and abuse while in [The Satanic Temple]." ECF 101-16 (NEWSWEEK191). Dr. Laycock's book also indicates that he interviewed Blackmore for his book. Tesoriero Decl. Ex. 2 (NEWSWEEK121).

105.    Dr. Laycock did not hear any rumors about coverup of sexual harassment. Laycock Decl. ¶ 6.

**RESPONSE:**    Defendant lacks sufficient knowledge to form a belief as to the truth of the statements in Paragraph 105 and therefore denies them.

106.    Dr. Laycock also attended events for The Satanic Temple sufficient to testify to the culture within The Satanic Temple. He did not see any permutation of sexual abuse or cover up. Laycock Decl. ¶¶ 9-10.

**RESPONSE:**    Defendant objects to this statement because it is not material, or even relevant, to any claim or defense at issue in this litigation. *See* F. R. Civ. P. 56; L.R. 56.1(a). Defendant also objects to this statement because it is not supported by any admissible evidence. Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

Subject to these objections, Defendant lacks sufficient knowledge to form a belief as to the truth of the statements in Paragraph 106 and therefore denies them.

107.    In fact, The Satanic Temple does *not* engage in sexual abuse or cover up. Stevens Depo. at 12:20-13:10, 44:17-45:7, 160:10-20 (Exhibit 43).

**RESPONSE:**    Defendant denies the statements in Paragraph 107 for the reasons set forth in response to Paragraphs 70, 76, 78, 96–100, 104, 108, and 110–12, and in Counterstatement Paragraphs 158–68, and 191–211.

**Appendix 847**

108. To the contrary, The Satanic Temple has specific reporting and investigation requirements about any form of sexual misconduct. Stevens Depo. at 12:20-14:16, 26:6–27:7, 28:4-31:15 (Exhibit 43).

**RESPONSE:** Defendant denies the statements in Paragraph 108 because they are not supported by the cited testimony, which generally explains the role of the Suryan Council, but does not set forth the investigation and reporting requirements for "any form of sexual misconduct." *See* ECF 110-7 (Deposition of Gregory Stevens, dated November 3, 2023 ("Stevens Depo.") 12:20–14:16, 26:6-27:7, 28:4-31:15).

109. Part of The Satanic Temple's reporting and investigation requirements include advising claimants to make a police report. Stevens Depo. at 28:4-18 (Exhibit 43).

**REPONSE:** Defendant admits that Stevens testified that the Suryan Counsel's policy includes encouraging a sexual assault victim to file a police report. ECF 110-7 (Stevens Depo. 28:4–11).

110. The Satanic Temple's reporting and investigation requirements prohibit retaliation. Stevens Depo. 91:16-20; 92:2-14 (Exhibit 43).

**RESPONSE:** Defendant denies the statements in Paragraph 110 because they are not supported by the cited testimony. *See* ECF 110-7 (Stevens Depo. 91:16–20 (describing an effort to "minimize the change of retaliation" but not stating The Satanic Temple's reporting and investigation requirements prohibit retaliation), 92:2–14 (same)).

**Appendix 848**

111.    The Satanic Temple's reporting and investigation requirements predate the article by more than one year. See Stevens Depo. at 13:11–16 (Exhibit 43).

**RESPONSE:**    Defendant admits that the Suryan Council was established in 2020 or 2021, and that the Article was published in 2021, and otherwise denies the statements in Paragraph 111. ECF 110-7 (Stevens Depo. 50:14–23); Compl. Ex. 1.

112.    Every instance in which a claim of sexual harassment has been made known to The Satanic Temple's decisionmakers, the perpetrator of the misconduct has either voluntarily stepped down or has been removed. Stevens Depo. at 50:24-51:5 and 86:10-17 (Exhibit 43).

**RESPONSE:**    Defendant denies the statements in Paragraph 112 because it is not supported by the cited testimony, *see* ECF 110-7 (Stevens Depo. 50:24–51:5 (testifying about the informal nature of handling complaints, not about the result of all known complaints), 86:10–17 (testifying regarding one example of an accused member stepping down)), and because Plaintiff has admitted there were complaints prior to 2020 that were not formally addressed, ECF 101-2 (Stevens Depo. 83:9–12).

113.    Nancy Cooper requested a statement be included to the article, that The Satanic Temple doesn't "actually have an abortion ritual" and that "it's a piece of political theatre." Exhibit 19 (Cooper19).

**RESPONSE:**    Defendant objects to this statement because it is not material, or even relevant, to any claim or defense at issue in this litigation.  *See* F. R. Civ. P. 56; L.R. 56.1(a).

Subject to this objection, Defendant admits that, during the editing process, Cooper suggested adding "a phrase about the abortion suit" and indicated she believed it was "political theater" but otherwise denies the statements in Paragraph 113. ECF 105-22 (COOPER21).

**Appendix 849**

114.    Julia Duin resisted that insertion, stating: "I don't *know* that's true and of course TST would never admit that." Exhibit 3 (Cooper37).

**RESPONSE:**       Defendant objects to this statement because it is not material, or even relevant, to any claim or defense at issue in this litigation.  *See* F. R. Civ. P. 56; L.R. 56.1(a).

Subject to this objection, Defendant admits that Duin wrote to Cooper, "I don't *know* that's true and of course TST would never admit that" and otherwise denies the statements in Paragraph 114. ECF 105-3 (COOPER37).

115.    Nancy Cooper insisted on its inclusion: "Okay to say that TST does not appear to practice abortion as a ritual?" Exhibit 6 (Cooper48); but see Cooper Depo. at 166:16-23 (Exhibit 37).

**RESPONSE:**       Defendant objects to this statement because it is not material, or even relevant, to any claim or defense at issue in this litigation.  *See* F. R. Civ. P. 56; L.R. 56.1(a).

Subject to this objection, Defendant admits that Cooper wrote to Duin, "Okay to say that TST does not appear to practice abortion as a ritual?" and otherwise denies the statements in Paragraph 115.  ECF 105-22 (COOPER19).

116.    Nancy Cooper did not engage in any fact investigation for the article, only Julia Duin performed any fact checking of this article. Cooper Depo. at 140:4-24 (Exhibit 37).

**RESPONSE:**       Defendant admits the statements in Paragraph 116.

117.    During Julia Duin's entire career at Newsweek, nobody ever fact-checked any of her articles. Cooper Depo. at 140:17-20 (Exhibit 37).

**RESPONSE:**       Defendant admits the statements in Paragraph 117.

**Appendix 850**

118.     Nancy Cooper did not inquire into Julia Duin's investigation at all. Cooper Depo. at 160:24-161:8 (Exhibit 37); see also id. at 192:24-193:5 and 223:23-224:8.

**RESPONSE:**     Defendant admits that Cooper did not independently fact check the Article but otherwise denies the allegations in Paragraph 118.  *See* ECF 110-13 (Cooper Depo. 183:7–17 (Duin represented to Cooper that she had "fact-checked this [Article] until [her] eyes were bleary.").

119.     Newsweek does not employ fact-checkers. Cooper Depo. at 133:13-17 (Exhibit 37).

**RESPONSE:**     Defendant admits that Newsweek does not employ persons whose sole job responsibility it is to fact check.

120.     Nancy Cooper, and Newsweek, had "faith" in Julia Duin's reporting. Cooper Depo. 233:4-7 (Exhibit 37).

**RESPONSE:**     Defendant admits the statements in Paragraph 120.

121.     Nancy Cooper praised this article three times:

   a.  Exhibit 23 (Cooper45) (October 28, 2021 at 1:01 PM: "Fabulous stuff here! Wow.")

   b.  Exhibit 24 (Cooper40) (October 29, 2021 at 8:28 AM: "Looks great!");
       and

   c.  Exhibit 25 (NEWSWEEK377) (October 29, 2021 at 3:19 PM: "Thanks again for terrific story!").

**RESPONSE:**     Defendant admits that Nancy Cooper sent Julia Duin the emails identified Paragraph 121.

29

**Appendix 851**

122.     On October 29, 2021 at 8:02 PM, Julia Duin reported back to Kevin J. Jones of the Catholic News Agency: "The Newsweek folks love it - first article I've turned in that they've raved about - so that's good." Exhibit 20 (NEWSWEEK 465).

**RESPONSE:**     Defendant admits the statements in Paragraph 122.

123.     On October 29, 2021 at 5:41 PM, Lucien Greaves took issue with the article statement. Exhibit 26 (NEWSWEEK032) ("nor is there any truth to the claim that we've covered up sexual abuse.").

**RESPONSE:**     Defendant admits that on October 29, 2021, Greaves emailed Duin and indicated he was unhappy with the Article and otherwise denies the statements in Paragraph 123. ECF 105-26 (NEWSWEEK032).

124.     On October 30, 2021, undersigned counsel issued a demand for retraction and specifically took issue with the article statement. Exhibit 27 (Compl. Ex. 5), at 8 ¶ 16 ("This is not journalism, it is gossip-mongering.").

**RESPONSE:**     Defendant admits the statements in Paragraph 124.

125.     Newsweek did not and, to this day, has not issued any retraction.

**RESPONSE:**     Defendant admits the statements in Paragraph 125.

126.     The article immediately drew unfavorable comparisons between The Satanic Temple and the Catholic Church. Exhibit 1 (Compl. Ex. 1), at 22:

     a.   "At a glance I thought it was the Catholic Church in hot water again."

     b.   "Oh sorry, I thought this story was about the Catholic Church."

     c.   "They should just settle...[*sic*] like the Catholic Church does. The damage won't be as much if no minor is involved."

30

**Appendix 852**

**RESPONSE:** Defendant objects to and denies the statements in Paragraph 126 because it is not material, or even relevant, to any claim or defense at issue in this litigation. *See* F. R. Civ. P. 56; L.R. 56.1(a). Defendant also objects to this statement because it is hearsay and not supported by any admissible evidence. F.R.E. 801(c); Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

127. People have canceled their recurring donations to The Satanic Temple because of the article. Stevens Depo. 153:13-19 (Exhibit 43); Jarry Decl. ¶ 4.

**RESPONSE:** Defendant objects to and denies the statements in Paragraph 127 because it is hearsay and not supported by any admissible evidence. F.R.E. 801(c); Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2); ECF 110-7 (Stevens Depo. 153:8 ("I can't give you numbers.")).

128. Others have pointed to the article as proof of the truth of the matters asserted within it. Stevens Depo. 153:20-25 (Exhibit 43); Jarry Decl. ¶ 4.

**RESPONSE:** Defendant objects to and denies the statements in Paragraph 128 because it is hearsay and not supported by any admissible evidence. F.R.E. 801(c); Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2); ECF 110-7 (Stevens Depo. 153:20–25 (referring generally to the concern that people will point to the Article but not identify any specific incidents)).

129. To combat the ill effects of the article, The Satanic Temple hired a public relations firm. Jarry Decl. ¶ 5.; Exhibit 28 (Invoice no. 7204).

**RESPONSE:** Defendant objects to this statement because what services the public relations firm provided is not supported by admissible evidence. *See* Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

Subject to these objections, Defendant lacks sufficient knowledge to form a belief as to the truth of the statements in Paragraph 129 and therefore denies them.

**Appendix 853**

130.     To combat the ill effects of the article, The Satanic Temple retained a public relations professional from July 2022 – June 2023. Jarry Decl. ¶ 5.; Exhibits 29-36 (Invoice nos.1001-1039).

**RESPONSE:**     Defendant objects to this statement because there is no admissible evidence supporting the claim that all costs were incurred as a result of the Article. *See* Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

Subject to these objections, Defendant lacks sufficient knowledge to form a belief as to the truth of the statements in Paragraph 130 and therefore denies them.

131.     The sum of The Satanic Temple's remediation expenses is $43,350. Jarry Decl. ¶ 5.; Exhibits 28-36 (Invoice no. 7204 and nos. 1001-1039).

**RESPONSE:**     Defendant objects to this statement because there is no admissible evidence supporting the claim that any costs were incurred as a result of the Article. *See* Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

Subject to this objection, Defendant admits that Plaintiff produced invoices purporting to be from a Public Relations service, and otherwise denies the allegations in paragraph 131.

132.     The Satanic Temple has also suffered general reputational damages in an amount to be determined by the fact-finder.

**RESPONSE:**     Defendant objects to and denies the statements in Paragraph 132 because there is no admissible evidence offered in support of the statements. *See* Fed. R. Civ. P. 56(c)(1)(A), 56(c)(2).

**Appendix 854**

133.     The Satanic Temple also seeks punitive damages in an amount to be determined by the fact-finder.

**RESPONSE:**     Defendant objects to the statements in Paragraph 133 because there is no admissible evidence offered in support of Plaintiff's claim for punitive damages.

Subject to this objection, Defendant admits that Plaintiff's Complaint includes a claim for punitive damages but denies that Plaintiff is entitled to punitive damages.

134.     Newsweek has supplied no polling data to substantiate a claim that The Satanic Temple is a "household name." Kezhaya Decl. ¶ 7.

**RESPONSE:**     Defendants object to this statement because it is not material, or even relevant, to any claim or defense at issue in this litigation. *See* Fed. R. Civ. P. 56; L.R. 56.1(a).

Subject to this objection, Defendant admits it has not produced polling data regarding The Satanic Temple and otherwise denies the statements in Paragraph 134.

135.     Julia Duin denied familiarity with The Satanic Temple prior to receiving the idea for this article from the Catholic News Agency's reporter. Duin Depo. at 73:7-8 (Exhibit 38); see also Exhibit 13 (JDUIN001).

**RESPONSE:**     Defendant admits the statements in Paragraph 135.

136.     Nancy Cooper denied even hearing of The Satanic Temple prior to Julia Duin's pitch of this article. Cooper Depo. at 145:22-146:5, 153:13-17 (Exhibit 37); see also Exhibit 15 (Cooper51-52).

**RESPONSE:**     Defendant admits the statements in Paragraph 136.

## COUNTERSTATEMENT OF UNDISPUTED MATERIAL FACTS

### The Parties

137.     The Satanic Temple, Inc. has chapters throughout the United States.  Compl. ¶¶ 87, 89, 90 (identifying chapters of The Satanic Temple in Washington, West Florida, and Arizona).

138.     The Satanic Temple was founded in or around 2013 or 2014.  ECF 101-1 (Greaves Depo. 6:23–7:2).

139.     The Satanic Temple "engages in various charitable activities" and "advocates for the religious rights of its membership" through litigation, among other forms of advocacy. Compl. ¶¶ 14, 15.

140.     The Satanic Temple publishes press releases to promote Satanic Temple activities, campaigns, and issues.  ECF 101-1 (Greaves Depo. 26:14–27:13).

141.     The press releases are sent to numerous media outlets.  ECF 101-1 (Greaves Depo. 30:2–7).

142.     The Satanic Temple publishes press releases so that people are aware of the group and what it is doing.  ECF 101-2 (Stevens Depo. 141:23–142:4).

143.     Through the press releases, The Satanic Temple sometimes has "specific political or specific initiatives which [it] promote[s]." ECF 101-2 (Stevens Depo. 143:2–4).

144.     The Satanic Temple relies on the public knowing about The Satanic Temple's activities, including lawsuits it files, in order to generate donations. ECF 101-1 (Greaves Depo. 38:5–15).

145.     The Satanic Temple also uses billboards to advertise its initiatives.  ECF 101-2 (Stevens Depo. 146:12–147:11).

34

146.     Greaves has done multiple interviews with Tucker Carlson, on Fox news radio, and with Chris Hayes on MSNBC, to discuss The Satanic Temple.  ECF 101-1 (Greaves Depo. 40:8–41:3).

### The Washington Lawsuit

147.     In 2020, The Satanic Temple filed a lawsuit for defamation and "cyberpiracy" against several former members of its Washington Chapter in the United States District Court for the Western District of Washington (the "Washington Lawsuit").  *United Fed'n of Churches v. Johnson*, 522 F.Supp.3d 842 (W.D. Wash. 2021), *recons. denied*, 2022 WL 1093025 (W.D. Wash. 2022), *aff'd in part, vacated in part and remanded,* 2023 WL 8271978 (9th Cir., Nov. 30, 2023); Compl. ¶ 19.

148.     The defendants in the Washington Lawsuit are David Alan Johnson, Leah Fishbaugh, Mickey Meeham (a/k/a Joshua Calavera), and Nathan Sullivan, who are former members of The Satanic Temple and now members of a group called Queer Satanic.  *See gen., Johnson*, 522 F.Supp.3d 842.

149.     Queer Satanic operates a social media account under the handle @QueerSatanic. ECF 101-3 (Duin Depo.93:16–19); ECF 101-4 (Sullivan Depo. 6:15–17).

### The Article

#### *Background*

150.     After the Washington Lawsuit was dismissed by the District Court, Newsweek reporter Julia Duin received an email from Kevin Jones, a journalist with the Catholic News Agency, stating that former members of The Satanic Temple had told him about The Satanic Temple's alleged use of "defamation lawsuits . . . to harass internal critics." ECF 101-3 (Duin Depo. 37:16–38:9); ECF 101-5 (JDUIN002).

Appendix 857

151.    Duin is a freelancer who worked for Newsweek as an independent contractor from September 1, 2021 until February 2023.  ECF 101-3 (Duin Depo. 29:3–4, 78:1–16).

152.    Duin has been a journalist for over forty-five years.  ECF 101-3 (Duin Depo. 183:10–12).

153.    Duin has received multiple awards for her reporting, including awards from the Religion News Writers Association, the Associated Press, and the Religion Communicators Council.  ECF 101-3 (Duin Depo. 11:13–12:9).

154.    Duin has published six books about religion.  ECF 101-3 (Duin Depo. 15:5–21).

155.    Duin served as a visiting journalism professor at the University of Alaska at Fairbanks, a visiting professor at Union University, an adjunct professor at the University of Maryland, and an adjunct professor at Patrick Henry University.  ECF 101-3 (Duin Depo. 15:22–16:11).

156.    Duin has a master's degree in religious studies from Trinity Episcopal School for Ministry.  ECF 101-3 (Duin Depo. 88:4–19).

### *Researching the Article*

157.    In connection with her research for the Article, Duin communicated with the Queer Satanic members in person and via their @queersatanic social media account.  *See* ECF 101-3 (Duin Depo. 91:10–21 (referring to her in person interview with members of Queer Satanic), 93:3–19 (referring to her social media communications with members of Queer Satanic)); ECF 101-6 (JDUIN019-025).

158.    When Duin communicated with Nathan Sullivan, he told her that the Queer Satanic members had been removed from the Washington Chapter of The Satanic Temple because they were copied on an ethics complaint, and that the ethics complaint involved the

36

mismanagement of a sexual harassment complaint within the Washington Chapter.  ECF 101-4

(Sullivan Depo. 16:3–12; 22:11–23:21); ECF 101-7 (JDUIN018).

159.    Sullivan also sent Duin social media posts between a member of The Satanic

Temple and The Satanic Temple's International Council, in which the member claimed she was

removed from groups within The Satanic Temple after publicly criticizing the behavior of

Satanic Temple leaders for, among other things, making inappropriate sexual comments.  ECF

101-6 (JDUIN019-025).

160.    When Duin communicated with David Johnson, he told her that he had been a

witness to a sexual harassment complaint within The Satanic Temple.  ECF 101-8 (Johnson

Depo. 10:23–11:13).

161.    On October 24, 2021, Duin emailed Scott Malphas, a former member of The

Satanic Temple, and asked if he would "mind telling [her] what chapter you were part of . . . ,

when you left [The Satanic Temple] and why."  ECF 101-9 (DUIN48-003).

162.    Duin's October 24th email to Malphas did not mention sexual abuse.  *Id.*

163.    In response to Duin's email, Malphas stated that he would be "happy to share

[his] experience with her," and further stated:

> There was an account of sexual assault, and the response was "we are looking into
> it," then never followup [sic]. One individual was in charge of on-boarding new
> chapters . . . turns out they were using their authority to coerce potential chapter
> leaders into having sex. That person was protected by the national council and
> executive leadership, for months . . . until they finally "stepped down" and the
> allegations of statutory rape were never addressed.
> [. . .]
> The nail in the coffin for me was when I found out that the national council had
> been reviewing and approving official events that included orgies. [. . .] Well,
> shortly after the first celebration, national council released "sex-positive
> guidelines." It was clear that this was in response to the complaints of sexual
> assault; an effort to shed responsibility."

ECF 101-9 (DUIN48-002–48-003).

**Appendix 859**

164.    On October 24, 2021, Duin emailed Jinx Strange (a/k/a Paul Millirons), another former member of The Satanic Temple, and asked if he would "mind telling [her] what chapter you were part of, when you left [The Satanic Temple] and why."  ECF 101-10 (NEWSWEEK017).

165.    Duin's October 24th email to Strange did not mention sexual abuse.  *Id.*

166.    Strange wrote a lengthy response to Duin, in which he stated that he had heard "concerning" stories from other members of The Satanic Temple, and that:

> A lot of times those things were anecdotal or unsupported, but sometimes they were very concerning. Screenshots or images of things and connections I hadn't seen before. Leaders posing happily with major alt-right media figures. Accounts of sexual abuse being covered up in ways that were more than anecdotal.  Dozens of people kicked out for asking for financial records from this alleged-non-profit organization.

ECF 101-10 (NEWSWEEK16).

167.    Strange explained that he ceased his involvement with The Satanic Temple after hearing accounts of sexual abuse and "observ[ing] behavior on social media by people [he] understood to be leaders in [The Satanic Temple]," which appeared to be efforts to cover up those allegations.  ECF 101-11 (Strange Depo. 11:7–15).

168.    Duin found the sources who told her about allegations of sexual abuse within The Satanic Temple credible "[b]ecause [Scott Malphas] was a true believer when he came in, and so was Jinx.  And they were all true believers, and they saw stuff they didn't like, and they left. They all . . . wanted to believe.  They all came in, and they believed in the organization, and they left not believing in it."  ECF 101-3 (Duin Depo. 175:24–176:4).

169.     Duin also interviewed Lucien Greaves, spokesperson and co-founder of The Satanic Temple as part of her research for the Article.  ECF 101-3 (Duin Depo. 103:13, 104:4–7); ECF 101-1 (Greaves Depo. 14:10–12).

170.     During Duin's communications with Greaves, Greaves generally denied claims against The Satanic Temple. ECF 101-3 (Duin Depo. 124:15–18, 126:17–24).

171.     On October 29, 2021, Duin emailed Greaves and asked him about Malphas's complaints that The Satanic Temple's national council had been "approving official events that included orgies."  ECF 101-12 (NEWSWEEK027).

172.     In response, Greaves stated that "[n]o events are compulsory to continued membership within [The Satanic Temple]."  *Id.*

173.     Duin also interviewed Matt Kezhaya, The Satanic Temple's general counsel, as part of her research on the Article.  ECF 101-3 (Duin Depo. 103:22–104:7).

### *Writing the Article*

174.     The Article begins:

Can you defame a religion, especially one that doesn't believe in God, Satan or the supernatural?

The answer to that question could cost four former members of The Satanic Temple (TST) more than $140,000 in damages, including "reputation losses," in a civil lawsuit that has dragged on for more than a year and a half.

Compl. Ex. 1.

175.     The Article then sets forth the claims in the Washington Lawsuit, provides some background on The Satanic Temple's founding and history, and describes the involvement of each defendant in the organization.  *Id.*  The Article also outlines other recent legal disputes involving The Satanic Temple, reports on complaints other former members have made about The Satanic Temple's practices, and includes responses from Greaves and Kezhaya.  *Id.*  Finally,

**Appendix 861**

the Article details the holding of the federal court that dismissed Plaintiff's claims, notes that "[The Satanic Temple's] brand is still under debate in Seattle," and concludes with comments from both sides in the Washington Lawsuit on the relative merits of their positions.  *Id.*

176.     As background, and as part of the reporting on other complaints made by other former members, the Article includes Jinx Strange's quote that he left The Satanic Temple after hearing "[a]ccounts of sexual abuse being covered up in ways that were more than anecdotal."  *Id.*

177.     While Duin found the Article Statement "inherently plausible," she did not intend to accuse The Satanic Temple of any wrongdoing by including the Article Statement in the Article.  ECF 101-3 (Duin Depo. 134:23–135:1); *see also* ECF 101-3 (Duin Depo. 99:13–15 ("[The Article] was not an investigation into the sexual abuse or the finances or the alt-right figures.")).

178.     Rather, Duin included the Article Statement "[b]ecause it gave a general view of the various controversies surrounding The Satanic Temple."  ECF 101-3 (Duin Depo. 100:1–2).

179.     Duin "was looking for . . . [Jinx Strange's] perception of what The Satanic Temple was about.  What he thought, what his experience was, what he was hearing from other people." ECF 101-3 (Duin Depo. 102: 5–11).

180.     Two paragraphs after the Article Statement, the Article includes Lucien Greaves' statement that he considers complaints about The Satanic Temple "old news" and that, "We get this litany of senseless disparaging claims against us that says we're a religious group acting in a nefarious manner."  Compl. Ex. 1.

181.     Duin put Greaves's general denial about claims made against The Satanic Temple after the Article Statement because she believed Greaves's denial applied to the "various

40

**Appendix 862**

accusations" made against The Satanic Temple, including the Article Statement.  ECF 101-3 (Duin Depo. 128:20–129:7).

### *Editing the Article*

182.     Cooper testified that Duin was hired as a religion reporter for Newsweek because "[s]he was an experienced religion reporter," who had "won [] awards," and was "interested in the topic and knew about it."  ECF 101-13 (Cooper Depo. 70:6–13).

183.     Regarding Duin's experience as a reporter, Cooper further testified that "she clearly knew what she was talking about.  She was an experienced reporter . . . [S]he had been a reporter for other news outlets and covered religion for them." ECF 101-13 (Cooper Depo. 203:8–23).

184.     Newsweek relied on Duin to fact check her articles.  ECF 101-13 (Cooper Depo. 140:21–24).

185.     Duin represented to Cooper that she had "fact-checked this [Article] until [her] eyes were bleary."  ECF 101-13 (Cooper Depo 183:7–17); *see also* ECF 101-14 (COOPER49 ("Whew . . . have factchecked until I am buggy-eyed.")).

186.     Duin typically did not provide Cooper with notes for her articles because Duin "is a very experienced senior person who was hired to be on this [religion] beat who knows this beat, and I [Cooper] don't re-report stories.  That's not an editor's role."  ECF 101-13 (Cooper Depo. 157:16–2).

187.     Cooper saw no evidence Duin was biased in her reporting on The Satanic Temple. ECF 101-13 (Cooper Depo. 222:6–17).

188.     Cooper understood the Article Statement to be a report of claims people were making, not an accusation of legal guilt.  ECF 101-13 (Cooper Depo. 209:5–14).

189.     Cooper believes the Article Statement was true.  ECF 101-13 (Cooper Depo. 184:17–21).

190.     Cooper believes that Newsweek did not intend to, and did not, defame The Satanic Temple by publishing the Article Statement.  ECF 101-13 (Cooper Depo. 229:6–8).

### Additional Support for The Article Statement

191.     Regarding allegations of sexual abuse within The Satanic Temple, Strange recalled that:

> One case was the case at the heart of the Washington Chapter issue. My understanding is that someone came forward with an allegation, and then they were immediately removed and as well as anyone it was just perceived might support them.

> The second was a young woman from, I believe, the Austin TST Chapter at the time. Her name was Kylie Scenario, and very similarly, my understanding was that she had made an allegation and was immediately removed, possibly along with other supporters.

> The third instance is a personal friend who confided in me something that happened to her at a—at a party.

ECF 101-11 (Strange Depo. 25:1–16).

192.     Regarding the sexual harassment claim he was a witness to, Johnson testified:

> There was a former member of the local [Satanic Temple] group who had been, from my understanding, repeatedly made to feel uncomfortable by a much older member. . . They left because it was non-addressed for months, and then I found out about it in 2020.

ECF 101-8 (Johnson Depo. 11:7–13).

193.     Regarding other accounts of sexual abuse he had hear about, Johnson testified that:

> [T]he most significant one would be a member of what was then The Satanic Temple, Austin chapter, who claimed that they were sexually assaulted by a chapter head. And in response to this, the—my understanding is that the chapter head and their partner, who was the leader of a Dallas group, created a doxing website to

**Appendix 864**

> attack the person who talked about being sexually assaulted . . . The person in Austin who posted about it had public Facebook posts talking about their experience . . . .

ECF 101-8 (Johnson Decl. 26:9–22).

194.   Johnson also testified that:

> [The Satanic Temple] has a holiday called Lupercalia . . . It's a celebration of sexuality, supposedly.  I know that the co-owner of [The Satanic Temple], Doug Misicko, used to solicit nudes for that. I don't know how comfortable everyone was with those things, but I know that some people talked about how Luercalia made them feel uncomfortable.

ECF 101-8 (Johnson Decl. 26:24–27:5).

195.   Regarding his removal from the Washington Chapter, Sullivan testified:

> My expulsion [from The Satanic Temple] was a part of . . . covering up the ethics complaint where the harassment was an underpinning factor. The chapter head at the time explicitly said that the—the reason for my removal was because I was a witness to that e-mail.

ECF 101-4 (Sullivan Depo. 16:3–8).

196.   Jex Blackmore is a former member of The Satanic Temple.  ECF 101-2 (Stevens Depo. 130:6–15).

197.   In August 2018, Blackmore wrote an article published on Medium in which she wrote:

> While I was part of the organization, [The Satanic Temple], I witnessed male members of the organization exploit their position and influence to behave inappropriately and disrespectfully towards women. I myself experienced harassment and abuse from members who have now left the organization. I know that my experience is one of many examples of systemic gaslighting, degradation and bulling that many women have experienced within [The Satanic Temple] over the years.

ECF 101-3 (Stevens Depo. 135:18–136:13); ECF 101-15.

198.   The Satanic Temple has admitted that "[o]ver the years we received a handful of complaints that were sexual in nature but not 'sexual assault.'"  ECF 101-17.

**Appendix 865**

199.    One such complaint was submitted by Enid Cooper, a former member of The

Satanic Temple San Jose, in December 2017. *Id.*

200.    Enid Cooper complained that: "One of the leadership, Miles Teg (Gus Hernandez)

pulled me aside during the picnic and mentioned that he had seen me online and thought I was

'beautiful.' I politely declined because I was with my date and excused myself to go back to my

seat. At this point, he followed me to my table where I was seated with my date and proceeded to

talk about his piercing on his penis, even going as far as looking for objects that were

comparable in shape to his genitals." *Id.*

201.    Regarding Enid Cooper's complaint, The Satanic Temple's 30(b)(6) witness

testified:

> Enid Cooper had made some complaints to national council and then was being
> very, very aggressive in not leaving, what are you going to do about it, what are
> you going to do about it, what are you going to do about it, repeatedly and very
> quickly, and that that led to some frustration because it's like you never want to tell
> somebody who is filing a complaint like to not . . . but at the same time sometimes
> looking in to things takes time, and Enid Cooper was not having I guess any of that.

ECF 101-2 (Stevens Depo. 73:13–74:3).

202.    In April 2020, a complaint was lodged against The Satanic Temple Austin

Chapter. ECF 101-17.

203.    The Satanic Temple admitted that:

- A [Satanic Temple] Austin member (Laura Smith) emailed NC [National
  Council] with the allegation that the [Satanic Temple] Austin Chapter Head
  (Shelby Scates) sexually assaulted another person (Kiley) whom they were
  friends with.

- NC's initial response was to encourage Kiley to file a police response, due
  to the seriousness of the allegations. She refused.

- (May) Laura Smith and other friends of Kiley reached out to individual
  [Satanic Temple] members to "warn" them with these claims. This

**Appendix 866**

escalated to them threatening to "go public" with the claim that TST was "covering up" the accusations.

- (June) Shelby emailed NC stating that he was stepping down from leadership and away from [The Satanic Temple].

*Id.*

204.    Regarding the Austin Chapter Complaint, The Satanic Temple's 30(b)(6) witness testified:

> [T]he allegation was that Shelby sexually assaulted Kiley. The report was e-mailed in by a person who was a friend of Kiley's and an ex of Shelby's . . . Over the course of the following month or so . . . it seemed like there was a lot of effort to reach out to people, [The Satanic Temple] members individually, to, you know, warn people, sway people . . . and it got to a point where someone, it was Laura, threatened to go public quote unquote, whatever that means, with the claim that [The Satanic Temple] was covering up these accusations, and it was at that point that Shelby stepped down.

ECF 101-2 (Stevens Depo. 111:5–25).

205.    Regarding the Austin Chapter's response to the Austin Chapter Complaint, The Satanic Temple's 30(b)(6) witness testified that after the alleged perpetrator "stepped down" from his leadership position, the alleged victim and people who continued to raise the issue at Chapter meeting were removed from the Austin Chapter. ECF 101-2 (Stevens Depo. 114:10–23, 115:5–12, 117:4–6, 117:12–20).

206.    In addition to the above testimony, there are numerous social media posts in which individuals purporting to be former members of The Satanic Temple have publicly recounted experiences of sexual abuse within The Satanic Temple and expressed their frustration with how such complaints were handled, including:

- A Facebook post and a X (formerly Twitter) post by a former Satanic Temple member, Rumor Solanine, dated May 2, 2021, in which the author shared screenshots of a chat with Southern California Satanic Temple leaders, and stated, "It's such a shame @satanic_temple_ turned out to be so hypocritical[.] We all had such high hopes for them[.] Covering up abusive behavior from your leaders

**Appendix 867**

to maintain an external image is gross[.] Punishing the victims and rewarding the abusers is gross[.] TST should be ashamed." ECF 101-18.

- A series of Facebook posts by a former Satanic Temple Member, "D.E.M.," dated March 8, 2020, in which the author described their experience of sexual harassment within the then-Seattle chapter of The Satanic Temple, stating, "First, the same [Satanic Temple] member was allowed to sexually harass me, over 5 reported counts, and even going as far as looking up my dress during The Womxns March movement while licking his lips, with the chapter doing nothing to prevent it from happening." The same person also stated on May 8, 2020, "I left The Satanic Temple then Seattle Chapter, now known as the WA State Chapter, in 2017 following the lack of action and care when I stepped forward, multiple times with proof, that I was being sexually harassed and groomed by an older member of the chapter since 2015. That member wasn't removed until 7 months later, when other femme presenting members said they were now being harassed, as well. [The Satanic Temple] WA then sent out an e-mail stating a member had been removed for inappropriate behaviors towards other members. In that e-mail, they anonymously mentioned my reports, by stating 'There were reports made by previous members, but those could of been handled between each other, and we didn't feel it necessary to intervene.'" ECF 101-19.

- A Reddit thread, from a former Satanic Temple member in the Philadelphia area dated February 15, 2020, in which the former member claims they were attending a Satanic Temple event at which there was "lots of unwanted touching, kissing, [and] a lot of pressure to be sexual and very 'out.'" ECF 101-20.

- A series of Facebook posts by a former member of The Satanic Temple Austin Chapter, who stated on September 11, 2020, "Guess who just got banned from TST for filing a report about a member of leadership in TST raping them along with everyone that has been talking to the police. This gal!" ECF 101-21.

207.    Within The Satanic Temple, member complaints about violations of The Satanic Temple code of conduct, including allegations of sexual assault, are handled by the Suryan Council. ECF 101-1 (Greaves Depo. 19:16–19); ECF 101-2 (Stevens Depo. 12:20–25, 25:24–26:15).

208.    The Suryan Council was not formed until 2020.  ECF 101-2 (Stevens Depo. 13:11–16).

46

209.    Prior to the formation of the Suryan Council, The Satanic Temple lacked a formal process for handling complaints, including complaints involving sexual abuse.  ECF 101-2 (Stevens Depo. 82:19–82:4).

210.    Prior to 2020 there were complaints that were not formally addressed.  ECF 101-2 (Stevens Depo. 83:9–12).

211.    The Satanic Temple did not conduct any investigation into Blackmore's claims from the Medium article.  ECF 101-1 (Greaves Depo. 74:4–8).

Dated:   May 31, 2024                              Respectfully submitted,


                                                  /s/*Cameron Stracher*
                                                  Cameron Stracher
                                                  Sara C. Tesoriero
                                                  CAMERON STRACHER, PLLC
                                                  51 Astor Place, 9th Floor
                                                  New York, NY 10003
                                                  Tel: 646.992.3850
                                                  Fax: 646.992.4241
                                                  cam@stracherlaw.com
                                                  sara@stracherlaw.com

                                                  *Attorneys for Defendant Newsweek Digital, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2024, I caused a true copy of the foregoing to be served on all counsel of record via ECF.

/s/ *Sara C. Tesoriero*
Sara C. Tesoriero, Esq.

**Appendix 870**