# 25-868

## United States Court of Appeals
### For the Second Circuit

---

The Satanic Temple, Inc.,
*Plaintiff - Appellant,*

*vs.*

Newsweek Digital LLC,
*Defendant - Appellee*

Julia Duin
*Defendant.*

---

On appeal from the United States District Court
for the Southern District of New York

District Court case no. 1:22-cv-01343-MKV-SLC

The Honorable Mary Kay Vyskocil, U.S. District Judge, presiding

---

## Appendix for The Satanic Temple

## Volume IV of IV (redacted) (pages 871-1149)

---



**Matt Kezhaya**
MN # 0402193

matt@kezhaya.law
(612) 276-2216

150 S. Fifth Street, Suite 1850, Minneapolis, MN 55402

| VOLUME I | | | |
|---|---|---|---|
| **Date** | **ECF** | **Title** | **Page** |
| 02/16/2022 | 1 | TST's Complaint with Jury Demand | 11 |
| 02/16/2022 | 1-1 | Subject Newsweek Article - Ex. 1 to Complaint | 44 |
| 02/16/2022 | 1-2 | Newsweek's Press Kit - Ex. 2 to Complaint | 71 |
| 02/16/2022 | 1-3 | Newsweek's Editorial Guidelines - Ex. 3 to Complaint | 93 |
| 02/16/2022 | 1-4 | Fuller's Removal Letter - Ex. 4 to Complaint | 101 |
| 02/16/2022 | 1-5 | TST's Demand for Retraction - Ex. 5 to Complaint | 103 |
| 02/16/2022 | 1-6 | Newsweek's Response to Retraction Demand - Ex. 6 to Complaint | 114 |
| 02/16/2022 | 1-7 | PACER Search Return for Calavera - Ex. 7 to Complaint | 117 |
| 02/16/2022 | 1-8 | PACER Search Return for Meeham - Ex. 8 to Complaint | 118 |
| 02/16/2022 | 1-9 | Greaves/Duin Email Exchanges - Ex. 9 to Complaint | 119 |
| 02/16/2022 | 1-10 | Laycock/Duin Email Exchanges - Ex. 10 to Complaint | 127 |
| 05/24/2022 | 14 | TST's Response Letter on Proposed MTD | 129 |
| 08/15/2022 | 22 | TST's Response in Opposition to Duin's MTD | 133 |
| 08/15/2022 | 23 | Decl. of Matthew Sheppe | 148 |
| 03/08/2023 | 27 | Opinion and Order on MTD | 150 |
| 05/17/2024 | 101 | Decl. Cameron Stracher | 170 |
| 05/17/2024 | 101-1 | Decl. Stracher Ex. 1 - Greaves Depo. Excerpts, dated November 6, 2023 | 175 |
| 05/17/2024 | 101-2 | Decl. Stracher Ex. 2 - Stevens Depo. Excerpts, dated November 3, 2023 | 190 |

**Appendix 872**

| VOLUME I (CONT'D) | | | |
|---|---|---|---|
| **Date** | **ECF** | **Title** | **Page** |
| 05/17/2024 | 101-3 | Decl. Stracher Ex. 3 - Duin Depo. Excerpts, dated November 16, 2023 | 226 |
| 05/17/2024 | 101-4 | Decl. Stracher Ex. 4 - Sullivan Depo. Excerpts, dated November 17, 2023 | 265 |
| 05/17/2024 | 101-5 | Decl. Stracher Ex. 5 - Email sent from Kevin Jones on September 29, 2021 | 273 |
| 05/17/2024 | 101-6 | Decl. Stracher Ex. 6 - Social Media Messages between Duin and the social media account @queersatanic | 277 |
| 05/17/2024 | 101-7 | Decl. Stracher Ex. 7 - Portion of transcript of audio recording of Duin's interview with Queer Satanic | 285 |
| 05/17/2024 | 101-8 | Decl. Stracher Ex. 8 - Johnson Depo. Excerpts, dated November 17, 2023 | 287 |
| 05/17/2024 | 101-9 | Decl. Stracher Ex. 9 - Email exchange between Duin and Malphas in October of 2021 | 293 |

[*intentionally left blank*]

| | | VOLUME II | |
|---|---|---|---|
| **Date** | **ECF** | **Title** | **Page** |
| 05/17/2024 | 101-10 | Decl. Stracher Ex. 10 - Email exchange between Duin and Strange in October of 2021 | 309 |
| 05/17/2024 | 101-11 | Decl. Stracher Ex. 11 - Millirons (aka Jinx Strange) Depo. Excerpts, dated December 7, 2023 | 313 |
| 05/17/2024 | 101-12 | Decl. Stracher Ex. 12 - Email exchange between Duin and Greaves in October of 2021 | 320 |
| 05/17/2024 | 101-13 | Decl. Stracher Ex. 13 - Nancy Cooper Depo. Excerpts, dated November 7, 2023 | 326 |
| 05/17/2024 | 101-14 | Decl. Stracher Ex. 14 - Email sent from Duin to Cooper on October 28, 2021 | 352 |
| 05/17/2024 | 101-15 | Decl. Stracher Ex. 15 - "The Struggle for Justice is Ongoing" by Jex Blackmore | 356 |
| 05/17/2024 | 101-16 | Decl. Stracher Ex. 16 - Dr. Joseph Laycock's book Speak of the Devil: How The Satanic Temple is Changing the Way We Talk about Religion, excerpts | 372 |
| 05/17/2024 | 101-17 | Decl. Stracher Ex. 17 - Depo. notes prepared by Gregory Stevens | 377 |
| 05/17/2024 | 101-18 | Decl. Stracher Ex. 18 - Social media posts by Rumor Solanine dated May 2, 2021 | 381 |
| 05/17/2024 | 101-19 | Decl. Stracher Ex. 19 - Facebook posts by D.E.M. dated March 8, 2020 | 398 |
| 05/17/2024 | 101-20 | Decl. Stracher Ex. 20 - Reddit thread pertaining to former members of The Satanic Temple dated February 15, 2020 | 402 |
| 05/17/2024 | 101-21 | Decl. Stracher Ex. 21 - Facebook post dated September 11, 2020 produced by Plaintiff | 410 |
| 05/17/2024 | 103 | TST's Brief in Support of MSJ | 412 |

| | | **VOLUME II (cont'd)** | |
|---|---|---|---|
| **Date** | **ECF** | **Title** | **Page** |
| 05/17/2024 | 105 | Decl. Matt Kezhaya | 443 |
| 05/17/2024 | 105-1 | Decl. Matt Kezhaya Ex. 1 - Subject article (Compl. Ex. 1) | 448 |
| 05/17/2024 | 105-2 | Decl. Matt Kezhaya Ex. 2 - Email exchange ending October 29, 2021, 11:04 AM between Nancy Cooper and Julia Duin (Cooper26-27) | 476 |
| 05/17/2024 | 105-3 | Decl. Matt Kezhaya Ex. 3 - Email exchange ending October 29, 2021, 12:24 PM between Nancy Cooper and Julia Duin (Cooper37-39) | 479 |
| 05/17/2024 | 105-4 | Decl. Matt Kezhaya Ex. 4 - Email exchange ending October 29, 2021, 12:54 PM between Nancy Cooper and Julia Duin (Cooper28-30) | 483 |
| 05/17/2024 | 105-5 | Decl. Matt Kezhaya Ex. 5 - Email exchange ending October 29, 2021, 8:31 AM between Nancy Cooper and Julia Duin (Cooper31-32) | 487 |
| 05/17/2024 | 105-6 | Decl. Matt Kezhaya Ex. 6 - Email exchange ending October 28, 2021, 2:31 PM between Nancy Cooper and Julia Duin (Cooper48-50) | 490 |
| 05/17/2024 | 105-7 | Decl. Matt Kezhaya Ex. 7 - Email dated October 25, 2021, 12:22 PM from Juliana Pignataro to Julia Duin, Dayan Candappa, and Nancy Cooper (DUIN15-001-002) | 494 |
| 05/17/2024 | 105-8 | Decl. Matt Kezhaya Ex. 8 - Email exchange ending October 15, 2021, 1:08 PM between Juliana Pignataro and Julia Duin (NEWSWEEK442-443) | 498 |

| | | VOLUME II (cont'd) | |
|---|---|---|---|
| **Date** | **ECF** | **Title** | **Page** |
| 05/17/2024 | 105-9 | Decl. Matt Kezhaya Ex. 9 - Four articles by Julia Duin for the Houston Chronicle: Halloween: The sinister and the saintly/Occult practices embrace a variety of beliefs, rituals, (October 31, 1987); Police unable to link crime with Satanism (October 12, 1989); DEMONS & DARKNESS/Experts on evil shed light on things that go bump in the night (October 28, 1989); Satanism in the United States: a phenomenon on the rise Houston Chronicle (December 24, 1989), Houston Chronicle (JDUIN004-017) | 501 |
| 05/17/2024 | 105-10 | Decl. Matt Kezhaya Ex. 10 - Julia Duin, The Satanic Temple comes to Salem and the Boston Globe does a puff piece (September 22, 2016) (Duin Depo. Ex. 3) | 516 |
| 05/17/2024 | 105-11 | Decl. Matt Kezhaya Ex. 11 - Julia Duin, Young Satan worshippers foiled in Florida – but there's a deeper story here somewhere, (October 26, 2018) (Duin Depo. Ex. 4) | 520 |
| 05/17/2024 | 105-12 | Decl. Matt Kezhaya Ex. 12 - Julia Duin, ProPublica punts when digging into why the Family Research Council calls itself a church (August 18, 2022) (Duin Depo. Ex. 5) | 530 |
| 05/17/2024 | 105-13 | Decl. Matt Kezhaya Ex. 13 - Email exchange ending September 29, 2021, 10:08 AM between Julia Duin and Kevin J. Jones of the Catholic News Agency (JDUIN001-003) | 540 |
| 05/17/2024 | 105-14 | Decl. Matt Kezhaya Ex. 14 - Email dated September 30, 2021, 12:02 PM from Julia Duin to Juliana Pignataro, Dayan Candappa, and Nancy Cooper (NEWSWEEK025) | 544 |
| 05/17/2024 | 105-15 | Decl. Matt Kezhaya Ex. 15 - Email exchange ending October 25, 2021, 1:04 PM between Nancy Cooper, Julia Duin, Dayan Candappa, and Juliana Pignataro (Cooper51-53) | 546 |

| | | VOLUME II (cont'd) | | |
|---|---|---|---|---|
| **Date** | **ECF** | **Title** | **Page** | |
| 05/17/2024 | 105-16 | Decl. Matt Kezhaya Ex. 16 - Newsweek's editorial guidelines (Compl. Ex. 3) | 550 | |
| 05/17/2024 | 105-17 | Decl. Matt Kezhaya Ex. 17 - Email exchange ending October 24, 2021, 4:02 PM between Jinx Strange and Julia Duin (NEWSWEEK015-017) | 559 | |
| 05/17/2024 | 105-18 | Decl. Matt Kezhaya Ex. 18 - Email exchange ending October 29, 2021, 8:05 PM between Jinx Strange and Julia Duin (DUIN45-001-006) | 563 | |
| 05/17/2024 | 105-19 | Decl. Matt Kezhaya Ex. 19 - Email exchange ending October 29, 2021, 7:02 PM between Lucien Greaves and Julia Duin (Compl. Ex. 9) | 570 | |
| 05/17/2024 | 105-20 | Decl. Matt Kezhaya Ex. 20 - Email exchange ending October 29, 2021, 8:02 PM between Julia Duin and Kevin J. Jones of the Catholic News Agency (NEWSWEEK 465) | 579 | |
| 05/17/2024 | 105-21 | Decl. Matt Kezhaya Ex. 21 - Defendant's Revised Initial Disclosures | 581 | |
| 05/17/2024 | 105-22 | Decl. Matt Kezhaya Ex. 22 - Email exchange ending October 29, 2021, 2:54 PM between Nancy Cooper and Julia Duin (Cooper19-23) | 586 | |
| 05/17/2024 | 105-23 | Decl. Matt Kezhaya Ex. 23 - Email exchange ending October 28, 2021, 1:01 PM between Nancy Cooper and Julia Duin (Cooper45-46) | 592 | |
| 05/17/2024 | 105-24 | Decl. Matt Kezhaya Ex. 24 - Email exchange ending October 29, 2021, 8:28 AM between Nancy Cooper and Julia Duin (Cooper 40-41) | 595 | |

| VOLUME III | | | |
|---|---|---|---|
| **Date** | **ECF** | **Title** | **Page** |
| 05/17/2024 | 105-25 | Decl. Matt Kezhaya Ex. 25 - Email exchange ending October 29, 2021, 3:19 PM between Cooper and Duin | 608 |
| 05/17/2024 | 105-26 | Decl. Matt Kezhaya Ex. 26 - Email exchange ending October 29, 2021, 5:41 PM between Greaves and Duin | 611 |
| 05/17/2024 | 105-27 | Decl. Matt Kezhaya Ex. 27 - TST's demand letter to Newsweek (October 30, 2021) (Compl. Ex. 5) | 618 |
| 05/17/2024 | 106 | Decl. Malcolm Jarry with Invoice Exhibits (Exs. 28-36) | 630 |
| 05/17/2024 | 107 | Decl. Dr. Laycock | 650 |
| 05/17/2024 | 108 | Decl. Greaves | 653 |
| 05/17/2025 | 110 | Decl. Sonia Kezhaya | 655 |
| 05/17/2026 | 110-1 | Decl. Sonia Kezhaya Ex. 37 - Excerpts from deposition of Nancy Cooper, dated November 7, 2023 | 657 |
| 05/17/2027 | 110-2 | Decl. Sonia Kezhaya Ex. 38 - Excerpts from deposition of Julia Duin, dated November 16, 2023 | 701 |
| 05/17/2028 | 110-3 | Decl. Sonia Kezhaya Ex. 39 - Excerpts from deposition of Lucien Greaves, dated November 6, 2023 | 751 |
| 05/17/2029 | 110-4 | Decl. Sonia Kezhaya Ex. 40 - Excerpts from deposition of David Alan Johnson, dated November 17, 2023 | 760 |
| 05/17/2030 | 110-5 | Decl. Sonia Kezhaya Ex. 41 - Excerpts from deposition of Nathan Sullivan, dated November 17, 2023 | 769 |
| 05/17/2031 | 110-6 | Decl. Sonia Kezhaya Ex. 42 - Excerpts from deposition of Jinx Strange, dated December 7, 2023 | 786 |
| 05/17/2032 | 110-7 | Decl. Sonia Kezhaya Ex. 43 - Excerpts from deposition of Greg Stevens (TST's 30(b)(6) deponent), dated November 3, 2023 | 798 |
| 05/31/2024 | 113 | Newsweek's Response to TST's 56.1 Statement | 822 |

| VOLUME IV | | | |
|---|---|---|---|
| **Date** | **ECF** | **Title** | **Page** |
| 05/31/2024 | 116 | TST's Response to Newsweek's 56.1 Statement | 881 |
| 05/31/2024 | 117 | Decl. Matt Kezhaya | 912 |
| 05/31/2024 | 117-1 | Decl. Matt Kezhaya Ex. 44 - Screenshot of search results for "tossatanicacc" | 915 |
| 05/31/2024 | 117-2 | Decl. Matt Kezhaya Ex. 45 - Stevens Depo. Exhibit 9, Enid Cooper's December 11, 2017 complaint | 917 |
| 05/31/2024 | 117-3 | Decl. Matt Kezhaya Ex. 46 - Stevens Depo. Exhibit 8, TST's January 8, 2018<br>resolution of Enid Cooper's complaint | 921 |
| 05/31/2024 | 118 | Decl. Hollow Axis | 924 |
| 05/31/2024 | 119 | TST's Response to Newsweek's MSJ (corrected brief) | 927 |
| 06/07/2024 | 122 | TST's Reply on MSJ | 958 |
| 06/07/2024 | 124 | Decl. Sonia Kezhaya | 973 |
| 06/07/2024 | 124-2 | Decl. Sonia Kezhaya 48 - Excerpts from deposition of Nancy Cooper, dated November 7, 2023 | 975 |
| 06/07/2024 | 124-3 | Decl. Sonia Kezhaya 49 - Excerpts from deposition of David Alan Johnson, dated November 3, 2023 | 1003 |
| 06/07/2024 | 124-4 | Decl. Sonia Kezhaya 50 - Excerpts from deposition of Gregory Stevens (TST's 30(b)(6) deponent), dated November 3, 2023 | 1012 |
| 06/07/2024 | 124-5 | Decl. Sonia Kezhaya 51 - Excerpts from deposition of Lucien Greaves, dated November 6, 2023 | 1025 |
| 06/12/2024 | 125 | TST's Letter to Seal Deposition Testimony | 1040 |
| 08/21/2024 | 127 | Depo. Excerpts of Duin (Redacted) | 1042 |
| 02/18/2025 | 132 | MSJ Oral Argument Transcript - February 4, 2025 | 1074 |

| VOLUME IV (cont'd) | | | |
|---|---|---|---|
| **Date** | **ECF** | **Title** | **Page** |
| 03/26/2025 | 134 | Opinion and Order Granting Newsweek's MSJ, Denying TST's MSJ | 1117 |
| 03/27/2025 | 135 | Judgement on MSJ | 1144 |
| 04/07/2025 | 136 | Notice of Appeal | 1145 |
| 07/22/2025 | -- | N.Y. Civ. Rights Law § 76-a(1), (2) - Actions involving public petition and participation; when actual malice to be proven | 1147 |
| 07/22/2025 | -- | CPLR § 302(a)(1) - Personal jurisdiction by acts of non-domiciliaries | 1149 |

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| The Satanic Temple, Inc.<br><br>*Plaintiff*<br><br>*v.*<br><br>Newsweek Digital LLC<br><br>*Defendant.* | 1:22-cv-1343 (MKV)<br><br>**RESPONSE TO NEWSWEEK'S<br>LR 56.1 STATEMENT** |

COMES NOW Plaintiff The Satanic Temple, Inc., by and through counsel of record, with a response to Newsweek Digital LLC's statement of material facts pursuant to LR 56.1.

# THE PARTIES

1.     The Satanic Temple, Inc. ("Plaintiff" or "The Satanic Temple") is an "atheistic religious corporation" with chapters throughout the United States.  Compl. ¶ 6; *see also* Compl. ¶¶ 87, 89, 90 (identifying chapters of The Satanic Temple in Washington, West Florida, and Arizona).

**Response**: Uncontroverted.

2.     The Satanic Temple was founded in or around 2013 or 2014.  Deposition of Lucien Greaves, dated November 6, 2023 ("Greaves Depo."), 6:23–7:2. (The excerpts from the Greaves Deposition cited herein are attached as Exhibit 1 to the Declaration of Cameron Stracher, dated May 17, 2024 ("Stracher Decl.") filed herewith).

**Response**: Uncontroverted.

**Appendix 881**

3.      The Satanic Temple "engages in various charitable activities" and "advocates for the

religious rights of its membership" through litigation, among other forms of advocacy.

Compl. ¶¶ 14, 15.

**Response**: Uncontroverted.


4.      The Satanic Temple publishes press releases to promote Satanic Temple activities,

campaigns, and issues.  Greaves Depo. 26:14–27:13.

**Response**: Uncontroverted.


5.      The press releases are sent to numerous media outlets.  Greaves Depo. 30:2–7.

**Response**: Uncontroverted.


6.      The Satanic Temple publishes press releases so that people are aware of the group

and what it is doing.  Deposition of Gregory Stevens, dated November 3, 2023 ("Stevens

Depo."), 141:23–142:4. (The excerpts from the Stevens Deposition cited herein are also

attached as Exhibit 2 to the Stracher Declaration).

**Response**: Uncontroverted.


7.      Through the press releases, The Satanic Temple sometimes has "specific political or

specific initiatives which [it] promote[s]." Stevens Depo. 143:2–4.

**Response**: Uncontroverted.


8.      The Satanic Temple relies on the public knowing about The Satanic Temple's

activities, including lawsuits it files, in order to generate donations. Greaves Depo. 38:5–15.

**Response**: Uncontroverted.


– 2 –

**Appendix 882**

9.      The Satanic Temple also uses billboards to advertise its initiatives.   Stevens Depo. 146:12–147:11.

**Response**: Uncontroverted.

10.     Greaves has done multiple interviews with Tucker Carlson, on Fox news radio, and with Chris Hayes on MSNBC, to discuss The Satanic Temple.  Greaves Depo. 40:8–41:3.

**Response**: Uncontroverted.

11.     Newsweek is a New York limited liability company that publishes the online news magazine *Newsweek* through its website at www.newsweek.com.  Compl. ¶ 7.

**Response**: Uncontroverted.

12.     Newsweek published the article at issue in this case, titled "Orgies, Harassment, Fraud: Satanic Temple Rocked by Accusations, Lawsuit" (the "Article"), which was written by Juila Duin.  Compl. Ex. 1.

**Response**: Uncontroverted.

## THE WASHINGTON LAWSUIT

13.     In 2020, The Satanic Temple filed a lawsuit for defamation and "cyberpiracy" against several former members of its Washington Chapter in the United States District Court for the Western District of Washington (the "Washington Lawsuit").  *United Fed'n of Churches v. Johnson*, 522 F.Supp.3d 842 (W.D. Wash. 2021), *recons. denied*, 2022 WL 1093025 (W.D. Wash. 2022), *aff'd in part, vacated in part and remanded,* 2023 WL 8271978 (9th Cir., Nov. 30, 2023); Compl. ¶ 19.

– 3 –

Appendix 883

**Response**: Controverted in part. It also includes claims for tortious interference, trespass to chattels, conversion, and breach of fiduciary duty. Kezhaya Decl. ¶ 3.

14.     The defendants in the Washington Lawsuit are David Alan Johnson, Leah Fishbaugh, Mickey Meeham (a/k/a Joshua Calavera), and Nathan Sullivan, who are former members of The Satanic Temple and now members of a group called Queer Satanic. *See gen., Johnson*, 522 F.Supp.3d 842.

**Response**: Uncontroverted.

15.     Queer Satanic operates a social media account under the handle @QueerSatanic.  23 ("Duin Depo."), 93:16–19; Deposition of Nathan Sullivan, November 17, 2023 ("Sullivan Depo."), 6:15–17.  (The excerpts from the Duin and Sullivan Depositions cited herein are also attached as Exhibits 3 and 4 to the Stracher Declaration).

**Response**: Uncontroverted.

# THE ARTICLE

## Background

16.     After the Washington Lawsuit was dismissed by the District Court, Newsweek reporter Julia Duin received an email from Kevin Jones, a journalist with the Catholic News Agency, stating that former members of The Satanic Temple had told him about The Satanic Temple's alleged use of "defamation lawsuits . . . to harass internal critics." Duin Depo. 37:16–38:9; Stracher Decl. Ex. 5 at JDUIN002.

**Response**:  Controverted  as  incomplete.  The  Catholic  News  Agency's  reporter  more

particularly reached out to Duin on September 29, 2021; less than one month after she was hired by Newsweek. JDUIN002; Duin Depo. 29:3–4, 78:1–16.

17.     Jones's email also stated that former members of The Satanic Temple had told him about "allegations of [The Satanic Temple] leadership sexually exploiting members or failing to respond to harassment/sexual assault allegations against chapter heads." *Id.*

**Response**: Uncontroverted.

18.     Duin is a freelancer who worked for Newsweek as an independent contractor from September 1, 2021 until February 2023.  Duin Depo. 29:3–4, 78:1–16.

**Response**: Controverted that Duin is properly designated an "independent contractor." Her work was subject to Newsweek's editorial control, she reported to three separate managers, she was paid a salary, at all times in connection with this article she was held out as a reporter "for" Newsweek, and she worked full-time "for" Newsweek. Cooper26; Cooper37; Cooper Depo. at 134:13-16, 189:17-22 (Cooper edited the Article), Cooper Depo. at 97:19-23; 149:3-7; Duin Depo. at 150:20-21 (Duin reported to Juliana Pignataro), Duin Depo. at 151:8-22 (three managers greenlit the Article), 29:14-15, 68:16-69:7, 69:23-70-7 (paid monthly), 29:5-6, 36:13-18 (worked "for Newsweek," full-time).

19.     Duin has been a journalist for over forty-five years.  Duin Depo. 183:10–12.

**Response**: Uncontroverted.

20.     Duin has received multiple awards for her reporting, including awards from the Religion News Writers Association, the Associated Press, and the Religion Communicators Council.  Duin Depo. 11:13–12:9.

**Response**: Uncontroverted.

**Appendix 885**

21.     Duin has published six books about religion.  Duin Depo. 15:5–21.

**Response**: Uncontroverted.

22.     Duin served as a visiting journalism professor at the University of Alaska at
Fairbanks, a visiting professor at Union University, an adjunct professor at the University of
Maryland, and an adjunct professor at Patrick Henry University.  Duin Depo. 15:22–16:11.

**Response**: Uncontroverted.

23.     Duin has a master's degree in religious studies from Trinity Episcopal School for
Ministry.  Duin Depo. 88:4–19.

**Response**: Uncontroverted.

## Researching the Article

24.     In connection with her research for the Article, Duin communicated with the Queer
Satanic members in person and via their @queersatanic social media account.  *See* Duin
Depo. 91:10–21 (referring to her in person interview with members of Queer Satanic); *id.* at
93:3–19 (referring to her social media communications with members of Queer Satanic);
Stracher Decl. Ex. 6.

**Response**: Uncontroverted.

25.     When Duin communicated with Nathan Sullivan, he told her that the Queer Satanic
members had been removed from the Washington Chapter of The Satanic Temple because
they were copied on an ethics complaint, and that the ethics complaint involved the

mismanagement of a sexual harassment complaint within the Washington Chapter.
Sullivan Depo. 16:3–12; 22:11–23:21; Stracher Decl. Ex. 7.

**Response**: Uncontroverted that Sullivan said this, but the truth of the matter asserted is controverted. Johnson Depo. at 25:6-11.

26.    Sullivan also sent Duin social media posts between a member of The Satanic Temple and The Satanic Temple's International Council, in which the member claimed she was removed from groups within The Satanic Temple after publicly criticizing the behavior of Satanic Temple leaders for, among other things, making inappropriate sexual comments. Stracher Decl. Ex. 6.

**Response**: Controverted. None of these documents indicate that this unidentified hearsay declarant suffered any sexual comments.

27.    When Duin communicated with David Johnson, he told her that he had been a witness to a sexual harassment complaint within The Satanic Temple.  Deposition of David Johnson, November 17, 2023 ("Johnson Depo."), 10:23–11:13. (The excerpts from the Johnson Deposition cited herein are also attached as Exhibit 8 to the Stracher Declaration).

**Response**: Controverted. Johnson Depo. at 21:14-19.

28.    On October 24, 2021, Duin emailed Scott Malphas, a former member of The Satanic Temple, and asked if he would "mind telling [her] what chapter you were part of . . . , when you left [The Satanic Temple] and why."  Stracher Decl. Ex. 9 at DUIN48-003.

**Response**: Uncontroverted.

29.    Duin's October 24th email to Malphas did not mention sexual abuse.  *Id.*

**Response**: Uncontroverted.

**Appendix 887**

30.     In response to Duin's email, Malphas stated that he would be "happy to share [his] experience with her," and further stated:

> There was an account of sexual assault, and the response was "we are looking into it," then never followup [sic]. One individual was in charge of on-boarding new chapters . . . turns out they were using their authority to coerce potential chapter leaders into having sex. That person was protected by the national council and executive leadership, for months . . . until they finally "stepped down" and the allegations of statutory rape were never addressed.
>
> [. . .]
>
> The nail in the coffin for me was when I found out that the national council had been reviewing and approving official events that included orgies. [. . .] Well, shortly after the first celebration, national council released "sex-positive guidelines." It was clear that this was in response to the complaints of sexual assault; an effort to shed responsibility.

Stracher Decl. Ex. 9 at DUIN48-002–48-003.

**Response**: Uncontroverted that the email says this, but Malphas makes no claim to having first-hand knowledge of the facts behind the "account," and is not a listed witness in Newsweek's discovery disclosures. DUIN48-002–003; Defendant's Revised Initial Disclosures, at 2.

31.     On October 24, 2021, Duin emailed Jinx Strange (a/k/a Paul Millirons), another former member of The Satanic Temple, and asked if he would "mind telling [her] what chapter you were part of, when you left [The Satanic Temple] and why." Stracher Decl. Exhibit 10 at NEWSWEEK017.

**Response**: Uncontroverted.

32.     Duin's October 24th email to Strange did not mention sexual abuse. *Id.*

**Response**: Uncontroverted.

**Appendix 888**

33.    Strange wrote a lengthy response to Duin, in which he stated that he had heard "concerning" stories from other members of The Satanic Temple, and that:

> A lot of times those things were anecdotal or unsupported, but sometimes they were very concerning. Screenshots or images of things and connections I hadn't seen before. Leaders posing happily with major alt-right media figures. Accounts of sexual abuse being covered up in ways that were more than anecdotal.  Dozens of people kicked out for asking for financial records from this alleged-non-profit organization.

Stracher Decl. Ex. 10 at NEWSWEEK16.

**Response**: Uncontroverted that the email says this, but Strange does not claim first-hand knowledge of the "anecdotal" stories he is passing on in the vaguest possible terms. Strange Depo. at 11:16-18.

34.    Strange testified that by "sexual abuse" he meant "unwanted sexual advances or contact."  Deposition of Paul Millirons (a/k/a Jinx Strange), December 7, 2023 ("Strange Depo."), 10:17–20. (The excerpts from the Strange Deposition cited herein are also attached as Exhibit 11 to the Stracher Declaration).

**Response**: Uncontroverted, although whether the article has defamatory meaning is a question for the Court not any particular witness. The article statement, "sexual abuse being covered up," is criminal in nature. Cooper Depo. 186:21–188:6 (both claims are criminal in nature); see also Duin Depo. at 129:21-22 and 130:17-18 ("Sex abuse is a crime.").

35.    Strange explained that he ceased his involvement with The Satanic Temple after hearing accounts of sexual abuse and "observ[ing] behavior on social media by people [he] understood to be leaders in [The Satanic Temple]," which appeared to be efforts to cover up those allegations.  Strange Depo. 11:7–15.

**Response**: Controverted. Strange denied any personal knowledge of sexual abuse or cover-

– 9 –

**Appendix 889**

up. Strange Depo. at 11:16-18.

36.     Strange said that he observed behavior that he "would not consider to be ethical or responsible . . . in response to these sort of [sexual abuse] allegations" and that "lent more credibility to those claims."  Strange Depo. 14:13–18.

**Response**: Controverted. Strange denied any personal knowledge of sexual abuse or cover-up. Strange Depo. at 11:16-18.

37.     In researching the Article, Duin learned that "there [were] multiple reports among . . . former members [of The Satanic Temple], of sexual abuse/harassment . . . whether it's from Scott [Malphas] or from the Seattle members or from Jinx [Strange]."  Duin Depo. 186:19–23.

**Response**: Controverted. Strange denied any personal knowledge of sexual abuse or cover-up. Strange Depo. at 11:16-18. Malphas made no claim of personal knowledge of the truth of the matters asserted by his nebulous "accounts." DUIN48-002–003. Nor is Malphas a listed witness on Defendant's discovery disclosures. Defendant's Revised Initial Disclosures, at 2.

38.     Duin "found what [Strange] said to be inherently plausible" because it was consistent with other statements made by members of Queer Satanic and by Scott Malphas.  Duin Depo. 121:23–123:9.

**Response**: Controverted. Duin did not ask "anyone on the face of the planet what sexual abuse and cover-up means" in context of Strange's email. Duin Depo. at 136:9-13. Neither Strange nor Malphas nor "Queer Satanic" provided any details as to their overt rumormongering, and Duin did not ask any follow-up questions. Duin Depo. at 99:3-17.

**Appendix 890**

Duin did not find Strange's claim "inherently plausible," she found it to be a "delicious quote." NEWSWEEK 465.

39.     Duin found the sources who told her about allegations of sexual abuse within The Satanic Temple credible "[b]ecause [Scott Malphas] was a true believer when he came in, and so was Jinx.  And they were all true believers, and they saw stuff they didn't like, and they left. They all . . . wanted to believe.  They all came in, and they believed in the organization, and they left not believing in it."  Duin Depo. 175:22–176:4.

**Response**: Controverted. Duin described each of these individuals as "disgruntled former members." Duin Depo. at 178:8-18.

40.     Duin also interviewed Lucien Greaves, spokesperson and co-founder of The Satanic Temple as part of her research for the Article.  Duin Depo. 103:13, 104:4–7; Greaves Depo. 14:10–12.

**Response**: Uncontroverted.

41.     During Duin's communications with Greaves, Greaves generally denied claims against The Satanic Temple. Duin Depo. 124:15–18, 126:17–24.

**Response**: Controverted. Julia Duin never asked Lucien Greaves about the accusation of sexual abuse or cover up. Duin Depo. at 123:10-18 and 123:24-124:5; see also ECF No. 27, at 13 ("The denial …was clearly in reference to a separate allegation that appeared several paragraphs below"). Julia Duin "constructed the article" to *appear* as if Lucien gave a general denial, but she did not feel Lucien "had to address every single thing specifically." Duin Depo. at 126:17-24.

**Appendix 891**

42.     On October 29, 2021, Duin emailed Greaves and asked him about Malphas's complaints that The Satanic Temple's national council had been "approving official events that included orgies." Stracher Decl. Ex. 12 at NEWSWEEK027.

**Response**: Uncontroverted.

43.     In response, Greaves stated that "[n]o events are compulsory to continued membership within [The Satanic Temple]." *Id.*

**Response**: Uncontroverted. Greaves further states: "The guidelines are merely meant to set parameters … [so that The Satanic Temple's events] are done in a way that is safe, sane, and consensual, and that nobody feels uncomfortable or coerced." NEWSWEEK 027.

44.     Duin did not ask Greaves about Strange's statement regarding accounts of sexual abuse because she felt Greaves's general denial of allegations against The Satanic Temple, and his response to questions about "official orgies," was a "fair rebuttal" to Strange's statement as well. Duin Depo. 125:19–21, 127:5–18.

**Response**: Controverted. Duin did not ask Greaves about Strange's statement because she was looking for "delicious quotes," not the truth. NEWSWEEK 465. This article was not, in Duin's view, an investigation into sexual abuse. Duin Depo. at 99:8-17.

45.     Greaves suggested Duin speak with Dr. Joseph Laycock, the author of *Speak of the Devil: How The Satanic Temple is Changing the Way We Talk about Religion*. Duin Depo. 104:1–3; Stracher Decl. Ex. 12 at NEWSWEEK028.

**Response**: Uncontroverted.

46.     Duin interviewed Dr. Laycock as part of her research for the Article, and read excerpts from his book. Duin Depo. 103:22–104:8, 157:12–15.

**Response**: Uncontroverted.

47.     Duin also interviewed Matt Kezhaya, The Satanic Temple's general counsel, as part of her research on the Article.  Duin Depo. 103:22–104:7.

**Response**: Uncontroverted.

## Writing the article

48.     The focus of the article was the Washington Lawsuit.  Duin Depo. 99:21; Deposition of Nancy Cooper, November 7, 2023 ("Cooper Depo."), 189:20–190:7. (The excerpts from the Cooper Deposition cited herein are also attached as Exhibit 13 to the Stracher Declaration).

**Response**: Controverted. This was a low effort hit piece commissioned by "disgruntled former members" and the Catholic News Agency. Cooper52; JDUIN002; Duin Depo. at 37:13-38:9; see also NEWSWEEK 465 and Duin Depo. at 99:8-17.

49.     The Article begins:

> Can you defame a religion, especially one that doesn't believe in God, Satan or the supernatural?

> The answer to that question could cost four former members of The Satanic Temple (TST) more than $140,000 in damages, including "reputation losses," in a civil lawsuit that has dragged on for more than a year and a half.

Compl. Ex. 1.

**Response**: Uncontroverted.

– 13 –

50.    The Article then sets forth the claims in the Washington Lawsuit, provides some background on The Satanic Temple's founding and history, and describes the involvement of each defendant in the organization.  *Id.*  The Article also outlines other recent legal disputes involving The Satanic Temple, reports on complaints other former members have made about The Satanic Temple's practices, and includes responses from Greaves and Kezhaya.  *Id.*  Finally, the Article details the holding of the federal court that dismissed Plaintiff's claims, notes that "[The Satanic Temple's] brand is still under debate in Seattle," and concludes with comments from both sides in the Washington Lawsuit on the relative merits of their positions.  *Id.*

**Response**: Uncontroverted.

51.    As background, and as part of the reporting on other complaints made by other former members, the Article includes Jinx Strange's quote that he ceased his involvement with The Satanic Temple after hearing "[a]ccounts of sexual abuse being covered up in ways that were more than anecdotal" (the "Article Statement").  *Id.*

**Response**: Controverted. The article statement appears because it is a "delicious quote." NEWSWEEK 465. It went unquestioned by Duin because it was consistent with her predetermined narrative. Duin Depo. at 136:9-13 and 173:18-174:3 (unquestioned); JDUIN002 and Duin Depo. at 35:1-8 (predetermined narrative of the article); see also JDUIN 4-17 and Duin Depo. Exhibits 3, 4, and 5 (predetermined narrative of the Satanic Panic).

52.    While Duin found the Article Statement "inherently plausible," she did not intend to accuse The Satanic Temple of any wrongdoing by including the Article Statement in the

**Appendix 894**

Article.  Duin Depo. 134:23–135:1; *see* also Duin Depo. 99:13–15 ("[The Article] was not an investigation into the sexual abuse or the finances or the alt-right figures.").

**Response**: Controverted. The article uncritically passed on a "criminal" accusation, without so much as a fair opportunity to comment, in direct violation of Newsweek's own Ethical Guidelines. Compl. Ex. 1; Cooper Depo. 186:21-187:22 and Duin Depo. at 129:21-22 and 130:17-18; Compl. Ex. 3.

53.     Rather, Duin included the Article Statement "[b]ecause it gave a general view of the various controversies surrounding The Satanic Temple."  Duin Depo. 100:1–2.

**Response**:  Controverted.  Newsweek published this "delicious quote" because it was consistent with the predetermined narrative commissioned by "disgruntled former members" and the Catholic News Agency. NEWSWEEK 465; Cooper52, JDUIN002, and Duin Depo. at 37:13-38:9.

54.     Duin "was looking for . . . [Jinx Strange's] perception of what The Satanic Temple was about.  What he thought, what his experience was, what he was hearing from other people." Duin Depo. 102: 5–9.

**Response**: Controverted. Duin was looking for "delicious quotes." NEWSWEEK 465. Otherwise, she would have asked any of the most basic follow-up questions. Cf. Duin Depo. at 136:9-13 (Duin did not ask "anyone on the face of the planet what sexual abuse and cover-up means").

55.     Two paragraphs after the Article Statement, the Article includes Lucien Greaves' statement that he considers complaints about The Satanic Temple "old news" and that,

– 15 –

"We get this litany of senseless disparaging claims against us that says we're a religious group acting in a nefarious manner."  Compl. Ex. 1.

**Response**: Controverted. The article was "constructed" this way to make it appear as if Greaves had a fair opportunity to respond. Duin Depo. at 126:17-24. In fact, Duin did not ask Greaves anything about sexual abuse or cover-up. Duin Depo. at 123:10-18 and 123:24-124:5.

56.    Duin put Greaves's general denial about claims made against The Satanic Temple after the Article Statement because she believed Greaves's denial applied to the "various accusations" made against The Satanic Temple, including the Article Statement.  Duin Depo. 128:20–129:7.

**Response**: Controverted. The article was "constructed" this way to make it appear as if Greaves had a fair opportunity to respond. Duin Depo. at 126:17-24. In fact, Duin did not ask Greaves anything about sexual abuse or cover-up. Duin Depo. at 123:10-18 and 123:24-124:5.

## Editing the Article

57.    Nancy Cooper is the Global Editor in Chief of Newsweek. Cooper Depo. 4:20–22
**Response**: Uncontroverted.

58.    Nancy Cooper edited the Article.  Cooper Depo. 155:17–19, 158:22–159:3.
**Response**: Uncontroverted.

**Appendix 896**

59.     Cooper did not know anything about The Satanic Temple prior to hearing Duin's pitch for the Article. Cooper Depo. 145:22–146:5.

**Response**: Uncontroverted.

60.     Cooper had "faith in [Duin's] reporting."  Cooper Depo. 233:4–7.

**Response**: Uncontroverted.

61.     Cooper testified that Duin was hired as a religion reporter for Newsweek because "[s]he was an experienced religion reporter," who had "won [] awards," and was "interested in the topic and knew about it."  Cooper Depo. 70:6–13.

**Response**: Uncontroverted.

62.     Regarding Duin's experience as a reporter, Cooper further testified that "she clearly knew what she was talking about.  She was an experienced reporter . . . [S]he had been a reporter for other news outlets and covered religion for them." Cooper Depo. 203:8–23.

**Response**: Uncontroverted.

63.     Newsweek relied on Duin to fact check her articles.  Cooper Depo. 140:21–24.

**Response**: Controverted. Newsweek's editing process includes flagging "a mistake in a failure of fact-checking." Cooper Depo. 35:16-36:3.

64.     Duin represented to Cooper that she had "fact-checked this [Article] until [her] eyes were bleary."  Cooper Depo 183:7–17; *see also* Stracher Decl. Ex. 14 at COOPER49 ("Whew . . . have factchecked until I am buggy-eyed.").

**Response**: Uncontroverted that the email says this. But, as pertains to the article statement, that was a lie. Duin Depo. at 99:3-17, 123:10-124:5, 136:9-13, 173:18-174:3; Johnson Depo.

– 17 –

at 21:20-22:10.

65.     Duin typically did not provide Cooper with notes for her articles because Duin "is a very experienced senior person who was hired to be on this [religion] beat who knows this beat, and I [Cooper] don't re-report stories. That's not an editor's role." Cooper Depo. 157:16–23.

**Response**: Controverted. Newsweek's editing process entails flagging "a mistake in a failure of fact-checking." Cooper Depo. 35:16-36:3.

66.     Cooper saw no evidence Duin was biased in her reporting on The Satanic Temple. Cooper Depo. 222:6–17.

**Response**: Controverted. Cooper made no inquiry into Duin's reporting process. Cooper Depo. at 160:24-161:8, 192:24-193:5, and 223:23-224:8.

67.     Cooper understood the Article Statement to be a report of claims people were making, not an accusation of legal guilt. Cooper Depo. 209:5–14.

**Response**: Controverted. Cooper read the article. Cooper26, Cooper37. The article claims that Strange "was leaked material about … 'Accounts of sexual abuse being covered up in ways that were more than anecdotal.'" Compl. Ex. 1. This article accuses The Satanic Temple of two criminal acts: "sexual abuse," and "cover up." Cooper Depo. 186:21-188:6.

68.     Cooper believed the Article Statement was true. Cooper Depo. 184:17–21.

**Response**: Controverted. Cooper denied any understanding of what the article statement means. Depo. Cooper at 207:12–208:3.

69.     Cooper believes that Newsweek did not intend to, and did not, defame The Satanic Temple by publishing the Article Statement.  Cooper Depo. 229:6–8.

**Response**: Controverted. Cooper's own Editorial Guidelines required the article statement be fact-checked. Cooper Depo. at 38:20-25. Julia Duin did not fact-check it. Duin Depo. at 99:8-17 and 173:18-174:3; Johnson Depo. at 21:20-22:10. Nobody at Newsweek fact-checked it. Cooper Depo. at 140:4-24 and 156:7-11. And Nancy Cooper did not inquire into whether it had been fact-checked. Cooper Depo. at 160:24-161:8, 192:24-193:5, and 223:23-224:8.

70.     On October 29, 2021, Newsweek published the Article.  Compl. Ex. 1.

**Response**: Uncontroverted.

## ADDITIONAL SUPPORT FOR THE ARTICLE STATEMENT

71.     Regarding allegations of sexual abuse within The Satanic Temple, Strange recalled that:

> One case was the case at the heart of the Washington Chapter issue. My understanding is that someone came forward with an allegation, and then they were immediately removed and as well as anyone it was just perceived might support them.
>
> The second was a young woman from, I believe, the Austin TST Chapter at the time. Her name was Kylie Scenario, and very similarly, my understanding was that she had made an allegation and was immediately removed, possibly along with other supporters.
>
> The third instance is a personal friend who confided in me something that happened to her at a—at a party.

Strange Depo. 25:1–16.

**Response**: Controverted. All of these hearsay claims are made by declarants who do not even appear on Newsweek's discovery disclosures. Defendant's Revised Initial Disclosures, at 2.

– 19 –

**Appendix 899**

Strange specifically denied any personal knowledge of any claim he passed on in his deposition. Strange Depo. at 11:16-18. As to the first allegation, the parties lack any information to even find the third-party complainant who made the accusation two years after the fact. Johnson Depo. at 16:5-24. As to the third allegation, the truth of the matter asserted is denied. Axis Decl. ¶ 3.

72.     Regarding the sexual harassment claim he was a witness to, Johnson testified:

> There was a former member of the local [Satanic Temple] group who had been, from my understanding, repeatedly made to feel uncomfortable by a much older member. . . They left because it was non-addressed for months, and then I found out about it in 2020.

Johnson Depo. 11:7–13.

**Response**: Controverted. Johnson specifically denied being a "witness" to this anecdote. Johnson Depo. at 10:10-12. The allegation to which he refers occurred "before I was a member." Johnson Depo. at 11:11. The purported incident was somewhere around "2017 to 2018." Johnson Depo. at 11:10-11. The issue was raised in 2020 by someone other than the alleged victim. Johnson Depo. at 15:15-23. When Johnson says he was a "witness," he means that he was CC'd on the emails. Johnson Depo. at 15:12-14. We don't know the true identity or email address of the third-party complainant. Johnson Depo. at 16:5-16. We don't have the third-party complainant's address. Johnson Depo. at 16:21-24.

73.     Regarding other accounts of sexual abuse he had hear about, Johnson testified that:

> [T]he most significant one would be a member of what was then The Satanic Temple, Austin chapter, who claimed that they were sexually assaulted by a chapter head. And in response to this, the—my understanding is that the chapter head and their partner, who was the leader of a Dallas group, created a doxing website to attack the person who talked about being sexually assaulted . . . The person in Austin who posted about it had public Facebook posts talking about their experience . . . .

**Appendix 900**

Johnson Decl. 26:9–22.

**Response**: Controverted. Johnson specifically denied being a "witness" to this anecdote.

Johnson Depo. at 18:3-14, 21:14-19, 13:4-16, 10:10-12. Object to hearsay as to the truth of the

matter asserted.

74.     Johnson also testified that:

> [The Satanic Temple] has a holiday called Lupercalia . . . It's a celebration of
> sexuality, supposedly.  I know that the co-owner of [The Satanic Temple],
> Doug Misicko, used to solicit nudes for that. I don't know how comfortable
> everyone was with those things, but I know that some people talked about how
> Luercalia made them feel uncomfortable.

Johnson Decl. 26:24–27:5.

**Response**: Controverted. Johnson specifically denied being a "witness" to this anecdote.

Johnson Depo. at 18:3-14, 21:14-19, 13:4-16, 10:10-12. Object to hearsay as to the truth of the

matter asserted.

75.     Regarding his removal from the Washington Chapter, Sullivan testified:

> My expulsion [from The Satanic Temple] was a part of . . . covering up the
> ethics complaint where the harassment was an underpinning factor. The
> chapter head at the time explicitly said that the—the reason for my removal
> was because I was a witness to that e-mail.

Sullivan Depo. 16:3–8.

**Response**: Controverted. Johnson denied that they "were removed from TST guild leadership

because you were copied on an e-mail complaint about sexual harassment." Johnson Depo.

at 25:6-11.

76.     Jex Blackmore is a former member of The Satanic Temple.  Stevens Depo., 130:6–

15.

**Response**: Controverted as incomplete. Jex Blackmore was removed from The Satanic

– 21 –

**Appendix 901**

Temple because she "made a statement about encouraging people to the kill the president" in one of her rituals. Stevens Depo. 134:19-24; see also Greaves Depo. 66:8-17 (her threat to kill the President appears in *Hail Satan?*) and Greaves Depo. 66:22-67:6 (Greaves personally informed her that she had been removed). Prior to her ouster, "Blackmore had stepped down as head of the Detroit chapter and had little engagement with TST leadership." ECF No. 101-16, at 2. Then "the NC was established and approval for actions became mandatory;" but Blackmore was "very antagonistic" to those by, e.g., conducting activities in Texas without any proposal or communication which upset the Texas groups. Id.; Stevens Depo. 132:17-24 (ECF No. 101-2, at 27). Shortly prior to her *we're going to assassinate the President* fiasco, she resurfaced "to maximize her own exposure utilizing the documentary [*Hail Satan?* (Magnolia Films, 2019)]." Greaves Depo. 67:16-68:1.

77.     In August 2018, Blackmore wrote an article published on Medium in which she wrote:

> While I was part of the organization, [The Satanic Temple], I witnessed male members of the organization exploit their position and influence to behave inappropriately and disrespectfully towards women. I myself experienced harassment and abuse from members who have now left the organization. I know that my experience is one of many examples of systemic gaslighting, degradation and bulling that many women have experienced within [The Satanic Temple] over the years.

Stevens Depo. 135:18–136:13; Stracher Decl. Ex. 15 at 4.

**Response**: Controverted as to the truth of the matter asserted. Greaves Depo. 50:19-20 and 51:8-10. Object to hearsay as to the truth of the matter asserted. Uncontroverted that Jex Blackmore published this hearsay on Medium, "a website that people can dump their content on." Greaves Depo. 48:8-15. Jex Blackmore does not appear on Newsweek's discovery disclosures. Defendant's Revised Initial Disclosures, at 2.

78.    Dr. Laycock's book, *Speak of the Devil*, references Blackmore's article and states that, "[Blackmore] reported experiencing harassment and abuse while in [The Satanic Temple]." Stracher Decl. Ex. 16 at NEWSWEEK191.

**Response**: Uncontroverted that Dr. Laycock's book references Blackmore's article. Object to hearsay, double hearsay at that, as to the truth of the matter asserted.

79.    The Satanic Temple has admitted that "[o]ver the years we received a handful of complaints that were sexual in nature but not 'sexual assault.'" Stracher Decl. Ex. 17 at 3.

**Response**: Uncontroverted.

80.    One such complaint was submitted by Enid Cooper, a former member of The Satanic Temple San Jose, in December 2017. *Id.*

**Response**: Uncontroverted that a complaint was submitted. Object to hearsay as to the truth of the matter asserted therein.

81.    Enid Cooper complained that: "One of the leadership, Miles Teg (Gus Hernandez) pulled me aside during the picnic and mentioned that he had seen me online and thought I was 'beautiful.' I politely declined because I was with my date and excused myself to go back to my seat. At this point, he followed me to my table where I was seated with my date and proceeded to talk about his piercing on his penis, even going as far as looking for objects that were comparable in shape to his genitals." *Id.*

**Response**: Controverted. Enid Cooper does not appear on Newsweek's discovery disclosures. Defendant's Revised Initial Disclosures, at 2. Object to hearsay as to the truth of the matters asserted.

82.    Regarding Enid Cooper's complaint, The Satanic Temple's 30(b)(6) witness testified:

– 23 –

**Appendix 903**

Enid Cooper had made some complaints to national council and then was being very, very aggressive in not leaving, what are you going to do about it, what are you going to do about it, what are you going to do about it, repeatedly and very quickly, and that that led to some frustration because it's like you never want to tell somebody who is filing a complaint like to not . . . but at the same time sometimes looking in to things takes time, and Enid Cooper was not having I guess any of that.

Stevens Depo. 73:13–74:3.

**Response**: Uncontroverted, but incomplete. The complaint was made in December 2017. Stevens Depo. Ex. 9 (Decl. Kezhaya Exhibit 45). By January 2018, the offending member was removed. Stevens Depo. Ex. 8 (Decl. Kezhaya Exhibit 46).

83.     In April 2020, a complaint was lodged against The Satanic Temple Austin. Stracher Decl. Ex. 17 at 1.

**Response**: Controverted. The complaint arose out of the Austin Chapter but was made against Shelby Scates. Stevens Depo. Ex. 3; Stevens Depo. 110:15-23. Object to hearsay as to the truth of the matters asserted.

84.     The Satanic Temple admitted that:

- A [Satanic Temple] Austin member (Laura Smith) emailed NC [National Council] with the allegation that the [Satanic Temple] Austin Chapter Head (Shelby Scates) sexually assaulted another person (Kiley) whom they were friends with.

- NC's initial response was to encourage Kiley to file a police response, due to the seriousness of the allegations. She refused.

- (May) Laura Smith and other friends of Kiley reached out to individual [Satanic Temple] members to "warn" them with these claims. This escalated to them threatening to "go public" with the claim that TST was "covering up" the accusations.

- (June) Shelby emailed NC stating that he was stepping down from leadership and away from [The Satanic Temple].

– 24 –

**Appendix 904**

*Id.*

**Response**: Controverted in part. The timeline is uncontroverted. The fact that National Council encouraged Kiley (the alleged victim) to file a police report is uncontroverted. Stevens Depo. 111:8-9. The fact that a third party (Laura Smith) made the complaint is uncontroverted. Stevens Depo. 111:9-16. Object to hearsay as to the truth of the matter asserted within the complaint.

85.    Regarding the Austin Chapter Complaint, The Satanic Temple's 30(b)(6) witness testified:

> [T]he allegation was that Shelby sexually assaulted Kiley. The report was e-mailed in by a person who was a friend of Kiley's and an ex of Shelby's . . . Over the course of the following month or so . . . it seemed like there was a lot of effort to reach out to people, [The Satanic Temple] members individually, to, you know, warn people, sway people . . . and it got to a point where someone, it was Laura, threatened to go public quote unquote, whatever that means, with the claim that [The Satanic Temple] was covering up these accusations, and it was at that point that Shelby stepped down.

Stevens Depo. 111:5–25.

**Response**: Uncontroverted. Object to hearsay as to the truth of the matter asserted within the allegation.

86.    Regarding the Austin Chapter's response to the Austin Chapter Complaint, The Satanic Temple's 30(b)(6) witness testified that after the alleged perpetrator "stepped down" from his leadership position, the alleged victim and people who continued to raise the issue at Chapter meeting were removed from the Austin Chapter.  Stevens Depo. 114:10–23, 115:5–12, 117:4–6, 117:12–20.

**Response**: Controverted. It is unknown whether the alleged victim was removed. Stevens

**Appendix 905**

Depo. 115:25-116:3. The Austin Chapter removed the third party complainant (Laura Smith) and others because they were "constantly turning attention to themselves" and making it "impossible for them [the Austin Chapter] to have meetings." Stevens Depo. 114:5-23.

87.      In addition to the above testimony, there are numerous social media posts in which individuals purporting to be former members of The Satanic Temple have publicly recounted experiences of sexual abuse within The Satanic Temple and expressed their frustration with how such complaints were handled, including:

- A Facebook post and a X (formerly Twitter) post by a former Satanic Temple member, Rumor Solanine, dated May 2, 2021, in which the author shared screenshots of a chat with Southern California Satanic Temple leaders, and stated, "It's such a shame @satanic_temple_ turned out to be so hypocritical[.]  We all had such high hopes for them[.] Covering up abusive behavior from your leaders to maintain an external image is gross[.] Punishing the victims and rewarding the abusers is gross[.] TST should be ashamed."  Stracher Decl. Ex. 18.

- A series of Facebook posts by a former Satanic Temple Member, "D.E.M.," dated March 8, 2020, in which the author described their experience of sexual harassment within the then-Seattle chapter of The Satanic Temple, stating, "First, the same [Satanic Temple] member was allowed to sexually harass me, over 5 reported counts, and even going as far as looking up my dress during The Womxns March movement while licking his lips, with the chapter doing nothing to prevent it from happening."  The same person also stated on May 8, 2020, "I left The Satanic Temple then Seattle Chapter, now known as the WA State Chapter, in 2017 following the lack of action and care when I stepped forward, multiple times with proof, that I was being sexually harassed and groomed by an older member of the chapter since 2015. That member wasn't removed until 7 months later, when other femme presenting members said they were now being harassed, as well. [The Satanic Temple] WA then sent out an e-mail stating a member had been removed for inappropriate behaviors towards other members. In that e-mail, they anonymously mentioned my reports, by stating 'There were reports made by previous members, but those could of been handled between each other, and we didn't feel it necessary to intervene.'"  Stracher Decl. Ex. 19.

- A Reddit thread, from a former Satanic Temple member in the Philadelphia area dated February 15, 2020, in which the former member claims they were attending a Satanic Temple event at which there was "lots of unwanted touching, kissing, [and] a lot of pressure to be sexual and very 'out.'"  Stracher Decl. Ex. 20.

- A series of Facebook posts by a former member of The Satanic Temple Austin Chapter, who stated on September 11, 2020, "Guess who just got banned from [The Satanic Temple] for filing a report about a member of leadership in [The Satanic Temple] raping them along with everyone that has been talking to the police. This gal!" Stracher Decl. Ex. 21.

**Response**: Controverted. None of these internet hearsay declarants are identified as witnesses in Newsweek's discovery disclosures. Defendant's Revised Initial Disclosures, at 2. As to each:

- Stracher Decl. Ex. 18 was printed three months after the close of discovery. No part of "Rumor Solanine's" gibberish includes an allegation of sexual abuse or cover up. Quite the opposite, she is complaining that someone told her to "shut up" and others didn't want her to attend meetings. Id., at 1. Further, the document appearing as Ex. 18 was not produced in discovery. Kezhaya Decl. ¶ 4.

- Stracher Ex. 19 acknowledges that the offending member was removed. Further, the document appearing as Ex. 19 was not produced in discovery. Kezhaya Decl. ¶ 4.

- Stracher Ex. 20 is outright fabrication. Axis Decl.¶ 4. It was published by a "throwaway account," which is a temporary account created to anonymously engage on reddit for a particular purpose. Kezhaya Decl. ¶ 5. The throwaway account has only two engagements, the reddit post in question and a response to a comment by "ADavidJohnson," which is David Alan Johnson of QueerSatanic. Kezhaya Decl. ¶ 5; Decl. Kezhaya Ex. 44. Further, the document appearing as Ex. 20 was not produced in discovery. Kezhaya Decl. ¶ 4. Nor is "tossatanicacc" an identified witness. Newsweek's Revised Initial Disclosures (ECF No. 104-21), at 2.

- Stevens Depo. Ex. 19 is a self-serving narrative. This unidentified hearsay declarant was removed, not because of a complaint, but because she was "just constantly turning attention to themselves and … made it impossible for them [the Austin Congregation] to have meetings." Stevens Depo. 114:6-23.

88.   Within The Satanic Temple, member complaints about violations of The Satanic Temple code of conduct, including allegations of sexual assault, are handled by the Suryan Council. Greaves Depo. 19:16–19; Stevens Depo. 12:20–25, 25:24–26:15.

**Response**:  Controverted  as  incomplete.  Uncontroverted  that  member  complaints  were handled with the Suryan Council beginning with its formation in September 2020. Before that

(from December 2015 until August 2020), member complaints were handled by National Council / International Council. Newsweek's Exhibit 17 (ECF No. 101-17), at 2.

89.     The Suryan Council was not formed until 2020. Stevens Depo. 13:11–16.

**Response**: Uncontroverted.

90.     Prior to the formation of the Suryan Council, The Satanic Temple lacked a formal process for handling complaints, including complaints involving sexual abuse. Stevens Depo. 82:19–83:4.

**Response**: Uncontroverted; but this does not negate the fact of an informal process. See Newsweek's Exhibit 17 (ECF No. 101-17), at 2.

91.     Prior to 2020 there were complaints that were not formally addressed. Stevens Depo. 83:9–12.

**Response**: Uncontroverted; but this does not negate the fact of informal resolutions. See Newsweek's Exhibit 17 (ECF No. 101-17), at 2 (addressing informal resolution of complaints in July 2018, August 2019, and April 2020, all before the formation of the Suryan Council).

92.     The Satanic Temple did not conduct any investigation into Blackmore's claims from the Medium article. Greaves Depo. 74:4–8.

**Response**: Controverted. The nondescript claim gave "little to work off and also [were published] under circumstances where we knew that she had been lying about essentially everything else in the Medium article" such that "I don't think we viewed these claims of hers as actionable on our end." Greaves Depo. 74:15–18.

# PLAINTIFF'S ADDITIONAL MATERIAL FACTS

Pursuant to LR 56.1(b), Plaintiff submits additional material facts:

93.     Through her role in editing this article for Newsweek, Nancy Cooper accused The Satanic Temple of falsely presenting its religious practices to the public despite having no understanding of the Temple. Cooper Depo at 157:6-13, Cooper19, Cooper37, Cooper48.

94.     A third party made a police report about the Kiley / Scates accusation. Stevens Depo. 112:19-113:17.

95.     The police report was made about the Kiley / Scates accusation one month after National Council encouraged Kiley to file a police report. Stevens Depo. 112:12-14.

96.     After the police report, Scates voluntarily stepped down from his role in TST Austin leadership. Stevens Depo. 112:23-24.

97.     Scates cooperated with the police. Stevens Depo. 113:9.

98.     National Council did not further investigate the Scates matter after police involvement because it is counterproductive to have two investigations going on at the same time. Stevens Depo. 113:6-14.

99.     Everyone involved in the police investigation were removed because they were disrupting Chapter meetings. Stevens Depo. 114:16-19; 115:5-12.

100.    The police did not pursue a case against Scates. Stevens Depo. 115:15-18.

101.    Enid Cooper's complaint was an interpersonal dispute which complaint accused

**Appendix 909**

various members of "being part of ANTIFA, sharing offensive memes, guilting people into giving money, and farting in someone's face." Stevens Depo. Ex. 3., at 3.

102.   Enid Cooper's complaint exonerates The Satanic Temple from any wrongdoing. Depo. Stevens. Ex. 9 (Decl. Kezhaya Ex. 45) ("The Temple itself is not the problem.")

103.   Jex Blackmore was removed from The Satanic Temple because she "made a statement about encouraging people to the kill the president" in one of her rituals. Stevens Depo. 134:19-24; see also Greaves Depo. 66:8-17 (her threat to kill the President appears in *Hail Satan?*) and 66:22-67:6 (Greaves personally informed her that she had been removed).

104.   Jex Blackmore lied about the circumstances of her removal. Stevens Depo. 135:8-12; see also Greaves Depo. 49:21-25; and Greaves Ex. 2 ("This past March, I left my position as spokesperson and member of The Satanic Temple").

105.   Jinx Strange's email to Julia Duin does not include the words "leaked" or "materials." NEWSWEEK 016.

106.   Newsweek issued notice that it will rely on precisely six witnesses to address sexual abuse and cover-up. Newsweek's Revised Initial Disclosures (ECF No. 104-21), at 2.

107.   Those six people are: Jinx Strange, David Alan Johnson, Nathan Sullivan, Dr. Joseph Laycock, Lucien Greaves, and Matthew Kezhaya. Newsweek's Revised Initial Disclosures (ECF No. 104-21), at 2.

108.   Jinx Strange has no personal knowledge of sexual abuse or cover-up. Strange Depo. at 11:16-18 (ECF No. 110-6).

Appendix 910

109.    David Alan Johnson has no personal knowledge of sexual abuse or cover-up. Johnson Depo. at 18:3-14, 21:14-19, 13:4-16, 10:10-12 (ECF No. 110-4).

110.    Nathan Sullivan has no personal knowledge of sexual abuse or cover-up. Sullivan Depo. at 10:14-22, 14:15-15:4, 15:15-24 (ECF No. 110-5).

111.    Lucien Greaves has no personal knowledge of sexual abuse or cover-up. Greaves Decl. ¶ 4; see also Greaves Depo. 18:14-19:15 (ECF No. 110-3).

112.    Dr. Joe Laycock has no personal knowledge of sexual abuse or cover-up. Laycock Decl. ¶¶ 6-7 (ECF No. 107).

113.    Matthew Kezhaya has no personal knowledge of sexual abuse or cover-up. Kezhaya Decl. ¶ 6 (ECF No. 105)

114.    Every instance in which a claim of sexual harassment has been made known to The Satanic Temple's decisionmakers, the perpetrator of the misconduct has either voluntarily stepped down or was removed. Stevens Depo. at 50:24-51:5 and 86:10-17 (ECF No. 110-7).

 Respectfully submitted on May 31, 2024,

By:    */s/ Matt Kezhaya*

Matt Kezhaya (# 0402193)
KEZHAYA LAW PLC
150 S. Fifth St., Suite 1850
Minneapolis, MN 55402
phone:    (479) 431-6112
email:    matt@kezhaya.law

### CERTIFICATE OF SERVICE

NOTICE IS GIVEN that I, Matt Kezhaya, efiled the foregoing document by uploading it to the Court's CM/ECF system on May 31, 2024, which sends service to registered users, including all other counsel of record in this cause. *s/ Matt Kezhaya*

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

The Satanic Temple, Inc.

*Plaintiff*

*v.*

Newsweek Digital LLC

*Defendant.*

</td><td>

1:22-cv-1343 (MKV)

**DECLARATION OF
MATT KEZHAYA**

</td></tr>
</table>

**COMES NOW** Matt Kezhaya, who states as follows under penalty of perjury of the laws of the United States of America.

1.      **Purpose**. This declaration is made in support of The Satanic Temple's response to Newsweek's motion for summary judgment in the above cause.

2.      **Identity and qualifications**. I am Matt Kezhaya, counsel of record for The Satanic Temple in the above cause. I am an adult of sound mind with no felonies. I base the following statements on my own personal knowledge and under penalty of perjury.

3.      **The *Johnson* lawsuit in Washington**. I also serve as counsel of record for The Satanic Temple in *United Federation of Churches, LLC v. Johnson et al.* In addition to asserting defamation and cyberpiracy, the litigation also includes claims for tortious interference, trespass to chattels, conversion, and breach of fiduciary duty. The claims for tortious interference, trespass to chattels, and conversion all survived the Johnson Defendants' Rule 12(b)(6) attack. *United Fed'n of Churches, LLC v. Johnson*, 598 F. Supp. 3d 1084, 1099–101 (W.D. Wash. 2022). The claim for breach of fiduciary duty was brought in the State court and arises from the same facts as the other three claims, but more particularly addresses that any improved value in the stolen social media account is collectible as damages because either

– 1 –

(1) the improved value was not the subject of a good faith mistake; or (2) Defendants were the Temple's agents and the stolen social media accounts were the subject matter of the agency. *See Restatement (Second) of Torts* § 927, cmt. *f, j* (1979); *Straka Trucking, Inc. v. Est. of Peterson*, 98 Wash. App. 209, 211, 989 P.2d 1181, 1183 (1999); *Crawford-Brunt v. Kruskall*, 489 F. Supp. 3d 1, 3 (D. Mass. 2020); *see also Restatement (Second) of Torts* at § 931(a), cmt. *b* and *d*; *Howard v. Edgren*, 62 Wash. 2d 884, 886, 385 P.2d 41, 42 (1963).

4.     **Exhibits 18-20 were not received through discovery**. I personally conducted all aspects of discovery in this case, including a comprehensive review of all documents received from Newsweek during discovery. Discovery ended on December 7, 2023. ECF No. 69. Newsweek's motion relies on three documents which I did not receive from Newsweek through discovery. To-wit:

> (1) Stracher Ex. 18 (printed March 22, 2024);
>
> (2) Stracher Ex. 19 (no print date); and
>
> (3) Stracher Ex. 20 (printed March 22, 2024).

Further, Newsweek bates stamped its discovery disclosures. The above exhibits lack bates stamps.

5.     **"tossatanicacc" is a throwaway account**. I have also reviewed Newsweek's Exhibit 20, a reddit post by "tossatanicacc" purportedly made on February 15, 2020. Stracher Decl. ¶ 22. The post was made by a "throwaway account," which is a temporary account created to anonymously engage on reddit for a particular purpose. Reddit has a search function which reveals that: (1) "tossatanicacc" was created on February 16, 2020–*i.e.*, after Stracher claims the post was made; and (2) the account has only two engagements, the reddit post in question and a response to a comment by "ADavidJohnson," which is David Alan Johnson of

**Appendix 913**

QueerSatanic. A true and correct screenshot of the search results for "tossatanicacc" is attached hereto as **Exhibit 44**.

6.      A true and correct copy of Stevens Depo. Exhibit 9, Enid Cooper's December 11, 2017 complaint, is attached hereto as **Exhibit 45**.

7.      A true and correct copy of Stevens Depo. Exhibit 8, the Temple's January 8, 2018 resolution of Enid Cooper's complaint, is attached hereto as **Exhibit 46**.

FURTHER AFFIANT SAYETH NOT.

Pursuant to 28 USC § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. *s/Matt Kezhaya*
Executed on May 31, 2024.

– 3 –

**Appendix 914**

# Exhibit 44

"tossatanicacc" engagement history



# Exhibit 45

Stevens Depo. Ex. 9 (December 11, 2017 Enid Cooper complaint)

 Gmail

<div align="right">Greg Stevens &lt;gregtstevens@gmail.com&gt;</div>

---

## Fwd: TST NC: San Jose Chapter Complaint

1 message



**Chalice Blythe** &lt;chaliceblythe@gmail.com&gt;                                                          Thu, Jun 8, 2023 at 1:24 PM
To: Greg Stevens &lt;gregtstevens@gmail.com&gt;

I'm just going to forward everything to you as I've found them to MAYBE be relevant.

## Forwarded Conversation
**Subject: TST NC: San Jose Chapter Complaint**
------------------------

From: **Greg Stevens** &lt;gregtstevens@gmail.com&gt;
Date: Tue, Dec 12, 2017 at 6:08 AM
To: National Council &lt;nationalcouncil@thesatanictemple.com&gt;, Sarah Ponto Rivera &lt;sarahpaulinapr@gmail.com&gt;


Sarah,

Since you are the point of contact for San Jose, there are a couple of things I'd like to know before we even begin discussion of this:

- In the Hive, I have James Cook as the signed chapter head with contact information, but I have absolutely no name or email for a co-chapterhead nor do I have signed forms for anyone other than James. Can you tell me who the co-chapterhead there is, and whether you have any signed forms for that person?

- Is this the first you are hearing of any of these allegations?


Thanks!,
Greg


On Tue, Dec 12, 2017 at 1:23 AM, The Satanic Temple &lt;satanictempleorg@gmail.com&gt; wrote:

---------- Forwarded message ----------
From: **Enid Cooper** &lt;lipstickb0tch@gmail.com&gt;
Date: Mon, Dec 11, 2017 at 10:40 PM
Subject: I need help regarding abuse going on in San Jose California TST chapter
To: info@thesatanictemple.com


To whom it may concern,

Hello. My name is Enid Cooper and I am a former member of The Satanic Temple of San Jose.(Although at this point in time I would ask that you keep my identity anonymous.)
I would like to lodge a formal complaint against The San Jose CA TST chapter and its leadership. I haven't been part of this institution for very long (since July 2017); however, in the short time I have been a member, I have witnessed several infractions including cronyism, public shaming that resembles hazing, inappropriate behavior and unwanted sexual advances. I have attempted to go through the chapter head Duncan Cook regarding these grievances but have gotten nothing back from him but threats and gas-lighting.
My first encounter with the TST was at a potluck picnic in Santa Cruz during the summer of this year. One of the leadership, Miles Teg (Gus Hernandez) pulled me aside during the picnic and mentioned that he had seen me online and thought I was "beautiful". While this was going on, he was caressing my arm which made me very uncomfortable. I politely declined because I was with my date and excused myself to go back to my seat. At this point, he followed me to my table where I was seated with my date and proceeded to talk about the piercing on his penis, even going as far as looking for objects that were comparable in shape to his genitals. I didn't speak up to Duncan at time because I knew that

**Appendix 918**

3PP TST 0000089.0001

he was part of the leadership, and I was afraid of losing membership. Looking back, this should have been a blaring red flag.

A few weeks later, I attended a Facebook event that Duncan created and held at his house called "Game Night". Everything was going well until Duncan sat next to my date and started to rub his shoulders. We realized he was at this point obviously inebriated and "euphoric". He leans into my date and says, " Sorry, I just feel so good right now I needed to touch someone". My date handled Duncan graciously, but told me that he didn't like people randomly touching him. He was upset with Duncan's lack of boundaries and confided that he had been sexually abused as a child. (Would this have been ok if Duncan had done this to a woman?)

A month or so later I attended Lana Mara Navalia's (her Facebook name) birthday party. She is currently being groomed to be a co-chapter head. I have to say the following about her however. She is a self proclaimed, self diagnosed narcissist who has mentioned that she enjoys manipulating people to get what she wants. In fact she has confessed to responding to a geriatric racist female protester with violence when she was in AntiFa last year (she said she curb stomped her). She has called herself an "ELITE HACKER" who ruins peoples' reputations online. This person has absolutely no personal boundaries or shame and during her birthday party farted on my face in front of other people including Michelle Eris and Duncan, both of whom were very drunk and apparently amused by this. I was mortified and humiliated by such a disgusting and abusive act she claimed it was initiation to the TST. She then spent the rest of the party pan-handling by mentioning her bleak bank account. (Something she has done at every event I've seen her in.) Of course, after people feel bad (embarrassed?) and give her some cash, she then proceeds to loudly declare her anticipation to treat herself to some Birthday Cocaine.

Around the same time as Lana's birthday (about one day prior). Devy Dev who is Duncan's best friend posted a RAPE MEME which upset a lot of the members. What followed can only be described as a cluster-fuck. Members who were critical of Devy's meme were met with backlash. The fear that some people had about leadership abusing their powers were now proven to be real. Members were kicked out for their opinion and of course Duncan was right behind Devy during this whole shit show. A concerned member, Gabriel Showers spoke out against Devy retaining his status in the Temple after everything he did, which included a weak and insincere apology. Duncan retorted to this by telling him to "tread lightly", because he was "new", an obvious threat to new members. At this time, Gabriel has been unceremoniously removed from the Temple for speaking out against Devy and Duncan.

I will send a copy of the meme because you need to understand the context of this whole thing. You need to see how offensive this meme is, not only to feminists, but to anyone who has lived through sexual abuse/assault.

The reason why I mentioned these people specifically is because they are all part of Duncan's circle of friends, even before they became part of the leadership. The order of which matters a lot. He gave his friends positions of power regardless of how undeserving and unqualified they were.

The Temple itself is not the problem. Many of its members genuinely want to affect the community in a good way. They want to prove that morality and atheism/satanism are not mutually exclusive. I joined TST because I saw this institution as an institution for change. And so many of the members including myself want to affect this change through charitable events, activism, and community outreach. Unfortunately, Duncan and his friends (AKA Horned Order) don't really care to do all that or any off it. Their priority seems to be more geared towards when the next "Satanic" party is to fill their social media with or what to drink or snort next. I'm all for having fun, but this organization is becoming more like a club than an activist group. There's a reason why I didn't join the Church of Satan. It looks and sounds useless. I thought TST would be different.

I apologize for the wall of text, but thank your for you time. Please advice.

Sincerely,

Enid Cooper

--------
From: **Sarah Ponto Rivera** <sarahpaulinapr@gmail.com>
Date: Tue, Dec 12, 2017 at 6:18 AM
To: Greg Stevens <gregtstevens@gmail.com>
Cc: National Council <nationalcouncil@thesatanictemple.com>

Yes, James Cook is Duncan.

I have heard of the meme incident and talked with Duncan at length about the details of this and how he handled it which was removing Devon from the "horned order" and revoking any internal assignments he had. I felt this was appropriate.

I have a meeting with Duncan tonight to discuss changing Michelle's title to co-chapter head from Media liaison. Which in the past Duncan had expressed concerns about but I'm not recollecting all the details of that. I can inquire about these allegations.

3PP TST 0000089.0002

----------
From: **Greg T Stevens** <gregtstevens@gmail.com>
Date: Tue, Dec 12, 2017 at 6:43 AM
To: Sarah Ponto Rivera <sarahpaulinapr@gmail.com>
Cc: National Council <nationalcouncil@thesatanictemple.com>


In the absence of paperwork, Duncan is the only leadership in that chapter and by policy they need a second leader, and that person needs to sign paperwork. This is critical for our protection.

But another question: how long has Michelle been acting as leadership in the chapter? We generally have "grandfathered in" existing leadership when it comes to new processes..... but if Michelle has no signed paperwork I wonder if we need to go through the full process (interviews, background check)?

Greg

----------
From: **Sarah Ponto Rivera** <sarahpaulinapr@gmail.com>
Date: Tue, Dec 12, 2017 at 9:31 AM
To: Greg T Stevens <gregtstevens@gmail.com>
Cc: National Council <nationalcouncil@thesatanictemple.com>


Michelle has been interviewed and completed a BG check. As for the oversight for signing the agreement I believed I had completed but after going through my communications with michelle I see is not. I'm getting that done now.



--
**Chalice Blythe**
Minister of Satan
Satanic Ministry
The Satanic Temple

donate.thesatanictemple.org

**CONFIDENTIALITY NOTICE**
The content of this email is confidential and intended only for those parties who received the email directly from chaliceblythe@gmail.com. It is strictly forbidden to share any part of this message with any third party without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

**Appendix 920**

3PP TST 0000089.0003

# Exhibit 46

Stevens Depo. Ex. 8 (January 6, 2018 resolution of Enid Cooper complaint)



Greg Stevens <gregtstevens@gmail.com>

---

## Fwd: Cooper -Formal Complaint SJ
1 message



DEFENDANT'S
EXHIBIT
8
11-3-23 AM
PENGAD 800-631-6989

Chalice Blythe <chaliceblythe@gmail.com>                                    Thu, Jun 8, 2023 at 1:24 PM
To: Greg Stevens <gregtstevens@gmail.com>

---------- Forwarded message ---------
From: **Sarah Ponto Rivera** <sarahpaulinapr@gmail.com>
Date: Sat, Jan 6, 2018 at 12:10 PM
Subject: Re: Cooper -Formal Complaint SJ
To: David Moses <verite999@gmail.com>
Cc: National Council <nationalcouncil@thesatanictemple.com>, Stuart de Haan, Esq. <stu.dehaan@gmail.com>

Though I don't agree with dismantling the chapter and feel it is a bit of a dramatic step if we have a quorum on the matter I will write the letter.

On Fri, Jan 5, 2018 at 3:55 PM David Moses <verite999@gmail.com> wrote:
> Well, she's clearly unstable.
> The option she completely misses is that she could have just asked what had been done instead of opening with a threat.
>
> At least she gave us what we would need to show how unstable she is if she does decide to go to the press.
>
> Her instability doesn't negate the concerns raised about the chapter leadership.
>
> Kym
>
> On Jan 4, 2018, at 12:40 PM, Stuart de Haan, Esq. <stu.dehaan@gmail.com> wrote:
>
>> Response from Enid Cooper. This went as well as expected.....
>>
>> ------
>>
>> I don't want money, or five minutes of fame on a shitty segment over something humiliating like this, so while you may see me as a threat, I'm not. These are actions of a desperate person; not a greedy or attention seeking idiot.
>> I hate being left in the dark, especially when I feel like I was ignored after opening up about something I haven't even told my best friends about. I get it now, I'm not privy to a lot of things that go on there (I'm actually not privy to anything), but because I literally have 0 idea what's going on, I naturally assume all of you are just friends laughing it off.
>> Notice I didn't "coerce" you into doing something specific. Maybe my tone should have been lighter, but considering all that's happened, my etiquette is wore off. I don't have to be polite to an organization that has wronged me simply for wanting to be a part of something greater. Have you been sexually harassed with what you perceive to be a safe place? Have you been told to take it? It's not a big deal? Have you had someone that's above you fart in your fucking face and again tells you to take it? I imagine that's a silent "no". Congratulations then.
>> And please, putting me in a category with nutty Christians that send death threats (and truly wish death upon you), while I myself only mentioned contacting the local news (because one of your chapters has gotten out of control, and I assumed wrongly that the investigation was done), is absolutely ridiculous considering you shouldn't be silencing any victim.
>> I already knew I'd never be let back into any chapter the moment I contacted you, so while my response may have irritated you, all of you can get back to me when someone farts in your faces and tells you to take it.
>> And regarding me going to the local news, it's not off the table, because like your organization, I won't be

coerced into being  silent. **I won't be contacting them anytime soon since you guaranteed the investigation was still ongoing (and will apparently take a while). And you know what's sad? That's all I wanted to know.** I wasn't given a time frame in the original response, like: "Cooper this may take a few months, please be patient with us". That in itself would have spared us this unsavory email exchange

By the way, prodding me with "my behavior is a legal matter now" still won't or scare me, **It was a legal matter the moment I was sexually harassed by senior members in the SJChapter, why don't you think in those terms instead?** So please, don't antagonize me, I may be a beaner, but I'm far from stupid or ignorant.

I didn't sue you people, nor did I go running to any news source that was going to sensationalize this matter the second I had a chance. I haven't mentioned a single thing about SJTST on ANY social media platform I use. At least my actions speak louder than any rude email I may have sent you, or any retort you had for me.

I don't need a response to the above. I get it, shut the fuck and "behave" Cooper. Like I haven't been doing that since the summer of 2017.

--
de Haan Law Firm, PLLC
Stuart de Haan, Esq.
100 N Stone #512
Tucson, AZ 85701
Tel:  520-358-4089
Fax:  520-628-4275
E-mail:  stu.dehaan@gmail.com

--
**Chalice Blythe**
Minister of Satan
Satanic Ministry
The Satanic Temple

donate.thesatanictemple.org

**CONFIDENTIALITY NOTICE**
The content of this email is confidential and intended only for those parties who received the email directly from chaliceblythe@gmail.com. It is strictly forbidden to share any part of this message with any third party without the written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

**Appendix 923**

3PP TST 0000088.0002

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| The Satanic Temple, Inc.<br><br>*Plaintiff*<br><br>*v.*<br><br>Newsweek Digital LLC<br><br>*Defendant.* | 1:22-cv-1343 (MKV)<br><br>**DECLARATION OF<br>HOLLOW AXIS** |

**COMES NOW** Hollow Axis, who states as follows under penalty of perjury of the laws of the United States of America.

1.      **Purpose**. This declaration is made in support of The Satanic Temple's response to Newsweek's motion for summary judgment in the above cause.

2.      **Identity and qualifications**. I am Hollow Axis, I have advised and assisted The Satanic Temple in a security capacity, and am a co-congregation head of Detroit. I am an adult of sound mind with no felonies. I base the following statements on my own personal knowledge and under penalty of perjury.

3.      **"Something" did not happen**. I am familiar with an accusation of sexual impropriety against me levied by "Evan Aytch," a pseudonym of the "personal friend" of Jinx Strange. As further addressed below, the claim is false.

> (a) *Nothing happened*. In July or August 2019, there was a party in Detroit. I and Evan Aytch were both in attendance. Nothing happened at the party between me and Evan Aytch. Nothing could have happened: at no point was I ever alone with Evan Aytch.

– 1 –

(b) *The claim is fabricated*. After the party, she made sexual advances on me. I declined, in part, because she was the live-in dating partner of a friend of mine. In retribution, she invented a false allegation of sexual impropriety to damage my reputation.

(c) *Evan Aytch is not a reliable declarant*. The party was during a period of mental health difficulties for Evan Aytch. She spoke frequently about her struggles with mental health. More particularly, she described her symptoms as including violent impulsive outbursts, and occasional instances of delusions. She also had a habit of falsely accusing people of sexual impropriety. In September 2019, she stabbed my friend (with whom she was living and dating). For which, she was arrested by the Novi, MI police department and was temporarily institutionalized in Stonecrest Center in Detroit.

4. **Newsweek's Exhibit 20 is obviously fabricated**. I have reviewed Newsweek's Exhibit 20, a reddit post by "tossatanicacc." As further addressed below, the claim is false.

(a) There was an event in Philadelphia, but it was not close in time to Lupercalia (celebrated in mid-February). The event was on November 13, 2019. There was no ritual at that event. Lucien gave a video presentation on the "Marvel Truther" movement (discussing the internet community which believes that Marvel comic characters are real); and, more generally, internet hysteria. We concluded the evening casually socializing at the bar, and went back to our respective hotel rooms so we could get up early the next day and drive to Boston. There was no after party.

– 2 –

**Appendix 925**

(b) Contrary to the article, I wasn't patrolling the venue. I don't do that when I provide security.

(c) There was no orgy or any other public sexual activity that night.

(d) This is clearly a fabricated tale designed specifically to alienate sensitive demographics. I know this because it plays on two key points of sensitivity: transitioning and body sensitivity. It is a typical example of a fictitious work created to harm The Satanic Temple's reputation.

FURTHER AFFIANT SAYETH NOT.

Pursuant to 28 USC § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. *s/Hollow Axis*
Executed on May 30, 2024.

– 3 –

**Appendix 926**

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| The Satanic Temple, Inc. | |
| *Plaintiff* | 1:22-cv-1343 (MKV) |
| *v.* | **RESPONSE IN OPPOSITION TO NEWSWEEK'S** |
| Newsweek Digital LLC | **MOTION FOR SUMMARY JUDGMENT** |
| *Defendant.* | |

Respectfully submitted on May 31, 2024,

By:   */s/ Matt Kezhaya*
Matt Kezhaya (# 0402193)
KEZHAYA LAW PLC
150 S. Fifth St., Suite 1850
Minneapolis, MN 55402
phone:   (479) 431-6112
email:   matt@kezhaya.law

# TABLE OF CONTENTS

# Contents

Table of contents .................................................................................................. ii

Table of authorities............................................................................................... iii

Statement of facts .................................................................................................. 1

Argument................................................................................................................ 5

   1: The article statement is substantially false. ................................................. 6

      1.1: At issue is whether the rumor is true, not whether it exists. ................. 6

      1.2: Newsweek's "proof" of substantial truth is all hearsay. ...................... 7

      1.3: There is no substantial truth to the claim of sexual abuse and cover-up. ................ 9

   2: Newsweek is at least negligent with respect to the claim. ......................... 15

      2.1: The article statement is of a private concern....................................... 15

      2.2: The objective indicia give rise to an inference of actual malice........... 18

      2.3: Newsweek's argument, like the article, ignores its own Editorial Guidelines....... 24

# TABLE OF AUTHORITIES

## Cases

*Biro v. Conde Nast,*
  807 F.3d 541 (2d Cir. 2015) ....................................................... 19

*Biro v. Conde Nast,*
  883 F. Supp. 2d 441 (S.D.N.Y. 2012) ........................................... 6

*Burnett v. Nat'l Enquirer, Inc.,*
  144 Cal. App. 3d 991 (Cal. Ct. App. 1983) ................................. 23

*Carroll v. Trump,* 685 F. Supp. 3d 267 (S.D.N.Y.), aff'd in part,
  88 F.4th 418 (2d Cir. 2023) ......................................................... 9

*Chapadeau v. Utica Observer-Dispatch,*
  38 N.Y.2d 196 (1975) ........................................................... 15, 18

*Coleman v. Grand,*
  523 F. Supp. 3d 244 (E.D.N.Y. 2021) .............................. 15, 16, 17

*Crane v. Arizona Republic,*
  972 F.2d 1511 (9th Cir. 1992) .................................................... 21

*Fairley v. Peekskill Star Corp.,*
  83 A.D.2d 294 (N.Y. App. Div. 1981) ............................... 15, 16, 18

*Gil v. Pizzarotti, LLC,*
  No. 1:19-CV-03497-MKV, 2021 WL 1178027 (S.D.N.Y. Mar. 29, 2021) ..................... 7

*Goodman v. Bouzy,*
  No. 21CV10878ATJLC, 2023 WL 3296203 (S.D.N.Y. May 8, 2023) ........................... 6

*Harte-Hanks Commc'ns, Inc. v. Connaughton,*
  491 U.S. 657 (1989) ................................................................... 19

*Huggins v. Moore,*
  94 N.Y.2d 296 (1999) ........................................................ 15, 16, 18

*Khan v. New York Times Co.,*
  269 A.D.2d 74 (N.Y. App. Div. 2000) ..................................... 18, 25

*King v. Globe Newspaper Co.,*
  400 Mass. 705 (1987) ................................................................. 22

*Leidig v. BuzzFeed, Inc.*,
    371 F. Supp. 3d 134 (S.D.N.Y.), aff'd, 788 F. App'x 76 (2d Cir. 2019) ......................... 6

*Lindberg v. Dow Jones & Co., Inc.*,
    No. 20-CV-8231 (LAK), 2021 WL 3605621 (S.D.N.Y. Aug. 11, 2021) ..................... 15

*Masson v. New Yorker Magazine, Inc.*,
    501 U.S. 496 (1991) .................................................................................................... 9

*McKimm v. Ohio Elections Comm.*,
    89 Ohio St. 3d 139 (2000) ........................................................................................ 25

*Palin v. New York Times Co.*,
    940 F.3d 804 (2d Cir. 2019) ................................................................................ 23, 24

*Palmtag v. Republican Party of Nebraska*,
    315 Neb. 679 (2024) ................................................................................................. 20

*St. Amant v. Thompson*,
    390 U.S. 727 (1968) ............................................................................................ 20, 22

*Stern v. Cosby*,
    645 F. Supp. 2d 258 (S.D.N.Y. 2009) .................................................................. 22, 25

*Sweeney v. Prisoners' Legal Servs. of New York, Inc.*,
    84 N.Y.2d 786 (1995) ............................................................................................... 21

*United Fed'n of Churches, LLC v. Johnson*,
    598 F. Supp. 3d 1084 (W.D. Wash. 2022) ............................................................... 12

*Watson v. NY Doe 1*,
    2023 WL 6540662 (S.D.N.Y. Oct. 6, 2023) ........................................................... 17

*Weiner v. Doubleday & Co.*,
    74 N.Y.2d 586 (1989) ................................................................................................. 6

**Statutes**

CPLR § 76a ...................................................................................................................... 15

42 USC § 2000e-2 ........................................................................................................... 17

42 USC § 2000e-5 ........................................................................................................... 17

**Other Authorities**

*Merriam-Webster Online Dictionary*, Cover-up .................................................................. 10

*Merriam-Webster Online Dictionary*, Sexual Abuse ................................................ 9

*Merriam-Webster Online Dictionary*, Sexual harassment ...................................... 9

## Rules

FRCP 26 ......................................................................................................... 8

FRCP 37 ......................................................................................................... 8

FRE 801 .......................................................................................................... 8

FRE 802 .......................................................................................................... 8

## Treatises

1 *Law of Defamation* § 3:117 (2d ed.) ...................................................... 24

1 *Law of Defamation* § 3:45 (2d ed.) ........................................................ 19

1 *Law of Defamation* § 3:59 (2d ed.) ........................................................ 22

30B *Fed. Prac. & Proc. Evid.* § 6718 (2024 ed.) ................................... 8

**Appendix 931**

# STATEMENT OF FACTS

At issue is a single count of defamation arising from a rumor that Plaintiff The Satanic Temple engages in sexual abuse and cover-up in ways that are more than anecdotal. ECF No. 104 ¶ 9. The rumor connotes criminality. ECF No. 104 ¶¶ 59-60. The rumor is false. ECF No. 104 ¶ 107.

Defendant Newsweek published the rumor to its readership of "more than one in five Americans." ECF No. 104 ¶¶ 4, 7. Around 10-15 years ago, Newsweek enjoyed a reputation as one of the "Big Three," the biggest and most credible names in the news industry. ECF No. 104 ¶¶ 5-6.

Julia Duin wrote the article. ECF No. 104 ¶ 11. Duin is a religion reporter who was hired through ties to its chief strategy and content officer. ECF No. 104 ¶¶ 18-23. Duin has been in the journalism business since at least 1987 and has taught at four separate colleges. ECF No. 104 ¶¶ 31-36. She subjectively understands that claims about a religion should be heard from the religion firsthand. ECF No. 104 ¶ 34. She also subjectively understands that charges of criminality should be questioned. ECF No. 104 ¶ 93. While at Newsweek, Duin regularly met with the highest levels of Newsweek's management, including Global Editor in Chief Nancy Cooper. ECF No. 104 ¶¶ 20-30.

Prior to this article, Duin has written about Satanism a total of seven times, four of which were at the height of the Satanic Panic. ECF No. 104 ¶¶ 35-43. Of her prior anti-Satanic writings, two fixated on the Temple: one decried the Temple's equal access to zoning rights and the other decried the Temple's equal access to tax-exempt status. ECF No. 104 ¶¶ 42-43.

Nancy Cooper edited and contributed to the article. ECF No. 104 ¶¶ 12, 15-16, 113-115. She also wrote Newsweek's Editorial Guidelines, sets the standard for Newsweek's

**Appendix 932**

organizational practices, and determines for Newsweek what is "newsworthy." ECF No. 104 ¶¶ 26-27, 56. Cooper reports directly to Newsweek's CEO. ECF No. 104 ¶ 24. The Editorial Guidelines set the "highest professional standards" for all Newsweek reporters. ECF No. 104 ¶ 55. Four requirements from the Editorial Guidelines are salient to this litigation. First, a charge of criminal wrongdoing be both "specific" and "complete." ECF No. 104 ¶ 58. Second, there must be an opportunity to respond, especially when "we are accusing a person or company of wrongdoing." ECF No. 104 ¶ 57. Third, reporters must use only "credible" sources. ECF No. 104 ¶ 65. Fourth, a claim of sexual abuse and cover-up must be fact-checked before publishing. ECF No. 104 ¶ 66.

About one month before publishing, the idea for this article was first provided to Duin by a reporter for the Catholic News Agency. ECF No. 104 ¶ 7, 44-46. The Catholic News Agency's reporter passed on an unverified claim that there were "some allegations of TST leadership sexually exploiting members or failing to respond to harassment / sex assault allegations against chapter heads." ECF No. 104 ¶ 46.

The next day, Duin pitched the article as one that would entail "NDAs being used to hide wrongdoing" and "sexual harassment." ECF No. 104 ¶¶ 47, 50. These claims were sourced from "disgruntled former members." ECF No. 104 ¶ 69. As pitched, the article would arrive "Just in time for Halloween." ECF No. 104 ¶ 48. Duin considers Halloween to be a Satanic holiday. ECF No. 104 ¶ 49. Two of her prior anti-Satanism articles, written during the height of the Satanic Panic, were published around Halloween. ECF No. 104 ¶¶ 35-38. Cooper took special interest in Duin's pitch. ECF No. 104 ¶ 52. Although Duin ordinarily reported to U.S. Editor Juliana Pignataro (ECF No. 104 ¶¶ 28-29), Duin worked with Cooper for this one. ECF No. 104 ¶ 12-14. Within one week of the pitch, all three of Newsweek's top management

– 2 –

greenlit the article. ECF No. 104 ¶¶ 53-54.

Shortly later, Duin met with two of the "disgruntled former members:" David Alan Johnson and Nathan Sullivan. ECF No. 104 ¶¶ 68-69. Neither claimed to have any personal knowledge that the Temple engages in sexual abuse and cover-up. ECF No. 104 ¶ 70. Under oath, both affirmatively denied having any personal knowledge of these claims. ECF No. 104 ¶¶ 97-98. After the meeting, Sullivan provided Duin with contact information for Jinx Strange. ECF No. 104 ¶ 71. Jinx Strange is a pseudonym. ECF No. 104 ¶ 72.

Five days before publishing, upon Duin's inquiry, Strange wrote a three-page email with his comments about the Temple. ECF No. 104 ¶ 73. Midway into page two is the article statement. Id. His email does not suggest that he has personal knowledge of sexual abuse or cover-up. Id. But he opens with an offer to Duin of "information, receipts, screenshots, etc., of things that range from probably-illegal malfeasance to covering up and protecting men accused of sexual misconduct." Id. Duin asked no follow-up questions and didn't accept his offer. ECF No. 104 ¶ 80.

Four days before publishing, Duin talked to Lucien Greaves. ECF No. 104 ¶ 81. The next day, she asked Greaves follow-up questions on other topics. ECF No. 104 ¶ 82. She never asked him about Strange's rumor. ECF No. 104 ¶ 83. Two days before publishing, Duin talked to Dr. Joe Laycock, who she considered to be the "unofficial biographer" of the Temple. ECF No. 104 ¶¶ 84-85. She did not ask Dr. Laycock about Strange's rumor. ECF No. 104 ¶ 86. She never talked to anyone who claimed to have been subjected to sexual abuse or cover-up. ECF No. 104 ¶ 88. She did not ask "anyone on the face of the planet what sexual abuse or cover-up means" in context of the article statement. ECF No. 104 ¶ 87. This is because, to her, the article was not an investigation into sexual abuse. ECF No. 104 ¶ 89. She

– 3 –

included Strange's rumor because it was a "delicious quote." ECF No. 104 ¶ 91.

Prior to this article, Cooper was unaware of the Temple. ECF No. 104 ¶ 136. Cooper did not perform any investigation and did not inquire into Duin's investigation into the article. ECF No. 104 ¶¶ 116-118. But she still insisted on editorializing in an assertion that the Temple falsifies its religious practices over Duin's objection that Newsweek had no basis to make the claim. ECF No. 104 ¶¶ 113-115. Cooper approved of the article for publishing and praised it three times. ECF No. 104 ¶ 121. Duin reported to the Catholic News Agency that "The Newsweek folks love it." ECF No. 104 ¶ 122.

Upon publishing, Greaves immediately took issue with the article statement. ECF No. 104 ¶ 123. The next day, undersigned counsel issued a demand for retraction which asserted that the article statement was false. ECF No. 104 ¶ 124. Newsweek never issued a retraction. ECF No. 104 ¶ 125.

The article's comment section immediately drew unfavorable comparisons between the Catholic Church and the Temple. ECF No. 104 ¶ 126. People canceled their recurring donations because of the article. ECF No. 104 ¶ 127. Others pointed to the article as proof of the truth of the matters asserted within it. ECF No. 104 ¶ 128. As a result, the Temple hired out public relations assistance. ECF No. 104 ¶¶ 129-130. The Temple expended a sum of $43,350 in remediation costs. ECF No. 104 ¶ 131.

# ARGUMENT

Newsweek's first ground for summary judgment is that the article statement is substantially true. At issue is the rumor that leaked material shows, in ways that are more than anecdotal, that the Temple engages in sexual abuse and covers up the same. There are three fundamental flaws in Newsweek's motion. *First*, it misdirects from the issue at hand because it contends that the inquiry is into whether the rumor exists. This defies the republishing rule. *Second*, it insincerely contends that its proof of the rumors is not used for the truth of the matters asserted, only to do an about face in the last half-page of its discussion on the relevant inquiry. This defies the rule against hearsay. *Third*, even when taking the hearsay at face value, none of the proffered materials show "sexual abuse" being "covered up in ways that were more than anecdotal." Newsweek's "proof" only further supports a finding that the rumor is substantially false, especially when it is viewed in the light most favorable to the Temple. The Court should deny Newsweek's motion on this ground.

Newsweek's second ground for summary judgment is that there is no proof of actual malice. *First*, actual malice does not attach to the article statement because it is "mere gossip" on a matter of "prurient interest." *Second*, actual malice is shown by the failure to adhere to Newsweek's own Editorial Guidelines, which were drafted and otherwise enforced by Cooper who edited this very article. Caselaw has already rejected Newsweek's and Duin's self-serving professions of innocence; the inquiry is into the objective facts. And Newsweek cannot evade liability by pinning all blame on Duin because Cooper herself insisted on injecting a claim for which she had no basis to believe.

The Court should deny Newsweek's motion in full.

**Appendix 936**

# 1: The article statement is substantially false.

## 1.1: At issue is whether the rumor is true, not whether it exists.

Newsweek correctly states that the substantial truth inquiry is into "the substance, the gist, or the sting" of the statement. ECF No. 99, at 18; *Leidig v. BuzzFeed, Inc.*, 371 F. Supp. 3d 134, 143 (S.D.N.Y.), *aff'd*, 788 F. App'x 76 (2d Cir. 2019). However, Newsweek overlooks the substance of the article statement and focuses on its form. In Newsweek's view, a statement cannot be defamatory if it accurately quotes a third party, here Jinx Strange. ECF No. 99, at 18-19. But this argument overlooks the republication rule, under which "It is well settled that Defendants cannot escape liability simply because they are conveying someone else's defamatory statements without adopting those viewpoints as their own." *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 461 (S.D.N.Y. 2012) (citing *Cianci v. New Times Pub. Co.*, 639 F.2d 54, 60–61 (2d Cir.1980)); *see also Weiner v. Doubleday & Co.*, 74 N.Y.2d 586, 594 (1989) (rejecting a "privilege to repeat the statements of third parties so long as no endorsement was given.") Despite that the Temple gave Newsweek advanced warning of this point, ECF No. 97 at 2, Newsweek's motion makes no mention of the republication rule.

To further its argument, Newsweek singularly relies on *Goodman v. Bouzy*, No. 21CV10878ATJLC, 2023 WL 3296203 (S.D.N.Y. May 8, 2023) (subsequent history omitted). *Goodman* is distinguishable. There, "Bouzy did not allege that Goodman raped someone; Bouzy stated only that he was aware of allegations that Goodman had raped someone." *Id.*, at *10 (emphasis in original). Here, the article statement falsely implies the existence of "leaked material" which shows sexual abuse and cover-up. *Biro*, 883 F. Supp. 2d at 462 (applying the republication rule where "the statements imply the existence of undisclosed facts on which those opinions were based"). Yet even the most cursory review of

**Appendix 937**

Newsweek's exhibits reveals no "leaked material," no "sexual abuse," and no "cover-up." To prove the contrary, all Newsweek provides is rank internet hearsay, the truth of which it vociferously denies relying upon. ECF No. 99, at 19-20 n. 4 and 24 n. 7 (twice disclaiming the truth of the matters asserted within the rumors it provides).

The litigation proceeded to discovery upon a finding that "Plaintiff flatly denies that any sexual abuse has occurred or that any abuse has been covered up." ECF No. 27, at 13. This finding resulted from an inquiry into the underlying truth of the rumor, not into whether the article accurately quoted Jinx Strange. Given the republication rule and the Court's order, Newsweek's defenses that (1) it accurately quoted Strange and (2) the rumors actually exist are both entirely without merit. Thus, the Court should deny Newsweek's motion for summary judgment to the extent it simply points to the existence of rumors without advancing the truth of the matter asserted.

## 1.2: Newsweek's "proof" of substantial truth is all hearsay.

Immediately after denying that it is advancing rank hearsay for the truth of the matters asserted, Newsweek does an about face and contends that the rumors are true. ECF No. 99, at 20-21 (relying on the truth of the matters asserted within the rumors). An order for summary judgment must be predicated upon competent evidence, and hearsay does not make the cut. *Gil v. Pizzarotti, LLC*, No. 1:19-CV-03497-MKV, 2021 WL 1178027, at *7 n.3 (S.D.N.Y. Mar. 29, 2021) (citing *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999); *Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.*, 769 F.2d 919, 924 (2d Cir. 1985)).

Newsweek issued notice that it will rely on precisely six witnesses to address sexual abuse and cover-up. Response ¶ 106-107. All six witnesses deny any personal knowledge of sexual abuse or cover-up. Response ¶¶ 108-113. Newsweek instead proffers some hearsay claims.

**Appendix 938**

Response ¶¶ 71-78 and ¶¶ 80-87. The Court should decline to consider any of Newsweek's hearsay. The fact of the claim is irrelevant under the republishing rule. 30B *Fed. Prac. & Proc. Evid.* § 6718 (2024 ed.) ("The non-hearsay purpose for which the out-of-court statement is offered must be relevant to the issues in the case if it is to provide a viable route around the hearsay prohibition.") And the truth of the matters asserted within the rumors is barred by the rule against hearsay. FRE 801, 802.

Newsweek's relied-upon claims were also uttered by declarants not disclosed as potential witnesses. FRCP 26(a)(1)(A)(i) (requiring "without awaiting a discovery request" disclosure of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses). Some of the hearsay documents Newsweek relies upon weren't even produced during discovery. Response ¶ 87 (Newsweek's Exhibits 18-20). FRCP 26(a)(1)(A)(ii) (same for documents the disclosing party may rely upon). The failure to provide discovery as required under Rule 26(a) results in automatic exclusion. FRCP 37(c)(1).

Thus, the Court should exclude Newsweek's Exhibits 6 (neither of the unidentified conversing parties are witnesses), 9 (Scott Malphas is not a witness), 15 (Jex Blackmore is not a witness), 16 (double hearsay, quoting Jex Blackmore who is not a witness), 18 ("Rumor Solanine" is not a witness), 19 ("D.E.M." is not a witness), 20 ("tossatanicacc" is not a witness), and 21 (double hearsay, quoting an unidentified alleged member who is not a witness). The Court should further exclude all of Newsweek's references to the unverified rumors. Response ¶¶ 71-78 and ¶¶ 80-87.

Newsweek's Exhibit 20 highlights the importance of the minimum fairness to opposing parties in developing a case for an orderly presentation to the Court. That document is printed after the close of discovery, is an undated, unauthenticated, unverified reddit post by an

unidentified declarant which, on its face, shows unwanted sexual contact at a Temple event. Response ¶ 87. It is also an obvious fabrication, designed to pluck the emotional strings of a credulous reader for the sole purpose of tarnishing the Temple's reputation. Id. This hearsay is not even fit for a *Newsweek* article, it is well beneath the peace and dignity of this Court.

Because Newsweek solely offers hearsay as "proof" of the substantial truth of the article statement, the Court should find that it has failed to meet its *prima facie* burden for summary judgment and deny its motion.

### 1.3: There is no substantial truth to the claim of sexual abuse and cover-up.

Even if Newsweek's proffered hearsay were taken at face value, it still fails to present any substantial truth. Context is key to a substantial truth argument. The standard is whether the statement "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991). A reasonable reader will apply the dictionary definition of the words Newsweek chose to publish when forming an opinion about the Temple. *See Carroll v. Trump*, 685 F. Supp. 3d 267, 277 (S.D.N.Y.), *aff'd in part*, 88 F.4th 418 (2d Cir. 2023) (applying the dictionary definition of the allegedly defamatory words to weigh "substantial truth").

Newsweek's motion relies on its circular argument that a charge of "sexual abuse" is not different in kind from a charge of "sexual harassment." ECF No. 99, at 20-21. But there is a world of difference, one with criminal implications, between "sexual abuse" and "sexual harassment." Compare *Merriam-Webster Online Dictionary*, Sexual Abuse ("the infliction of sexual contact upon a person by forcible compulsion") with *Merriam-Webster Online Dictionary*, Sexual harassment (the "uninvited and unwelcome verbal or physical behavior of a sexual

– 9 –

nature especially by a person in authority toward a subordinate").[1] "Sexual abuse" adds forcible compulsion and, therefore, criminality. *Ibid.*; see also ECF No. 104 ¶¶ 58-60.

Likewise, Newsweek's motion relies on conflating a charge of "cover-up" with a charge of taking four weeks to investigate or ousting disruptive narcissists. ECF No. 99, at 21. But a "cover-up" entails concerted efforts to keep the information from becoming public. *See Merriam-Webster Online Dictionary*, Cover-up (available at https://www.merriam-webster.com/dictionary/cover-up) (last visited May 16, 2024).

To avoid the natural consequence of binding caselaw, indisputable fact, and the plain text definition of the words it chose to publish, Newsweek falsifies the record. The Temple has *not* "admitted that there have been several accusations of sexual abuse." ECF No. 100, at 16. Quite the contrary, the Temple's representative testified that "[o]ver the years we received a handful of complaints that were sexual in nature *but not* 'sexual assault.'" ECF No. 100 ¶ 79 (emphasis added). As addressed, "sexual harassment" is not "sexual abuse," and no amount of *post hoc* mental gymnastics will change the dictionary definition of the words published. On this ground, a reasonable reader would have a material difference of opinion when comparing the words used ("sexual abuse" and "cover[] up") with the hearsay proffered. To-wit:

### 1.3.1: The San Jose Chapter complaint was neither sexual abuse nor cover-up.

*First*, Newsweek relies on the "San Jose" complaint. ECF No. 99, at 20-21. On December 11, 2017, a member of the San Jose Chapter complained of unwanted flirting and an undesired reference to a genital piercing by the chapter head. Response ¶¶ 80-82. The same

---

[1] Respectively available at https://www.merriam-webster.com/legal/sexual%20abuse and https://www.merriam-webster.com/dictionary/sexual%20harassment (last visited May 30, 2024).

Appendix 941

complaint raises various other perceived slights. Response ¶ 101 ("being part of ANTIFA, sharing offensive memes, guilting people into giving money, and farting in someone's face"). But no part of the complaint involves sexual contact or forcible compulsion. Id. ("This is an interpersonal dispute, not a 'sexual assault' complaint.") The complaint also exonerates the Temple from any wrongdoing. Response ¶ 102 ("The Temple itself is not the problem"). But the Temple's investigation took too long for the member's preference, which resulted in the member impatiently and aggressively demanding immediate action. Response ¶ 82. ("what are you going to do about it … repeatedly and very quickly.") By January 6, 2018 – just under four weeks after the complaint – the offending chapter head was ousted and, there being no successor, the chapter disbanded. Id.

A *reasonable* reader would draw materially different opinions between offensive commentary (the truth) *vs.* forced sexual contact (the article statement). A *reasonable* reader would find that a serial whiner's impatience over a four-week investigative delay is not a "cover-up" by any stretch of the imagination. This hearsay complaint has no tendency to show sexual abuse or cover-up, even if it is considered for the truth of the matter asserted.

### 1.3.2: The Austin complaint was directed to the police.

*Second*, Newsweek relies on the "Austin" complaint. ECF No. 99, at 21. In April 2020, a member of the Austin Chapter raised an allegation of sexual assault by the chapter head against a third party. ECF No. 99, at 21 (citing Response ¶ 88, at 2). Sexual assault concededly meets the definition of sexual abuse, but Newsweek conveniently omits that the Temple directed the complainant to make a police report. Response ¶ 88, at 2 (the Temple's "initial response was to encourage [the alleged victim] to file a police report.") "She refused." Id. Three months later, the member filed a police report on behalf of the third party alleged

– 11 –

victim. Id. In the interim, the chapter head voluntarily stepped down from chapter leadership. Id. He cooperated with the police, and upon the police department's professional investigation, they declined to press charges. Id.; see also Response ¶ 100.

A *reasonable* reader would know that directing the alleged victim to make a police report is the exact opposite of a "cover-up." The Temple's directive to file a police report invited public scrutiny rather than concealed it. This is so, even though the Austin Chapter ousted the third party for "constantly turning attention to themselves" and making it "impossible for them to have meetings." Response ¶¶ 86, 99. Assuming the Court considers this third-party's hearsay complaint for the truth of the matter asserted, it still fails to make a *prima facie* case for a summary judgment because it shows the opposite of a "cover-up."

### 1.3.3: Sullivan wasn't expelled for being copied on an email.

*Third*, Newsweek relies on Nathan Sullivan's testimony that it was a "cover-up" when he was expelled from the Washington Chapter for being a "witness to a sexual harassment complaint." ECF No. 99, at 21. *First*, Sullivan wasn't a "witness" to anything. He specifically denied any firsthand knowledge of sexual abuse or cover-up. Response ¶ 110. When he uses the word "witness," he disingenuously refers to being copied on an email about sexual harassment two or three years after-the-fact. Response ¶ 72. *Second*, he wasn't expelled for being copied on that email. Response ¶ 75. He was expelled because he participated in a conspiracy to steal the Temple's property. *See United Fed'n of Churches, LLC v. Johnson*, 598 F. Supp. 3d 1084 (W.D. Wash. 2022). *Third*, "sexual harassment" is materially different from "sexual abuse." *Fourth*, there is no concerted effort to keep the information from becoming public, he doesn't even have the first notion of what allegedly happened, when it allegedly happened, to whom it allegedly happened, or where the alleged victim can be found.

Response ¶ 72.[2] No *reasonable* reader informed of the facts would begin to think that Sullivan's ouster from the Temple was a "cover-up."

### 1.3.4: The Temple had an <u>informal</u> process of reporting complaints before 2020.

*Last*, Newsweek contends that the absence of a formal process before 2020 means the Temple "could not possibly determine whether and how complaints of sexual abuse were handled prior to that time." ECF No. 99, at 21. Evidently, Newsweek did not read its own exhibits. See Response ¶ 88. The very first entry on this exhibit addresses the "Process" for "responding to complaints" from "December 2015 – August 2020," which was conducted by "National Council (NC), later rebranded as International Council (IC)," and entailed:

- o Anyone could use email or a form to submit a complaint to NC (when the issue could not be resolved locally or involved local leadership)

- o NC reviewed the complaint and accompanying documentation, identified key allegations, reached out to the submitter for clarification if needed, reached out to other parties for corroboration if appropriate, collectively assessed the complaint and decided on remedy or consequences (if any).

- o Consequences could range from warning, to removal from leadership, to removal from the organization.

Response ¶ 88, at 2. As far back as December 2015, there has been a process to raise complaints, including those of sexual misconduct. Id. (addressing complaints of sexual misconduct dated July 2018, August 2019, and April 2020, all before implementation of the Suryan Council in September 2020). Both of the alleged victims of unwanted sexual contact

---

[2] It appears that the email Sullivan was copied on pertained to a Seattle member who had been summarily removed by the chapter upon a finding of "sexual assault and harassment of members and non-members, as well as embezzlement (not from us)," without any complaints made to the Temple's central decisionmakers. See ECF 101-17, at 2.

– 13 –

were directed to the police. Response ¶ 88 (April 2020 and May 2023, respectively). In all events, the offending member was either forcibly removed or voluntarily left. ECF No. 104 ¶ 112. Contrary to Newsweek's motion, the hearsay does not show "sexual abuse" and shows the exact opposite of "cover-up." The Court should deny Newsweek's motion on the ground of "substantial truth."

### 1.3.5: Jex Blackmore was removed for threatening to kill the President.

Although nowhere to be found in its discussion as to substantial truth of the rumors, Newsweek references Jex Blackmore five times in its memorandum. Curiously omitted is any reference to the fact that Jex Blackmore published her Medium piece on the heels of her removal for threatening to kill the United States President. Response ¶ 103. Yet her piece opens with the false claim that she left voluntarily. Response ¶ 104. Prior to her ouster, "Blackmore had stepped down as head of the Detroit chapter and had little engagement with TST leadership." ECF No. 101-16, at 2. Then "the NC was established and approval for actions became mandatory;" but Blackmore was "very antagonistic" to those by, *e.g.*, conducting activities in Texas without any proposal or communication which upset the Texas groups. Id.; Stevens Depo. 132:17-24 (ECF No. 101-2, at 27). Shortly prior to her *we're going to assassinate the President* fiasco, she resurfaced "to maximize her own exposure utilizing the documentary [*Hail Satan?* (Magnolia Films, 2019)]." Response ¶ 76.

A *reasonable* reader would not conclude that there is a culture of sex abuse and cover up within the Temple, even after reading Blackmore's nondescript claim, because she had no qualms about publicly lying. A *reasonable* reader would not think that the Temple has an obligation to scour the internet for every hint of misgiving, and to investigate every nebulous anonymous claim asserted, on pain of being labeled complicit in sexual abuse and cover-up.

## 2: Newsweek is at least negligent with respect to the claim.

### 2.1: The article statement is of a private concern.

Newsweek's motion relies on the circular argument that the article statement addresses a matter of "public interest." ECF No. 99, at 22. The statute defines an issue of "public interest" as something "other than a purely private matter." CPLR § 76-a(d). Courts have since applied the familiar New York law standards for public *vs.* private concern to this statutory text. *Lindberg v. Dow Jones & Co., Inc.*, No. 20-CV-8231 (LAK), 2021 WL 3605621, at *7 (S.D.N.Y. Aug. 11, 2021); *Coleman v. Grand*, 523 F. Supp. 3d 244, 259 (E.D.N.Y. 2021). The question is thus whether the statement lies "arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition." *Chapadeau v. Utica Observer-Dispatch*, 38 N.Y.2d 196, 199 (1975). A matter is of private concern when the statement falls "into the realm of mere gossip and prurient interest." *Huggins v. Moore*, 94 N.Y.2d 296, 302 (1999). Likewise, the matter is of private concern when it is "directed only to a limited, private audience." *Id.* at 303. This analysis is closely related to the limited public figure question of whether the attention acquired by a plaintiff pertains to a "public controversy," the subject of the defamation. *Krauss v. Glove Int'l, Inc.*, 251 A.D.2d 191, 193–94 (N.Y. App. Div. 1998). There, the same considerations that compelled a finding that the plaintiff's sex life is not a "public controversy" also required a determination that the story was of private concern. *Id.* A "public controversy" is something more than simply newsworthy. *Id.*, at 192. The public controversy subject of the cause "must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Fairley v. Peekskill Star Corp.*, 83 A.D.2d 294, 298 (N.Y. App. Div. 1981). And it must have "received attention *because* its ramifications will be felt by persons who are not direct

participants." *Id.* at 298. (emphasis added). On this point, Newsweek circularly argues that the Temple is a public figure. ECF No. 99, at 21 n. 5. Newsweek bears the burden of persuasion on that claim. *Coleman*, 523 F. Supp. 3d at 255. In full, the discussion reads: "The Satanic Temple is a public figure," followed by a recitation of the elements for public figure. ECF No. 99, at 21 n. 5. There is no effort to tie any evidence to the elements, so the Court should reject the argument summarily.[3]

The defamatory statement at bar is "mere gossip," which is not a public controversy regardless of how many clicks were baited. *Huggins*, 94 N.Y.2d at 303 ("the fact that the article has been published in a newspaper is not conclusive that its subject matter warrants public exposition"); *see also Time, Inc. v. Firestone*, 424 U.S. 448, 454 (1976) ("Dissolution of a marriage through judicial proceedings is not the sort of "public controversy" referred to in *Gertz*, even though the marital difficulties of extremely wealthy individuals may be of interest to some portion of the reading public.") Newsweek's motion fails to make a *prima facie* showing for summary judgment because its own 56.1 statement contends that the "focus" of this article was the Washington lawsuit, not sex abuse and cover-up. ECF No. 100 ¶¶ 48, 52. Duin included the article statement, not because it had anything to do with the Washington lawsuit, but because it was a "delicious quote." ECF No. 104 ¶¶ 90-91.

Of course, Newsweek does not discuss any of the public concern or the public controversy standards in its memorandum. ECF No. 99, at 22. Instead, it contends with a clever use of brackets that "sexual impropriety and power dynamics in [*a given*] industry, as in others, were indisputably an issue of public interest." Id. (emphasis added) (citing *Coleman*, 523 F. Supp. 3d, at 259). *Coleman* is distinguishable. There, it was the *music* industry at issue, the allegedly

_____

[3] For discussion on why the Temple is not a limited public figure, see ECF No. 103 at 13-17.

defamatory statement was part of the "rising tide of public concern over workplace sexual harassment known as the #MeToo movement," and the plaintiff was a "prominent musician of interest to the jazz community." *Coleman*, 523 F. Supp. 3d at 259-260. Those findings "set the litigation battlefield," to which Newsweek's relied-upon statute applied. *Id.*, at 260. But this case does not involve the music industry, the article statement is not part of the #MeToo movement, there is no workplace sexual harassment involved in this case, and the Temple most certainly is not a prominent musician. *Coleman* did not change the defamation landscape such that every accusation of sexual impropriety is a "public concern," it repetitiously limited its holding to the *music* industry five times.

Newsweek's only other cited case in its two-sentence argument as to "public concern" is *Watson v. NY Doe 1*, 2023 WL 6540662, at *3 (S.D.N.Y. Oct. 6, 2023). The #MeToo movement makes an encore performance there, this time as pertains to the advertising industry. *Id.* The word "advertising" appears ten times in that opinion, each in context of the workplace. Again, the article statement makes no reference to the #MeToo movement and the rumor at issue does not pertain to the workplace.

Neither of Newsweek's cited cases support the proposition that all accusations about sexual misconduct are of "public concern." Rather, both more particularly pertain to accusations within the workplace, a place which has historically been so permeated with sex discrimination that Congress had to modify the freedom of contract to curb it. See 42 USC § 2000e-2 (prohibition on sex discrimination), 42 USC § 2000e-5 (enforcement mechanism). Sexual harassment within the workplace carries with it an element of economic coercion which is entirely lacking in a volunteer-based association like the Temple. That element of economic coercion creates a sensitive power dynamic which, given the widespread economic

– 17 –

**Appendix 948**

reality of needing to work, creates "a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Fairley*, 83 A.D.2d at 298.

That element of economic necessity is missing for the Temple's membership. Members are free to come and go as they please. Rather than being "arguably within the sphere of legitimate public concern," the article statement is instead directed at the Temple's "limited, private audience." *Chapadeau*, 38 N.Y.2d at 199; *Huggins*, 94 N.Y.2d at 303. And, in context of the article, the article statement is presented not as part of a genuine discourse on the power dynamics of this relatively unknown group. See ECF No. 100 ¶ 59 (Newsweek's arbiter of newsworthiness did not know "anything" about the Temple prior to the pitch). Rather, it is presented as "mere gossip," part of a "prurient interest" hit piece featured alongside scandalous tales of orgies, harassment, and fraud. *Huggins*, 94 N.Y.2d at 302; ECF No. 104 ¶ 91 (the article statement is included, not to prompt discourse, but as a "delicious quote"). For the foregoing reasons, the article statement pertains to a "private concern" which falls outside the statutory definition of "public interest." The Court should find that the applicable standard of fault is negligence, not actual malice.

## 2.2: The objective indicia give rise to an inference of actual malice.

Even if the Court finds that the Temple must show actual malice, the evidence supports that finding. This case presents the need for only a single yardstick, the Editorial Guidelines, because those establish both the objective standard of care and Newsweek's own subjective standard of care. *See Khan v. New York Times Co.*, 269 A.D.2d 74, 77 (N.Y. App. Div. 2000) (objective standard for negligence, subjective standard for actual malice). Because the author of Newsweek's standard of care both edited and contributed to this article, Newsweek was "negligent" for the same reasons it had "actual malice."

– 18 –

Like any other inquiry into a defendant's state of mind, actual malice must be inferred from objective facts. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989) ("a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence"); *Biro v. Conde Nast*, 807 F.3d 541, 545 (2d Cir. 2015). ("a court typically will infer actual malice from objective facts" because a defamation defendant "will rarely admit … actual malice"). The objective facts must be interpreted in the aggregate, "for it is a rare case in which any one fact, standing alone, is enough of a 'smoking gun' to meet the constitutional standard." 1 *Law of Defamation* § 3:45 (2d ed.).

On these facts, three common threads create a *prima facie* case that Newsweek published the article statement with actual malice: (1) despite the Editorial Guidelines' requirement that the article statement be both specific and fact-checked, Newsweek did nothing to ensure that it was true; (2) despite the Editorial Guidelines' requirement that the Temple be given an opportunity to respond, Newsweek meticulously avoided the subject in discussions with Greaves; and (3) despite the Editorial Guidelines' requirement that only credible sources be used, Newsweek intentionally relied only on those with known hostility to the Temple.

### 2.2.1: The statement was neither specific nor fact-checked.

The Editorial Guidelines require that a charge of criminal wrongdoing be both "specific" and "complete." ECF No. 104 ¶ 58. Nancy Cooper, Newsweek's author of the Editorial Guidelines, admitted that sexual abuse and cover up connote criminality. ECF No. 104 ¶¶ 56, 59-60. Yet the article statement is neither specific nor complete: Nancy Cooper admitted that she had no idea who was sexually abused, what the sexual abuse entailed, who engaged in the cover-up, or what the cover-up entailed. See ECF No. 104 ¶¶ 61-64. Of course, these immediate questions have no answer because there was neither sexual abuse nor cover-up.

**Appendix 950**

ECF No. 104 ¶ 107. Newsweek's requirement to be specific exists to ensure questionable accusations are actually questioned.

Likewise, the Editorial Guidelines require that an accusation of covered-up sexual abuse be fact-checked. ECF No. 104 ¶ 66. This requirement has a close relationship to preexisting caselaw that actual malice may be found when the statement is "based wholly on an unverified anonymous telephone call." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968). Yet Duin did not take the slightest effort to fact-check the rumor. She did not ask any follow-up questions about who was "sexually abused" or what was entailed in the "cover up." ECF No. 104 ¶ 80. She did not talk to anyone who claimed to have been subjected to sexual abuse or cover-up. ECF No. 104 ¶ 88. She did not ask Lucien Greaves about the rumor, although she followed up with him about different topics. ECF No. 104 ¶¶ 81-83. Nor did she ask the author of a book-length study on the Temple, who she deemed the "unofficial biographer," anything about it. ECF No. 104 ¶¶ 85-86. She did not ask "anyone on the face of the planet what sexual abuse and cover-up means" in context of the rumor. ECF No. 104 ¶ 87. She deliberately chose not to accept Strange's offer to provide substantiating information. ECF No. 104 ¶ 77.

Her conscious avoidance of investigating this criminal allegation is not borne out of ignorance. Had the rumor been that the Temple engages in child murder, Duin admitted it would have occurred to her to inquire further. ECF No. 104 ¶ 93. Duin did not inquire into the truth of the rumor because, in her view, the article was not an "investigation into sexual abuse." ECF No. 104 ¶ 89. But, as the Supreme Court of Nebraska just held, a defendant may not consciously avoid the truth only to later plead ignorance. *See Palmtag v. Republican Party of Nebraska*, 315 Neb. 679, 704 (2024). The Editorial Guidelines did not give Duin an option to publish this criminal allegation without first fact-checking it. But she consciously avoided

– 20 –

**Appendix 951**

anything which would tend to disprove it. This shows that she entertained subjective doubt as to the truth of the rumor. *Sweeney v. Prisoners' Legal Servs. Of New York, Inc.*, 84 N.Y.2d 786, 793 (1995) (actual malice can be shown when defendants' "'inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity' of the published statement").

And Newsweek cannot escape liability by claiming it took a hands-off approach to Duin. ECF No. 104 ¶ 67, 120. The author of the Editorial Guidelines, who sets the standard for the organization, served as the editor of this article. ECF No. 104 ¶¶ 12,14-16, 26, 52, 56. Yet there was no oversight into Duin's investigation. ECF No. 104 ¶¶ 116-118. Blind faith does not protect a defendant's decision to deliberately avoid inconvenient facts. *Id.*

### 2.2.2: There was no opportunity to respond.

The Editorial Guidelines also require an opportunity to respond, especially when "we are accusing a person or company of wrongdoing." ECF No. 104 ¶ 57. Duin not only subjectively understood this basic proposition, but she also instilled it in her pupils. ECF No. 104 ¶ 34. Yet she did not ask Greaves about the article statement, although she followed up with him about other topics. ECF No. 104 ¶ 81-83. Duin went even further than simply avoiding the topic with Greaves, she "constructed" the article to make it appear as if he gave a general denial to this alleged misconduct. Response ¶¶ 41, 44. Actual malice may be found where the publisher juxtaposes denials "in reckless disregard[] of the false impression the collocation would produce." *Crane v. Arizona Republic*, 972 F.2d 1511, 1524 (9th Cir. 1992).

### 2.2.3: Newsweek intentionally relied on obviously hostile sources.

The Editorial Guidelines also require the use of "credible" sources. ECF No. 104 ¶ 65.

– 21 –

This requirement is closely related to caselaw that "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant*, 390 U.S. at 732; *see also Stern v. Cosby*, 645 F. Supp. 2d 258, 284 (S.D.N.Y. 2009) ("obvious reasons to doubt the truthfulness" of a biased source as actual malice). There is no room to dispute that there were obvious reasons to doubt Strange's transmission of the rumor. Beginning with the pitch of this article, Duin referred to her sources as "disgruntled former members." ECF No. 104 ¶ 69; *accord.* 1 *Law of Defamation* § 3:59 (2d ed.) ("When a source harbors biases or hostilities against a plaintiff, and the defendant is aware of those biases or hostilities, that awareness is probative of the existence of actual malice.")

Nobody Duin talked to claimed to have personal knowledge of sexual abuse or cover-up. ECF No. 104 ¶¶ 70, 74; *accord. King v. Globe Newspaper Co.*, 400 Mass. 705, 721–22 (1987) (sole reliance on "hearsay perhaps multi-level" where the underlying declarant was "neither disclosed … nor vouched for" as actual malice). Johnson's tale took place two to three years before he was even a member. Response ¶ 72. Worse than a rumor "based wholly on an unverified anonymous telephone call" (*St. Amant*, 390 U.S. at 732), Newsweek published a rumor based wholly on an unverified anonymous *internet* source. ECF No. 104 ¶ 78. Duin took a pseudonymous email at face value that the underlying anonymous hearsay declarant must be telling the whole truth. ECF No. 104 ¶ 80. There can be no genuine dispute that she entertained serious doubts about the rumor.

It'd be one thing if Duin simply happened across this "delicious quote" by happy accident. ECF No. 104 ¶ 91. But the evidence shows otherwise. From its very conception, this article was going to include a claim of covered up sexual abuse. ECF No. 104 ¶ 46 ("allegations of TST leadership sexually exploiting members or failing to respond to harassment / sex assault

allegations against chapter heads.") Duin took that unverified claim (ECF No. 104 ¶ 45) and presented it as a fact in her pitch to Newsweek's highest levels of management. ECF No. 104 ¶ 50. It cannot be said that Duin is merely ignorant of basic journalistic standards, she was a senior hire who has served as a professor of journalism at four colleges. ECF No. 104 ¶¶ 31-33. Duin did not include this "delicious quote" in the article by happy accident, she included it because it was consistent with her pre-determined narrative. *Palin v. New York Times Co.*, 940 F.3d 804 (2d Cir. 2019) (pre-determined narrative as actual malice).

She included the article statement as part of a pattern of spreading rumors about sexual abuse and cover-up. In her Satanic Panic-era article entitled *Satanism in the United States: a phenomenon on the rise*, she wrote: "Sex is introduced early in the game, as adolescents are fascinated by sexuality and the occult offers plenty of it," further claiming "gang rapes" and purporting that this is all covered up by Satanists not hesitating to "kill defectors." See ECF No. 104 ¶ 39. And, exactly as this article would be "Just in time for Halloween" (ECF No. 104 ¶ 48), she similarly wrote about Satanism on October 31, 1987 and October 28, 1989. See ECF No. 104 ¶ 39. The article statement was nothing more than another rote sale of trash claims to society's lowest common denominator. *See Burnett v. Nat'l Enquirer, Inc.*, 144 Cal. App. 3d 991, 1020 (Cal. Ct. App. 1983) (Beach, A.J., concurring in part) (affirming a finding of actual malice where "[t]he defendant engages in a form of legalized pandering designed to appeal to the readers' morbid sense of curiosity") Duin's fearmongering about Satanism, generally, applies with equal force to her three prior writings about the Temple, specifically. ECF No. 104 ¶¶ 42-43. In each, she complains of the Temple's very existence: whether because the Temple benefits from an equal right to have a physical presence (ECF No. 105-10) or from an equal right to tax-exempt status (ECF No. 105-12). These preexisting articles

– 23 –

**Appendix 954**

show that the subject article was authored by someone who willfully looked past her source's obvious bias against the Temple because she shared the same sentiments. Again, this shows a pre-determined narrative. *Palin*, above.

Nor can Newsweek plead ignorance about the above thread of open hostility toward the Temple (ECF No. 104 ¶ 39-48) because Cooper, too, shared Duin's bias. ECF No. 104 ¶ 113-116. As shown there, Cooper, who swore that she had never previously heard of the Temple and who swore she engaged in no fact investigation for it, insisted upon casting aspersions of the Temple's ritual activity. ECF No. 104 ¶¶ 113-116, 136. Even Duin pushed back, unsuccessfully, on Cooper's editorialization. ECF No. 104 ¶ 114. In this, we see yet another departure from the Editorial Guidelines: a prohibition against editorialization. ECF No. 101-16, at 2 (editorializing *vs.* reporting).

There is no escape from liability for Newsweek. All the above issues were ratified by Newsweek's highest management, with Cooper not only contributing to the article but giving it glowing praise immediately after the fact. ECF No. 104 ¶¶ 12, 15-16, 113-116, 121. 1 *Law of Defamation* § 3:117 (2d ed.) ("activity or acquiescence of executives, high officers, or principal managers" as ratification).

## 2.3: Newsweek's argument, like the article, ignores its own Editorial Guidelines.

At no point has Newsweek engaged with the argument that its own subjective standard of care, which the editor of this very article crafted and otherwise enforced, explicitly prohibited publishing an anonymous internet rumor as told by a source with a stated bias against the Temple, without fact-checking, and without the opportunity to respond. Instead, Newsweek argues that it is entitled to summary judgment based on self-serving assertions of naivete by both the author and the editor/publisher. ECF No. 99, at 19-20. This point is defeated by the

**Appendix 955**

fact that defendants will "rarely" admit actual malice, that is why courts look to the objective facts rather than self-serving denials. *Biro*, 807 F.3d at 545; *see also St. Amant*, 390 U.S. at 732 (a defendant cannot "automatically insure a favorable verdict by testifying that he published with a belief that the statements were true," the jury must determine whether the "publication was indeed made in good faith.")

Newsweek next tries to pass off all the blame to its month-long relationship with Duin, the purported "independent contractor," Newsweek emplaced blind faith in. ECF No. 99, at 19-20; see also Response ¶¶ 16, 18, 60. But Newsweek overlooks that Cooper insisted on editorializing in a claim, overruling her "trusted" reporter's objection that they had no basis to believe it was true, about an organization of which she disclaimed knowing "anything" about. Response ¶ 59. The paper trail reveals in real time that Newsweek's highest management insisted on publishing a fact claim it had no basis to believe it was true. *See McKimm v. Ohio Elections Comm.*, 89 Ohio St. 3d 139, 148 (2000) (publishing an accusation for which there is "no basis to believe" it as actual malice).

Newsweek also errantly relies on *Stern*, 645 F. Supp. 2d at 284-86. There, it is held three times that a *book* publisher has no independent duty to investigate an author's story without actual, subjective doubts as to its accuracy. *See id.* ("To require a book publisher to check … every potentially defamatory reference might raise the price of non-fiction works beyond the resources of the average man.") But the article isn't a book and Newsweek isn't a book publisher. Newsweek is a *news* organization, one held to the lowest possible standard of adhering to its own subjective standard of care. *Khan*, 269 A.D.2d at 77. Because it comprehensively failed to meet that standard, the inference of actual malice is drawn.

WHEREFORE the Court should deny Newsweek's motion in full.

Respectfully submitted on May 31, 2024,

By: */s/ Matt Kezhaya*

Matt Kezhaya (# 0402193)
KEZHAYA LAW PLC
150 S. Fifth St., Suite 1850
Minneapolis, MN 55402
phone: (479) 431-6112
email: matt@kezhaya.law

### CERTIFICATE OF SERVICE

NOTICE IS GIVEN that I, Matt Kezhaya, efiled the foregoing document by uploading it to the Court's CM/ECF system on May 31, 2024, which sends service to registered users, including all other counsel of record in this cause. *s/ Matt Kezhaya*

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| The Satanic Temple, Inc. | |
| *Plaintiff* | 1:22-cv-1343 (MKV) |
| *v.* | **REPLY ON THE SATANIC TEMPLE'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY** |
| Newsweek Digital LLC | |
| *Defendant.* | |

Respectfully submitted on June 7, 2024,

By:  */s/ Matt Kezhaya*

Matt Kezhaya (# 0402193) (*phv*)
KEZHAYA LAW PLC
150 S. Fifth St., Suite 1850
Minneapolis, MN 55402
phone:  (479) 431-6112
email:  matt@kezhaya.law

# TABLE OF CONTENTS

Table of contents ................................................................................................ ii

Table of authorities............................................................................................ iii

Argument .............................................................................................................. 1

    1: The statement is provably false.................................................................. 2

        1.1: The Article Statement is a falsifiable claim of fact. ........................... 2

        1.2: Passing on a rumor is still actionable. ............................................... 3

        1.3: The Temple does not engage in sexual abuse or cover-up.................. 5

        1.4: Newsweek has no competent evidence to support a truth defense....... 6

    2: Newsweek is at least negligent with respect to the claim. ......................... 7

        2.1: The Temple is a private figure. ......................................................... 7

        2.2: At issue is a matter of private concern. ............................................. 8

        2.3: The objective indicia give rise to an inference of actual malice. ........... 9

**Appendix 959**

# TABLE OF AUTHORITIES

## Cases

*600 W. 115th St. Corp. v.*
  *Von Gutfeld*, 80 N.Y.2d 130 (1992) ...........................................................2, 4

*Biro v. Conde Nast,*
  883 F. Supp. 2d 441 (S.D.N.Y. 2012)......................................................3, 7

*Carroll v. Trump,*
  685 F. Supp. 3d 267 (S.D.N.Y. 2023).....................................................2, 3

*Celle v. Filipino Rep. Enterprises Inc.,*
  209 F.3d 163 (2d Cir. 2000) ........................................................................ 6

*Dunlop-McCullen v. Rogers,*
  No. 00 CIV.3274(JSR)(JCF), 2002 WL 1205029 (S.D.N.Y. Feb. 21, 2002).................. 6

*Gil v. Pizzarotti, LLC,*
  No. 1:19-CV-03497-MKV, 2021 WL 1178027 (S.D.N.Y. Mar. 29, 2021) ..................... 7

*Gross v. New York Times Co.,*
  82 N.Y.2d 146 (1993) ................................................................................. 2

*Huggins v. Moore,*
  94 N.Y.2d 296 (1999) ..........................................................................7, 8, 9

*Khan v. New York Times Co.,*
  269 A.D.2d 74 (N.Y. App. Div. 2000) ......................................................... 9

*King v. Globe Newspaper Co.,*
  400 Mass. 705 (1987)................................................................................. 9

*Krauss v. Globe Int'l, Inc.,*
  251 A.D.2d 191 (N.Y. App. Div. 1998)........................................................ 8

*Lindberg v. Dow Jones & Co., Inc.,*
  No. 20-CV-8231 (LAK), 2021 WL 3605621 (S.D.N.Y. Aug. 11, 2021) ........................ 8

*Loeb v. New Times Commc'ns Corp.,*
  497 F. Supp. 85 (S.D.N.Y. 1980) ............................................................. 10

*Milkovich v. Lorain J. Co.,*
  497 U.S. 1 (1990) ...................................................................................... 3

**Appendix 960**

*Palin v. New York Times Co.*,
    940 F.3d 804 (2d Cir. 2019) ........................................................... 9

*Scacchetti v. Gannett Co.*,
    90 A.D.2d 985 (N.Y. App. Div. 1982) ......................................... 8

*Steinhilber v. Alphonse*,
    68 N.Y.2d 283 (1986) ..................................................................... 2

*Stern v. Cosby*,
    645 F. Supp. 2d 258 (S.D.N.Y. 2009) .......................................... 2

*Sweeney v. Prisoners' Legal Servs. Of New York, Inc.*,
    84 N.Y.2d 786, 793 (1995) ............................................................ 9

*Time, Inc. v. Firestone*,
    424 U.S. 448 (1976) ......................................................................... 8

*Yiamouyiannis v. Consumers Union of U. S., Inc.*,
    619 F.2d 932 (2d Cir. 1980) .......................................................... 7

**Statutes**

CPLR § 76-a ................................................................................................ 8

**Other Authorities**

*Dictionary of Psychology*, "Sexual Abuse" ....................................... 3

*Dictionary of Psychology*, "Sexual Contact" .................................... 3

**Rules**

FRCP 56 ............................................................................................... 7, 8

LR Civ. 56.1 ............................................................................................. 7

Second Circuit Rule 32.1.1 .................................................................... 6

**Treatises**

30B *Fed. Prac. & Proc. Evid.* § 6718 (2024 ed.) .............................. 7

**Appendix 961**

# ARGUMENT

The Temple asserts grounds for summary judgment on all four elements of defamation. Newsweek only responds to the first and second elements. The Court should enter partial summary judgment on the third and fourth elements by concession. At issue is a single claim over an unprivileged, unauthorized defamatory *per se* statement which caused special harm.

The statement is false. The Temple presented evidence and well-founded testimony to support that it prohibits sexual misconduct, investigates complaints, directs the complainant to make a police report when appropriate (*i.e.*, in cases of "sexual abuse"), and all offending members have been either removed or voluntarily departed. Newsweek responds that the article merely recites Strange's stated basis for dissociating from the Temple. That is barred by the republishing rule. As a fallback position, Newsweek relies on hearsay. This is *verboten*.

Newsweek has fault. Simple negligence applies because the statement is about a private figure on a matter of private concern. Newsweek offers no legal or factual basis to contest either ground. Even if a showing of actual malice was required, the undisputed evidence shows it. Newsweek's own Editorial Guidelines, drafted and otherwise enforced by the very editor for this article, required factchecking and an opportunity to respond and prohibited reliance on anonymous hearsay conveyed by a hostile source. Newsweek offers no response to the point that Cooper breached her own subjective standard of care when she approved the publishing of this defamatory *per se* statement. No part of this record shows that Newsweek had any concern for the truth. It shows that Newsweek set out to accuse the Temple of sexual wrongdoing and, when the facts didn't support that claim, it published the accusation anyway. Newsweek consciously disregarded its own subjective standards. That is actual malice.

# 1: The statement is provably false.

## 1.1: The Article Statement is a falsifiable claim of fact.

The article statement is provably false, *i.e.*, it pertains to facts as opposed to an unfalsifiable opinion. *Gross v. New York Times Co.*, 82 N.Y.2d 146, 152-53 (1993); *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 286 (1986). The article statement is: "He [Jinx Strange] soon left the group, then was leaked material about … 'Accounts of sexual abuse being covered up in ways that were more than anecdotal.'" ECF No. 113 ¶ 9. These words are actionable claims of fact because they are "commonly understood to mean criminal behavior and refer to verifiable acts." *600 W. 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 143 (1992); *Stern v. Cosby*, 645 F. Supp. 2d 258, 284 (S.D.N.Y. 2009) (statement is actionable which "in substance accuse[d] Stern of murder") accord. ECF No. 113 ¶ 59 (Depo. Cooper 186:24-187:6) (Q: "Would you agree with me that covering up sexual abuse would be a criminal act?" A: "Yes.")[1]

Newsweek contends that these words should be given meaning, not by the dictionary or as determined by the Court, but by the *post hoc* testimony of the rumormongers whose "delicious quotes" Newsweek uncritically chose to publish. Response at 21-22; ECF No. 113 ¶¶ 60, 91. But the issue at hand asks whether a "reasonable listener" could have concluded that the delicious quote is "conveying facts about the plaintiff." *Von Gutfeld*, 80 N.Y.2d at 139. Given the dictionary definition of the words Newsweek chose to publish, the article statement

---

[1] Newsweek objects that this question called for a legal conclusion. ECF No. 113 ¶ 59. It didn't. The Temple relies on the dictionary definition and the sworn testimony of its opposing party's Rule 30(b)(6) representative, not some technical argument based on a penal statute. *See Carroll v. Trump*, 685 F. Supp. 3d 267, 277 (S.D.N.Y. 2023) (applying dictionary definition to ascertain the legal question of what the reasonable listener understood, rejecting counter-plaintiff's "fine and shaded distinction" drawn by reference to a penal statute).

– 2 –

can only be understood as "an articulation of an objectively verifiable event." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 22 (1990). Newsweek also points to half the definition of sexual abuse in the "Dictionary of Psychology." This is a jargon definition which runs afoul of the rule to construe how a "reasonable reader" would interpret the words. *Carroll*, 685 F. Supp. 3d at 277. If the "delicious quote" appeared in *Psychology Today*, Newsweek would begin to have a colorable point. Even then, the remaining half of the American Psychological Association's definition defeats Newsweek's point: sexual abuse entails "sexual contact."[2] "Sexual contact" more particularly entails touching, not words: "any person-to-person *touching* or *connection with genital or erogenous skin* … as in fondling, kissing, biting, or coitus" (emphasis added).[3] Once again, Newsweek's own authorities betray it.

## 1.2: Passing on a rumor is still actionable.

Newsweek's response chiefly contends that it cannot be held liable for defamation because it merely passed on Strange's stated basis for leaving the Temple. Response at 18-19.[4] There are two problems. *First*, binding caselaw precludes that defense: "one who republishes a libel is subject to liability just as if he had published it originally, even though he attributes the libelous statement to the original publisher, and even though he expressly disavows the truth of the statement." *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 461 (S.D.N.Y. 2012) (quoting *Cianci*

---

[2] American Psychological Association, *Dictionary of Psychology*, "Sexual Abuse" available at https://dictionary.apa.org/sexual-abuse (last visited June 6, 2024) ("Although the term typically is used with reference to any *sexual contact* between adults and children, sexual abuse can also occur in any relationship of trust") (emphasis added).

[3] American Psychological Association, *Dictionary of Psychology*, "Sexual Contact" available at https://dictionary.apa.org/sexual-contact (last visited June 6, 2024)

[4] Citations are to the ECF header's page number, *e.g.*, "Response at 18" is paginated as 13.

– 3 –

*v. New Times Pub. Co.*, 639 F.2d 54, 60–61 (2d Cir.1980)). This is hornbook law which the Temple has been repeating since the pleadings stage. See ECF No. 21, at 6 ("a newspaper is subject to liability if it republishes a defamatory statement, although it names the author and another newspaper in which the statement first appeared.") (quoting *Restatement (Second) of Torts* § 578, cmt. b (1977)). Newsweek's defense is inapt under black-letter, binding law.

*Second*, the article does not state that Strange left "because he heard about accounts of sexual abuse being covered up." Response at 19. The text of the article is that he left "*then* was leaked material about … Accounts of sexual abuse being covered up in ways that were more than anecdotal." ECF No. 105-1, at 17 (emphasis added). The non-existent "leaked material" was purportedly received *after* he left, it is impossible for it to have caused his departure. ECF No. 121 ¶ 105 (the words "leaked" and "materials" do not appear in his email).

A newspaper's decision to publish "is the product of some deliberation, not of the heat of a moment." *Von Gutfeld*, 80 N.Y.2d at 142. Prior to its publication, the article statement had to pass through the hands of "professional editors" and thus "carrie[d] with it the cloak of credibility and authority of the particular newspaper and the profession." Id.; accord. ECF No. 113, at ¶¶ 4-6, 14, 28, 29 (it is undisputed that Newsweek was, until recently, one of the "Big Three" news magazines and that this article was edited by Newsweek's global editor in chief, a "much more experienced editor" than who otherwise supervised Duin). Given the undisputed facts, the only inference to be drawn is that the reasonable reader will be "less skeptical and more willing to conclude that the report is stating or implying facts garnered by a professional news gatherer and reporter." *Id.* The Court should find that the article statement, published under the name of a recently credible newspaper, is actionable because it implies the existence of undisclosed "leaked material" which purportedly shows "sexual

– 4 –

**Appendix 965**

abuse being covered up in ways that are more than anecdotal."

### 1.3: The Temple does not engage in sexual abuse or cover-up.

The article statement is false: the Temple does *not* engage in sexual abuse or cover-up. The Temple has a code of conduct which prohibits sexual misconduct, provides a complaint process to address sexual misconduct of any sort (including "sexual abuse"), investigates those complaints, directs the complainant to make a police report when appropriate (*i.e.*, in cases of "sexual abuse"), and provides an appropriate resolution for the facts of the particular case which has uniformly resulted in the removal or departure of the offending member. ECF No. 113 ¶¶ 107-112. Newsweek responds that the process wasn't formalized until 2020, so "it could not possibly determine whether and how complaints of sexual abuse were handled prior to that time." Response at 16. At most, this is an appeal to ignorance, the assertion of "metaphysical doubt" of the kind that does not defeat a motion for summary judgment. *See Sheindlin v. Brady*, 597 F. Supp. 3d 607, 622 (S.D.N.Y. 2022). More importantly, Newsweek's response disregards the evidence. Prior to the Suryan Council, complaints were *informally* addressed by the National Council. ECF No. 116 ¶ 88-91 (Newsweek's Exhibit 17 addresses the pre-2020 process and complaints resolved in July 2018, August 2019, and April 2020).

Newsweek's response offers nothing to controvert the material facts that the Temple prohibits sexual abuse, not engages in it, and invites public scrutiny into accusations of criminal sexual acts, not covers up the same. Even Newsweek admits that the Temple has an investigative and reporting structure which both predated the article and involve a directive to file a police report in a case of "sexual abuse." ECF No. 113 ¶¶ 108-109. Problems only arose when the rare individual got confounded by the Temple's "evidence-based" disciplinary decisions when they apparently expected the Temple to instead "act[] on accusations." Compare ECF

No. 104 ¶ 107 (Depo. Stevens 90:19-24) with ECF No. 116 ¶¶ 82, 86. The article statement is proven false by the evidence that the Temple prohibits all sexual misconduct and directs a police report be made about accusations of sexual abuse.

### 1.4: Newsweek has no competent evidence to support a truth defense.

Rather than present admissible evidence of "sexual abuse being covered up in ways that are more than anecdotal," Newsweek bristles at the idea of competing with a general denial. Response at 17. As grounds, Newsweek singularly relies on *Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 188 (2d Cir. 2000).[5] There, the "colorless denial" was a "bald assertion of falsity" without a foundation to support the denial. *Id.* The question was whether a radio station had "dwindling listeners and advertisers" which could have been falsified by discussing advertising trends or with evidence of sales. *Id.* To contrast, *Celle* upheld a finding of falsity on the testimony that (1) "AT & T was not withdrawing its sponsorship of Radyo Pinoy an that AT & T was not being shortchanged on advertising time," (2) that "AT &T had never complained to Radyo Pinoy that it was being shortchanged" and (3) that "AT & T continued advertising with Radyo Pinoy." *Id.*, at 189. The evidence cited at ECF No. 104 ¶¶ 107-112 more than satisfies the *Celle* requirement of laying a foundation to support a general denial.

Because the Temple presented a well-founded basis to find that the article statement falsely accused the Temple of sexual abuse and cover-up, it was incumbent upon Newsweek to present admissible evidence of the statement's truth. *See Dunlop-McCullen v. Rogers*, No. 00 CIV.3274(JSR)(JCF), 2002 WL 1205029, at *6 (S.D.N.Y. Feb. 21, 2002) (burden shifts to

---

[5] Newsweek also relies on a summary order which "do[es] not have precedential effect." Second Circuit Rule 32.1.1(a).

non-movant to defeat the motion); *Yiamouyiannis v. Consumers Union of U. S., Inc.*, 619 F.2d 932, 940 (2d Cir. 1980) (defamation cases use the normal summary judgment standards).

On this point, Newsweek offers nothing but internet hearsay. *Gil v. Pizzarotti, LLC*, No. 1:19-CV-03497-MKV, 2021 WL 1178027, at *7 n.3 (S.D.N.Y. Mar. 29, 2021). Initially, Newsweek contends that the hearsay it relies upon isn't for the truth of the matter asserted. Response at 20 n. 6. But the non-truth purpose of the evidence must be relevant in the first place. 30B *Fed. Prac. & Proc. Evid.* § 6718 (2024 ed.). The fact of the rumors is irrelevant because repeating rumors is no defense to liability. *Biro*, 883 F. Supp. 2d at 461. Even then, Newsweek quickly abandons the pretext of its non-truth purpose. Response at 20-21 (relying on the rumors to prove the truth of the rumors). Every single witness Newsweek can call has denied having any personal knowledge to substantiate the truth of the matters asserted within the rumors. ECF No. 113 ¶¶ 94-101; FRE 602 (requirement of personal knowledge). Thus, Newsweek has nothing to compete with the Temple's proof that it does *not* engage in sexual abuse or cover-up. LR Civ. 56.1(d). The Court should summarily find falsity. FRCP 56(g).

## 2: Newsweek is at least negligent with respect to the claim.

The third element requires proof that the publisher made the statement with "fault," which requires at least negligence. Simple negligence is the threshold for liability, here, because the Temple is a private figure and at issue is "mere gossip" on a matter of "prurient interest" which is a private concern. *Huggins v. Moore*, 94 N.Y.2d 296, 302 (1999).

### 2.1: The Temple is a private figure.

Newsweek bears the burden to show that the Temple is a public figure. *Scacchetti v. Gannett*

– 7 –

*Co.*, 90 A.D.2d 985, 986 (N.Y. App. Div. 1982). In full, Newsweek's discussion reads: "The Satanic Temple is a public figure," followed by a recitation of the elements for a limited public figure. ECF No. 112, at 23 n. 8. There is no effort to tie any evidence to the elements, nor any response to the points and authorities in the Temple's memorandum. The Court should find that Newsweek failed to meet its burden and that fthe Temple is a private figure. FRCP 56(g).

## 2.2: At issue is a matter of private concern.

Newsweek also blithely disregards the Temple's comprehensive briefing on the point that the article statement is on a matter of private concern. Response, at 23-24. Instead, it relies upon a statute which only incorporates the public *vs.* private concern inquiry. CPLR § 76-a(d); *Lindberg v. Dow Jones & Co., Inc.*, No. 20-CV-8231 (LAK), 2021 WL 3605621, at *7 (S.D.N.Y. Aug. 11, 2021). The article statement is unabashed rumormongering about private disputes among private individuals as pertains to their sex lives, *i.e.*, the very definition of "private concern." *Krauss v. Globe Int'l, Inc.*, 251 A.D.2d 191, 192 (N.Y. App. Div. 1998); *Time, Inc. v. Firestone*, 424 U.S. 448, 454 (1976). As to Newsweek's two #MeToo cases, this article isn't presented as part of the #MeToo movement nor is it about power dynamics in the workplace.

Newsweek provides neither evidence nor authority to support the proposition that the rumor it passed on was "arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition." *Chapadeau v. Utica Observer-Dispatch*, 38 N.Y.2d 196, 199 (1975). Nor does Newsweek respond to the point that the rumor falls "into the realm of mere gossip and prurient interest." *Huggins*, 94 N.Y.S. at 302. Instead, Newsweek leans in to the point that it engaged in outright gossipmongering. Response at 19-20. The simple fact of the matter, unacknowledged by Newsweek's response, is that the rumormongering Newsweek participated in is "directed only to a limited, private audience."

– 8 –

*Huggins*, 94 N.Y.2d at 303. Nobody outside of the Temple has any legitimate concern about the "handful of complaints that were sexual in nature *but not* 'sexual assault.'" ECF No. 100 ¶ 79 (emphasis added). And the article statement was included, notwithstanding that it was outside the "focus" of the article, because it was a "delicious quote." ECF No. 113 ¶¶ 8, 91. That presentation of alleged criminal sexual activity was clickbait, purely included to cause scandal and promote ridicule of the Temple "just in time for Halloween." Id. ¶¶ 48, 89, 91.

## 2.3: The objective indicia give rise to an inference of actual malice.

Even if actual malice was the threshold for liability, the undisputed evidence shows it. It is indisputable that Cooper ignored her own Editorial Guidelines, which she drafted and otherwise enforced, in the publishing of this article. ECF No. 113 ¶¶ 26, 56. Newsweek responds that violating someone *else's* standards is not sufficient to show actual malice. Response, at 26. That is non-responsive. Cooper had to consciously disregard her *own* standards to publish this hit piece. *Khan v. New York Times Co.*, 269 A.D.2d 74, 77 (N.Y. App. Div. 2000).

From its very conception, this article was going to include a claim of covered up sexual abuse. Id. ¶¶ 46, 50; *Palin v. New York Times Co.*, 940 F.3d 804 (2d Cir. 2019) (pre-determined narrative as actual malice). Cooper took no action to ascertain whether Duin performed an investigation (there was none); even though the Editorial Guidelines required fact-checking. Id. ¶¶ 58, 59, 89, 118; *accord. Sweeney v. Prisoners' Legal Servs. Of New York, Inc.*, 84 N.Y.2d 786 (1995) (deliberate avoidance of truth as actual malice). She published this accusation of sexual criminality, even though the text of the article shows that it was based on the overt retelling of hearsay by a biased source; although the Editorial Guidelines require reliance on only "credible" sources. Id. ¶¶ 65, 69, 73-74; *accord. King v. Globe Newspaper Co.*, 400 Mass. 705, 721–22 (1987) (sole reliance on "hearsay perhaps multi-level" as actual malice). A plain

– 9 –

reading of the article shows that Greaves was not given an opportunity to comment; although the Editorial Guidelines requires one. Id. ¶¶ 57, 81-83. And the emails show in real time that Cooper contributed a fabricated claim that the Temple falsifies its ritual activities and over-ruled *Duin's* objection they had no basis to make the claim. Id. ¶¶ 113-115. Cooper consciously disregarded her own standards and published this claim without any factual basis to believe it was true. That is actual malice.

Newsweek misrepresents the record when it contends that Duin relied on "four separate sources," who were "true believers" which ostensibly left because of "what they observed." Response at 27-28. The accusation of covered up sexual abuse was derived solely from Strange, not from four separate sources. Id. ¶¶ 73-74; see also ECF No. 116 ¶ 25 (QueerSatanic made no mention of sexual abuse or cover-up). Strange denied being "involved." ECF No. 105-17 at 1. And Strange never claimed to have "observed" anything. Id. ¶¶ 77-80.

Newsweek's authority is distinguishable. Response at 27-28; *Loeb v. New Times Commc'ns Corp.*, 497 F. Supp. 85, 93 (S.D.N.Y. 1980) (emphasis added). There, the defendants presented an "overwhelming showing" that the article was "prepared with a reasonable concern for the truth." *Id.* The authors investigated their claims for "over a year" and interviewed more than 200 "friends and enemies," and poured through 40 years' worth of documents. *Id.*, at 89 n 5. Newsweek, on the other hand, published a "delicious quote" from one enemy, without investigation, without inquiry, and without opportunity to comment. Id. ¶¶ 88-93. Because Newsweek offers nothing to show that it published this statement with a reasonable concern for the truth, *id.*, the Court should summarily find actual malice.

– 10 –

Respectfully submitted on June 7, 2024,

By: */s/ Matt Kezhaya*
Matt Kezhaya (# 0402193)
KEZHAYA LAW PLC
150 S. Fifth St., Suite 1850
Minneapolis, MN 55402
phone:  (479) 431-6112
email:  matt@kezhaya.law

## CERTIFICATE OF SERVICE

NOTICE IS GIVEN that I, Matt Kezhaya, efiled the foregoing document by uploading it to the Court's CM/ECF system on June 7, 2024, which sends service to registered users, including all other counsel of record in this cause. *s/ Matt Kezhaya*

**Appendix 972**

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| The Satanic Temple, Inc. | 1:22-cv-1343 (MKV) |
| *Plaintiff* | |
| *v.* | **DECLARATION OF** |
| | **SONIA KEZHAYA** |
| Newsweek Digital LLC | |
| *Defendant.* | |

**COMES NOW** Sonia Kezhaya, who states as follows under penalty of perjury of the laws of the United States of America.

1.　**Purpose**. This declaration is made in support of The Satanic Temple's motion for summary judgment in the above cause.

2.　**Identity and qualifications**. I am Sonia Kezhaya, law partner to Matt Kezhaya. I am an adult of sound mind with no felonies. I base the following statements on my own personal knowledge and under penalty of perjury.

3.　**Foundation**. I personally attended all depositions in this cause. The depositions attached hereto truly and correctly reflect what was said under oath. I personally compiled the excerpts of depositions in support of the reply. True and correct copies of the excerpts follow, in order of appearance:

　　　47: Excerpts from deposition of Julia Duin

　　　48: Excerpts from deposition of Nancy Cooper

　　　49: Excerpts from deposition of David Alan Johnson

　　　50: Excerpts from deposition of Gregory Stevens (as 30(b)(6) deponent)

　　　51: Excerpts from deposition of Lucien Greaves

– 1 –

**FURTHER AFFIANT SAYETH NOT.**

Pursuant to 28 USC § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. *s/Sonia Kezhaya*

Executed on June 7, 2024.

– 2 –

**Appendix 974**

# Exhibit 48

Excerpts of deposition of Nancy Cooper
(November 7, 2023)

## In the Matter Of:

THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL

1:22-cv-01343-MKV

## NANCY COOPER

*November 07, 2023*

*30b6*



800.211.DEPO (3376)
EsquireSolutions.com

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ------------------------------------x

4    THE SATANIC TEMPLE, INC.,

5                          Plaintiff,

6               -against-                Case No.
                                         1:22-cv-01343-MKV
7    NEWSWEEK DIGITAL, LLC,

8                          Defendant.

9    ------------------------------------x

10                       November 7, 2023
                         10:03 a.m.
11

12

13        Videotaped 30(b)(6) Deposition of

14   Defendant by NANCY COOPER, and NANCY COOPER

15   Individually, taken by Plaintiff, pursuant

16   to Notice, held at 425 Madison Avenue, New

17   York, New York, before Joseph R. Danyo, a

18   Shorthand Reporter and Notary Public within

19   and for the State of New York.

20

21

22

23

24

25



```
 1

 2   A P P E A R A N C E S :

 3

 4        KEZHAYA LAW PLC
          Attorneys for Plaintiff and the Witness
 5            150 S. Fifth Street
              Suite 1850
 6            Minneapolis, Minnesota 55401

 7        By:   MATT KEZHAYA, ESQ.
                SONIA KEZHAYA, ESQ.
 8

 9

10        LAW OFFICES OF CAMERON STRACHER PLLC
          Attorneys for Defendant and the Witness
11            51 Astor Place
              9th Floor
12            New York, New York 10003

13        By:   CAMERON STRACHER, ESQ.
                SARA TESORIERO, ESQ. (Via Zoom)
14

15

16   Also Present:

17        LAURA HENRIQUE, ESQ., Newsweek (Via Zoom)

18        ELIZABETH GONZALEZ, Videographer

19                     ~oOo~

20

21

22

23

24

25
```



1                        Cooper

2          Q.    Please describe how Newsweek

3    fact-checks.

4          A.    Reporters are responsible for every

5    word in their stories always.  In addition, we          10:38

6    have a publishing desk that reads things, that

7    looks out for any kind of error from a typo to a

8    big error.

9          Q.    What would constitute a big error?

10         A.    You know, Trump was diagnosed with          10:38

11   cancer today.  Like, no.

12         Q.    So something that is clearly a

13   factual error that is something of public

14   knowledge.  Is that correct?

15         A.    Yes.                                         10:39

16         Q.    Okay.  What are some other big errors

17   that might be flagged by a publishing desk?

18         A.    You know, anything you can imagine.

19   Somebody who has a typo that says he did win when

20   he didn't win or the opposite, or, you know,           10:39

21   anything that you can imagine a mistake you'd

22   make, whether an actual mistake or a typo that

23   makes it a mistake.

24         Q.    What about a mistake in a failure of

25   fact-checking?  Is that something that a               10:39



1                          Cooper

2    publishing desk would flag?

3          A.    Yes.  They would try and catch that.

4          Q.    How would they go about catching

5    that?                                                 10:39

6          A.    They would Google it.  It depends

7    what it is, but they would try and figure out, or

8    they would ask the reporter, you know.

9          Q.    Who all staffs this publishing desk?

10         A.    We have a publishing desk in the U.S.    10:39

11   and one in the U.K. and copy, you know, very

12   experienced publishing editors, standards editors

13   staff it.

14         Q.    How many people staff it in the U.S.

15   approximately?                                        10:40

16         A.    A half dozen.  I really don't know is

17   the truth.

18         Q.    And is that half dozen comprised of

19   the 60 or so people that ultimately report up to

20   you?                                                  10:40

21         A.    They report to the head of the desk

22   who reports to me.

23         Q.    Okay.  So ultimately, yes, the head

24   of the desk reports to you, and below the head of

25   the desk are staffers that will perform the same     10:40



1                      Cooper

2          A.    No, I don't say to Google it.

3          Q.    Okay.  Do you require them,

4     specifically we're talking about the desk, to

5     engage in any level of fact-checking efforts?          10:41

6          A.    Yes.

7          Q.    Okay.  What are those fact-checking

8     efforts that they shall engage in?

9          A.    It's a spectrum.  There's

10    straightforward stuff where you can see that this       10:42

11    is a mistake.  This is a typo.  This is just a

12    transcription error, and then there are larger

13    questions, and their job is to make sure that our

14    stories are accurate and fair.  I don't dictate

15    you have to Google the words.                           10:42

16         Q.    How does one delineate whether a fact

17    question is big enough that it should be looked

18    into?

19         A.    Experience.

20         Q.    In your experience, would an            10:42

21    accusation of covered-up sexual abuse qualify as

22    one of these big questions that should be

23    fact-checked?

24              MR. STRACHER:  Objection to the form.

25         A.    Yes.                                     10:42



1                        Cooper

2          A.    Yes.

3          Q.    Do you sit on all discussions of all

4    articles, or is that managed by lower employees?

5          A.    No.  I don't sit in on every              11:57

6    discussion.

7          Q.    Okay.  What delineates the

8    discussions that you do versus don't?

9          A.    Timing, importance of the story,

10   questions about the story.                            11:57

11         Q.    Earlier you mentioned that you met

12   with Duin on a weekly basis.  Is that correct?

13         A.    As I remember.

14         Q.    Did you meet with all reporters on a

15   weekly basis?                                         11:57

16         A.    No, not all.  I believe there were

17   others that Juliana and I spoke with once a week,

18   but I don't remember.

19         Q.    Was Juliana in charge of Duin because

20   of the seniority of Duin?                             11:58

21         A.    It was just the topic I think.  It

22   was that she was a U.S. reporter, and Juliana was

23   the U.S. editor.

24         Q.    Okay.  Under what circumstances might

25   a dispute get escalated to you as to whether or       11:58



```
 1                          Cooper

 2   of 2021?

 3          A.   I don't believe so.

 4          Q.   And the same question about did you

 5   have people whose job it was independently to        12:57

 6   fact-check articles in the fall of 2021?

 7          A.   No.

 8          Q.   Did you work on any edits to the

 9   article that is the subject of this lawsuit with

10   Julia Duin via Slack?                                12:57

11          A.   I don't think so.  I have no reason

12   to think so.

13          Q.   How did you give Julia any edits, if

14   you did, for this article?  By what means?

15          A.   I e-mailed back and forth with her,     12:57

16   and I wrote notes into the draft.

17               MR. STRACHER:  That's it.  Those are

18          my only questions.

19               MR. KEZHAYA:  As to recross.

20   EXAMINATION (Continued)                              12:58

21   BY MR. KEZHAYA:

22          Q.   When did -- we are using the phrase

23   "publishing desk."

24          A.   Yes.

25          Q.   When did this publishing desk begin?    12:58
```



NANCY COOPER  30b6                          November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                140

```
 1                          Cooper
 2          Q.   I'll rephrase the question.
 3          A.   Yes.
 4          Q.   Julia Duin wrote articles for
 5     Newsweek, correct?                                      01:05
 6          A.   Yes.
 7          Q.   Did you fact-check anything in the
 8     articles?
 9          A.   No.  I raised questions to her, but I
10     didn't personally fact-check things.                    01:05
11          Q.   Did Juliana fact-check anything?
12          A.   I don't believe so.
13          Q.   And we're not talking just this
14     article.  We're talking overall.
15          A.   As I recall, yes, to what you're        01:05
16     saying.
17          Q.   Did anyone else over Julia Duin's
18     entire career at Newsweek fact-check any of her
19     articles?
20          A.   I don't believe so.                      01:05
21          Q.   Okay.  So you relied, you Newsweek,
22     relied on Julia Duin to fact-check her articles,
23     correct?
24          A.   Yes.
25          Q.   And if something slipped through the    01:05
```



NANCY COOPER  30b6                                      November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                        149

```
 1                       Cooper
 2         A.   Yes.
 3         Q.   And remind me who Juliana is?
 4         A.   She would be Julia's manager.
 5         Q.   Okay.  So Julia directly reports to      01:52
 6    Juliana?
 7         A.   Yes.
 8         Q.   Who in turn reports to you, is that
 9    correct?
10         A.   Yes.                                     01:52
11         Q.   And then, in terms of the
12    organizational chart, you and --
13         A.   Dayan.
14         Q.   Dayan.
15         A.   Report to Dev.  Yes.                     01:52
16         Q.   Meaning you don't report to Dayan,
17    and Dayan does not report to you, correct?
18         A.   Correct.
19         Q.   Okay.  Turning your attention back to
20    this October 25 e-mail on page 2, Julia writes,    01:52
21    "Are we meeting today at 2 your time, 11 my
22    time?"  Do you see that?
23         A.   Yes.
24         Q.   Do you have any reason to believe
25    that Dayan and Juliana were not copied on this     01:52
```



NANCY COOPER 30b6                          November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL              156

                              Cooper

1

2        Q.   Did she speak with Jinx Strange?

3        A.   I don't recall.

4        Q.   And if I recall correctly, you did

5   not speak to Jinx Strange, correct?                    01:59

6        A.   As far as I know, no.

7        Q.   Did you do any fact-checking on this

8   article?

9        A.   No.

10        Q.   The subject article?                          01:59

11        A.   No.

12             MR. STRACHER:  I'm just trying to get

13        him, try to let him finish his question,

14        so that you can get a full answer, and he

15        can get a full question, because if you        01:59

16        look at the question right now, it says,

17        "Did you do any fact-checking on this?

18        No.  The subject article.  No."  So you

19        have a very messed up record.

20             THE WITNESS:  I'm sorry.                     02:00

21             MR. STRACHER:  That's okay.

22             THE WITNESS:  Do you want to ask me

23        again?

24        Q.   I think it's clear under the

25   circumstances.  Adequately clear under the            02:00



```
 1                          Cooper
 2     sources used in the article prior to it being
 3     published?
 4              A.    No.
 5              Q.    Did you review any of the          02:04
 6     communications between Julia Duin and Lucien
 7     Greaves prior to the article being published?
 8              A.    I don't believe so.  No.
 9              Q.    What was the purpose of you editing
10     this article?                                    02:04
11              A.    Everybody needs an editor.
12              Q.    Why is that?
13              A.    Because you can't see your own
14     mistakes, because you can't catch your own typos,
15     because you can't, you're so close to the story  02:04
16     sometimes, you're not a good judge of what is
17     confusing to the reader, what is boring to the
18     reader.  You always need an outside person.
19              Q.    Did you have any telephone
20     conversations with Duin about this article?      02:04
21              A.    I don't believe so.
22              Q.    What about this meeting on October
23     25th?
24              A.    That's where we were on the phone.
25     We were never in person I don't think ever.      02:05
```



NANCY COOPER  30b6                              November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                  161

```
 1                         Cooper
 2     That's where we were on the phone, and I guess I
 3     said great story.  Let's do it.
 4           Q.   Did you say that on the phone?
 5           A.   I don't recall, but judging from the        02:05
 6     e-mails at some point I said maybe, you know.
 7     Yeah.
 8           Q.   How involved were you in the drafting
 9     and editing of this article?
10                MR. STRACHER:  Objection to the form.       02:05
11                I mean you can answer.
12           Q.   To the best of your ability.  If you
13     don't understand a particular aspect of the
14     question.
15           A.   No, you know, I looked back at the          02:05
16     e-mails, and then I had some questions.  I asked
17     her questions.
18           Q.   Which e-mails did you look back to?
19           A.   The e-mails in the document pile.
20     Whatever you call this.                                02:05
21           Q.   When you say you looked at the
22     e-mails, when did you look at these e-mails?
23                MR. STRACHER:  You can answer.
24           A.   Yesterday.
25           Q.   Okay.  Drawing your attention back to       02:06
```



NANCY COOPER  30b6                                        November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                          186

```
 1                          Cooper
 2         Q.   Would you agree with me that the
 3    assertion that there are accounts of sexual abuse
 4    being covered up in ways that are more than
 5    anecdotal is an accusation of wrongdoing?          02:41
 6         A.   Yes.
 7         Q.   So, throughout these e-mails, we see
 8    that you included language in this article.  Do
 9    you remember including language in the article?
10         A.   Not particularly.                        02:41
11         Q.   Do you remember whether you included
12    language in the article?
13         A.   No.
14         Q.   Do you recall the e-mail in which you
15    said that the blue insertions are yours?           02:42
16         A.   I see the line.  I see the e-mail,
17    but do I remember it?  No.
18         Q.   I draw your attention to Plaintiff's
19    13.
20              (Plaintiff's Exhibit 13, Document        02:42
21         Bates stamped Cooper 31 and Cooper 32, was
22         so marked for identification, as of this
23         date.)
24         Q.   Would you agree with me that covering
25    up sexual abuse would be a criminal act?           02:42
```



NANCY COOPER  30b6                              November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                    187

```
 1                          Cooper
 2              MR. STRACHER:  I object to the form
 3         of the question.  Speculative.
 4         Q.   For purposes of the editorial
 5    guidelines --                                      02:43
 6         A.   Yes.
 7         Q.   -- would you agree with me that this
 8    is an accusation of a criminal act?
 9              MR. STRACHER:  I object to the form.
10         A.   Of a possibly criminal act.             02:43
11         Q.   What about the sexual abuse in the
12    first place?
13              MR. STRACHER:  Objection to form.
14         What's the question?  Your question is
15         "What about the sexual abuse in the first    02:43
16         place?"
17         A.   What's the question?
18         Q.   My preceding statement was, within
19    the meaning of the editorial guidelines, is
20    covering up sexual abuse a criminal act to which   02:43
21    you respond yes.
22         A.   Yes.
23         Q.   Follow-up.  What about the sexual
24    abuse in the first place, within the meaning of
25    the editorial guidelines, is accusing someone of   02:43
```



```
 1                         Cooper
 2    having a systemic sexual abuse problem --
 3          A.   Yes.
 4          Q.   -- would that not also be a criminal
 5    act?                                              02:43
 6          A.   It could be.
 7               MR. STRACHER:  Objection to the form
 8          of the question.
 9          Q.   I believe the witness said yes,
10    correct?                                          02:44
11               MR. STRACHER:  No, I thought she
12          said, I believe she said it could be.
13          A.   It could be.
14               MR. STRACHER:  This is why you should
15          wait until the question is finished so I    02:44
16          can object and so that you can answer.
17               THE WITNESS:  Okay.  I'm sorry.  I'm
18          sorry.
19               MR. STRACHER:  That's okay.
20          Q.   When is sexual abuse of a systemic     02:44
21    nature not potentially criminal?
22               MR. STRACHER:  We're getting far
23          afield here now from like what the article
24          actually says.
25               So, if you want to get into this      02:44
```



1                          Cooper

2            area, I'm going to object, but I'm not

3            going to prevent the witness from

4            answering, but let me just note we're

5            getting pretty far afield.                       02:44

6                 MR. KEZHAYA:  I'm delineating the

7            difference as pertains to the editorial

8            guidelines as to the difference between

9            criminal sexual abuse and non-criminal

10           sexual abuse.  She said it could be.          02:44

11                MR. STRACHER:  Okay.

12                MR. KEZHAYA:  I would like you to

13           answer the delineating question.

14                MR. STRACHER:  But the word you used

15           was "systemic sexual abuse."  Where do you   02:45

16           find that phrase?

17           Q.   Nancy, you edited this article,

18     correct?

19           A.   Yeah.

20           Q.   Was this article not about TST as an    02:45

21     organization?

22           A.   It was about a lawsuit about TST.

23           Q.   Was the subject of this article TST?

24           A.   The subject of the article was this

25     lawsuit.  We didn't just like say here's the      02:45



NANCY COOPER  30b6                          November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL          192

| | |
|---|---|
| 1 | Cooper |
| 2 | A.   Because she's one of our senior |
| 3 | reporters, as I said. |
| 4 | Q.   Did you write headlines and leads for |
| 5 | all of the senior reporters? |
| 6 | A.   For many of them.  I didn't write |
| 7 | heads and leads for every one of her stories |
| 8 | either, I don't think.  It's just. |
| 9 | Q.   Your earlier testimony is that this |
| 10 | article is about the litigation. |
| 11 | A.   Yes. |
| 12 | Q.   And your earlier testimony also was |
| 13 | the lead is how you go about introducing the |
| 14 | concept of the article, correct? |
| 15 | A.   Um-hum. |
| 16 | Q.   Please help me understand how this |
| 17 | lead ties to the litigation when it makes no |
| 18 | reference to the litigation? |
| 19 | A.   The litigation is about defaming a |
| 20 | religion.  So it's exactly about that. |
| 21 | Q.   Please say that again. |
| 22 | A.   The lead is about can you defame a |
| 23 | religion.  So it's about the lawsuit. |
| 24 | Q.   Did you ever look at the complaint in |
| 25 | this case? |

Timestamps:
02:47 (line 5)
02:47 (line 10)
02:47 (line 15)
02:47 (line 20)
02:48 (line 25)



NANCY COOPER 30b6                                    November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL              193

```
 1                          Cooper
 2          A.   The complaint meaning what?  The
 3    original lawsuit?
 4          Q.   Correct.  The Johnson lawsuit.
 5          A.   I don't believe so.                    02:48
 6          Q.   Did Julia Duin ever look at the
 7    complaint?
 8          A.   I'm sure she did.
 9          Q.   Do you have any personal knowledge
10    whether she did?                                  02:48
11          A.   I think she quotes from it in her
12    e-mails or in the story.
13          Q.   Is that why you are sure?
14          A.   Yes.
15          Q.   Turning your attention to our earlier 02:49
16    bullet point, "Reach out for comment and give
17    parties time to respond," how much time is
18    reasonable for a response?
19          A.   Again, it depends on the story.  If
20    it's just saying Mike Johnson got elected, and   02:49
21    his priority will be this, you know, you don't
22    have to wait forever for a response.
23               If you say, Mike Johnson, you know,
24    beat his previous wife, you have to wait for a
25    response.                                         02:49
```



```
 1                          Cooper

 2      or allegations, be specific and complete."

 3           Q.   Is it your opinion as Newsweek's

 4      editor in chief that the article statement is

 5      both specific and complete?                        03:16

 6                MR. STRACHER:   Objection to the form

 7           of the question.

 8           A.   Yes.

 9           Q.   Okay.  Please describe the specifics.

10           A.   That there were allegations of sexual    03:16

11      abuse and that they had not been dealt with.

12           Q.   Okay.  Who was sexually abused?

13           A.   We don't know.  Members.

14           Q.   Okay.  What was entailed in the

15      coverup?                                           03:16

16           A.   I don't know.

17           Q.   And it's your testimony today that

18      these are -- withdrawn.  Who engaged in the

19      sexual abuse?

20           A.   I don't know.                            03:16

21           Q.   Who engaged in the coverup?

22           A.   I don't know.  Officials of the

23      church, but I don't know.

24           Q.   You are presuming, correct?

25           A.   Yes.                                     03:16
```



NANCY COOPER  30b6                                    November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                      208

```
 1                          Cooper
 2           Q.   What was the sexual abuse?
 3           A.   I don't know.  Sorry.
 4           Q.   What was the coverup?
 5           A.   Again, I don't know.                    03:17
 6           Q.   And, once again, it's your testimony
 7      as the person in charge of enforcing these
 8      guidelines and the person --
 9                MR. STRACHER:  I object to the form.
10           She did not say enforcing.  Right?  She        03:17
11           didn't use the word "enforcing."
12           Q.   Were you in charge of enforcing these
13      guidelines?
14           A.   Yes.
15           Q.   Okay.  As the person who was in          03:17
16      charge of enforcing these guidelines, as the
17      global editor in chief, and as the person who
18      edited this particular article, it's your
19      testimony that this statement is complete,
20      correct?                                           03:17
21           A.   Yes.
22           Q.   And specific as well, correct?
23           A.   Yes.
24           Q.   Please read the last sentence in the
25      same bullet point.                                 03:17
```



```
 1                        Cooper
 2    this is an investigative story and this isn't.
 3    I'm just saying in my mind this was a pretty
 4    straightforward story.
 5            Q.   How would you describe the story if      03:54
 6    not an investigative piece?
 7            A.   It's a reported piece.  A report.
 8            Q.   What would an investigation look like
 9    in an investigative piece?
10            A.   I'm trying to think of an example.       03:54
11    If you look at what The New York Times did about
12    Harvey Weinstein.  They traced back all the
13    cases.  They talked to a million people.  They
14    uncovered things that had been covered up.  They
15    didn't just write about, oh, there's this suit,       03:55
16    which is what ours could be.
17            Q.   And is it your understanding that the
18    Johnson lawsuit involved allegations in which The
19    Satanic Temple sexually abused and then covered
20    up its membership?                                    03:55
21              MR. STRACHER:  I object to the form.
22            Q.   Is that your understanding?
23            A.   No, I don't have an understanding of
24    what the Johnson lawsuit is.  That's the suit
25    here in the case?                                     03:55
```



NANCY COOPER  30b6                              November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                224

```
 1                         Cooper
 2          Q.   It's my understanding of your
 3     testimony that the article is about the Johnson
 4     lawsuit.
 5          A.   Oh, I just think of it as a lawsuit.    03:55
 6     Yeah.
 7          Q.   So is that a yes?
 8          A.   Yes.
 9          Q.   That is your testimony?
10          A.   Yeah.                                   03:55
11          Q.   What is the basis of this belief?
12          MR. STRACHER:  I'm sorry.  What is
13          the question?  What is the basis of this
14          belief?
15          MR. KEZHAYA:  She just testified,            03:55
16          yes, it is my belief that this statement
17          is about the Johnson, an allegation.
18          MR. STRACHER:  No.  No, it is not.
19          Your question was, "It is my understanding
20          that your testimony is that the article is  03:56
21          about the Johnson lawsuit."
22          A.   Right.
23          Q.   Correct.
24          MR. STRACHER:  And then you said,
25          "What is the basis of that belief?"          03:56
```



NANCY COOPER  30b6                                    November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                  233

```
 1                          Cooper

 2          of the statement.

 3          Q.   Yes or no?

 4          A.   I have faith in Julia's reporting,

 5     yes.                                                    04:04

 6          Q.   You have faith in that, correct?

 7          A.   Yes.

 8               MR. KEZHAYA:  I pass the witness.

 9               MR. STRACHER:  No questions.

10               MR. KEZHAYA:  Okay.                           04:05

11               THE WITNESS:  Are we done?

12               MR. KEZHAYA:  We are done.

13               THE WITNESS:  Okay.  Thank you.

14               THE VIDEOGRAPHER:  This is the end of

15          the deposition of Nancy Cooper.  The time         04:05

16          is 4:05 p.m.  Thank you.

17               THE WITNESS:  Thank you.

18               MR. STRACHER:  Thank you.

19               (Time noted:  4:05 p.m.)

20                               _____

21

22     Subscribed and sworn to

23     before me this____day of_____, 2023.

24     _____

25
```



800.211.DEPO (3376)
EsquireSolutions.com
Appendix 999

NANCY COOPER  30b6                                    November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                    234

```
 1
 2                    C E R T I F I C A T I O N
 3
 4            I, JOSEPH R. DANYO, a Shorthand Reporter
 5   and Notary Public, within and for the State of New
 6   York, do hereby certify:
 7            That I reported the proceedings in the
 8   within entitled matter, and that the within transcript
 9   is a true record of such proceedings.
10            I further certify that I am not related, by
11   blood or marriage, to any of the parties in this
12   matter and that I am in no way interested in the
13   outcome of this matter.
14            IN WITNESS WHEREOF, I have hereunto set my
15   hand this 16th day of November, 2023.
16
17            _____
18                   JOSEPH R. DANYO
19                   STATE OF NEW YORK
20                   My Commission Expires 2/20/2027
21
22
23
24
25
```



NANCY COOPER  30b6                                     November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                      235

1

2                          I N D E X

3    Witness                                              Page

4    NANCY COOPER                                            3

5

6                       E X H I B I T S

7    Plaintiff's                                          Page

8         Exhibit 3   LinkedIn profile of Nancy            6
                      Cooper
9
          Exhibit 4   TST's 30(b)(6) Notice of            14
10                    Deposition of Newsweek

11        Exhibit 5   Newsweek Editorial Guidelines       30

12        Exhibit 6   Subject Newsweek article by         52
                      Julia Duin dated October 29,
13                    2021

14        Exhibit 7   Article in CJR entitled             77
                      Dropshipping Journalism
15
          Exhibit 8   Newsweek Policies and Standards    136
16
          Exhibit 9   Document Bates stamped             147
17                    Cooper 51 through Cooper 53

18       Exhibit 10   Document Bates stamped             163
                      Cooper 19 through Cooper 23
19
         Exhibit 11   Document Bates stamped             168
20                    Cooper 37 through Cooper 39
         Exhibit 12   Document Bates stamped             170
21                    Cooper 48 through Cooper 50

22       Exhibit 13   Document Bates stamped             186
                      Cooper 31 and Cooper 32
23
         Exhibit 14   Opinion and Order of Judge         197
24                    Vyskocil dated March 8, 2023

25                          ~oOo~



NANCY COOPER 30b6                                November 07, 2023
THE SATANIC TEMPLE -against- NEWSWEEK DIGITAL                 236

1

2                     DEPOSITION ERRATA SHEET

3     Our Assignment No. 10502574
      Case Caption: The Satanic Temple v Newsweek Digital LLC
4

5              DECLARATION UNDER PENALTY OF PERJURY

6              I declare under penalty of perjury that I have

7     read the entire transcript of my deposition taken in

8     the above-captioned matter or the same has been read

9     to me, and the same is true and accurate, save and

10    except for changes and/or corrections, if any, as

11    indicated by me on the DEPOSITION ERRATA SHEET

12    hereof, with the understanding that I offer these

13    changes as if still under oath.

14             Signed on the _____day of_____

15    2023.

16                   _____

17                            NANCY COOPER

18

19    Subscribed and sworn to on the_____day of

20    _____, 2023 before me.

21

22    _____

23    Notary Public in and for the State of New York.

24

25



# Exhibit 49

Excerpts of deposition of David Alan Johnson
(November 17, 2023)

(134 of 279), Page 134 of 279
Case: 25-868, 07/28/2025, DktEntry: 50.1, Page 134 of 279
Case 1:22-cv-01343-MKV-SLC    Document 124-3    Filed 06/07/24    Page 2 of 3

**In the Matter Of:**

THE SATANIC TEMPLE

vs

NEWSWEEK DIGITAL

---

**DAVID JOHNSON**

November 17, 2023

---



**Moburg Reporting**
33400 9th Ave. South, Suite 207
Federal Way, WA 98003
(206) 622-3110
www.MoburgReporting.com

```
 1            UNITED STATES DISTRICT COURT

 2            SOUTHERN DISTRICT OF NEW YORK

 3    --------------------------------------------------------
                                        )
 4   THE SATANIC TEMPLE, INC.,          )        COPY
                                        )
 5            Plaintiff,                )
                                        )
 6       vs.                            )NO. 1:22-CV-01343-MKV
                                        )
 7   NEWSWEEK DIGITAL, LLC,             )
                                        )
 8            Defendant.                )
                                        )
 9    --------------------------------------------------------

10       Videotaped Deposition Upon Oral Examination

11                        of

12            DAVID ALAN JOHNSON

13    --------------------------------------------------------

14            Friday, November 17, 2023

15                   9:36 a.m.

16            7900 Southeast 28th Street

17            Mercer Island, Washington

18

19

20

21

22

23

24   Cheryl Macdonald, CRR, RMR
     Court Reporter
25   License No. 2498
```

November 17, 2023

THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                    David Johnson

---

Page 10

1  after a complaint was made.  It could be incidental.
2  They could be removed for some other reason besides
3  that.
4      Q.    So if they were removed because of the
5  complaint, though, then that's not a cover-up, in your
6  opinion; is that correct?
7          MS. TESORIERO:  Objection to form.
8      A.    I think it depends on the particulars of
9  the situation.
10     Q.    Okay.  Have you personally witnessed any
11 sexual abuse within The Satanic Temple?
12     A.    I have not.
13     Q.    You gave an interview to Julia Duin at some
14 point previously; is that correct?
15     A.    That is correct.
16     Q.    During that interview you indicated --
17 well, let's back up.  I believe during that interview
18 you indicated that you were a witness to a sexual
19 harassment complaint.  Do you recall that?
20     A.    That sounds correct, yes.
21     Q.    And when I say "I believe," I'm not sure if
22 it was you or if it was someone else.  So unpacking it
23 slightly, did you indicate to Julia Duin that you were
24 a witness to a sexual harassment complaint?
25     A.    I believe that is correct, yes.

Page 11

1      Q.    Okay.  In your definition of sexual abuse,
2  whatever the sexual harassment complaint was, was that
3  sexual abuse?
4      A.    I don't know that I feel qualified to say.
5      Q.    Okay.  Well, what was the sexual harassment
6  complaint?
7      A.    There was a former member of the local
8  TST group who had been, from my understanding,
9  repeatedly made to feel uncomfortable by a much older
10 member.  I think -- I think this was in a period of
11 2017 to 2018.  So it was before I was a member.  They
12 left because it was nonaddressed for months, and then
13 I found out about it in 2020.
14     Q.    Let's unpack that slightly.  You indicated
15 that you were a listed witness on a complaint;
16 correct?
17          MR. ROLLER:  Object to the form.  I think
18 it misstates prior testimony.
19     Q.    Let me rephrase.  You indicated to Duin
20 that you were a listed witness on a sexual harassment
21 complaint; correct?
22     A.    I'm not -- I'm not sure.  There was a
23 complaint by a person who was no longer a member.  We
24 found out about it in 2020, and then that was brought
25 up.  That's when I was made aware of it.

Page 12

1      Q.    You say when "that was brought up."  What
2  was brought up?
3      A.    In 2020, when the former member, who was
4  unhappy about the way their sexual harassment had been
5  treated, talked publicly about it, as their
6  unhappiness with their treatment in the organization.
7      Q.    Was this a written complaint or an
8  unwritten complaint?
9      A.    I believe it was a Facebook post.
10     Q.    So this was -- backing up slightly, are you
11 familiar with the concept of National Council or
12 International Council?
13     A.    Within the context of The Satanic Temple?
14     Q.    Correct.
15     A.    My understanding is that the National
16 Council and International Council were a leadership
17 committee directly below Doug Misicko and Cevin
18 Soling, the executive committee.
19     Q.    But the question posed is whether you're
20 familiar with them in the first place.  So that's a
21 yes, correct?
22     A.    If what I just said was accurate, then yes.
23     Q.    Within your understanding, did
24 International Council or National Council investigate
25 matters of claims of sexual harassment?

Page 13

1          MS. TESORIERO:  Objection to form.
2          MR. ROLLER:  Object to form.
3      A.    Sorry.  Could you restate the question?
4      Q.    In your understanding, did national -- I'm
5  just going to call it the National Council.  In your
6  understanding, did National Council investigate claims
7  of sexual harassment?
8      A.    I am not sure.  I have heard that that's
9  so.
10     Q.    Okay.  But you lack personal knowledge;
11 correct?
12     A.    That's correct.
13     Q.    Okay.  Do you have any personal knowledge
14 whether the person who claimed sexual harassment ever
15 raised a complaint to national council?
16     A.    I do not know that, no.
17     Q.    You indicated that you were a witness.  I'm
18 having trouble understanding how you are a witness in
19 this complaint.
20          MR. ROLLER:  Object to the form.
21     Q.    Please help me understand that.  You
22 indicated to Duin, "We were a witness", correct?
23     A.    I'm not sure what the -- that's what we
24 said.  If that's what the transcript is, then that's
25 what we said.

---



November 17, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                                    David Johnson

**Page 14**

1    Q.   Well, let's interject there and play the
2  clip.  So for benefit of the record, we're pulling
3  Newsweek 390, which is a portion of an -- which prior
4  testimony has established that this is a portion of an
5  interview between Duin and four prior members of The
6  Satanic Temple.
7    A.   I do not believe it was four.  It was three
8  people were in it.
9    Q.   Oh, okay.  So prior testimony suggested it
10  was you, Leah Fishbaugh, and --
11    A.   Nathan Sullivan.
12    Q.   Okay, yes.  So who is the fourth member of
13  QueerSatanic?
14    A.   The fourth person that you're suing is
15  Micky Powell.
16    Q.   And Micky was not at this interview; is
17  that correct?
18    A.   That is correct.
19    Q.   So returning again to the audio clip, this
20  is Newsweek 390.  We have a four-minute clip from that
21  interview.  Prior testimony established that this was
22  approximately an hour-and-a-half-long interview; is
23  that correct?
24    A.   I am not sure.  It's been a while.  So I
25  don't recall.

**Page 15**

1         (Tape played.)
2    Q.   Pausing at 16 seconds, a male voice is
3  speaking here.  Is that Nathan Sullivan?
4    A.   That's Nathan Sullivan.
5         (Tape played.)
6    Q.   Pausing at 50.  So thus far, Nathan tells
7  Duin that there was an ethics complaint.  It was
8  e-mailed, and several of us were listed as witnesses.
9  Were you one of the "several of us"?
10         MS. TESORIERO:  Objection to form.
11    A.   I was CC'd on that e-mail, yes.
12    Q.   So this terminology "listed as witnesses,"
13  is that just because you were CC'd on the e-mail?
14    A.   I believe so, yes.
15    Q.   And when did this e-mail take place?
16    A.   By recollection, it was in March of 2020.
17    Q.   Who sent the e-mail?
18    A.   Another former member who is not a party in
19  the suit.
20    Q.   So not one of the four constituting QS.
21  Was it the former member who claimed sexual
22  harassment?
23    A.   No.
24    Q.   Who was it?
25    A.   It was another former member who knew that

**Page 16**

1  person.
2    Q.   Okay.  But I need to find this e-mail.  So
3  do you recall the e-mail address?
4    A.   I do not.
5    Q.   Do you recall whether they used a
6  pseudonym?
7    A.   I believe they were going by Wylie,
8  W-Y-L-I-E.
9    Q.   Do you recall Wylie's last name?
10    A.   Duffy, D-U-F-F-Y.
11    Q.   And to clarify, that is a pseudonym, to the
12  best of your knowledge; correct?
13    A.   Correct.
14    Q.   Do you recall whether this was a Gmail
15  address?
16    A.   It was probably a Gmail address.
17    Q.   Do you know where Wylie is?
18    A.   I do, yes.
19    Q.   Where is Wylie?
20    A.   They live in Seattle.
21    Q.   Do you have Wylie's residential address?
22    A.   I do not, no.
23    Q.   Do you have Wylie's work address?
24    A.   I do not.
25    Q.   Do you have Wylie's telephone number?

**Page 17**

1    A.   I might.
2    Q.   Do you have Wylie's e-mail address?
3    A.   I would have Wylie's e-mail address, yes.
4    Q.   Do you have this e-mail?
5    A.   You mean off the top of my head?
6    Q.   Yes.
7    A.   No.
8    Q.   So off the top of your head you know that
9  you do not have his e-mail?
10    A.   I can't recall to you what the e-mail
11  address is.
12    Q.   No, no.  I'm not asking whether you can
13  recall the e-mail address.  I'm asking whether you
14  have that e-mail.  If I were to, for example, issue a
15  subpoena duces tecum, could you produce the e-mail?
16    A.   I haven't checked in a while.  I might be
17  able to.
18    Q.   Returning your attention to the earlier
19  testimony.  You did not personally witness this
20  particular event; correct?
21    A.   Can you specify what this particular event
22  is?
23    Q.   This e-mail complaint raised by Wylie Duffy
24  about sexual harassment that continued on for some
25  period of time three years before you were a member.



November 17, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                                    David Johnson

Page 18

1   A.   I did not witness the sexual harassment
2   before I was a member, that's correct.
3   Q.   And have you seen any other sexual abuse of
4   any sort within The Satanic Temple?
5        MS. TESORIERO:  Objection to form.
6   A.   When you say that, do you mean have I
7   witnessed with my own eyes?
8   Q.   Correct, yeah.  You personally.
9   A.   No, I don't believe so.
10   Q.   Okay.  So any knowledge you have would be
11   based on hearsay; is that correct?
12       MR. ROLLER:  Object to the form.
13   A.   Knowledge I have comes from other people
14   who experienced things, yes.
15   Q.   And the information that you received from
16   other people who experienced things, did they give you
17   this information under penalty of perjury?
18       MS. TESORIERO:  Objection to form.
19   A.   No.
20   Q.   This complaint in 2020, did you raise any
21   criminal complaints on the matter?
22   A.   I did not.
23   Q.   To your knowledge, were any criminal
24   complaints ever raised?
25   A.   To my knowledge, no.

Page 19

1   Q.   To your knowledge, were there ever any
2   criminal charges on the matter?
3   A.   To my knowledge, no.
4        MR. KEZHAYA:  I think we're at a good place
5   to take a break.
6        THE VIDEOGRAPHER:  We're now going off the
7   record.  The time is now 9:56 a.m.
8        (Recess.)
9        THE VIDEOGRAPHER:  We are now back on the
10   record.  The time is now 10:02 a.m.
11   Q.   Do you recall the name of the person about
12   whom this 2017 sexual harassment claim was raised?
13   A.   I believe I know their pseudonym.
14   Q.   What is their pseudonym?
15   A.   Dice Marlow.
16   Q.   How do I spell Dice?
17   A.   D-I-C-E, and then Marlow, I believe, is
18   M-A-R-L-O-W.
19   Q.   Do you recall the name or pseudonym of the
20   person who allegedly sexually harassed Dice Marlow?
21   A.   To my recollection, the pseudonym was John
22   Milton.
23   Q.   Do you know whether John Milton, as of
24   2020, was still a member of TST Washington?
25   A.   To my knowledge he was not.

Page 20

1   Q.   So to be more particular, you personally
2   know that he was not a member of TST Washington in
3   2020; correct?
4        MR. ROLLER:  Object to the form, but you
5   can answer.
6   A.   That's a somewhat complicated question
7   because membership was not kept up in a particularly
8   organized way.  So, to my knowledge, he was not a
9   member anymore.
10   Q.   But I'm trying to ascertain -- you say to
11   your knowledge, meaning you affirmatively know that he
12   was not; is that correct?
13   A.   I do not know that he was not.
14   Q.   Okay.
15   A.   Yeah.
16   Q.   And how do you know that or -- strike that.
17       What would constitute him being a member or
18   not a member of TST Washington, in your opinion?
19   A.   In my mind?
20   Q.   Mm-hmm.
21   A.   There were lists of people who were
22   members.  However, those lists were not up to date.
23   So sometimes people who were supposedly expelled were
24   not actually, like, officially expelled, if that makes
25   sense.

Page 21

1   Q.   Yeah, meaning their name was not struck
2   from some list; correct?
3   A.   No.  There were lists of active members and
4   supposedly expelled members, but this was not kept up
5   to date in any sort of accurate way, in my experience
6   with the organization.
7   Q.   Did TST Washington have in-person events?
8   A.   They did, yes.
9   Q.   If John Milton showed up at one of those
10   in-person events, would he have been removed?
11   A.   I am not sure.
12   Q.   Would he have been welcomed?
13   A.   I am not sure.
14   Q.   Did you ever tell Duin that you personally
15   witnessed any form of sexual abuse?
16   A.   Not to my knowledge, no.
17   Q.   Did you ever tell Duin that you personally
18   witnessed any form of cover-up?
19   A.   Not to my recollection, no.
20   Q.   Did Duin ever ask you for any clarifying
21   details as to the ethics complaint?
22       MS. TESORIERO:  Objection to form.
23   A.   Not to my recollection, but if you have the
24   interview, then that would -- that should say that.
25   Q.   So, in other words, if it's not in the


MOBURG
REPORTING

(139 of 279), Page 139 of 279
Case: 25-868, 07/28/2025, DktEntry: 50.1, Page 139 of 279
Case 1:22-cv-01343-MKV-SLC   Document 124-3   Filed 06/07/24   Page 7 of 9

November 17, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                      David Johnson

Page 22

1  clip, there was no follow-up writings, you know,
2  asking follow-up questions.  Is that --
3      A.   Not to my recollection.
4      Q.   Okay.  Did Duin ever ask you for any
5  clarifying details as to cover-up?
6      A.   Not to my recollection.
7      Q.   Did Duin ever ask you any follow-up
8  questions about issues raised by Jinx Strange?
9          MS. TESORIERO:  Objection to form.
10     A.   Not to my recollection.
11     Q.   Do you recall the time difference between
12 the interview and you providing Duin contact
13 information for Jinx Strange?
14     A.   I do not know.
15     Q.   And I earlier asked you more generally --
16 let's establish that foundation.  Did you personally
17 provide Duin the contact information for Jinx Strange?
18     A.   I honestly don't recall.
19     Q.   Do you recall how Duin received the contact
20 information for Jinx Strange?
21         MR. ROLLER:  Objection to form.
22         MS. TESORIERO:  Objection.
23     A.   I do not know.
24         MR. KEZHAYA:  Okay.  Pass the witness.
25         MS. TESORIERO:  Thank you.

Page 23

1              EXAMINATION
2  BY MS. TESORIERO:
3      Q.   Good morning, Mr. Johnson.  Thank you for
4  being here.  As I said earlier, my name is Sara
5  Tesoriero.  I'm an attorney for Newsweek, who is the
6  defendant in this case.  I just have a couple
7  follow-up questions.
8          First, a point of clarification from the
9  earlier conversation.  Did you say that John Milton
10 was the accused in the complaint we've been
11 discussing?
12     A.   I believe that's correct, yes.
13     Q.   And Dice Marlow was the alleged victim?
14     A.   That's correct.
15     Q.   Thank you.  Turning to the discussion you
16 and the other QueerSatanic members and Duin had during
17 the interview.  Based on the interview, it is my
18 understanding that your position is that you were
19 removed from TST leadership after being copied on the
20 e-mail complaint; is that correct?
21     A.   I believe the dissolution of the so-called
22 guild structure happened after that, yes.
23     Q.   Would you please describe the timeline and
24 connect for me the e-mail to the breakdown of the
25 guild structure?

Page 24

1          MR. KEZHAYA:  I'm going to interpose an
2  objection here.  We have a protective order that
3  limits this deposition to sexual abuse and cover-up.
4  I very intentionally did not ask any questions about
5  the guild structure.  We can get into it, but this is
6  outside the protective order that you-all asked for.
7          MS. TESORIERO:  Let me clarify.
8      Q.   I am trying to get to the allegation of a
9  cover-up.  If individuals were removed after being
10 copied on a sexual harassment complaint, I believe
11 that goes to cover-up.  I am only asking for you to
12 explain to me the connection between this complaint,
13 your knowledge of the complaint, and to the extent you
14 believe it led to your removal from the group.
15         MR. ROLLER:  If I can just say one thing
16 before you answer.  I have no objection to the line of
17 inquiry here without waiver of raising the scope of
18 the protective order.
19         MR. KEZHAYA:  Okay.  I'm just letting you
20 know now before we get into it further, I'm going to
21 cross-examine him further about the nature of the
22 guild structure, what did he do for TST.  This has a
23 very high likelihood of turning into a dispute that
24 I'm trying to avoid here.
25         MS. TESORIERO:  I am only asking about a

Page 25

1  specific incident that, based on the definition we
2  discussed, could constitute a cover-up.
3          MR. KEZHAYA:  Okay.
4      A.   I'm sorry.  Could you restate the question?
5  I know it's difficult.
6      Q.   One moment.  What is your basis for
7  believing that you personally were removed from TST
8  guild leadership because you were copied on an e-mail
9  complaint about sexual harassment?
10     A.   I do not understand that to be the cause
11 and effect.
12     Q.   Then I have no further questions on that
13 matter.
14     A.   Okay.
15     Q.   You mentioned briefly that the e-mail
16 complaint that Wylie Duffy brought to your attention
17 was not the only incident of -- actually, pause that
18 question one moment.  Strike that.
19         I know you and Mr. Kezhaya discussed your
20 understanding of sexual abuse.  For the purpose of my
21 questions, I'm going to tell you that my definition of
22 sexual abuse for these questions is any and all forms
23 of unwanted sexual contact, whether physical or
24 verbal, which would include but not be limited to
25 sexual harassment.  Do you understand that definition?

November 17, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                                   David Johnson

Page 34
1  questions.
2         THE VIDEOGRAPHER:  We are now going off the
3  record.  This marks the end of the deposition of David
4  Alan Johnson.  The time is now 10:27 a.m.
5         THE REPORTER:  Signature?
6         MR. ROLLING:  Yes.  We want to read it.
7         MR. KEZHAYA:  We'll need the transcript.
8         MS. TESORIERO:  Copy, please.
9            (Deposition concluded at 10:27 a.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 36
1  outcome thereof;
2      I further certify that the witness before
3  examination was by me duly sworn to testify to the
4  truth, the whole truth, and nothing but the truth;
5      I further certify that the deposition, as
6  transcribed, is a full, true and correct transcript of
7  the testimony, including questions and answers, and
8  all objections, motions, and exceptions of counsel
9  made and taken at the time of foregoing examination
10  and was prepared pursuant to Washington Administrative
11  Code 308-14-135, the transcript preparation format
12  guideline;
13      I further certify that I am sealing the
14  deposition in an envelope with the title of the above
15  cause and the name of the witness visible, and I am
16  delivering the same to the appropriate authority;
17
18      IN WITNESS WHEREOF, I have hereunto set my hand,
19  and affixed my official seal this 30th day of
20  NOvember 2023.
21            _____
22            Cheryl Macdonald, CCR
23            Washington State Certified
24            Court Reporter
25            License No. 2498

Page 35
1            C E R T I F I C A T E
2
3  STATE OF WASHINGTON    )
4                         ) ss.
5  COUNTY OF KING         )
6
7      I, the undersigned Washington Certified Court
8  Reporter, pursuant to RCW 5.28.010, authorized to
9  administer oaths and affirmations in and for the State
10  of Washington, do hereby certify:
11      That the annexed and foregoing deposition
12  consisting of Page 1 through 34 was taken
13  stenographically before me and reduced to a typed
14  format under my direction;
15      I further certify that according to CR 30(e) the
16  witness was given the opportunity to examine, read and
17  sign after the same was transcribed, unless indicated
18  in the record that the review was waived;
19      I further certify that all objections made at the
20  time of said examination to my qualifications or the
21  manner of taking the deposition, or to the conduct of
22  any party, have been noted by me upon said deposition;
23      I further certify that I am not a relative or
24  employee of any such attorney or counsel, and that I
25  am not financially interested in said action or the

Page 37
1            D E C L A R A T I O N
2
3
4
5      I declare under penalty of perjury that I
6  have read my within deposition, and the same is true
7  and accurate, save and except for changes and/or
8  corrections, if any, as indicated by me on the
9  correction sheet hereof.
10
11
12            _____
13            DAVID ALAN JOHNSON
14
15
16
17
18
19      Dated this_____day of_____,
20  2023.
21
22
23
24
25  CHERYL MACDONALD, Court Reporter



(141 of 279), Page 141 of 279
Case: 25-868, 07/28/2025, DktEntry: 50.1, Page 141 of 279
Case 1:22-cv-01343-MKV-SLC    Document 124-3    Filed 06/07/24    Page 9 of 9

November 17, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                    David Johnson

Page 38

1
  MOBURG REPORTING
2  COURT REPORTERS & LEGAL VIDEO
   33400 9th Avenue South
3  Suite 207
   Federal Way, WA 98003
4  206-622-3110
5
  PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS SHEET,
6  SHOWING PAGE, LINE, AND REASON, IF ANY.  SIGN THIS
   SHEET, SIGN THE ACCOMPANYING SIGNATURE SHEET AND
7  RETURN AS PER INSTRUCTIONS IN COVER LETTER.
8
   PAGE    LINE        CORRECTION AND REASON
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
                   (SIGNATURE)
24
25
   REPORTER: CHERYL MACDONALD

Page 39

1
2              MOBURG REPORTING
           Court Reporters & Legal Video
3        33400 9th Avenue South, Suite 207
              Federal Way, WA 98003
4        (206) 622-3110  FAX (206) 343-2272
           E-mail: info@moburgreporting.com
5
6  TO:   Jeremy E. Roller        November 30, 2023
         Arete Law Group
7        1218 3rd Avenue
         Suite 2100
8        Seattle, WA 98101
9
   IN RE:  The Satanic Temple v. Newsweek
10
   DEPOSITION(S) OF: David Alan Johnson
11
   DATE OF DEPOSITION: November 17, 2023
12
13 A copy of the deposition transcript of the above-named
   is provided via E-transcript.  Please have the
14 deponent read the deposition, sign the correction
   sheet and declaration.  The signed correction sheet
15 and declaration should then, within 30 (thirty) days,
   be forwarded to:
16
              CHERYL MACDONALD
17
           33400 9th Ave. So.  #207
18
           Federal Way, Washington 98003
19
   who will then enclose them in the original transcript,
20 seal it, and forward it to Mr. Kezhaya for retention
   until the time of trial.
21
       If you have any questions, feel free to contact
22 me at the number listed above.
23 Sincerely,
24
   CHERYL MACDONALD, CCR
25
   CC: S. Tesoriero  M. Kezhaya

Page 40

1
2     Certification of Court Rule and WAC Compliance
3           The Satanic Temple v. Newsweek
4      I, VALERIE SEATON, am an authorized representative of
   MOBURG REPORTING and do hereby, under penalty of perjury,
5  certify that Moburg Reporting and all court reporters
   providing services in the above-captioned case on MOBURG
6  REPORTING'S behalf will fully comply with all applicable
   rules and regulations governing the provision of court
7  reporting services, including, where applicable,
   Washington Superior Court Rule 28(c)-(e) and WAC
8  308-14-130(1).*
9                              11/30/23
   _____        _____
10 Valerie L. Seaton                  Date
   President
11 Moburg Reporting
12    *28(c)  Disqualification for Interest.  No deposition
   shall be taken before a person who is a relative or
13 employee or attorney or counsel of any of the parties, or
   is a relative or employee of such attorney or counsel, or
14 is financially interested in the action.
   28(d)  Equal Terms Required.  Any arrangement concerning
15 court reporting services or fees in a case shall be
   offered to all parties on equal terms.  This rule applies
16 to any arrangement or agreement between the person before
   whom a deposition is taken or a court reporting firm,
17 consortium, or other organization providing a court
   reporter, and any party or any person arranging or paying
18 for court reporting services in the case, including any
   attorney, law firm, person or entity with a financial
19 interest in the outcome of the litigation, or person or
   entity paying for court reporting services in the case.
20 28(e)  Final Certification of the Transcript.  The court
   reporter reporting a deposition shall not certify the
21 deposition transcript until after he or she has reviewed
   the final version of the formatted transcript.  A court
22 reporting firm, consortium, or other organization
   transmitting a court reporter's certified transcript
23 shall not alter the format, layout, or content of the
   transcript after it has been certified.
24    *308-14-130(1)  Offer arrangements on a case
   concerning court reporting services or fees to all parties
25 on equal terms.


Appendix 1011

# Exhibit 50

Excerpts of deposition of Gregory Stevens as TST 30(b)(6)
(November 3, 2023)

**In the Matter Of:**

THE SATANIC TEMPLE V. NEWSWEEK DIGITAL

1:22-cv-01343-MKV

---

**GREGORY STEVENS**

*November 03, 2023*

---

*30B6*



*800.211.DEPO (3376)*
*EsquireSolutions.com*

**Appendix 1013**

GREGORY STEVENS  30B6                                November 03, 2023
THE SATANIC TEMPLE V. NEWSWEEK DIGITAL                            1

```
 1

 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    -----------------------------------x

 4    THE SATANIC TEMPLE, INC.,

 5                          Plaintiff,

 6              -against-                    Case No.
                                            1:22-cv-01343-MKV
 7    NEWSWEEK DIGITAL, LLC,

 8                          Defendant.

 9    -----------------------------------x

10                          November 3, 2023
                            9:43 a.m.
11

12

13         30(b)(6) Deposition of Plaintiff by

14    GREGORY STEVENS, taken by Defendant, held at

15    30 Rockefeller Plaza, New York, New York,

16    before Joseph R. Danyo, a Shorthand Reporter

17    and Notary Public within and for the State

18    of New York.

19

20

21

22

23

24

25
```



GREGORY STEVENS  30B6                                November 03, 2023
THE SATANIC TEMPLE V. NEWSWEEK DIGITAL                             2

```
 1

 2    A P P E A R A N C E S :

 3

 4        KEZHAYA LAW PLC
          Attorneys for Plaintiff and the Witness
 5           150 S. Fifth Street
             Suite 1850
 6           Minneapolis, Minnesota 55401

 7        By:  MATT KEZHAYA, ESQ.
               SONIA KEZHAYA, ESQ.
 8

 9

10        LAW OFFICES OF CAMERON STRACHER PLLC
          Attorneys for Defendant
11           51 Astor Place
             9th Floor
12           New York, New York 10003

13        By:  CAMERON STRACHER, ESQ.
               SARA TESORIERO, ESQ. (Via Zoom)
14

15

16    Also Present:

17        LAURA HENRIQUE, ESQ., Newsweek (Via Zoom)

18        RACHELLE PIKE, Paralegal, Cameron Stracher PLLC
                          (Via Zoom)
19

20                    ~oOo~

21

22

23

24

25
```



GREGORY STEVENS  30B6                          November 03, 2023
THE SATANIC TEMPLE V. NEWSWEEK DIGITAL                      110

```
 1                    Stevens
 2   nature, you want me to give you a high level
 3   summary?
 4        Q.   Yeah, that would be great, based on
 5   your record or your recollection.
 6        A.   Some of this is indirect knowledge.
 7   Some of it is because, although I wasn't at this
 8   time on the national council or anything when it
 9   first started, I know Shelby and I know other
10   members of Austin fairly well.  Yeah.
11   Conversations with people who were involved as
12   well.  So Kiley started making claims about
13   Shelby.  If you don't mind, I will actually refer
14   back to my document because I am bad with dates.
15        Q.   Sure.
16        A.   Kiley started making claims about
17   Shelby, and it was actually earlier than April
18   2020 sort of informally that some of these claims
19   were being made and even shared online that seem
20   to be sort of an effort to draw other people in
21   to, you know, quote warn people and let people
22   know unquote about Shelby before even an official
23   complaint was filed.
24             Then on or about in April of 2020 was
25   when, not Kiley, but an ex of Shelby's who also
```



GREGORY STEVENS  30B6                        November 03, 2023
THE SATANIC TEMPLE V. NEWSWEEK DIGITAL                    111

```
 1                       Stevens
 2   was friends with Kiley e-mailed the national
 3   council with the allegation that Shelby had
 4   sexually assaulted Kiley.  So the allegation was
 5   that Shelby sexually assaulted Kiley.  The report
 6   was e-mailed in by a person who was a friend of
 7   Kiley's and an ex of Shelby's.
 8              National council's first response was
 9   to encourage Kiley to file a police report, but
10   she said she was not going to do that.  Over the
11   course of the following month or so, I'm trying
12   to think of a good neutral way of phrasing this,
13   because I don't want to sound like I'm making any
14   accusations one way or the other, but it seemed
15   like there was a lot of effort to reach out to
16   people, TST members individually, to, you know,
17   warn people, sway people, whatever language you
18   want to use, right, about this.
19         Q.   By who?
20         A.   By friends of Kiley's or friends of
21   Laura's, and it got to the point where someone,
22   it was Laura, threatened to go public quote
23   unquote, whatever that means, with the claim that
24   TST was covering up these accusations, and it was
25   at that point that Shelby stepped down.
```



(148 of 279), Page 148 of 279 Case: 25-868, 07/28/2025, DktEntry: 50.1, Page 148 of 279
Case 1:22-cv-01343-MKV-SLC   Document 124-4   Filed 06/07/24   Page 7 of 13

GREGORY STEVENS  30B6                     November 03, 2023
THE SATANIC TEMPLE V. NEWSWEEK DIGITAL              114

```
 1                         Stevens
 2   even there was a point when the national council
 3   advised that like, you know, the congregation if
 4   you see stuff because there was so much stuff
 5   going on online, there was so much like people
 6   talking, you know, making accusations online and
 7   all this stuff, and so there was urging messages
 8   to leadership like please don't get involved,
 9   please don't respond, please don't argue back,
10   just please, please, and then at one point I
11   don't know exactly when this was, but the people,
12   you know, like Laura because of the fact that
13   every single, every single meeting in the
14   congregation there was a lot of just constantly
15   turning attention to themselves and to this and,
16   hey, did you hear that Shelby, just constant, and
17   it made it impossible for them to have meetings,
18   and so they ended up making the decision to
19   remove everybody, anybody who was involved in any
20   side of the case, right, just anybody who was
21   currently a part of the police investigation, we
22   just please take some time, please take some
23   time, and they were no longer part of Austin.
24             So yeah.  That's really, like I said,
25   I'm speaking from the point of view of TST at the
```



```
 1                        Stevens
 2    point where Shelby stepped down and national knew
 3    that there was police work going on, so there was
 4    no more national interest in it, because like
 5    this is being handled.  Shelby is no longer a
 6    part of this, and then from the point of view of
 7    the congregation itself when eventually they
 8    said, hey, for our members' comfort and safety,
 9    anybody involved in the investigation based on
10    their behavior, and they're being removed, this
11    became no longer a TST thing even though there's
12    obviously --
13             Q.   A lot of stuff about it?
14             A.   Stuff that happened since then.
15             Q.   Yeah.  Okay.  What result, if you
16    know, became of the police investigation of
17    Shelby?
18             A.   They dropped the case.
19             Q.   And Shelby resigned you said from
20    TST.  Is that right?
21             A.   He resigned from being in leadership
22    and a member of the congregation.  I think he
23    still considered him himself a member of TST
24    generally, but yeah.
25             Q.   And what about Kiley?  What happened
```



GREGORY STEVENS  30B6                         November 03, 2023
THE SATANIC TEMPLE V. NEWSWEEK DIGITAL                      116

```
 1                      Stevens
 2   to her vis-à-vis TST?
 3          A.   I don't know.
 4          Q.   So let's mark this as Exhibit 19.
 5               (Defendant's Exhibit 19, Document
 6          Bates stamped TST 430, was so marked for
 7          identification, as of this date.)
 8          Q.   I just marked Exhibit 19 a document
 9   Bates numbered TST 430.  Do you recognize this
10   document?
11          A.   I do not.
12          Q.   I'll represent to you this was
13   produced by the Plaintiff in this lawsuit in
14   response to Newsweek's document request.
15          A.   Okay.
16          Q.   Do you see the reference in that
17   document to being banned from TST for filing a
18   report about a member of leadership in TST raping
19   them?
20          A.   I see the sentence you're referring
21   to.
22          Q.   Do you know whether Kiley was banned
23   from TST?
24          A.   I know for a fact that Kiley was not.
25          Q.   She was not banned.  How do you know
```



GREGORY STEVENS  30B6                        November 03, 2023
THE SATANIC TEMPLE V. NEWSWEEK DIGITAL                    132

```
 1                          Stevens
 2    let a lot of things slide.  So many stories
 3    involved leaving a lot of things to the side, but
 4    then nothing had risen to the point of Jex being
 5    a real topic of conversation until I remember, I
 6    remember the evening getting the phone call
 7    saying, hey, Jex just like literally like made a
 8    statement about encouraging people to kill the
 9    president in one of the rituals.
10             We need to freaking do something
11    about this.  Jex was almost a ghost prior to
12    that.  You know what I mean?  Like doing things,
13    not completely, because there were some things
14    she did that were very antagonistic.  We had
15    chapters in Texas, and chapters tend to be very
16    territorial isn't necessarily the right word, but
17    they have their area, and so Jex just
18    independently, no proposal, no communication,
19    decided to like do a thing in Texas and got the
20    Texas groups upset, because they felt like they
21    were being, like why are we even here, if Jex can
22    just without even telling us ahead of time do
23    this ritual thing, this call for this action in
24    our area.
25             So that kind of thing was the only
```



GREGORY STEVENS 30B6                          November 03, 2023
THE SATANIC TEMPLE V. NEWSWEEK DIGITAL                      134

```
 1                    Stevens
 2          A.   Sure.
 3          Q.   The bottom of page 6.
 4          A.   Yeah.
 5          Q.   So on May 9th, Doug Mesner, Lucien,
 6   right?
 7          A.   Yes.
 8          Q.   Writes a draft e-mail?
 9          A.   Hang on.  Hang on.  Are you talking
10   about page 6?
11          Q.   Yes.  Page 6?
12          A.   I'm looking at a page 6.  Where's
13   May 9th?
14          Q.   No.  I'm sorry.  May 5th, 2019.
15          A.   I got it.  Yeah, yeah, yeah.
16          Q.   And I'm wondering if that refreshes
17   your recollection about the nature of this
18   e-mail, the timing, what it was referring to?
19          A.   It does.  Thank you very much.  So
20   this wasn't a direct consequence of the incident
21   of her having a ritual in which she told people
22   that they should kill the president, which is why
23   she was terminated.  You know, it wasn't that
24   incident, but after the movie came out --
25          Q.   And, by the movie, you mean the movie
```



```
                            Stevens
 1
 2          didn't get that document, and I think you
 3          testified you're not aware of where or
 4          whether that document exists, but, Matt,
 5          if you can make an effort to see if you
 6          could find that document, and I ask the
 7          deponent as well.
 8               THE WITNESS:  I see.
 9               MR. STRACHER:  Will you do that for
10          us?  Go back to the original e-mail and
11          see if there's an attachment.  Alright.
12          That's my only question.  That's it.
13          Thank you all.  Thanks very much.
14               (Time noted:  3:40 p.m.)
15                         _____
16
17   Subscribed and sworn to
18   before me this____day of_____, 2023.
19   _____
20
21
22
23
24
25
```



1

2                    C E R T I F I C A T I O N

3

4            I, JOSEPH R. DANYO, a Shorthand Reporter

5    and Notary Public, within and for the State of New

6    York, do hereby certify:

7            That I reported the proceedings in the

8    within entitled matter, and that the within transcript

9    is a true record of such proceedings.

10           I further certify that I am not related, by

11   blood or marriage, to any of the parties in this

12   matter and that I am in no way interested in the

13   outcome of this matter.

14           IN WITNESS WHEREOF, I have hereunto set my

15   hand this 10th day of November, 2023.

16

17

18                        JOSEPH R. DANYO

19                    STATE OF NEW YORK

20                    My Commission Expires 2/20/2027

21

22

23

24

25



# Exhibit 51

Excerpts of deposition of Lucien Greaves
(November 6, 2023)

(156 of 279), Page 156 of 279
Case: 25-868, 07/28/2025, DktEntry: 50.1, Page 156 of 279
Case 1:22-cv-01343-MKV-SLC   Document 124-3   Filed 08/07/24   Page 2 of 15

### In the Matter Of:

SATANIC TEMPLE vs NEWSWEEK DIGITAL

1:22-cv-01343-MKV

## LUCIEN GREAVES

*November 06, 2023*



800.211.DEPO (3376)
EsquireSolutions.com

Appendix 1026

1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   ------------------------------------x

4   THE SATANIC TEMPLE, INC.,

5                        Plaintiff,

6           -against-                    Case No.
                                         1:22-cv-01343-MKV
7   NEWSWEEK DIGITAL, LLC,

8                        Defendant.

9   ------------------------------------x

10                       November 6, 2023
                         9:32 a.m.
11

12

13       Deposition of LUCIEN GREAVES, taken by

14  Defendant, held at 30 Rockefeller Plaza, New

15  York, New York, before Joseph R. Danyo, a

16  Shorthand Reporter and Notary Public within

17  and for the State of New York.

18

19

20

21

22

23

24

25



```
 1

 2   A P P E A R A N C E S :

 3

 4        KEZHAYA LAW PLC
          Attorneys for Plaintiff and the Witness
 5           150 S. Fifth Street
             Suite 1850
 6           Minneapolis, Minnesota 55401

 7        By:  MATT KEZHAYA, ESQ.
               SONIA KEZHAYA, ESQ.
 8

 9

10        LAW OFFICES OF CAMERON STRACHER PLLC
          Attorneys for Defendant
11           51 Astor Place
             9th Floor
12           New York, New York 10003

13        By:  CAMERON STRACHER, ESQ.
               SARA TESORIERO, ESQ. (Via Zoom)
14

15

16   Also Present:

17        LAURA HENRIQUE, ESQ., Newsweek (Via Zoom)

18                      ~oOo~

19

20

21

22

23

24

25
```



```
 1                      Greaves
 2   contacted about her following the release of the
 3   documentary Hail Satan.
 4         Q.   Why is that?
 5         A.   Because the narrative arc of her
 6   removal from The Satanic Temple was a part of
 7   that.  It was a part of that documentary.
 8         Q.   So she made statements in the
 9   documentary about her removal and --
10         A.   Well, she made public statements
11   about her removal before the documentary came
12   out.  She wrote a Medium article, Medium is a
13   website that people can dump their content on, so
14   she wrote a Medium article listing these untrue
15   claims regarding her departure.
16         Q.   Do you know if you spoke to a
17   journalist for the Washington Post about Jex?
18         A.   I couldn't say specifically that it
19   was that I talked to somebody from the Washington
20   Post about her.
21         Q.   Do you recall how many journalists
22   you spoke to about Jex?
23         A.   No.  It wasn't a primary question
24   people had following Hail Satan, but following
25   Hail Satan there were at times a lot of
```

LUCIEN GREAVES                                    November 06, 2023
SATANIC TEMPLE vs NEWSWEEK DIGITAL                              50

```
 1                      Greaves
 2          Q.   Are you aware that Jex Blackmore said
 3   this in her Medium piece, and I quote, "While I
 4   was part of the organization, I witnessed male
 5   members of the organization exploit their
 6   position and influence inappropriately and
 7   disrespectfully towards women.  I myself
 8   experienced harassment and abuse from members who
 9   have now left the organization."
10          Do you remember that statement from
11   her Medium piece?
12          A.   Well, yeah.  I know she said that in
13   her Medium piece, but I don't know what reality
14   that's supposed to relate to.  I don't know what
15   instances she's claiming these happened, and
16   further, like I said, at the point where we
17   actually had an organizational structure, she
18   essentially wasn't working with us anymore.
19          So the likelihood of those comments
20   being true I think are pretty low.  Even though
21   you want to take those types of seriously, her
22   history of deceptive answers as to her
23   relationship with TST are enough to make me very
24   skeptical.
25          Q.   Are you aware of any claims of
```



LUCIEN GREAVES                                November 06, 2023
SATANIC TEMPLE vs NEWSWEEK DIGITAL                          51

```
 1                      Greaves
 2    harassment or abuse made by Jex?
 3          A.    No, none.
 4          Q.    She says that, when she complained
 5    about it, she was asked to "let it all blow
 6    over."  Are you aware of anyone that she spoke to
 7    about these claims?
 8          A.    No.  I think she's, honestly I think
 9    she's lying about those things.  I don't think
10    there's any truth to it.
11          Q.    What is the basis for saying that
12    she's lying?
13          A.    Because I feel like, if she was going
14    to talk to anybody, she would have talked to me.
15    I mean, you know, not to keep hammering on it,
16    but she really wasn't working with us, and, when
17    she would come around, she would talk to me.  She
18    would speak directly with me, and when she had
19    first started, we had so few people that she was
20    only just kind of working with me anyway.
21               So for her to suddenly come back
22    after a couple of years and say, oh, I made these
23    complaints, but nobody listened, and for me to
24    not actually know those complaints, I feel like
25    I have no idea who else she would have talked to,
```

LUCIEN GREAVES                                      November 06, 2023
SATANIC TEMPLE vs NEWSWEEK DIGITAL                              66

```
 1                     Greaves

 2   or after April of 2019?

 3        A.   You know, I don't.  I'm pretty sure

 4   it was before April of 2019.  I think it was, I

 5   think when it first was released in Sundance,

 6   there was snow in Utah where we were, and I think

 7   it was February.

 8        Q.   Okay.  In the documentary Jex

 9   Blackmore is portrayed as threatening to kill the

10   United States President at the time.  Was that an

11   accurate portrayal of something that happened?

12        A.   Yeah, and I don't think it was

13   presented in any deceptive context.  I think her

14   words were very apparent in the footage that was

15   shown, and you know, I don't see any way she can

16   absolve herself of responsibility for those

17   words.

18        Q.   After that scene, there was a scene

19   in which she received a phone call from you.  Do

20   you remember that scene?

21        A.   I do.

22        Q.   What was the nature of that call?

23        A.   To be honest, I can't be sure that

24   that was actually footage of when I called her to

25   tell her that she was kicked out of The Satanic
```



```
 1                    Greaves

 2  Temple.  Her being on the phone may have been

 3  staged for B roll, but in fact I did have a phone

 4  call with her after she was removed from her

 5  position from The Satanic Temple by unanimous

 6  vote from our national council at the time.

 7        Q.   I'm going to mark the Medium article

 8  that we've been addressing as Plaintiff's Exhibit

 9  2.

10              (Plaintiff's Exhibit 2, Medium

11         article titled The Struggle for Justice Is

12         Ongoing, was so marked for identification,

13         as of this date.)

14        Q.   Do you remember the time frame in

15  which Jex Blackmore was involved with TST?

16        A.   Well, like I said, she started out

17  with us very early on like 2014, and after like

18  2015 she pretty much wasn't doing anything with

19  us, and she only kind of tried to revive her role

20  I think in response to the fact that a

21  documentary was being made, and she wanted to do

22  what she could to maximize her own exposure

23  utilizing the documentary, and towards that end

24  she put together the event in which she claimed

25  that some "we" were going to assassinate the
```



LUCIEN GREAVES                                    November 06, 2023
SATANIC TEMPLE vs NEWSWEEK DIGITAL                              68

```
 1                    Greaves
 2    President.
 3              She put together this event without
 4    our knowing it, and this was after having
 5    performed other events without telling us about
 6    them, events that could directly impact our
 7    reputation and public image, she put together
 8    events like that previously, and then after the
 9    call for presidential assassination that is when
10    it was unanimously mandated that she needed to be
11    removed.
12         Q.   Do you remember when the filming of
13    Hail Satan began?
14         A.   I believe filming for Hail Satan must
15    have began around 2016.
16         Q.   Was Jex Blackmore aware prior to
17    filming of the notion of a documentary being
18    filmed?
19         A.   I'm not sure when she became aware of
20    a documentary being filmed, but I'm convinced
21    that the documentary being filmed is what made
22    her come back to identifying with us at all when
23    holding events.
24         Q.   Okay.  Drawing your attention now to
25    Plaintiff's Exhibit 2, I note the first sentence
```



(165 of 279), Page 165 of 279
Case: 25-868, 07/28/2025, DktEntry: 50.1, Page 165 of 279
Case 1:22-cv-01343-MKV-SLC    Document 124-5    Filed 06/07/24    Page 11 of 15

| | |
|---|---|
| 1 | Greaves |
| 2 | that they would be, but the rationale should be |
| 3 | there as well. |
| 4 | Q.   Was there any investigation into |
| 5 | claims that Jex had been sexually harassed? |
| 6 | A.   Not that I'm aware of, but I'm also |
| 7 | not aware that she ever actually made a complaint |
| 8 | or gave us anything to actually investigate. |
| 9 | Q.   After the Medium article came out, |
| 10 | were there any investigations into her claims |
| 11 | that she had been sexually harassed? |
| 12 | A.   Well, I take issue with the idea that |
| 13 | she made an actual claim within the Medium |
| 14 | article.  She made a statement claiming that |
| 15 | there were these circumstances giving very little |
| 16 | to work off and also under circumstances where we |
| 17 | knew that she had been lying about essentially |
| 18 | everything else in the Medium article, that I |
| 19 | don't think we viewed these claims of hers as |
| 20 | actionable on our end. |
| 21 | Q.   So the answer is no, there was no |
| 22 | investigation after the Medium article came |
| 23 | out? |
| 24 | A.   Not that I'm aware of, but nor do I |
| 25 | know what form that could take with such little |



LUCIEN GREAVES                                          November 06, 2023
SATANIC TEMPLE vs NEWSWEEK DIGITAL                                     75

```
 1                        Greaves

 2    information.

 3            MR. STRACHER:  Okay.  No further

 4       questions.

 5            MR. KEZHAYA:  No further questions of

 6       mine.

 7            (Time noted:  11:30 a.m.)

 8                           _____

 9

10    Subscribed and sworn to

11    before me this____day of_____, 2023.

12    _____

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1
 2                    C E R T I F I C A T I O N
 3
 4          I, JOSEPH R. DANYO, a Shorthand Reporter
 5  and Notary Public, within and for the State of New
 6  York, do hereby certify:
 7          That I reported the proceedings in the
 8  within entitled matter, and that the within transcript
 9  is a true record of such proceedings.
10          I further certify that I am not related, by
11  blood or marriage, to any of the parties in this
12  matter and that I am in no way interested in the
13  outcome of this matter.
14          IN WITNESS WHEREOF, I have hereunto set my
15  hand this 12th day of November, 2023.
16
17  _____
18                JOSEPH R. DANYO
19                STATE OF NEW YORK
20                My Commission Expires 2/20/2027
21
22
23
24
25
```



LUCIEN GREAVES                                                November 06, 2023
SATANIC TEMPLE vs NEWSWEEK DIGITAL                                          77

```
 1

 2                          I N D E X

 3   Witness                                              Page

 4   LUCIEN GREAVES                                          3

 5

 6                        E X H I B I T S

 7   Defendant's/Plaintiff's                             Page

 8       Exhibit 25   Document Bates stamped TST 37,       30
                      TST 38, TST 39, TST 40 and
 9                    TST 44

10       Exhibit 26   Document Bates stamped TST 41,       30
                      TST 42, TST 43 and TST 45
11

12       Exhibit 27   Invoice dated 6/15/22 from          56
                      Levick Strategic
13                    Communications, LP

14       Exhibit 28   Document Bates stamped TST 36        56

15       Exhibit 2    Medium article titled The           67
                      Struggle for Justice Is Ongoing

16                          ~oOo~

17

18

19

20

21

22

23

24

25
```



LUCIEN GREAVES                                         November 06, 2023
SATANIC TEMPLE vs NEWSWEEK DIGITAL                               78

 1

 2                      DEPOSITION ERRATA SHEET

 3   Our Assignment No. 10478372
     Case Caption: The Satanic Temple v Newsweek Digital
 4

 5              DECLARATION UNDER PENALTY OF PERJURY

 6          I declare under penalty of perjury that I have

 7   read the entire transcript of my deposition taken in

 8   the above-captioned matter or the same has been read

 9   to me, and the same is true and accurate, save and

10   except for changes and/or corrections, if any, as

11   indicated by me on the DEPOSITION ERRATA SHEET

12   hereof, with the understanding that I offer these

13   changes as if still under oath.

14          Signed on the _____day of_____

15   2023.

16                 _____

17                      LUCIEN GREAVES

18

19   Subscribed and sworn to on the_____day of

20   _____, 2023 before me.

21

22   _____

23   Notary Public in and for the State of New York.

24

25





**Matt Kezhaya**
150 S. Fifth St., Suite 1850
Minneapolis, MN 55402

matt@kezhaya.law
Direct: (479) 431-6112
General: (612) 276-2216

**BY ECF**

June 12, 2024

The Honorable Mary Kay Vyskocil
United States District Court
Southern District of New York
500 Pearl Street, Room 2230
New York, NY 10007

Re:   *Satanic Temple v. Newsweek* (22-CV-1343) – request to seal and to refile with redactions

Dear Judge Vyskocil:

Pursuant to Individual Civil Rule 9(B), The Satanic Temple requests leave to seal a selection of Julia Duin's deposition under seal (ECF No. 124-1); and for leave to refile the redacted version of the same. A proposed redacted version is attached as **Exhibit 47**. Newsweek stipulates that this request should be granted.

The material to be sealed and then redacted pertains to Duin's compensation amounts. The compensation amount was provided under the protective order (ECF No. 38) and was previously filed in redacted format in the context of a discovery dispute. See ECF Nos. 79 (Newsweek's letter motion), 81 (order granting same). As grounds to file a redacted version of the transcript, Newsweek cited *Dodona I, LLC v. Goldman, Sachs & Co.*, 119 F. Supp. 3d 152 (S.D.N.Y. 2015). In *Dodona*, it was salient that the information was "not relevant to the parties' legal dispute and implicate legitimate privacy interests." 119 F. Supp. at 157. The same is true here.

**WHEREFORE** Plaintiff respectfully requests a directive that the Clerk should seal ECF No. 124-1 (Plaintiff's Exhibit 47) and leave to refile the attached instead.

– 1 –

**Appendix 1040**

Respectfully submitted,

By: */s/ Matt Kezhaya*

Matt Kezhaya (*pro hac vice*)
KEZHAYA LAW PLC
150 S. Fifth St., Suite 1850
Minneapolis, MN 55402
phone:  (479) 431-6112
email:  matt@kezhaya.law

## CERTIFICATE OF SERVICE

NOTICE IS GIVEN that I, Matt Kezhaya, efiled the foregoing document by uploading it to the Court's CM/ECF system on June 12, 2024, which sends service to registered users, including all other counsel of record in this cause.
*s/ Matt Kezhaya*

– 2 –

**Appendix 1041**

# Exhibit 47

Redacted excerpts of deposition of Julia Duin
(November 16, 2023)

**In the Matter Of:**

THE SATANIC TEMPLE

vs

NEWSWEEK DIGITAL

---

## JULIA DUIN

### November 16, 2023

---



**Moburg Reporting**

33400 9th Ave. South, Suite 207

Federal Way, WA 98003

(206) 622-3110

www.MoburgReporting.com

**Appendix 1043**

(174 of 279), Page 174 of 279
Case: 25-868, 07/28/2025, DktEntry: 50.1, Page 174 of 279
Case 1:22-cv-01343-MKV-SLC    Document 127    Filed 08/21/24    Page 3 of 32

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                                    Julia Duin

```
 1              UNITED STATES DISTRICT COURT

 2           SOUTHERN DISTRICT OF NEW YORK

 3    -------------------------------------------------------
                                    )
 4    THE SATANIC TEMPLE, INC.,     )
                                    )
 5              Plaintiff,          )
                                    )
 6         vs.                      )NO. 1:22-CV-01343-MKV
                                    )
 7    NEWSWEEK DIGITAL, LLC,        )        COPY
                                    )
 8              Defendant.          )
                                    )
 9    -------------------------------------------------------

10        Videotaped Deposition Upon Oral Examination

11                          of

12                      JULIA DUIN

13    -------------------------------------------------------

14              Thursday, November 16, 2023

15                     9:37 a.m.

16            7900 Southeast 28th Street

17            Mercer Island, Washington

18

19

20

21

22

23

24    Cheryl Macdonald, CRR, RMR
      Court Reporter
25    License No. 2498
```

Moburg Reporting
206-622-3110

MOBURG REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003
Appendix 1044

Page 2

```
 1               A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF:

 4                   MATT KEZHAYA
                     SONIA KEZHAYA
 5                   Attorneys at Law
                     KEZHAYA LAW PLC
 6                   150 South Fifth Street
                     Suite 1850
 7                   Minneapolis, Minnesota 55402
                     matt@kezhaya.law
 8                   sonia@kezhaya.law

 9

10    FOR THE DEFENDANT and THE WITNESS:

11                   SARA TESORIERO
                     CAMERON STRACHER (via Zoom)
12                   Attorneys at Law
                     STRACHER LAW
13                   51 Astor Place
                     9th Floor
14                   New York, New York 10003
                     sara@stracherlaw.com
15                   cam@stracherlaw.com

16

17    THE COURT REPORTER and VIDEOGRAPHER:

18                   CHERYL MACDONALD
                     KALIA HENDRICKS
19                   MOBURG REPORTING
                     33400 9th Avenue South
20                   Suite 207
                     Federal Way, Washington 98003
21                   info@moburgreporting.com

22

23    ALSO PRESENT:  LUCIAN GREAVES (via Zoom)

24

25
```

Page 3

```
 1                  I N D E X

 2

 3   EXAMINATION                                    PAGE

 4   BY MR. KEZHAYA:  .........................     5

 5

 6   EXHIBITS MARKED                                PAGE

 7   No. 1           Bates-stamped Newsweek 025...  34

 8   No. 2           Bates-stamped Newsweek 015,
                     16 and 17...................   59
 9
     No. 3           Boston Globe "puff piece"...   74
10
     No. 4           GetReligion podcast 2018....   75
11
     No. 5           GetReligion podcast 2022....   75
12
     No. 6           GetReligion podcast
13                   referring to Boston Globe...   79

14   No. 7           Editorial guidelines........   80

15   No. 8           Newsweek article re orgies,
                     harassment, et cetera.......   100
16
     No. 9           E-mail string Bates-stamped
17                   Duin04-001 - 003............   112

18   No. 10          E-mail string Bates-stamped
                     Duin48-001 - 005............   117
19
     No. 11          E-mail string Bates-stamped
20                   Newsweek 032................   136

21   No. 12          E-mail string Bates-stamped
                     Newsweek 065 - 66...........   136
22
     No. 13          E-mail string Bates-stamped
23                   Cooper 51 - 53..............   177

24   Conference before Magistrate Judge Sarah L. Cave:

25   Pages 60 - 66
```

Page 29

```
 1    interview process and your start date?

 2            MS. TESORIERO:  Objection to form.

 3       A.   Not really.  I mean, we agreed on a start

 4    date, I mean, as of September 1st.

 5       Q.   Was your role full-time or part-time?

 6       A.   I was full-time.

 7       Q.   Were you paid -- how were you paid?  To

 8    expand on the question, were you paid salary?  Were

 9    you paid piece rate?

10       A.   Salary.  I'm salary.

11       Q.   What was the cadence with which you were

12    paid?

13       A.   Cadence?

14       Q.   Were you paid monthly?

15       A.   Monthly, monthly.

16       Q.   How much were you paid per month?

17       A.   I don't have to say that.

18       Q.   Yes, you do.

19            MS. TESORIERO:  Actually, I'm going to

20    object.

21       A.   No.  I don't have to say that.

22            MS. TESORIERO:  Hang on one second.  That

23    is not relevant to the case.

24            MR. KEZHAYA:  I disagree.

25            THE WITNESS:  No.
```

Page 35

```
 1        A.    [As read] "A major rift in an organization
 2   called The Satanic Temple:  Defamation lawsuits,
 3   anti-Semitic stuff, mismanagement of funds, NDAs being
 4   used to hide wrongdoing, sexual harassment, shell
 5   corporations, harassment of internal critics.  Sounds
 6   like quite a brew.  Am diving into it to see if I can
 7   glean anything new of how much of the story this is.
 8   More to come."
 9        Q.    Was this the first pitch for the subject
10   article that you wrote?
11        A.    I believe so.
12        Q.    When did you begin working on this article?
13        A.    Well, it would have been at the beginning
14   of October.
15        Q.    I see that the date would be September
16   30th, so you clearly formulated the idea of the
17   article at some point before September 30th; correct?
18        A.    Let's see.  Well, remember, I have to pitch
19   it first to make sure they approve it before I start
20   major work on a piece.
21        Q.    I understand that that might be before you
22   start major work.  My question posed is when did you
23   start working on it, including minor work.
24        A.    I don't remember.
25        Q.    Was it before September 1st, 2020?
```

November 16, 2023

Page 36

```
 1      A.    Before September 1st?

 2      Q.    Correct.

 3      A.    No.

 4      Q.    Sorry.  September 1st, 2021.

 5      A.    Before September 1st?

 6      Q.    Correct.

 7      A.    No.

 8      Q.    So during the month of September 2021, you

 9   began work on this article; correct?

10      A.    No.  I wasn't working during the month of

11   September.  I was overseas most of that month, or part

12   of that month.  So, no.

13      Q.    Your earlier testimony is that you began

14   working full-time at Newsweek in September of 2021; is

15   that correct?

16      A.    Yeah.  And I was also -- well, never mind.

17      Q.    You were overseas, correct?

18      A.    Doing articles for Newsweek, yes.

19      Q.    And this pitch is part of your work on this

20   article; correct?

21            MS. TESORIERO:  Objection to form.

22      A.    Not sure where you're going.

23      Q.    You don't have to know where I'm going.  My

24   question posed is whether this pitch was part of your

25   work for Newsweek creating the subject article.
```

November 16, 2023

THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                    Julia Duin

Page 37

```
 1    Correct or incorrect?

 2               MS. TESORIERO:  Objection to form.

 3       A.    This pitch was the -- this would have been,

 4    really, the beginning of my work on this article.

 5       Q.    This pitch was the very beginning of your

 6    work on this article; correct?

 7               MS. TESORIERO:  Objection.

 8       A.    I would say yes.

 9       Q.    That's your testimony?

10               MS. TESORIERO:  Objection.

11       A.    Just a moment.  It depends on what you call

12    "work."

13       Q.    What was entailed in drafting this pitch?

14       A.    I had gotten -- I had gotten an idea for

15    this article and I drafted the pitch.

16       Q.    Where did the idea come from?

17       A.    I had -- someone suggested it to me.

18       Q.    Who suggested it to you?

19       A.    I had a -- another journalist.

20       Q.    Another journalist suggested it to you?

21       A.    Mm-hmm.

22       Q.    Who was this journalist?

23       A.    His name is Kevin.

24       Q.    What is Kevin's last name?

25       A.    Trying to remember.  My mind is blank right
```

```
 1    now.  I can't remember.
 2        Q.    How did you know Kevin?
 3        A.    Actually, I really didn't know him.
 4    Somehow he had heard of me.  I really didn't -- I
 5    really hardly knew the man.  I mean, I really didn't
 6    know him, actually.
 7        Q.    How did Kevin convey this idea for this
 8    article?
 9        A.    E-mail.
10        Q.    Did he write this pitch for you?
11        A.    Did he write the pitch?
12        Q.    Correct.
13        A.    I wrote the pitch.  He had some -- some of
14    this is -- some of this is pitch is taken from what he
15    wrote me.
16        Q.    When did he write you that?  Before or
17    after September 1st, 2021?
18        A.    When did he send me that e-mail?  Let's
19    see.  I'm trying to remember.  I know I had gotten an
20    e-mail, and I'm just trying to remember when.  Trying
21    to remember when he sent it to me.  And I -- I don't
22    remember.  I don't remember.  I really don't remember
23    when he sent it to me.
24        Q.    Did you provide your counsel approximately
25    26 pages of e-mails in the course of preparing for
```

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                                      Julia Duin

Page 68

```
 1        Q.    Did you negotiate an annual salary?

 2        A.    Yes.

 3        Q.    Okay.  And was that annual salary divided

 4   by 12 to constitute a monthly payment?

 5              MS. TESORIERO:  Objection.  The judge just

 6   said you can ask her what she was paid in October of

 7   2021.  She has answered that question.

 8              MR. KEZHAYA:  She has not.  She has said

 9   it's something more than ▮▮▮▮▮ and her preference

10   would be to round it at ▮▮▮▮▮   However, we don't

11   really know if that's the answer.  So I'm trying to

12   get to the answer with specificity.

13        A.    You lost me.

14              MS. TESORIERO:  Would you repeat the

15   question?

16        Q.    That was a colloquy between counsel.  Did

17   you negotiate an annual salary?

18        A.    Yes.  I negotiated an annual salary.

19        Q.    Was that annual salary to be paid monthly?

20        A.    Yes.

21        Q.    What was the annual salary?

22              THE WITNESS:  Do I have to answer that

23   question?

24              MS. TESORIERO:  She's given you an estimate

25   for the month.  That was the judge's order.  If you
```

```
 1    wanted the annual salary, why didn't you bring it up

 2    when we just had the judge on the phone?

 3              MR. KEZHAYA:  Because I expected she would

 4    give me a specific answer, not a rounded answer.  I

 5    want to know the specific answer.

 6         A.    I mean, what is it?  $_____.  I mean, you

 7    know, multiply by 12.

 8              MR. KEZHAYA:  Hold on.  There is a lawyer

 9    colloquy going on here.  The question posed is, "How

10    much were you paid per month?"  That was authorized.

11    She could not give me a specific answer.  I want a

12    specific answer.  I don't want an estimated answer.  I

13    want the answer.  Hold on.  And since Newsweek has not

14    provided the document that could have answered this

15    question, I have to get it from her.

16              MS. TESORIERO:  Well, you brought it up

17    again in a deposition.  We had an ongoing dispute

18    about this that we could've brought up without the

19    judge for documents.  Now that the judge has ruled

20    this way, we will provide you the document with the

21    exact number.

22              MR. KEZHAYA:  That will do.

23         Q.    Was this monthly payment the same every

24    month?

25         A.    I'm trying to remember.  There might have
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003
Appendix 1053

Page 70

```
 1   been a penny or two difference.

 2        Q.    Okay.  But --

 3        A.    Yeah, pretty much.

 4        Q.    In terms of whether it was front loaded or

 5   back loaded or anything, October 2021 would have been

 6   the same as September of 2021?

 7        A.    Yeah.

 8        Q.    What about bonuses?  Were you paid a bonus

 9   for this article?

10        A.    No, no.

11        Q.    Did Newsweek have a bonus structure at the

12   time that you wrote this article?

13              MS. TESORIERO:  Objection to form.

14   Objection to form.

15        A.    I mean, I don't -- I don't know what they

16   did with other reporters.

17        Q.    So in the course of your negotiations with

18   Newsweek, was bonuses a contemplated aspect of payment

19   that you might receive?

20        A.    There was no discussion of bonuses.

21              MR. KEZHAYA:  Okay.  And as addressed while

22   the video was off, we're going to find out the timing

23   that Kevin sent you the article idea at our next

24   break.

25              MS. TESORIERO:  Yes.  And we'll revisit
```

Page 78

1        Q.    And you said that they laid you off because

2    of finances?

3        A.    Yes.

4        Q.    Could you please expand?

5        A.    That's all I was told.

6        Q.    Who told you that?

7        A.    It was Dayan.

8        Q.    And when did that conversation take place?

9        A.    November of 2022.

10        Q.    Was it effective immediately or effective

11    at some future date?

12        A.    Future date.

13        Q.    What was the future date?

14        A.    February 2023.

15        Q.    So you were paid through February of 2023?

16        A.    Trying to remember.  Yes.

17        Q.    Your last article is dated January 1, 2023.

18        A.    Mm-hmm.

19        Q.    So you were paid for both January and

20    February of 2023 even though you didn't write any more

21    articles for Newsweek?

22             MS. TESORIERO:  Objection to form.

23        A.    Yes, sir.

24        Q.    Did you perform any services for Newsweek

25    in January or February of 2023?

Page 99

 1    photos.

 2         A.    All right.  No.  That was -- no, I did not.

 3         Q.    **Did Jinx Strange ever give you any names of**

 4    **individuals who have allegedly been sexually abused by**

 5    **anyone in the course of TST services and then covered**

 6    **up?**

 7               MS. TESORIERO:  Objection to form.

 8         A.    He said he was willing to, but I didn't ask

 9    him.

10         Q.    **You did not ask him.  Why didn't you ask**

11    **him?**

12         A.    Because the article was mainly on the

13    lawsuit, and it was not on the -- it was not an

14    investigation into the sexual abuse or the finances or

15    the alt-right figures.  It wasn't on these various

16    permutations.  The article was on the QueerSatanic

17    people.

18         Q.    **Well, I mean, the article was about the**

19    **sexual abuse and cover-up plan, was it not?**

20               MS. TESORIERO:  Objection to form.

21         A.    No.  The article was on the lawsuit.

22         Q.    **Then why did you include the statement?**

23         A.    I included a lot of statements.

24         Q.    **Why didn't you include the subject**

25    **statement for which we are here today?**

Page 123

```
 1              In terms of there were -- I knew there were

 2   complaints about finances.  Even Doug Laycock -- we're

 3   talking about the sentence afterwards.  Doug Laycock

 4   went into that for his book.  So, you know, Jinx had

 5   given kind of a general -- it was a general read of

 6   The Satanic Temple.  And it was his -- it was how he

 7   saw the state of the religion.  And from my other

 8   interviews with people, I found it plausible he was

 9   correct.

10      Q.    Did you ask Lucien Greaves about coerced

11   sexual activity and cover-up within The Satanic

12   Temple?

13      A.    I asked him -- I certainly asked him in

14   connection with the orgies, yes.

15      Q.    Not in connection with the orgies.  Did you

16   ask him specifically about Jinx Strange's comment?

17      A.    No.  I did not ask him about Jinx Strange's

18   comment.

19      Q.    Why not?

20      A.    Why not?  I didn't -- I felt I had asked

21   Lucien plenty of questions.  And right below that, I

22   had a quote from Lucien that basically denied all

23   these accusations.

24      Q.    Did you confront Lucien Greaves with the

25   allegation that there are accounts of sexual abuse and
```

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                              Julia Duin

Page 124

```
 1    cover-up within The Satanic Temple?

 2            MS. TESORIERO:  Objection.  Asked and

 3    answered.

 4       A.    Did I confront him?  Did I confront him?

 5    Trying to remember.  I don't believe I did.

 6       Q.    So Lucien Greaves's comment in his e-mails

 7    could not possibly have related to something that you

 8    did not confront him with.  You would agree with me

 9    there; correct?

10            MS. TESORIERO:  Objection to form.

11       A.    I disagree.

12       Q.    You disagree?

13       A.    I disagree.

14       Q.    Please explain your basis for disagreeing.

15       A.    His quote here -- his quote underneath, it

16    covered the -- all of Jinx's accusations.  He says,

17    "We are accused of all sorts of nefarious things."  I

18    covered it.  I covered what Jinx was saying.

19       Q.    Did you ever even mention the word Jinx

20    Strange -- the name "Jinx Strange" to Lucien Greaves?

21       A.    I believe I talked to -- I may have talked

22    to Jinx maybe after I talked to Lucien.

23       Q.    So you didn't even talk to Jinx Strange and

24    then talk to Lucien, and yet you're telling me that

25    Lucien's comment pertains to Jinx Strange's
```

Page 126

 1    Strange or the allegations to Lucien Greaves, I find

 2    it very difficult to understand how Lucien Greaves's

 3    comment could have any pertinence to Jinx Strange's

 4    allegations.

 5         A.    I don't see how --

 6              THE REPORTER:  Please.  I need to hear the

 7    end of the question.

 8              MR. KEZHAYA:  Jinx Strange or Jinx

 9    Strange's allegation.

10              MS. TESORIERO:  Are you asking her a

11    question?

12              MR. KEZHAYA:  I'm asking her to explain

13    what she's -- where she's coming from with her

14    testimony.

15              MS. TESORIERO:  Objection.  Asked and

16    answered.

17         A.    The way -- the way I constructed the

18    article is that the -- okay.  Jinx gave -- Jinx had

19    several things to say about the organization, the

20    alt-right, the sexual abuse, the finances.  And I had

21    Lucien giving a general denial about -- a general

22    denial.  I did not feel he -- Lucien's general

23    statement had to address every single thing

24    specifically.

25         Q.    Why did you have him address anything in

Page 129

1    talked to person B right afterwards.  You can have --

2    you know, you can have them from separate

3    conversations at different times.  So if I have a

4    quote from Lucien that applies to various accusations

5    that people make to The Satanic Temple, I have the

6    right to put that in under a Jinx quote no matter when

7    Lucien said it.

8        Q.    Would you agree with me that the accusation

9    that TST engages in sexual abuse and cover-up is

10   serious?

11           MS. TESORIERO:  Objection to form.

12       A.    Well, sure.  That's what kind of got the

13   Seattle people in trouble; right?

14       Q.    Would you agree with me that writing an

15   article that states TST engages in sexual abuse and

16   cover-up is a criminal allegation?

17           MS. TESORIERO:  Objection to form.  That

18   misrepresents the article and calls for a legal

19   conclusion.

20       A.    Okay.  Can you please restate that.

21       Q.    Is sex abuse a crime?

22       A.    I believe so.

23       Q.    Is covering up sex abuse also a crime?

24           MS. TESORIERO:  Objection.  Form.  She's

25   not a lawyer.

Moburg Reporting
206-622-3110
MOBURG REPORTING
33400 9th Ave. South, Suite 207
Federal Way, WA 98003
Appendix 1060

Page 130

```
 1        A.    So what question do I have to answer?

 2        Q.    All of them, until you are instructed not

 3   to.

 4              MS. TESORIERO:  Repeat the question.

 5        A.    Yeah.  One second.

 6              MS. TESORIERO:  Let's get the pending

 7   question on the record.  Would you please repeat the

 8   question.

 9        Q.    Is covering up sexual abuse a crime?

10              MS. TESORIERO:  Objection.  Calls for a

11   legal conclusion.

12              You can answer.

13        A.    Is it a crime?  Is covering up sexual abuse

14   a crime?

15        Q.    Correct.

16        A.    I don't know.

17        Q.    But sex abuse is definitely a crime?

18        A.    Sex abuse is a crime.  Covering up, I don't

19   know.

20        Q.    So making the allegation that TST engages

21   in criminal activity is serious.  You agree with that;

22   correct?

23              MS. TESORIERO:  Objection to form.

24   Mischaracterizes prior testimony.

25        A.    Okay.  I do not -- where do I -- did I say
```

(192 of 279), Page 192 of 279
Case: 25-868, 07/28/2025, DktEntry: 50.1, Page 192 of 279
Case 1:22-cv-01343-MKV-SLC    Document 127    Filed 08/21/24    Page 21 of 32

Page 136

```
 1    question.

 2         Q.    Julia, I know things are getting heated,

 3    but you need to led me finish the question.

 4              MS. TESORIERO:  You need to let her finish

 5    her answers, too.

 6              MR. KEZHAYA:  Fair.

 7         A.    Did I ask anyone?  Anyone to be 7 billion

 8    people?  I mean --

 9         Q.    Well, did you ask anyone on the face of the

10    planet what sexual abuse and cover-up means in the

11    context of this here quote?

12              MS. TESORIERO:  Objection to form.

13         A.    Okay.  I'll say no to that one.  All right?

14         Q.    Thank you.

15              (Exhibit Nos. 11 and 12 were marked for

16              identification.)

17         A.    There's two here.

18         Q.    There's two, Exhibit 11 and Exhibit 12.

19         A.    Is one of them 10?

20         Q.    I believe 10 was previously introduced.

21              MS. TESORIERO:  I think 10 might have been

22    just sitting in front of you.

23              THE WITNESS:  All right.

24         Q.    Do you have Exhibit 11 in front of you?

25         A.    Yes, I do.
```

Page 150

```
 1        Q.    But you don't recall when you used it

 2    otherwise.   That's your testimony; right?

 3            MS. TESORIERO:   Objection to form.

 4        A.    God in heaven.   No.   I don't recall.   I

 5    mean, I rarely used it.   And I told you, it was like

 6    -- I mean, no.   I'm just going to say I don't recall.

 7    I'm sick and tired of this.   I mean, it is harassing

 8    me.

 9        Q.    This is not harassment.

10        A.    Yes, it is.

11        Q.    You-all can take it to the judge if you

12    think this is harassment, but when you I definitely

13    did not and also "I don't recall," I'm just telling

14    you right now this is (inaudible) --

15            MS. TESORIERO:   Please don't talk to my

16    witness.   Ask her a question and let's move on.

17            MR. KEZHAYA:   Fair.

18        Q.    Earlier you testified that you had how many

19    supervisors?

20        A.    Juliana was my direct supervisor at the

21    time.

22        Q.    How many supervisors did you testify you

23    had before?

24        A.    Well, there was a direct one, and then

25    there was one over her and then one over him.   So
```

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003
Appendix 1063

Page 151

```
 1    there was a direct one.  Add them all up, I guess.

 2    You could call -- you know, there was one direct one.

 3    There were three -- I guess you could say three were

 4    involved with me.

 5         Q.    And those three were Nancy Cooper, Dayan,

 6    and Juliana; correct?

 7         A.    Nancy, Dayan, and Juliana, right.

 8         Q.    Juliana was your direct supervisor;

 9    correct?

10         A.    Yes.

11         Q.    Did she have any involvement in the writing

12    of this article?

13         A.    She was listening -- no, not really.  No.

14    She was involved in the e-mails in the first week or

15    two, but then she did not do any of the editing.

16         Q.    Was she involved in the pitching of this

17    article?

18         A.    Well, yeah.  I mean, she received my pitch.

19         Q.    Did she green light this article?

20         A.    Let's see.  The article was discussed in a

21    meeting, and she would have been one of three people.

22    All three people would have green lighted it.  I'm

23    trying to remember.  I mean, it was a four-way

24    discussion.  I cannot remember what Juliana personally

25    said during those discussions.  She did not really say
```

Page 173

 1  asking me if I circled back after this hour-long --

 2  hour-and-a-half-long interview and asked them about

 3  something, this particular statement, who the "they"

 4  was?

 5       **Q.   I'm trying to ascertain if you performed**

 6  **any form of fact investigation on anything that these**

 7  **people had to say.**

 8            MS. TESORIERO:  Objection to form.

 9       A.   I performed -- look, yes, I did check out

10  stuff, but you're asking about one sentence.

11       **Q.   When you say you checked out stuff, did you**

12  **find any individuals who was actually sexually**

13  **harassed in TST?**

14            MS. TESORIERO:  Objection to form.

15       A.   Shall we say -- okay.  I found people who

16  said they knew people who were sexually harassed.  How

17  about that?

18       **Q.   No, not how about that.  Did you actually**

19  **talk to any individuals who were actually sexually**

20  **harassed by TST?**

21            MS. TESORIERO:  Objection to form.

22       **Q.   Yes or no.**

23       A.   Did I talk to -- no, I did not.

24       **Q.   Of the people who claim that they know**

25  **people who were sexually harassed by TST, did you ask**

Page 174

```
 1   even names or contact information who theoretically

 2   could be followed up with?

 3        A.    No.

 4        Q.    You have been a journalist for 45 years;

 5   correct?

 6        A.    Yes.

 7        Q.    You have been a professor of journalism for

 8   approximately two and a half years; correct?

 9        A.    Mm-hmm.

10        Q.    Do you consider yourself a serious

11   journalist?

12              MS. TESORIERO:  Objection to form.

13        A.    Yes, I do.

14        Q.    Did you consider this piece of work to be a

15   credible, serious, and fair statement about sexual

16   abuse and cover-up?

17        A.    My article was fair, yes.

18        Q.    I'm asking you about the statement.

19        A.    About your statement?

20        Q.    Your statement.  The one that you put in

21   the article.

22        A.    Yes, I did.  It was fair.  And, yes, if I

23   hadn't believed that there wasn't sexual abuse going

24   on, I would not have put that into the article.

25        Q.    And what was your basis to believe there
```

November 16, 2023

THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                                    Julia Duin

Page 178

```
 1   the future article ideas we discussed.  And there's

 2   one story I am working on re The Satanic Temple that

 3   is really taking off.  I am having a ton of

 4   disgruntled members contact me, and what started out

 5   as a TST lawsuit against four former Seattle-based

 6   members has turned into a much bigger story.  More

 7   below."

 8        Q.    These are disgruntled former members who

 9   were your sole sources for the claim that there was

10   actually sexual abuse and cover-up.  Correct?

11             MS. TESORIERO:  Objection to form.

12        A.    That's what I call them here.

13        Q.    That's what you called them; correct?

14        A.    There.

15        Q.    And they are, in fact, disgruntled former

16   members; correct?

17             MS. TESORIERO:  Objection to form.

18        A.    Yes.

19        Q.    Do you feel you have an ethical obligation

20   to convey both sides of a serious allegation?

21        A.    I did.

22        Q.    Did you?

23        A.    Yes.

24        Q.    Where did you ask Lucien Greaves about

25   sexual abuse and cover-up?
```

Moburg Reporting
206-622-3110

MOBURG REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003
Appendix 1067

Page 200

```
 1                C E R T I F I C A T E

 2

 3   STATE OF WASHINGTON       )

 4                             ) ss.

 5   COUNTY OF KING            )

 6

 7        I, the undersigned Washington Certified Court

 8   Reporter, pursuant to RCW 5.28.010, authorized to

 9   administer oaths and affirmations in and for the State

10   of Washington, do hereby certify:

11        That the annexed and foregoing deposition

12   consisting of Page 1 through 199 was taken

13   stenographically before me and reduced to a typed

14   format under my direction;

15        I further certify that according to CR 30(e) the

16   witness was given the opportunity to examine, read and

17   sign after the same was transcribed, unless indicated

18   in the record that the review was waived;

19        I further certify that all objections made at the

20   time of said examination to my qualifications or the

21   manner of taking the deposition, or to the conduct of

22   any party, have been noted by me upon said deposition;

23        I further certify that I am not a relative or

24   employee of any such attorney or counsel, and that I

25   am not financially interested in said action or the
```

Page 201

```
 1    outcome thereof;

 2        I further certify that the witness before

 3    examination was by me duly sworn to testify to the

 4    truth, the whole truth, and nothing but the truth;

 5        I further certify that the deposition, as

 6    transcribed, is a full, true and correct transcript of

 7    the testimony, including questions and answers, and

 8    all objections, motions, and exceptions of counsel

 9    made and taken at the time of foregoing examination

10    and was prepared pursuant to Washington Administrative

11    Code 308-14-135, the transcript preparation format

12    guideline;

13        I further certify that I am sealing the

14    deposition in an envelope with the title of the above

15    cause and the name of the witness visible, and I am

16    delivering the same to the appropriate authority;

17

18        IN WITNESS WHEREOF, I have hereunto set my hand,

19    and affixed my official seal this 22nd day of

20    November 2023.

21                           _____

22                           Cheryl Macdonald, CCR

23                           Washington State Certified

24                           Court Reporter

25                           License No. 2498
```

Page 202

```
 1                D E C L A R A T I O N

 2

 3

 4

 5         I declare under penalty of perjury that I

 6   have read my within deposition, and the same is true

 7   and accurate, save and except for changes and/or

 8   corrections, if any, as indicated by me on the

 9   correction sheet hereof.

10

11

12                              _____

13                              JULIA DUIN

14

15

16

17

18

19        Dated this_____day of_____,

20   2023.

21

22

23

24

25   CHERYL MACDONALD, Court Reporter
```

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                          Julia Duin

Page 203

```
 1
      MOBURG REPORTING
 2    COURT REPORTERS & LEGAL VIDEO
      33400 9th Avenue South
 3    Suite 207
      Federal Way, WA 98003
 4    206-622-3110

 5    _____
      PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS SHEET,
 6    SHOWING PAGE, LINE, AND REASON, IF ANY.  SIGN THIS
      SHEET, SIGN THE ACCOMPANYING SIGNATURE SHEET AND
 7    RETURN AS PER INSTRUCTIONS IN COVER LETTER.

 8    _____
      PAGE          LINE              CORRECTION AND REASON
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                              _____
                                (SIGNATURE)
24

25
      REPORTER: CHERYL MACDONALD
```



**Appendix 1071**

Page 204

```
 1                        MOBURG REPORTING
 2               Court Reporters & Legal Video
               33400 9th Avenue South, Suite 207
 3                   Federal Way, WA 98003
                  (206) 622-3110  FAX (206) 343-2272
 4                E-mail: info@moburgreporting.com

 5

 6   TO:   Sara Tesoriero               November 22, 2023
           51 Astor Place
 7         New York, New York 10003

 8
     IN RE:  The Satanic Temple v. Newsweek
 9
     DEPOSITION(S) OF: Julia Duin
10
     DATE OF DEPOSITION: November 16, 2023
11

12   A copy of the deposition transcript of the above-named
     is provided via E-transcript.  Please have the
13   deponent read the deposition, sign the correction
     sheet and declaration.  The signed correction sheet
14   and declaration should then, within 30 (thirty) days,
     be forwarded to:
15
                         CHERYL MACDONALD
16
                         33400 9th Ave. So.  #207
17
                         Federal Way, Washington 98003
18
     who will then enclose them in the original transcript,
19   seal it, and forward it to Mr. Kezhaya for retention
     until the time of trial.
20
          If you have any questions, feel free to contact
21   me at the number listed above.

22
     Sincerely,
23

24   CHERYL MACDONALD, CCR

25   CC: M. Kezhaya
```

November 16, 2023
THE SATANIC TEMPLE vs NEWSWEEK DIGITAL                                    Julia Duin

Page 205

```
 1           Certification of Court Rule and WAC Compliance
 2                  The Satanic Temple v. Newsweek
 3
 4       I, VALERIE SEATON, am an authorized representative of
     MOBURG REPORTING and do hereby, under penalty of perjury,
 5   certify that Moburg Reporting and all court reporters
     providing services in the above-captioned case on MOBURG
 6   REPORTING'S behalf will fully comply with all applicable
     rules and regulations governing the provision of court
 7   reporting services, including, where applicable,
     Washington Superior Court Rule 28(c)-(e) and WAC
 8   308-14-130(1).*
                                             11/22/23
 9   _____     _____
     Valerie L. Seaton                        Date
10   President
     Moburg Reporting
11
12       *28(c)  Disqualification for Interest.  No deposition
     shall be taken before a person who is a relative or
13   employee or attorney or counsel of any of the parties, or
     is a relative or employee of such attorney or counsel, or
14   is financially interested in the action.
     28(d)  Equal Terms Required.  Any arrangement concerning
15   court reporting services or fees in a case shall be
     offered to all parties on equal terms.  This rule applies
16   to any arrangement or agreement between the person before
     whom a deposition is taken or a court reporting firm,
17   consortium, or other organization providing a court
     reporter, and any party or any person arranging or paying
18   for court reporting services in the case, including any
     attorney, law firm, person or entity with a financial
19   interest in the outcome of the litigation, or person or
     entity paying for court reporting services in the case.
20   28(e)  Final Certification of the Transcript.  The court
     reporter reporting a deposition shall not certify the
21   deposition transcript until after he or she has reviewed
     the final version of the formatted transcript.  A court
22   reporting firm, consortium, or other organization
     transmitting a court reporter's certified transcript
23   shall not alter the format, layout, or content of the
     transcript after it has been certified.
24       *308-14-130(1)  Offer arrangements on a case
     concerning court reporting services or fees to all parties
25   on equal terms.
```

Moburg Reporting                                    33400 9th Ave. South, Suite 207
206-622-3110                                        Federal Way, WA 98003

**Appendix 1073**

P24CsatO

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | SOUTHERN DISTRICT OF NEW YORK |
| 2 | ------------------------------x |
| 3 | THE SATANIC TEMPLE, INC., |
| 4 | Plaintiff, |
| 5 | v.                                          22 Civ. 1343 (MKV) |
| 6 | NEWSWEEK MAGAZINE LLC and |
| | JULIA DUIN, |
| 7 | |
| | Defendants. |
| 8 | |
| | ------------------------------x |
| 9 | New York, N.Y. |
| | February 4, 2025 |
| 10 | 11:00 a.m. |
| 11 | Before: |
| 12 | HON. MARY KAY VYSKOCIL, |
| 13 | District Judge |
| 14 | APPEARANCES |
| 15 | KEZHAYA LAW PLC |
| | Attorneys for Plaintiff |
| 16 | BY:  MATT KEZHAYA |
| | -and- |
| 17 | REISS SHEPPE LLP |
| | BY:  MATTHEW H. SHEPPE |
| 18 | |
| 19 | CAMERON STRACHER PLLC |
| | Attorneys for Defendants |
| 20 | BY:  SARA TESORIERO |
| | CAMERON STRACHER |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

P24CsatO

1              (Case called)

2              THE COURT:  Please be seated, everyone.

3              MR. KEZHAYA:  Good morning, your Honor.  Matt Kezhaya,

4     joined by Sonia Kezhaya, and our cocounsel, Matt Sheppe.

5              THE COURT:  Good morning to all of you.

6              MS. TESORIERO:  Good morning, your Honor.  Sara

7     Tesoriero, joined by Cameron Stracher, both from Cameron

8     Stracher PLLC for the defendant Newsweek.

9              THE COURT:  Good morning to both of you.

10             Good morning to our court reporter.  Thank you for

11    being here.

12             We're here today for argument on competing motions for

13    summary judgment.  Have you all talked about how you propose to

14    go forward?

15             MR. KEZHAYA:  We have not, your Honor.  I would

16    propose that Mr. Stracher filed first, so he would argue first.

17             MS. TESORIERO:  And we are prepared to proceed in that

18    order.

19             THE COURT:  You can use the podium or there, whichever

20    you're more comfortable with.

21             MS. TESORIERO:  Thank you, your Honor.

22             THE COURT:  I will tell you this, though.  I don't

23    intend to hear argument on one motion and then argument on the

24    other motion because they basically are arguing the same issues

25    in two separate motions instead of a cross motion.  So if

**Appendix 1075**

(206 of 279), Page 206 of 279
Case: 25-868, 07/28/2025, DktEntry: 50.1, Page 206 of 279
Case 1:22-cv-01343-MKV-SLC   Document 132   Filed 02/18/25   Page 3 of 43      3

P24CsatO

1    you're speaking now, say what you need to say both in support

2    of your motion and in opposition to the motion by the Satanic

3    Temple, because I'm not going to have multiple rounds of

4    argument and opposition and rebuttal.

5            MS. TESORIERO:  Yes, your Honor.  This goes to both in

6    support of our argument and to the cross motion.

7            May we reserve time for rebuttal?

8            THE COURT:  Sure.

9            MS. TESORIERO:  Three minutes, your Honor?

10           THE COURT:  Okay.

11           MS. TESORIERO:  May it please the Court, my name is

12   Sara Tesoriero with Cameron Stracher PLLC.  We represent the

13   defendant Newsweek.

14           This case arises from the publication of an article on

15   Newsweek's website written by freelance reporter Julia Duin.

16   The article is about a lawsuit that was filed by the Satanic

17   Temple against some of its former members of the Washington

18   Chapter of Washington State.  The article details the

19   litigation and, as part of the background for that litigation,

20   includes information that Duin collected from interviews with

21   other former members about their experience in the Satanic

22   Temple and why they have left the organization.

23           THE COURT:  But the article doesn't read as a

24   recounting of here's why people left.  It reads as though, or

25   arguably reads as though, the Satanic Temple engages not only

(207 of 279), Page 207 of 279
Case: 25-868, 07/28/2025, DktEntry: 50.1, Page 207 of 279
Case 1:22-cv-01343-MKV-SLC    Document 132    Filed 02/18/25    Page 4 of 43    4

P24CsatO

```
 1   in orgy and some kind of sexual activity, while some may find

 2   it unseemly, it's certainly their prerogative, but it also

 3   seems to imply that there's sexual abuse or sexual assault that

 4   goes on.

 5          MS. TESORIERO:  Your Honor, the only statement

 6   remaining at issue in the case is the quote from the former

 7   member Jinx Strange, who indicated that after he left --

 8          THE COURT:  Slow down.  Slow down.

 9          MS. TESORIERO:  -- that after he left the temple, he

10   heard accounts of sexual abuse being covered up in ways that

11   were more than anecdotal, yes.  However, that is part of the

12   reporting in this article on the general background of former

13   members who had left the temple, which is related to the

14   Washington litigation, which was about an action that the

15   temple had brought against, specifically the Washington

16   Chapter, former members.

17          THE COURT:  But the article does talk about leaked

18   materials and certain conclusions that he seems to have drawn

19   from those leaked materials, including accounts of sexual abuse

20   being covered up in ways that were more than anecdotal.

21          MS. TESORIERO:  Yes, your Honor.  I think --

22          THE COURT:  Suggesting there's some evidence.

23          MS. TESORIERO:  In support of --

24          THE COURT:  The allegation that there was sexual abuse

25   going on.
```

(208 of 279), Page 208 of 279
Case: 25-868, 07/28/2025, DktEntry: 50.1, Page 208 of 279
Case 1:22-cv-01343-MKV-SLC    Document 132    Filed 02/18/25    Page 5 of 43    5

P24CsatO

1          MS. TESORIERO:  Well, the statement indicates, yes,
2    that he has heard accounts of sexual abuse being covered up in
3    ways that were more than anecdotal.
4          THE COURT:  No.  It says, then there were leaked
5    materials.
6          MS. TESORIERO:  The "leaked materials" refers to a
7    broader range of information he says he received.
8          THE COURT:  Including allegations of sexual abuse, no?
9          MS. TESORIERO:  That one of the things he heard about
10   were accounts of sexual abuse --
11         THE COURT:  Through leaked materials.  In other words,
12   he says it was more than anecdotal.
13         MS. TESORIERO:  Because he had heard support for those
14   claims?
15         THE COURT:  I'm asking you.  It seems to imply that
16   the leaked materials provided the accounts that were more than
17   anecdotal about sexual abuse.
18         MS. TESORIERO:  Your Honor, I think that in the
19   context of the article, the statement indicates that, yes, that
20   he is representing that accounts of sexual abuse being covered
21   up existed in the Satanic Temple and that former members are
22   aware of them, including himself.  But I think a key issue here
23   is whether or not such a statement was published with actual
24   malice.
25         THE COURT:  Well, the first question is:  Is it false?

P24CsatO

```
 1    Are you conceding falsity then and just talking about actual
 2    malice?
 3              MS. TESORIERO:  No, your Honor.  We think the --
 4              THE COURT:  So I was talking to you about the falsity
 5    point.
 6              MS. TESORIERO:  Yes, your Honor.  I think on the
 7    falsity point, taking that the statement indicates that there
 8    are accounts of sexual abuse being covered up in ways that are
 9    more than anecdotal, the evidence has demonstrated that such
10    accounts do in fact exist.  There were both former members of
11    the Washington Chapter testified that they were aware of such
12    accounts.  Mr. Strange, who gave the quote, gave a deposition
13    in this case, and he indicated that he was also aware of
14    accounts of sexual abuse being covered up.  And that was his
15    reason for giving the quote to --
16              THE COURT:  All right.  So the question I have for you
17    is:  When we're talking about falsity, are we to inquire about
18    whether it is false that sexual abuse happened and was covered
19    up or are we to look at whether that's the reason that Strange
20    chose to leave?
21              MS. TESORIERO:  The former -- I'm sorry.  The latter,
22    your Honor, that the article indicates in context that that was
23    the reason Mr. Strange chose to leave.  So --
24              THE COURT:  Even if the reason he chose to leave was
25    totally false, totally fabricated, she can still report that
```

P24CsatO

1    without saying, "I investigated it and I found it to be true"?

2              MS. TESORIERO:  Under the law, yes, your Honor.  But

3    we think the Court doesn't even need to go that far because

4    even if it's not read as just the reason he left, the

5    statement, taken out of the context of the article, indicates

6    that accounts of sexual abuse being covered up exist among its

7    former members, and the evidence supports that those accounts

8    do in fact exist.  Testimony was given on that -- on that

9    point.

10             THE COURT:  Tell me who.

11             MS. TESORIERO:  Mr. Strange testified that he was

12   aware of an allegation in the Austin Chapter of the Satanic

13   Temple.

14             THE COURT:  But an allegation is not a fact.  An

15   allegation is an allegation.  So he's aware of allegations.

16             MS. TESORIERO:  Yes, your Honor.  That is the

17   statement.  The statement is that there are -- accounts do

18   exist.  And I think the *Goodman* case is on point here.  In that

19   case, there -- the definition was based on a statement that the

20   defendant had made that he had heard plaintiff had been accused

21   of sexual assault.  In that case, he admitted that he had been

22   accused, he claimed it was false, he claimed that such claims

23   were made up, but he acknowledged that the claims existed.

24             THE COURT:  But the problem here is in the statement

25   you just told me about the *Goodman* case, you say he admitted he

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**Appendix 1080**

P24CsatO

1    had been accused of sexual assault, he denied the assault.

2    Here, in this article, where is there any airing of the Satanic

3    Temple side of the story?

4            MS. TESORIERO:  Well, Duin testified when she -- the

5    article --

6            THE COURT:  Slow down.  You're going too fast for me

7    to absorb, so I don't know if the court reporter is having

8    trouble.

9            MS. TESORIERO:  I apologize.

10           Duin testified that when she spoke to Mr. Greaves, the

11   cofounder of the Satanic Temple, and he issued a general

12   denial, admittedly on another statement, not directly on

13   Mr. Strange's statement, he generally denied allegations

14   against the Satanic Temple.  And she took that general denial

15   to apply to something such as Mr. Strange's statement --

16           THE COURT:  But she doesn't say that in the article.

17   I mean, the most she says in the article is that Greaves said

18   such complaints are old news, and that's after she details all

19   of the complaints.  So how is that a denial of accounts of

20   sexual abuse being covered up?

21           MS. TESORIERO:  It is a general denial of the

22   allegations against the temple, your Honor.

23           THE COURT:  It's not really.  It's not a denial.  It

24   says they're old news.  That's not a denial, that's just saying

25   it's stale information.

P24CsatO

```
 1              MS. TESORIERO:  And that -- I believe it also goes on
 2      to say that such statements are commonplace and to generally
 3      discredit them.
 4              THE COURT:  Sorry?
 5              MS. TESORIERO:  And to generally discredit --
 6              THE COURT:  No.  The beginning of what you said.  Such
 7      statements are commonplace?
 8              MS. TESORIERO:  Yes.
 9              THE COURT:  Is that in the article, are you saying?
10              MS. TESORIERO:  I apologize, your Honor.  I'm trying
11      to find the --
12              THE COURT:  Where he says, we get this litany of
13      senseless disparaging claims.  Is that what you're referring
14      to?
15              MS. TESORIERO:  Yes, your Honor.
16              THE COURT:  Okay.
17              MS. TESORIERO:  And even taking the denial out, a
18      denial is -- seeking a denial is not required for the
19      substantial truth doctrine.  If -- nor is it required for the
20      actual malice doctrine.  If Duin, as she testified, had no
21      reason to doubt the veracity of the statement and believed that
22      seeking a specific denial would only get another denial, then
23      whether or not she got the denial does not undermine the
24      substantial truth of the statement or the -- whether or not she
25      published it with actual malice.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**Appendix 1082**

P24CsatO

| | |
|---|---|
| 1 | THE COURT:  You said there's evidence that such |
| 2 | accounts do exist.  What's the evidence? |
| 3 | MS. TESORIERO:  Mr. Strange testified that he was |
| 4 | aware of accounts that exist within the Satanic Temple.  Even |
| 5 | if the statement were read to say, as plaintiff has argued in |
| 6 | their briefs, that there are in fact incidences of sexual abuse |
| 7 | that have been covered up, there was an incident by plaintiff's |
| 8 | own admission in the Austin Chapter where a woman accused a |
| 9 | chapter head of sexual assault, friends of hers accused the |
| 10 | Satanic Temple of covering up the allegation and threatened to |
| 11 | go public with it, and when the victim and her supporters |
| 12 | continued to raise the issue at chapter meetings, they were |
| 13 | removed from the chapter, and Mr. Strange testified that he was |
| 14 | also aware of this. |
| 15 | There was also an incident in the San Jose Chapter |
| 16 | where a woman reported that one of the superiors in the |
| 17 | organization kept describing his genitals to her, and she |
| 18 | reported the incident.  And -- |
| 19 | THE COURT:  Is that sexual assault? |
| 20 | MS. TESORIERO:  It's sexual abuse, your Honor. |
| 21 | And when she reported the incident, by the temple's |
| 22 | own admission, she was not pleased with how it was handled and |
| 23 | she felt that she was being brushed aside. |
| 24 | THE COURT:  Okay. |
| 25 | MS. TESORIERO:  Moreover, your Honor, even if the |

P24CsatO

 1    temple could establish substantial falsity, they can cannot

 2    establish actual malice.  Courts to have considered the issue

 3    have unanimously found, and plaintiff does not dispute, that in

 4    diversity cases such as this one, the substantive provisions of

 5    the New York anti-SLAPP statute apply.  And --

 6            THE COURT:  I mean, you spent a lot of time on that in

 7    your briefing.  Talk to me about what is the anti-SLAPP statute

 8    and what is its purpose.

 9            MS. TESORIERO:  The anti-SLAPP statute was amended in

10    2020.  The anti-SLAPP has two provisions in New York law —

11    there is the substantive provision and the procedural

12    provision.  We are not dealing with the procedural provision

13    today.  Under the substantive provision, it defined the

14    necessary elements of a defamation claim under New York law.

15    One of those elements under the statute is that when a

16    statement -- an action is based on a statement made in a public

17    forum on a matter of public interest, the plaintiff must prove

18    by clear and convincing evidence that the statement was made

19    with knowledge of its falsity or reckless disregard as to its

20    falsity.

21            The public interest is defined in the statute.  It is

22    to be construed broadly and includes anything that is not a

23    purely private matter, and the article statement here is a

24    matter of public interest.  Courts to have examined the issue

25    have noted that a matter of public interest is anything from

P24CsatO

```
 1   political to social commentary and does not need to affect the
 2   general population.  They have cautioned that issues where it
 3   is a purely private matter are incredibly rare.  Here, the
 4   statement, regardless of how it's read, has to do with accounts
 5   of sexual abuse being covered up by a religious organization,
 6   which is certainly a matter of public interest.  I think the
 7   Watson case that we described in the brief is on point here
 8   about public accusations of -- of public accounts of sexual
 9   abuse.  Courts have also recognized that calling out sexual
10   misconduct within an industry or organization are matters of
11   public interest.
12           Moreover, as this Court has recognized, when
13   determining if something is a matter of public interest, the
14   article, as a whole, is relevant.  And here, reporting on a
15   religious organization's ongoing dispute with former members is
16   a matter of public interest, and the statement reasonably
17   relates to that.
18           Because it is a matter of public interest, they must
19   prove actual malice.  There is no evidence of actual malice
20   here.  The relevant inquiry is Newsweek's state of mind, not
21   Ms. Duin's.  And the case law is also clear that an argument
22   that they departed from reporting standards is not sufficient
23   proof of actual malice, which is really the only argument
24   plaintiff raises here.  Rather, Newsweek was entitled to rely
25   on Duin's experience as a reporter for 45 years in the
```

P24CsatO

1   industry, and her -- and her known record in religion

2   reporting, she testified that she --

3          THE COURT:  But Ms. Cooper has no affirmative duty to

4   inquire or to check or to ensure the author did ascertain the

5   truth of what she was reporting?

6          MS. TESORIERO:  Not where they're relying on an

7   established reporter and where the publication has no reason to

8   doubt the veracity of the statement, your Honor.  And here

9   there is --

10          THE COURT:  But if you never ask about anything, why

11   would you ever have a reason to doubt the veracity?  I mean,

12   that seems like a pretty vague standard to say, well, I have no

13   reason to doubt it, so I can just bury my head in the sand.

14          MS. TESORIERO:  That's actual malice, your Honor.

15   It's not that the -- the bury head in the sand is where they

16   would have a reason to believe that it was untrue.  And here,

17   there is no evidence --

18          THE COURT:  No, not the way I'm using it anyway.  I'm

19   saying just don't bother to ask.

20          MS. TESORIERO:  There is the reckless disregard

21   standard, your Honor.  But in that case, there has to be some

22   indicator to the publisher that the statement would be

23   questionable or that the reporter would be unreliable, and

24   there is no evidence of that in this case.

25          THE COURT:  Either or?

**Appendix 1086**

P24CsatO

 1              MS. TESORIERO:  I think it would have to be in

 2    combination, your Honor.  I think, ultimately, the question is

 3    whether -- whether they think the statement is untrue or have

 4    reason to doubt its truth, and the cases where the Court has

 5    found actual malice that has been something such as the witness

 6    recants or they testified that they did not give that statement

 7    to the reporter or the --

 8              THE COURT:  But that was the question I was asking

 9    here.  There wasn't even a question asked.  I mean, it seems

10    like Ms. Cooper did nothing.

11              MS. TESORIERO:  Well, in fact, your Honor, the

12    reporter represented to Ms. Cooper that she had fact checked

13    the article until she was bleary-eyed, I believe is the quote,

14    and Ms. Cooper is allowed to take her at her word, and the case

15    law is clear on that.

16              THE COURT:  When you say, "the case law is clear,"

17    what case law?

18              MS. TESORIERO:  The Second Circuit in *Chaiken*

19    recognized that a publication can rely on the reputation of its

20    reporter.  Also *Stern* in the SDNY case, the court recognized,

21    specifically for the actual malice standard, that a publication

22    is entitled to rely on the good reputation and representation

23    that the reporter has fact checked the article.

24              THE COURT:  Is there a difference between the standard

25    under the anti-SLAPP statute and the common law actual malice

**Appendix 1087**

(218 of 279), Page 218 of 279
Case: 25-868, 07/28/2025, DktEntry: 50.1, Page 218 of 279
Case 1:22-cv-01343-MKV-SLC   Document 132   Filed 02/18/25   Page 15 of 43   15

P24CsatO

1    standard?

2              MS. TESORIERO:  I think it's a close question, your

3    Honor.  I think that when New York amended the anti-SLAPP

4    statute, they intentionally did so to make it broad.  And so I

5    think as the Court in *Kesner v. Buhl* provides a good guideline

6    where they recognize there are not many cases interpreting the

7    statute yet and they do look to the common law, but they note

8    the broadness of the language in the statute.  And so the --

9    the recent case law interpreting it is more persuasive and on

10   point than some of the old actual malice case law.

11             Moreover, even if Duin's state of mind could be

12   imputed to the Temple -- I'm sorry.  To Newsweek, there is no

13   evidence that she acted with actual malice as we set forth in

14   our brief.

15             And if your Honor has no further questions, we'll

16   refer to our briefs.

17             THE COURT:  Thank you.

18             Who wants to be heard for the Satanic Temple?

19             MR. KEZHAYA:  Matt Kezhaya for the Satanic Temple,

20   your Honor.

21             THE COURT:  Okay.

22             MR. KEZHAYA:  May it please Court.  Dr. Laycock, who

23   Duin identified as the unofficial biographer of TST, had an

24   interview with her.  He calls it in his affidavit the most

25   egregious example confirmation bias he had ever seen.  It

**Appendix 1088**

P24CsatO

```
 1    consisted solely of leading questions.  It was predicated on --
 2              THE COURT:  What consisted of leading questions?
 3              MR. KEZHAYA:  Her interview of him.
 4              THE COURT:  Of Laycock?
 5              MR. KEZHAYA:  Of Laycock started with, I've heard
 6    these vicious rumors of the Satanic Temple, do you have
 7    anything that would support them.  This is the investigation
 8    that we're referring to.  She asks leading questions.  He says,
 9    well, actually, your question is relying on a fact assertion
10    that's not the case, and it just does not register.  Time and
11    time again, if you go through the affidavit, you see this.
12    But --
13              THE COURT:  Isn't that opinion testimony, that this is
14    confirmation bias?
15              MR. KEZHAYA:  It is opinion testimony, but it's
16    indicative of --
17              THE COURT:  How is he qualified to give opinion
18    testimony?  You're telling me this I guess in connection with
19    the falsity issue?
20              MR. KEZHAYA:  This is in connection with the actual
21    malice issue.
22              THE COURT:  Okay.
23              MR. KEZHAYA:  Subjective intent is the inquiry at
24    actual malice.  The subjective intent --
25              THE COURT:  Do you agree that the anti-SLAPP statute
```

P24CsatO

```
1    applies or it doesn't matter?

2              MR. KEZHAYA:  It doesn't matter.  I think the statute

3    glosses over this notion of private plaintiff.  I think it

4    incorporates the private versus public concern.  It doesn't

5    matter that it's a public interest, it's whether it's of public

6    concern.

7              THE COURT:  And you don't think sexual abuse is a

8    matter of public concern in today's day and age with all of the

9    lawsuits that are going on and the #MeToo movement and the

10   governor of New York stepping down given allegations about

11   sexual misconduct?

12             MR. KEZHAYA:  The governor of New York is a public

13   figure.  He's a government official.

14             THE COURT:  That wasn't my question.  My question is:

15   You don't think the general topic is a topic of public interest

16   or concern?

17             MR. KEZHAYA:  I don't believe it is in context of a

18   religion.  I think that the #MeToo movement is distinguishable

19   because it pertains to employment.  Everyone has to have a job,

20   everyone has to be subject to, at least currently — hopefully

21   Title VII will continue into the new administration —

22   protections for sexual harassment in the workplace.

23             THE COURT:  So you think if you are a religion, you

24   can do whatever you want and no inquiry is appropriate?

25             MR. KEZHAYA:  I think it's a matter of private concern
```

**Appendix 1090**

P24CsatO

1    and it triggers --

2          THE COURT:  So if there are allegations of sexual

3    abuse in the catholic church, is that a matter of public

4    concern?

5          MR. KEZHAYA:  The catholic church is distinguishable

6    under the *Scientology* cases.  They're too big to be a private

7    plaintiff.

8          THE COURT:  Oh, so what's the standard for what's too

9    big?

10          MR. KEZHAYA:  Well, the *Scientology* case from the

11    Second Circuit — the name currently escapes me — seems to set a

12    threshold of north of 500,000 members, I believe.  I think they

13    had 2 million.  I think that, at any rate, I guess it doesn't

14    much matter under the statute because the statue inquires into

15    public versus private concern.  Our argument relies on the case

16    law and says this is mere gossip on the matter of prurient

17    interest.  There's no two ways about it.

18          THE COURT:  Well, it's not mere gossip if somebody

19    says there's evidence of it.

20          MR. KEZHAYA:  If somebody says that there's evidence

21    of it, that's one thing.

22          THE COURT:  That's what the statement says.

23          MR. KEZHAYA:  But it's a whole different thing, as the

24    Court indicated in earlier questioning, that they didn't even

25    look for it.

**Appendix 1091**

(222 of 279), Page 222 of 279 Case: 25-868, 07/28/2025, DktEntry: 50.1, Page 222 of 279
Case 1:22-cv-01343-MKV-SLC    Document 132    Filed 02/18/25    Page 19 of 43    19
P24CsatO

```
 1              THE COURT:  Look for what?

 2              MR. KEZHAYA:  This alleged evidence.  Strange's email

 3    opens with, I have receipts, I have proof of everything that

 4    I'm saying, I'm happy to give it to you.  She did not inquire

 5    further.

 6              THE COURT:  How do you know that?

 7              MR. KEZHAYA:  Because I had her testify to that.

 8              THE COURT:  Okay.

 9              MR. KEZHAYA:  She did not look into it, she did not

10    ask -- the direct quote from the testimony is, anyone on the

11    face of the planet what sexual abuse and coverup even means.

12    In this Austin Chapter --

13              THE COURT:  I'm sorry.  I didn't follow that.

14              MR. KEZHAYA:  This is following a series of questions.

15    Did you ask him, no.  Did you ask Laycock, no.  Did you ask

16    Greaves, no.  Did you ask anyone on the -- did you talk to any

17    alleged victims, no.  Did you ask anyone, anyone, anyone on the

18    face of the planet, I said, yes, anyone on the face of the

19    planet.

20              THE COURT:  Ask anyone what?  Finish your sentence.

21              MR. KEZHAYA:  What sex abuse and coverup even means.

22              THE COURT:  In this context or generally?

23              MR. KEZHAYA:  Yes, in context of this accusation, in

24    context of the article's statement, anyone on the face of the

25    planet, did you ask them what it means, the answer was no.  The
```

**Appendix 1092**

P24CsatO

1    guidelines require completeness and specificity.

2            THE COURT:  What guidelines?

3            MR. KEZHAYA:  The editorial guidelines, Newsweek's own

4    standard.

5            THE COURT:  Require?

6            MR. KEZHAYA:  Specificity and completeness when

7    levying an accusation of wrongdoing.

8            THE COURT:  Aren't there many cases that say failure

9    to comply with guidelines is not per se malice?

10           MR. KEZHAYA:  Other people's guidelines, that's what

11    the cases say.

12           THE COURT:  Other people's guidelines?

13           MR. KEZHAYA:  The cases say you don't have to comply

14    with other people's guidelines.  That shows negligence.  When

15    you're failing to comply with your own guidelines, that's

16    actual malice.

17           THE COURT:  Where is there a case that says that?

18           MR. KEZHAYA:  The case we cite is *Khan*.  It's a

19    subjective standard.

20           THE COURT:  And the case actually says that or you're

21    saying that's a fair inference to draw?

22           MR. KEZHAYA:  I suppose I said the latter because they

23    just say it's a subjective standard.  The subjective

24    standard --

25           THE COURT:  So *Khan* just stands for the proposition

P24CsatO

```
 1    that it's a subjective standard?  I don't think that's
 2    disputed.  I asked you for a case that says failure to comply
 3    with your own guidelines constitutes reckless disregard.
 4            MR. KEZHAYA:  I don't have a case immediately offhand,
 5    your Honor.
 6            THE COURT:  Is that because there isn't one?
 7            MR. KEZHAYA:  If it's not in my briefing, I have not
 8    found it.
 9            What I can say is that objective proof is the
10    determiner, not whether they say I believe it, not whether they
11    say oh, well, I heard so-and-so say it.  That's just the
12    republishing rule.
13            THE COURT:  Let me ask you a question about the
14    falsity issue.  As I read this account, and in particular this
15    one statement, this statement isn't saying that sexual abuse
16    happened and was covered up.  It is saying that Mr. Strange
17    says that's why he left.  Do you agree with that?
18            MR. KEZHAYA:  That is what it says, yes, your Honor.
19            THE COURT:  Okay.
20            MR. KEZHAYA:  Well, actually, let me backtrack --
21            THE COURT:  So isn't the question whether it's true
22    that that's why he left, not whether it's true that the abuse
23    happened and the accounts of it were covered up?
24            MR. KEZHAYA:  I need to retract my prior answer.  It's
25    not why he left.  The article says that he left, then was
```

P24CsatO

 1   leaked material that shows allegedly sex abuse and coverup.  So

 2   no, temporally speaking, it's not possible that he left because

 3   of leaked material, leaked material happened after.

 4        But going to your second question, which I think is

 5   operative, it doesn't matter, it doesn't matter whether they

 6   say Jinx Strange said that there's sex abuse and coverup.

 7   That's just the republishing rule.

 8        THE COURT:  No, because he doesn't just say -- I would

 9   agree with you if all this says is that he says it happened and

10   now I'm republishing it, but the gist of the story is about why

11   people left, and he may be wrong about the reason that he left,

12   but if that's why he left and that's what she reports, then

13   isn't that true?

14        MR. KEZHAYA:  No, your Honor.  You'd have to go look

15   at his email to say why he left.  It was a three-page-long

16   single-spaced email that details that out at length.  It's very

17   clear that he did not leave because he heard that there were

18   sex abuse and coverup.

19        First of all --

20        THE COURT:  And that wasn't any of the reason why?

21        MR. KEZHAYA:  That was not.  It says he left then.

22        THE COURT:  It does say "then."  You're right.

23        What's the three-page email exhibit number?

24        MR. KEZHAYA:  It appears that there's more than one

25   email.  It's either exhibit 17 or 18 of our cross motion, which

(226 of 279), Page 226 of 279
Case: 25-868, 07/28/2025, DktEntry: 50.1, Page 226 of 279
Case 1:22-cv-01343-MKV-SLC   Document 132   Filed 02/18/25   Page 23 of 43   23

P24CsatO

```
 1    I think it would be subsumed in ECF No. 105 or maybe 105-1.
 2    Under my exhibit is my declaration as an exhibit list.  It's
 3    either 17 or 18.
 4              THE COURT:  Thank you.
 5              MR. KEZHAYA:  The operative gist of his email is that,
 6    basically, TST's a bunch of posers.
 7              THE COURT:  Bunch of what?
 8              MR. KEZHAYA:  Posers.
 9              THE COURT:  Posers, is that what you're saying?
10              MR. KEZHAYA:  Correct.  "He's a real satanist, TST's
11    not real satanists.  And, by the way, I heard some scandalous
12    stuff happened, too.  Happy to give you some additional proof
13    if you're interested."  Duin was not interested.  All she was
14    interested in is what she called delicious quotes.  That's why
15    this statement made it to the article.
16              This article ostensibly is about a Washington lawsuit,
17    ostensibly.  But what's up with all this other stuff?  It's not
18    background, contextual background of various other people
19    leaving the organization, it's a hit piece.  The article is
20    entitled, "Orgies Harassment Fraud — Satanic Temple Rocked by
21    Accusations."  But it's about TST's lawsuit that some former
22    member stole our Facebook page?
23              THE COURT:  Here's the issue on the falsity point.
24    You offer one version of how to read this and construe this,
25    and the other side offers another version.  Why isn't that an
```

P24CsatO

1      issue of fact?

2              MR. KEZHAYA:  Because an issue of fact requires

3      admissible evidence.  If they went out and found this Austin

4      member, deposed her, found the subpoena documents of Strange's

5      alleged receipts and leaked materials, we would have evidence

6      to be talking about here.  Only one side is backed up by

7      admissible evidence.

8              THE COURT:  Why isn't Mr. Strange's testimony

9      admissible evidence?  Why isn't the reporter somebody who could

10     offer admissible evidence to a jury?

11             MR. KEZHAYA:  As to the truth or falsity of the

12     statement, Strange's testimony is, I didn't see any sex abuse

13     or coverup, I didn't hear of any sex abuse or cover up, all I

14     know are thirdhand allegations.

15             THE COURT:  The statement doesn't say that he saw

16     abuse or coverup, it says accounts of it.

17             MR. KEZHAYA:  Leaked material.

18             THE COURT:  Were out there.

19             MR. KEZHAYA:  Leaked material is what the article

20     says.  It suggests that --

21             THE COURT:  It says:  "Accounts of sexual abuse being

22     covered up in ways that were more than anecdotal."

23             MR. KEZHAYA:  The prior sentence refers to leaked

24     materials and shows this, allegedly.

25             THE COURT:  Yes.

P24CsatO

1    MR. KEZHAYA:  We are saying that this leaked material
2    doesn't exist because in fact there are no accounts of sex
3    abuse and coverup.  This Austin Chapter, we told her to go to
4    the police — that's not a coverup.  That's the exact opposite
5    of a coverup.

6    THE COURT:  Why shouldn't a jury be the one that
7    decides that instead of me?

8    MR. KEZHAYA:  Because at the end of the day, it's a
9    question of competing proof, admissible evidence.  Right now --

10   THE COURT:  Right, it's competing admissible evidence.
11   That's the fundamental definition of an issue of fact.

12   MR. KEZHAYA:  I'm not seeing the evidence.  They're
13   not providing testimony that, in fact, here's the Austin
14   Chapter person that says this actually happened.  We're saying
15   that he says he heard about it.  That's hearsay.

16   THE COURT:  The statement is not offered for the
17   truth, it's offered for whether there were accounts out there.

18   MR. KEZHAYA:  If it's not offered for the truth, that
19   means it's definitionally false, is it not?

20   THE COURT:  No.

21   MR. KEZHAYA:  Under the --

22   THE COURT:  No.  Something can be not offered for the
23   truth of the statement and yet still be true, but that's not
24   the reason that he's saying it.  You just said before, it's
25   subjective.  It goes to her state of mind and his state of

SOUTHERN DISTRICT REPORTERS, P.C.

**Appendix 1098**

P24CsatO

1    mind.

2         MR. KEZHAYA:  It's not about Duin's state of mind,

3    it's about Cooper's.

4         THE COURT:  Why?

5         MR. KEZHAYA:  Because Cooper is the one that wrote the

6    editorial guidelines in agreeing with the article --

7         THE COURT:  But you can't tell me a single case that

8    says failure to abide by your own editorial guidelines is proof

9    of now you're back to malice, right?

10        MR. KEZHAYA:  Correct.

11        THE COURT:  Is reckless per se.

12        MR. KEZHAYA:  Well --

13        THE COURT:  I asked you what case says that and you

14   couldn't give me one.

15        MR. KEZHAYA:  Sometimes, your Honor, this isn't a

16   qualified immunity case.  We don't have to have --

17        THE COURT:  This is what?

18        MR. KEZHAYA:  This is not qualified immunity.  We

19   don't have to show clearly established that another case is

20   directly on all fours --

21        THE COURT:  The cases you cited to me has nothing to

22   do with it.  You told me that all that stands for is the

23   proposition that it's a subjective standard, which is a fairly

24   noncontroversial proposition of law, and then the question

25   becomes how does one prove it.  And you're right, you can use

P24CsatO

| | |
|---|---|
| 1 | objective evidence so the guidelines may be objective evidence, |
| 2 | but it doesn't make it as a matter of law. |
| 3 | MR. KEZHAYA:  It gives rise to the inference, though. |
| 4 | And once the inference -- |
| 5 | THE COURT:  Yes, but it's not the only inference that |
| 6 | can be drawn. |
| 7 | MR. KEZHAYA:  There's one more point that I want to |
| 8 | address, your Honor, which is the several cases that mirror the |
| 9 | guidelines. |
| 10 | THE COURT:  Okay. |
| 11 | MR. KEZHAYA:  Actual malice, our actual malice |
| 12 | argument is not solely predicated on the guidelines.  In |
| 13 | several instances, those guidelines mirror actual malice case |
| 14 | law. |
| 15 | THE COURT:  The guidelines that Newsweek had, you're |
| 16 | saying? |
| 17 | MR. KEZHAYA:  Correct. |
| 18 | THE COURT:  Okay. |
| 19 | MR. KEZHAYA:  Newsweek's own guidelines mirror's |
| 20 | actual malice case law.  For example, this requirement that |
| 21 | there be fact checking, case law provides you cannot |
| 22 | consciously avoid the truth.  So Cooper knows that her |
| 23 | guidelines require that there be a fact checking.  Cooper |
| 24 | knows -- |
| 25 | THE COURT:  And the author testified that she fact |

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**Appendix 1100**

P24CsatO

1    checked until she was bleary-eyed.  That's the only evidence I

2    have in the record about fact checking.

3         MR. KEZHAYA:  She didn't, as I recall, testify to

4    that.  She wrote that in an email.

5         THE COURT:  So it's in an email.

6         MR. KEZHAYA:  Cooper performed no inquiry into it --

7         THE COURT:  But you keep saying Cooper.  The question

8    is to what extent can Cooper rely on Duin saying, "I fact

9    checked"?

10        MR. KEZHAYA:  Her earlier testimony established that

11   the purpose of editing is to inquire into the investigation.

12        THE COURT:  She inquired and she was told, yes, I did

13   these things.

14        MR. KEZHAYA:  She did not.  She performed no inquiry.

15   This email was part of the very tail end of the editing process

16   in which Duin says, I fact checked until I'm bleary-eyed.  No

17   followup, no inquiry, no checking into it.  And additionally,

18   we have a paper trail of Cooper injecting in this false

19   assertion that TST does not actually have an abortion ritual.

20   Duin pushes back.

21        THE COURT:  That what?

22        MR. KEZHAYA:  That TST does not have an abortion

23   ritual.  The purpose is to show a malice against the plaintiff

24   themselves.  So Cooper is over here inventing and concocting --

25        THE COURT:  Is that here in the article?

**Appendix 1101**

P24CsatO

1          MR. KEZHAYA:  Yes, your Honor.  That was part of the

2     issue that we rose.  Granted, it was denied on motion to

3     dismiss, that that assertion was not actual in and of itself,

4     but it still shows malice against the plaintiff.  It still

5     shows that she's willing to concoct false statements on her own

6     part.  Duin pushes back, says we don't have a basis to put that

7     in.  Cooper insists, no, you have to put that in.  We'll modify

8     it slightly so that it appears that TST does not actually have

9     abortion rituals, it's all just political theater.  We have the

10     paper trail in which she personally is concocting false claims

11     against TST.

12          This other notion of credible sources must be used is

13     mirrored in case law, as well.  Quote, recklessness may be

14     found where there are obvious reasons to doubt the veracity of

15     the informant or the accuracy of his reports.

16          THE COURT:  Okay.  But where is the evidence that

17     anything about what Strange told Duin is unreliable or a red

18     flag that it's false?

19          MR. KEZHAYA:  I don't have the case cite directly in

20     front of me, your Honor, but there's a Massachusetts case that

21     I cite in the reply in which they say sole reliance on hearsay,

22     perhaps multilevel, is actual malice.  You know that that's

23     not -- you are at least reckless with regard to whether it is

24     true when you are just taking some third party at face value.

25     This particular third party Duin repeatedly described as a

**Appendix 1102**

P24CsatO

1   disgruntled former member.  She knew that he had a reason to

2   lie, she knew that he had a bone to pick with TST, and she

3   unabashedly just copy-pastes his words into the email, "why

4   it's a delicious quote."  This does not show --

5          THE COURT:  What's so delicious about that?

6          MR. KEZHAYA:  It's salacious.  The whole point is to

7   drive clicks.  Oh, TST's having orgies, they're also raping

8   their members and covering it up.

9          THE COURT:  I put the whole paragraph in what I'm

10  looking at because I think a fair reading is what you're doing,

11  linking the leaked materials to the statement.  The statement

12  doesn't have the leaked materials in it.  The statement says,

13  "Accounts of sexual abuse being covered up in ways that were

14  more than anecdotal."  You agree that that's the statement

15  we're talking about, right?

16         MR. KEZHAYA:  That is the article statement.  But if

17  we're looking at the entirety of the paragraph, it starts

18  off --

19         THE COURT:  I know.  That's why I'm saying, I'm

20  reading it the way you are, in context, looking at the whole of

21  the paragraph.

22         So what this paragraph is doing is reporting this guy

23  Strange's experience.  It's not saying it's true, it's saying

24  this was his experience and why he left.

25         MR. KEZHAYA:  I respectfully disagree that it's not

**Appendix 1103**

P24CsatO

1    saying that it's true.

2            THE COURT:  Well, it's certainly hoping the reader

3    might infer it's true, but it's not stating it as a fact.  The

4    only thing it's stating as a fact is what Strange's experience

5    was.

6            MR. KEZHAYA:  Your Honor, I cite in our cross motion

7    brief, I believe it's document 103, some case law that provides

8    this proposition that when a news magazine staffed by

9    professional reporters and professional editors report a fact,

10   readers take that as true.

11           THE COURT:  But what is the fact that's being reported

12   here?  You're telling me I have to read the whole paragraph in

13   context, which I think is fair.  And the whole paragraph is

14   talking about Strange, he hadn't been involved long when he

15   came to feel.  When you're reporting about what someone feels,

16   how can I conclude, as a matter of law, that that's a false

17   statement?  Did Strange testify at his deposition that, this is

18   false, I didn't feel this way?

19           MR. KEZHAYA:  We did not ask him about that.

20           THE COURT:  I'm sure you didn't.

21           MR. KEZHAYA:  Our testimony was directed specifically

22   at the effort of the underlying truth of sex abuse and coverup.

23   They put him on their witness list that said he has personal

24   knowledge of sex abuse and coverup.  Well, what's your personal

25   knowledge.

P24CsatO

| 1 | THE COURT:  What witness list? |
| 2 | MR. KEZHAYA:  The 26(f) disclosures of potential |

witnesses, I should say.  Potential witnesses, he knows, he has
personal knowledge of sex abuse and coverup.  Well, what is it,
Strange?  I actually have none.

THE COURT:  That's his testimony, "I have none"?

MR. KEZHAYA:  That's -- I saw nothing, I heard
nothing, I personally don't know anything.

THE COURT:  Okay.

MR. KEZHAYA:  That's his testimony.

THE COURT:  Okay.  And you cite that in your papers?

MR. KEZHAYA:  Yes, your Honor.

THE COURT:  But this doesn't say anywhere that he saw,
right?

MR. KEZHAYA:  It says that he was leaked material.
His email doesn't say anything about leaked materials.

THE COURT:  So now you're contending that the leaked
material part is false?

MR. KEZHAYA:  We are also taking issue with that.

What we are saying in essence, the claim is Newsweek
publishes its statement that any reasonable reader will read to
understand TST engages in sex abuse and coverup.  There is no
other way, in our opinion, to read this paragraph.  There was
no sex abuse and coverup.  It says that there's leaked
materials.  There was no leaked materials.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P24CsatO

1          THE COURT:  Well, he did, in his email, say that he

2     got screenshots and Tweets, didn't he?

3          MR. KEZHAYA:  He says -- again, his email is three

4     pages long.  He's got screenshots and Tweets about --

5          THE COURT:  He's got?

6          MR. KEZHAYA:  Screenshots and Tweets about whatever it

7     is that he's talking about.  TST's alleging in this email — I

8     take this as a true quote — that TST is an inept, rudderless

9     organization that accidentally rose to prominence.

10          THE COURT:  It says he came to feel that?

11          MR. KEZHAYA:  It says that he came to feel that.  I'm

12     taking his direct quote.  So referring back to his earlier

13     statement --

14          THE COURT:  Why are you taking it as a direct quote?

15     It's not in quotes.

16          MR. KEZHAYA:  It appeared to be --

17          THE COURT:  That part is in quotes, yes.

18          MR. KEZHAYA:  Correct.

19          THE COURT:  But what he felt -- I mean, that's what

20     I'm really struggling with here.  To me, this article talks

21     about -- or the statement we're having a conversation about

22     relates to what Strange came to see and feel and believe and

23     why he left the Satanic Temple.  How can anybody determine, as

24     a matter of law, whether that is false, that that's what he

25     felt and why he left?

P24CsatO

1          MR. KEZHAYA:  Largely, your Honor, our claim is not

2     about what he felt.

3          THE COURT:  I know it isn't, but that's what the

4     article talks about.

5          MR. KEZHAYA:  But a reasonable reader, I don't think,

6     can possibly interpret this to be confined to its feelings.  A

7     reasonable reader would understand this to be a direct

8     assertion published by Newsweek and ostensibly fact checked

9     according to their editorial guidelines that, in fact, there

10    are sex abuse and coverup.  That is our claim.  It's not about

11    his feelings, it's not about whether he left --

12         THE COURT:  Because you're excising something out of

13    this entire paragraph.  You're on the one hand telling me I

14    have to read it as a whole because you want the leaked

15    materials to be linked or to be part of it, and then you're

16    telling me I shouldn't read the beginning part that says this

17    is what he came to feel.  I mean, you can't have it both ways,

18    at least not as a matter of law.  I mean, your argument that

19    you just made to me says, "a reader of this would conclude."

20    Isn't that a question for the jury?

21         MR. KEZHAYA:  How the article is interpreted we

22    believe to be initially a matter of law.  The threshold

23    question is, in our opinion, a question of law, which we

24    satisfied at the motion to dismiss stage.  It was this Court's

25    prior order that this accusation is in fact an accusation.

P24CsatO

1    It's our belief that under prior case law --

2              THE COURT:  No, a motion to dismiss ruling stands for

3    nothing more than the proposition that you have plausibly

4    alleged sufficiently.

5              MR. KEZHAYA:  Yes, your Honor.

6              THE COURT:  Not that in fact what you claim is

7    correct.

8              MR. KEZHAYA:  Yes, your Honor.

9              We've also asked in our cross motion for certain

10   summary findings.  The article --

11             THE COURT:  I'm sorry.  I didn't hear.

12             MR. KEZHAYA:  Certain summary findings under

13   Rule 56(g).  It appears to me that there is no genuine dispute

14   that the article, or at least the article's statement, is about

15   the Satanic Temple.  And this is a defamatory per se accusation

16   or it at least caused special damages.  We've asserted as

17   defamatory per se this is an accusation of criminal misconduct.

18   We have testimony from Cooper who says, yes, this is criminal

19   misconduct covering up sexual abuse.  Yes, it is criminal

20   misconduct, sex abuse in the first place, and we have adduced

21   the $43,000 and change that TST spent on PR expenses.

22             THE COURT:  And that's why you're calling this special

23   damages?

24             MR. KEZHAYA:  Yes, your Honor.

25             THE COURT:  Tell me the number.

P24CsatO

```
1          MR. KEZHAYA:  I believe it was $43,500.

2          THE COURT:  On investigation?

3          MR. KEZHAYA:  On PR efforts to --

4          THE COURT:  On?

5          MR. KEZHAYA:  Public relations efforts.

6          THE COURT:  Oh, P-R?

7          MR. KEZHAYA:  Correct.

8          THE COURT:  Okay.

9          MR. KEZHAYA:  So minimally, we should at least trim

10    down the issues for the jury to assert this.  We proffer this

11    is a defamatory per se statement or at least caused special

12    damages, checking the fourth element, and is about TST checking

13    the first element.  So, jury, it's up to you, is this article's

14    statement about why Jinx Strange left?  Fine, that is an

15    argument that they can raise to the jury.  Or --

16          THE COURT:  If you just said fine, that's an argument

17    they can raise to the jury, isn't that an admission that your

18    motion needs to be denied?

19          MR. KEZHAYA:  I'm following the Court's question to

20    infer that that's where the Court's heading in that direction.

21    I don't necessarily suggest that's where the Court should go.

22    It's our belief this article can only be read that this is an

23    accusation of criminal sexual misconduct.  However, if the

24    Court finds otherwise, that's the Court's prerogative.  We are

25    just saying, as a fallback position, at least check off the
```

P24CsatO

1    first and fourth elements for us.

2                If the Court has no further questions, I otherwise

3    rest on my briefs.

4                THE COURT:  Thank you.

5                MR. KEZHAYA:  Thank you, your Honor.

6                THE COURT:  All right.  So let me just begin where

7    counsel just ended.

8                Do you dispute that the article's statement is about

9    the Satanic Temple?

10               MS. TESORIERO:  That it's about -- it's accusing the

11   Satanic Temple --

12               THE COURT:  No.  Please pay attention, because I want

13   you to correct me if I'm saying it wrong.  What I wrote down is

14   that the article statement is about the Satanic Temple.  Isn't

15   that what you're asking me to find?

16               MR. KEZHAYA:  Are you asking me, your Honor?

17               THE COURT:  Yes.

18               MR. KEZHAYA:  Yes.

19               THE COURT:  Do you disagree?

20               MS. TESORIERO:  I think in a way there's no disputing

21   that it involves the Satanic Temple.  I think a better way to

22   say it, it's about former members of the Satanic Temple and

23   what they have heard about the Satanic Temple.

24               And I think the issue here on -- speaking to

25   substantial falsity, the burden is with the plaintiff to show

P24CsatO

 1    that the statement is substantially false.  Counsel is

 2    mistaken.  Strange testified in his deposition that one of the

 3    reasons he ceased his involvement with the temple is that he

 4    had heard accounts of sexual abuse, and he described at least

 5    three that he had heard of in his deposition.

 6           THE COURT:  He didn't dispute that, he just said you

 7    can't rely on hearsay.

 8           MS. TESORIERO:  Well, as your Honor noted, for the --

 9    offering them to show that the accounts exist, not whether the

10    underlying accounts are true, is not hearsay.

11           THE COURT:  So can you get around accusing some

12    organization, let's forget about Satanic Temple for now, can

13    you get around accusing some organization of having rampant

14    sexual abuse by saying, I've heard that there's rampant sexual

15    abuse?  There's all kinds of rumors and accounts.

16           MS. TESORIERO:  I think if you have no reason to doubt

17    that there are accounts of that happening, then, yes, under the

18    malice standard, you are protected in making that statement.

19           In this case --

20           THE COURT:  Well, first, we were talking about the

21    falsity point.  So if you don't verify it and you don't give

22    the other side the opportunity to respond --

23           MS. TESORIERO:  If you have no reason to doubt the

24    veracity of the statement, then no.  And I think here, even

25    without reaching the issue of substantial falsity, on actual

**Appendix 1111**

P24CsatO

1    malice, there is no evidence in this case that Newsweek acted

2    with actual malice.  Plaintiff points to allegations of bias on

3    behalf of Cooper based on unrelated statements she made during

4    editing or even bias as to Duin based on the fact that she

5    described it as a salacious quote.

6        But as your Honor recognized in the *McDougal* case,

7    allegations of bias are only relevant to actual malice in

8    conjunction with an allegation that the speaker otherwise had

9    knowledge of the falsity of her statements.  There is no

10   evidence in this case that plaintiff can point to that would

11   have alerted Cooper or Duin to the extent her state of mind is

12   even imputed to the falsity of his statements.

13       THE COURT:  What about the statement insofar as she

14   says that Greaves said such complaints are old news?  We get

15   this litany of senseless disparaging claims against us that

16   says we are a religious group acting in a nefarious manner.  I

17   mean, isn't that a denial that ought to put her on notice?

18       MS. TESORIERO:  No, your Honor.  Denial is not notice

19   of falsity considering that plaintiffs routinely deny

20   allegations.  If it was, it would almost eviscerate the actual

21   malice standard.

22       THE COURT:  And you don't have any duty of inquiry

23   when you get a denial --

24       MS. TESORIERO:  Only if --

25       THE COURT:  -- to verify what you're reporting?

P24CsatO

1            MS. TESORIERO:  Only if the denial is supported by

2      some evidence that would lead the relevant party to question

3      the veracity of the claim in *Celle*.  In fact, the Second

4      Circuit recognized that there were -- there was -- a general

5      denial was not enough to overcome a showing of actual malice.

6      It was a general denial for one of the three articles coupled

7      with evidence that they had intentionally avoided information

8      that was made available to them that undermined the veracity of

9      the claims.

10           Here, plaintiff counsel points to the fact that

11     Mr. Strange referenced other materials he could provide and

12     that Duin did not follow up on those materials.  If anything,

13     the fact that he was willing to offer additional material to

14     Duin gave more credibility to his statement.

15           Moreover, if she was to follow up on those leads and

16     ask him for those materials, as he testified, he would have

17     told her about accounts of sexual abuse.  It's not as if

18     plaintiff could point to anything that he would have produced

19     that would have then shown Duin or Cooper that the statement

20     was false.

21           And again, because the burden is on plaintiff to prove

22     actual malice in this case and they have not come forward with

23     any evidence that would have led either Cooper or Duin to

24     believe or to turn a blind eye on the falsity of the statement,

25     the defendants' motion to dismiss should be granted on that

P24CsatO

```
1    ground alone.
2             THE COURT:  But you just shifted from their motion
3    where the plaintiff does have burden of proof to your motion
4    where I'm now supposed to draw every inference from the
5    evidence in favor of the Satanic Temple.
6             MS. TESORIERO:  Yes, your Honor.  But the burden for
7    proving the defamation claim is still on the plaintiff.
8             THE COURT:  But now let's talk about the actual malice
9    point.
10            MS. TESORIERO:  Yes.  They still have to prove under
11   the statute by clear and convincing evidence that our burden on
12   summary judgment is showing that they cannot possibly meet that
13   burden, even construing all evidence in favor --
14            THE COURT:  Correct.  And so if they come forward with
15   arguments and evidence which lends itself to an inference,
16   different from the inference you're asking me to draw, doesn't
17   that mean your motion has to be denied because you're the
18   movant?
19            MS. TESORIERO:  No, your Honor, because they have not
20   offered any admissible evidence that would undermine the
21   showing that they cannot establish actual malice for Newsweek.
22            THE COURT:  Well, they have come forward with
23   evidence.  They have the evidence of the guidelines at Newsweek
24   that weren't followed.  You don't dispute that they weren't
25   followed here, do you?
```

P24CsatO

1          MS. TESORIERO:  We would dispute that they were

2    followed, your Honor.

3          THE COURT:  You would or would not?

4          MS. TESORIERO:  We would.  We do not concede that they

5    were not followed.  But in this case, whether or not Newsweek

6    followed the guidelines is not evidence of actual malice.

7          THE COURT:  It may not be evidence of actual malice

8    per se, but it is some evidence in a list of other evidence

9    that they could put forward, is it not?

10          MS. TESORIERO:  It can be taken in consideration when

11    there's an extreme departure, but it is clear from the case law

12    that it is never sufficient on its own.

13          THE COURT:  Right.

14          MS. TESORIERO:  And they have not brought forth

15    anything that would indicate to Cooper that the statement was

16    false.

17          THE COURT:  Well, they have the failure to follow

18    Newsweek's own guidelines, they have the statements by Cooper

19    that they say reflects bias on her part, they have the failure

20    on Cooper's part to do any inquiry of her own beyond asking

21    Duin, did you fact check.  Why can't all of that go to a jury

22    and let the jury decide?  You're asking me to reject all of

23    that and draw the inferences in your favor, but it's your

24    motion now that I'm talking about.  I mean, you ended saying

25    you're entitled to judgment.  So on that motion, you have the

P24CsatO

```
 1   burden and I'm supposed to draw all the inferences from the

 2   evidence in favor of the opposing party.

 3            MS. TESORIERO:  Yes, your Honor.  But even drawing

 4   those inferences, none of the evidence they put forward is

 5   evidence of actual malice --

 6            THE COURT:  Per se.  Per se.  But collectively, the

 7   totality of it, couldn't a reasonable finder of fact conclude

 8   from the totality of the evidence?

 9            MS. TESORIERO:  No, your Honor, because you have to

10   have a reason for the defendant to believe that the statement

11   was false, and they haven't put forward anything that would

12   lead Newsweek to believe that the statement was actually false.

13            THE COURT:  So you have to start with that?

14            MS. TESORIERO:  Yes, your Honor.

15            THE COURT:  Okay.

16            MS. TESORIERO:  If your Honor has no further

17   questions, we rest on your briefs.

18            THE COURT:  Thank you, all, very much.  I appreciate

19   the arguments, they were helpful to us, and we'll try to get

20   you an opinion as soon as we can.

21            Thank you.  We'll stand adjourned.

22                         *  *  *

23

24

25
```

**Appendix 1116**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/26/2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE SATANIC TEMPLE, INC., | 1:22-cv-1343 (MKV) |
| Plaintiff, | |
| -against- | **OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| NEWSWEEK MAGAZINE LLC, | |
| Defendant. | |

MARY KAY VYSKOCIL, United States District Judge:

The Satanic Temple, Inc. ("The Satanic Temple" or "Plaintiff") brought this action against Newsweek Magazine LLC ("Newsweek" or "Defendant") seeking damages for numerous allegedly defamatory statements made in the article titled *Orgies, Harassment, Fraud: Satanic Temple Rocked by Accusations, Lawsuit*" published by Newsweek. [ECF No. 1-1], (the "Article"). After this Court's Opinion and Order on Defendant's motion to dismiss, only one statement, "Accounts of sexual abuse being covered up in ways that were more than anecdotal" (the "Article Statement"), remains at issue. *See Satanic Temple, Inc. v. Newsweek Mag. LLC*, 661 F. Supp. 3d 159, 176 (S.D.N.Y. 2023), [ECF No. 27]. Now before the Court are the parties' competing motions for summary judgment. [ECF Nos. 98, 109]. For the reasons set forth below, Defendant's motion for summary judgment is GRANTED and Plaintiff's motion for summary judgment is DENIED.

**FACTUAL BACKGROUND**[1]

The Satanic Temple is an atheistic religious corporation. Pl. Resp. ¶ 1; Def. Resp. ¶ 1; Pl. Second Resp. ¶ 137. The Satanic Temple engages in various charitable activities and advocates

---

[1] The facts as stated herein are based on the parties' Rule 56.1 Statements in support of their motions for summary judgment and the opposing party's counterstatements. [ECF Nos. 100, 104, 113, 116, 121, 123]. All citations to "Pl. Resp. ¶" refer to ECF No. 116, which is Plaintiff's responses to Defendant's Rule 56.1 Statement. All citations to "Def. Resp. ¶" refer to ECF No. 113, which is Defendant's responses to Plaintiff's Rule 56.1 Statement. All citations to "Pl. Second Resp. ¶" refer to ECF No. 123. All citations to "Def. Second Resp. ¶" refer to ECF No. 121.

1

for the religious rights of its members though litigation and various forms of advocacy.  Pl. Resp. ¶ 3; Pl. Second Resp. ¶ 139.  The Satanic Temple publishes press releases, utilizes billboards, and participates in interviews to promote and advertise its activities, campaigns and specific political issues or initiatives.  Pl. Resp. ¶¶ 4–5, 7, 9, 10; Pl. Second Resp. ¶¶ 140–41, 143, 145–46.  The Satanic Temple engages in this conduct to ensure that the public is aware of the group and to help generate donations.  Pl. Resp. ¶¶ 6, 8; Pl. Second Resp. ¶¶ 142, 144.

Newsweek publishes the online news magazine *Newsweek* through its website.  Def. Resp. ¶ 3; Pl. Resp. ¶ 11.  Julia Duin[2] worked for Newsweek from September 1, 2021 until February 2023 and was hired to serve as the Newsweek religion reporter.  Pl. Resp. ¶ 18; Pl. Second Resp. ¶ 151; Def. Resp. ¶ 18.  Duin was considered a senior hire, Def. Resp. ¶ 3, because she had been a journalist for over forty-five years and had received multiple awards for her reporting.  Pl. Resp. ¶¶ 19–20; Pl. Second Resp. ¶¶ 152–53.  In addition, Duin had published six books about religion, served as a visiting and/or adjunct journalism professor at various universities, and has a master's degree in religious studies from Trinity Episcopal School for Ministry.  Pl. Resp. ¶¶ 21–23; Def. Resp. ¶¶ 32–33; Pl. Second Resp. ¶¶ 154–56.

In 2020, The Satanic Temple filed a lawsuit in the United States District Court for the Western District of Washington (the "Washington Lawsuit") asserting claims for defamation, among other claims, against several former members, including David Alan Johnson and Nathan Sullivan.  Pl. Resp. ¶¶ 13–14; Pl. Second Resp. ¶¶ 147–48.

On September 29, 2021, Duin received an email from Kevin Jones, a journalist with the Catholic News Agency, stating that some former members of The Satanic Temple had told him

---

[2] Duin was previously dismissed as a defendant in this case for lack of personal jurisdiction. *See Satanic Temple, Inc.*, 661 F. Supp. 3d at 167.

**Appendix 1118**

about The Satanic Temple's alleged use of "defamation lawsuits . . . to harass internal critics."  Pl. Resp. ¶ 16; Def. Resp. ¶ 44; Pl. Second. Resp. ¶ 150.  This email inspired Duin to pitch the Article, which is the subject of this lawsuit, to her direct supervisor, Juliana Pignataro, who was a U.S. Editor at Newsweek with the title of U.S. News Director.  Def. Resp. ¶¶ 47, 28–29.  Within a week of the pitch, all three of Newsweek's senior management—Pignataro, Nancy Cooper, the Global Editor in Chief of Newsweek, and Dayan Candappa, Chief Strategy and Content Officer of Newsweek—approved Duin to write the Article.  Def. Resp. ¶¶ 53–54, 22; Pl. Resp. ¶ 57.

In researching the Article, Duin had contact with numerous former members of The Satanic Temple, some of whom served as sources for the Article.  Def. Resp. ¶ 69.  Duin communicated with two of the defendants in the Washington Lawsuit, David Alan Johnson and Nathan Sullivan.  Pl. Resp. ¶ 24; Def. Resp. ¶ 68; Pl. Second Resp. ¶ 157.  After those communications, Sullivan provided Duin with the contact information for Jinx Strange, which is a pseudonym for Paul Millirons, a former member of the Satanic Temple.  Def. Resp. ¶¶ 71–72.

Duin emailed Strange to inquire of what chapter he was a part of before he left The Satanic Temple, and why he left.  Pl. Resp. ¶¶ 31–32; Pl. Second Resp. ¶ 164.  Duin's email to Strange did not contain any reference to or question about sexual abuse.  Pl. Second Resp. ¶ 165.  In response, Strange provided a three-page email with his experience as a former member of The Satanic Temple.  Def. Resp. ¶ 73; Pl. Second Resp. ¶ 166.  Included within this email Strange said that he had heard stories from other members and:

> [a] lot of times those things were anecdotal or unsupported, but sometimes they were very concerning. Screenshots or images of things and connections I hadn't seen before. Leaders posing happily with major alt-right media figures. Accounts of sexual abuse being covered up in ways that were more than anecdotal. Dozens of people kicked out for asking for financial records from this alleged-non-profit organization.

**Appendix 1119**

Pl. Resp. ¶ 33; Pl. Second Resp. ¶ 166.[3]  In his email response, Strange does not claim that he

personally suffered any sexual abuse or that he personally witnessed any sexual abuse.  Def. Resp.

¶¶ 74–75.  Duin did not ask Strange any follow up questions.  Def. Resp. ¶¶ 79–80.

In addition to the above-mentioned research, Duin also communicated with Scott Malphas,

another former member of The Satanic Temple.  Pl. Resp. ¶ 28; Pl. Second Resp. ¶¶ 160–62.  Duin

also spoke with Dr. Joseph Laycock, the author of "*Speak of the Devil: How The Satanic Temple*

*is Changing the Way We Talk about Religion*."  Pl. Resp. ¶¶ 45–46; Def. Resp. ¶¶ 84–85.  Finally,

Duin interviewed Matt Kezhaya, General Counsel of The Satanic Temple, and Lucien Greaves,

the spokesperson and co-founder of The Satanic Temple.  Pl. Resp. ¶¶ 40, 47; Def. Resp. ¶ 81; Pl.

Second Resp. ¶¶ 169, 173.  Duin did not specifically ask Greaves about the Article Statement in

their conversations.  Def. Resp. ¶ 83.

After concluding her research, Duin wrote the Article.  Def. Resp. ¶ 11.  Cooper was the

sole editor of the Article.  Pl. Resp. ¶¶ 57–58; Def. Resp. ¶¶ 12–17, 25, 28.  Neither Cooper, nor

anyone else at Newsweek, besides Duin, fact-checked the Article.  Def. Resp. ¶¶ 116–120.  Instead,

they relied on Duin to fact check the Article.  Def. Resp. ¶¶ 116–120.  Duin represented in an email

to Cooper that she had fact-checked the Article.  Pl. Resp. ¶ 64.[4]  Additionally, Cooper had faith

---

[3] Plaintiff does not dispute that Strange's email to Duin includes this quote, but cites to Strange's deposition testimony for the proposition that Strange did not personally witness any sexual abuse and therefore had no first-hand knowledge of the truth of the underlying stories he shared. Strange Depo. Tr. at 11:16-18.  After reviewing the cited deposition transcript, the Court deems this factual assertion admitted, insofar as what is asserted—*i.e.* that in Strange's response to Duin he said what is quoted—is supported by the evidence in the record and is not controverted with citations to evidence that raises a genuine dispute of material fact.  *See* Local Civ. R. 56.1(c)–(d); *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004).

[4] Plaintiff does not dispute that Duin's email to Cooper says that Duin fact-checked the Article, but asserts that as it pertains to the Article Statement it was a lie. The Court deems this factual assertion admitted, insofar as this factual assertion is supported by the evidence in the record. Specifically, an email from Duin to Cooper states "Whew . . . have factchecked until I am buggy-eyed." ECF No. 101–14.  Further, Cooper testified that Duin represented to her in an email that she had fact-checked the article. *See* Cooper Depo. Tr. at 183:13–17.  Other than this conclusory statement that the underlying truth of this statement is a lie, Plaintiff does not cite to specific evidence in the record to raise a genuine dispute of material fact.  (*See supra* note 3).

**Appendix 1120**

in Duin's reporting because she was hired specifically to serve as a religion reporter, had experience as a religion reporter, was interested in the topic, and knew what she was talking about. Pl. Resp. ¶¶ 59–62; Def. Resp ¶ 136; Pl. Second Resp. ¶ 182–83.  No one else at Newsweek other than Duin and Cooper had any substantive involvement in the Article.  Def. Resp. ¶¶ 13–14, 17.

Newsweek has Editorial Guidelines that require Newsweek journalists to "[r]each out for comment and give parties a time to respond" and note that "[i]f [Newsweek is] accusing a person or company of wrongdoing, [the article] must include fair comment."  Def. Resp. ¶ 57. Furthermore, the Editorial Guidelines state that "[w]hen writing about criminal charges or allegations, be specific and complete."  Def. Resp. ¶ 58.  Finally, the Editorial Guidelines also require that Newsweek journalists use "credible" sources.  Def. Resp. ¶ 65.

On October 29, 2021, Newsweek published the Article,  Pl. Resp. ¶ 70; Def. Resp. ¶ 7, which included the following:

> He hadn't been involved long when he came to feel that TST 'appeared to be an inept, rudderless organization that had accidentally risen to prominence through something of a disingenuous prank,' referring to the 2013 filming event in Florida. He soon left the group, then was leaked material about 'leaders posing happily with major alt-right media figures,' he wrote. *'Accounts of sexual abuse being covered up in ways that were more than anecdotal.* Dozens of people kicked out for asking for financial records from this alleged-non-profit organization.'

ECF No. 1-1 (emphasis added to indicate the Article Statement).

## PROCEDURAL HISTORY

Plaintiff initially filed its complaint asserting a single claim for defamation with respect to numerous statements in the Article.  [ECF No. 1].  Duin moved to dismiss the claims against her for lack of personal jurisdiction, [ECF Nos. 16, 17], and both Duin and Newsweek moved to dismiss the action for failure to state a claim, [ECF Nos. 19, 20], pursuant to Rule 12(b)(6).  The Court granted Defendant Duin's motion to dismiss and granted in part and denied in part Defendant

5

**Appendix 1121**

Newsweek's motion to dismiss for failure to state a claim. *See Satanic Temple, Inc.*, 661 F. Supp. 3d at 176. Before the Court now are the parties' competing motions for summary judgment with respect to the defamation claim on the sole remaining statement. [ECF Nos. 98, 109]. Pursuant to a request by Plaintiff, [ECF No. 111], the Court heard Oral Argument on the competing motions.

## **LEGAL STANDARD**

"Summary judgment is appropriate only when, 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 69 (2d Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine issue of material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248. A material factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court's role here "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011). In determining whether the moving party is entitled to judgment as a matter of law, the court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008); *see also Samuels v. Mockry*, 77 F.3d 34, 35 (2d Cir. 1996) ("Summary judgment is proper if, viewing all facts of record in a light most favorable to the non-moving party, no genuine issue of material fact remains for adjudication.") (citing *Anderson*, 477 U.S. at 247–50). The Court may not make factual findings, determine credibility of witnesses, or weigh evidence. *See Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir. 2005).

**Appendix 1122**

On a motion for summary judgment, the moving party bears the initial burden of demonstrating that it is entitled to judgment as a matter of law due to "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, the movant may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322; *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (The moving party may satisfy this burden "in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim.").

If the moving party satisfies its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson*, 477 U.S. at 249). But, "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018) (quoting *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996)); *see also Jeffreys*, 426 F.3d at 554 ("[A] nonmoving part[y] . . . may not rely on conclusory allegations or unsubstantiated speculation . . . [and] must offer some hard evidence showing that its version of the events is not wholly fanciful.").

When ruling on cross-motions for summary judgment, "a court must evaluate each party's own motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Cayuga Nation v. Tanner*, 6 F.4th 361, 373 (2d Cir. 2021).

**Appendix 1123**

Under New York law a defamation plaintiff must establish: (1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or *per se* actionability. *See Armstrong v. Simon & Schuster*, 85 N.Y.2d 373, 380–81 (1995); N.Y. Pattern Jury Instr. Civil 3:34; *see also Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019) (citing *Celle v. Filipino Reporter Enterps. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000) (citations omitted).

## **DISCUSSION**

The Satanic Temple moves for partial summary judgment as to liability and argues that the evidence demonstrates that all the required elements of defamation are satisfied and there are no genuine issues of material fact thereby entitling it to judgment as a matter of law. ("Pl. Mem." at 4–5, [ECF No. 103]). Newsweek opposes the motion, asserting that The Satanic Temple has failed to demonstrate two essential elements, falsity and actual malice, and therefore summary judgment is inappropriate. ("Def. Opp." at 1, [ECF No. 112]). The Satanic Temple replied. ("Pl. Reply," [ECF No. 112]).

Newsweek moves for summary judgment arguing that the evidence demonstrates that The Satanic Temple cannot meet its burden of demonstrating that the Article Statement is substantially false or that Newsweek published the Article Statement with actual malice. ("Def. Mem.," [ECF No. 99]). The Satanic Temple opposes the motion. ("Pl. Opp.," [ECF No. 115]). Newsweek replied. ("Def. Reply," [ECF No. 120]).

When ruling on competing motions for summary judgment the Court must evaluate each motion independently, on its merits, drawing all reasonable inferences against the moving party. *Cayuga*, 6 F.4th at 373. The Court is conscious of this standard and has carefully drawn all reasonable inferences against the party whose motion is under consideration, but since the motions here are mirror images of one another, for brevity the Court discusses the analysis in tandem.

8

I.   **THERE IS A GENUINE DISPUTE OF MATERIAL
     FACT REGARDING THE ARTICLE STATEMENT
     PRECLUDING JUDGMENT AS A MATTER OF LAW
     ON THE FALSITY ELEMENT.**

"Whether particular words are defamatory presents a legal question to be resolved by the court[ ] in the first instance." *Celle*, 209 F.3d at 177 (quoting *Aronson v. Wiersma*, 65 N.Y.2d 592, 593, 493 N.Y.S.2d 1006, 483 N.E.2d 1138 (1985)).  "If any defamatory construction is possible, it is a question of fact for the jury whether the statements were understood as defamatory." *Purgess v. Sharrock*, 33 F.3d 134, 140 (2d Cir. 1994); *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986) ("On a motion to dismiss or for summary judgment, the issue is not whether the court regards the language as libelous, but whether it is reasonably susceptible of such a construction.").

When a court interprets a publication in an action for defamation, "[t]he entire publication, as well as the circumstances of its issuance, must be considered in terms of its effect upon the ordinary reader." *Silsdorf v. Levine*, 59 N.Y.2d 8, 13, 462 N.Y.S.2d 822, 449 N.E.2d 716 (1983); *see also Celle*, 209 F.3d at 177 (quoting *Armstrong*, 85 N.Y.2d at 380) (a court "must give the disputed language a fair reading in the context of the publication as a whole").  "[T]he words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood by the *public to which they are addressed*." *Id.* (emphasis in original).  If a statement is reasonably susceptible to multiple meanings, some of which are not defamatory, it is "for the trier of fact, not for the court acting on the issue solely as a matter of law, to determine in what sense the words were used and understood." *Davis v. Ross*, 754 F.2d 80, 83 (2d Cir. 1985).

The relevant portion of the Article, with the Article Statement emphasized here (but not in the Article), reads:

> He hadn't been involved long when he came to feel that TST 'appeared to be an inept, rudderless organization that had accidentally risen to prominence through something of a disingenuous prank,' referring to the 2013 filming event in Florida.

9

He soon left the group, then was leaked material about 'leaders posing happily with major alt-right media figures,' he wrote. *'Accounts of sexual abuse being covered up in ways that were more than anecdotal.* Dozens of people kicked out for asking for financial records from this alleged-non-profit organization.'

In Newsweek's motion, it argues that the Article Statement is substantially true and therefore cannot be defamatory because the most straight forward interpretation of the Article Statement merely asserts that Jinx Strange, or other members of The Satanic Temple, were no longer involved with The Satanic Temple in part because they "heard about accounts of sexual abuse being covered up." Def. Mem. at 14–15. The Satanic Temple argues that the Article Statement does not merely convey that Strange, or other members, were aware of these allegations. Instead, The Satanic Temple asserts that the Article Statement "falsely implies the existence of 'leaked material' which shows sexual abuse and cover-up." Pl. Opp. at 6.

Conversely, in its motion The Satanic Temple argues that the Article Statement is false and defamatory because when read in context the Article Statement is reasonably interpreted as presenting an accusation that there are reports of sexual abuse that have been covered up by The Satanic Temple and those accounts are based on leaked materials. Pl. Mem. at 7–9. In opposition, Newsweek argues that read in context the Article Statement does not accuse The Satanic Temple of sexual abuse and cover up. Newsweek argues that instead it asserts "a former member of The Satanic Temple, Jinx Strange, was no longer involved with The Satanic Temple in part because he heard about accounts of sexual abuse being covered up." Def. Opp. at 13–14.

On Newsweek's motion, drawing all reasonable inferences in favor of The Satanic Temple the Court agrees that in the context of the Article an ordinary reader could reasonably understand the Article Statement to have a defamatory connotation. Specifically, The Satanic Temple argues that the "leaked materials" reference applies to the Article Statement and therefore, it is not just

**Appendix 1126**

relaying Strange's awareness of rumors, but is instead asserting that he received materials showing sexual abuse and cover ups occurring within The Satanic Temple.

> He soon left the group, *then was leaked material about* 'leaders posing happily with major alt-right media figures,' he wrote. 'Accounts of sexual abuse being covered up in ways that were more than anecdotal. Dozens of people kicked out for asking for financial records from this alleged-non-profit organization.'

ECF No. 1-1 (emphasis added). The Satanic Temple's interpretation is reasonable because the two quoted sections could lead a reasonable reader to connect them as the various pieces of information that Strange identified from the leaked materials. As both sides agree the Court needs to give the language a fair reading in the context of the publication as a whole. Here the Article Statement and the following statement are both fragment sentences following the sentence about Strange receiving leaked materials. Therefore, the way that the paragraph is written, punctuated, and structured could cause a reasonable reader to connect the sentence fragments as other topics that were covered in the allegedly leaked materials.

On The Satanic Temple's motion, drawing all reasonable inferences in favor of non-movant Newsweek, the Court agrees that in the context of the Article an ordinary reader also could reasonably interpret and understand the Article Statement merely to be conveying Strange's awareness of these rumors and that they were a reason that he left the organization.

> *He hadn't been involved long when he came to feel that TST* 'appeared to be an inept, rudderless organization that had accidentally risen to prominence through something of a disingenuous prank,' referring to the 2013 filming event in Florida. He soon left the group, then was leaked material about 'leaders posing happily with major alt-right media figures,' he wrote. 'Accounts of sexual abuse being covered up in ways that were more than anecdotal. Dozens of people kicked out for asking for financial records from this alleged-non-profit organization.'

11

**Appendix 1127**

ECF No. 1-1 (emphasis added).  This is also a reasonable interpretation since when reading the Article Statement in context, as the parties agree the Court must, the section of the Article and the specific paragraph in which the Article Statement appears is discussing Jinx Strange's experience with and his feelings about The Satanic Temple.  Additionally, the reference to leaked materials is in a separate sentence then the Article Statement, so a reasonable reader could interpret that reference to apply only to the preceding sentence discussing of leaders of The Satanic Temple posing with alt-right media figures statement.

Based on Newsweek's reasonable interpretation of the Article Statement, Newsweek argues that the Article Statement is true because Strange testified that the Article Statement was "some of the reasons that [he] was not involved with TST or had -- had left the organization, and that was part of a list of things that concerned [him]."  Strange. Depo. Tr. at 11:7–13.  Thus, if a jury were to determine that a reasonable reader would interpret the Article Statement as Newsweek proposes, as opposed to how The Satanic Temple proposes, then the Article Statement could be found to be true based on this evidence and therefore not defamatory.

In sum, in reviewing each of the motions and drawing all reasonable inferences in favor of the non-moving party, the Court concludes that the Article Statement is reasonably susceptible to multiple meanings, some of which are non-defamatory, and thus the Court cannot conclude as a matter of law that the Article Statement is false and defamatory or true and not defamatory.  *See Electra v. 59 Murray Enterprises, Inc.*, 987 F.3d 233, 259 (2d Cir. 2021) (rejecting appellants argument that the challenged statements were false and defamatory based on their proposed "most obvious interpretation" as "without merit" because the other side's alternative interpretation was also "a reasonable interpretation" and it was "for the trier of fact, not for the court acting on the issue solely as a matter of law, to determine in what sense the words were used and understood")

(internal quotations and citations omitted).  Because the Article Statement is susceptible to multiple meanings, some of which are non-defamatory, the Court cannot conclude as a matter of law whether the Article Statement is false and defamatory or true and not defamatory.

## II. THERE IS INSUFFICIENT EVIDENCE IN THE RECORD FOR A REASONABLE JURY TO FIND THAT NEWSWEEK PUBLISHED THE ARTICLE STATEMENT WITH ACTUAL MALICE.

Newsweek argues that even if the Article Statement is defamatory, it is entitled to summary judgment because the evidence demonstrates "that The Satanic Temple cannot meet its burden of demonstrating by clear and convincing evidence" that "Newsweek published the Article Statement with actual malice."  Def. Mem. at 1; Def Opp. at 18.  The Satanic Temple argues that the appropriate standard is negligence, but that even if the actual malice standard applies, there is sufficient evidence for a reasonable jury to find actual malice.  Pl. Mem. at 13, 18; Pl. Opp. at 5.

### A. The Actual Malice Standard Applies.

Newsweek asserts that actual malice is an essential element of The Satanic Temple's defamation claim under New York's anti-SLAPP statute.  Def. Mem. at 17, Def. Opp. at 18. Alternatively, Newsweek states, in a footnote, that even if the anti-SLAPP statute does not apply, The Satanic Temple is a "limited purpose public figure" and thus actual malice is required to prevail on a defamation claim.  Def. Mem at 17 n.5; Def. Opp. at 18 n.8.

The Satanic Temple argues that it is a private figure and the Article Statement covers a matter of private concern so it need only demonstrate negligence.  Pl. Mem. at 13–18; Pl. Opp. at 15–17.  The Satanic Temple also argues that even if the Court finds that the actual malice standard applies then it is nonetheless satisfied because Newsweek did not follow its own Editorial Guidelines.  Pl. Mem. at 18–25; Pl. Opp. at 18–19.

**Appendix 1129**

    *1.   The New York Anti-SLAPP Law Applies.*

The New York anti-SLAPP law states:

> In an action involving public petition and participation, damages
> may only be recovered if the plaintiff, in addition to all other
> necessary elements, shall have established by clear and convincing
> evidence that any communication which gives rise to the action was
> made with knowledge of its falsity or with reckless disregard of
> whether it was false, where the truth or falsity of such
> communication is material to the cause of action at issue.

N.Y. Civ. Rights Law § 76-a(2).  As a federal court sitting in diversity in this defamation action

we are governed by the substantive law of the state, including the substantive provisions of the

New York anti-SLAPP law.  *See La Liberte v. Reid*, 966 F.3d 79, 86 n.3 (2d Cir.

2020) (distinguishing between the applicability in federal court of substantive and procedural

elements of state anti-SLAPP laws); *see also Coleman v. Grand*, 523 F. Supp. 3d 244, 258

(E.D.N.Y. 2021) ("The anti-SLAPP provision at issue here, § 76-a, applies in federal court because

it is manifestly substantive, governing the merits of libel claims and increasing defendants' speech

protections.") (internal quotations and citations omitted).  Therefore, if the Court finds that The

Satanic Temple's defamation claim is "[a]n action involving public petition and participation," as

defined by in New York's anti-SLAPP law, The Satanic Temple must establish actual malice.

    The anti-SLAPP law defines an action involving public petition and participation as "a

claim based upon: (1) any communication in a place open to the public or a public forum in

connection with an issue of public interest."  N.Y. Civ. Rights Law § 76-a(1)(a).  The Court finds

that this action does involve a "communication in a place open to the public or a public forum,"

because the Article Statement was published on Newsweek's online website. Def. Resp. ¶¶ 3, 7;

Pl. Resp. ¶¶ 11–12, 70; *see Ctr. for Med. Progress v. Planned Parenthood Fed'n of America*, 551

F. Supp. 3d 320, 332 (S.D.N.Y. 2021), *aff'd sub nom*, *Daleiden v. Planned Parenthood Fed'n of*

**Appendix 1130**

*America*, No. 21-CV-2068, 2022 WL 1013982 (2d Cir. Apr. 5, 2022) (concluding that "[t]he present case clearly falls within the scope of the newly amended anti-SLAPP law" because the challenged statements were published on Twitter and Rewire News which "are both open to the public").

The Court also finds that the Article Statement falls within the statute's intentionally broad definition of a communication "in connection with an issue of public interest." The anti-SLAPP law expressly provides that the term " '[p]ublic interest' shall be construed broadly, and shall mean any subject other than a purely private matter." N.Y. Civ. Rights Law § 76-a(1)(d); *see Lindberg v. Dow Jones & Co., Inc.*, No. 20-CV-8231, 2021 WL 3605621, at *8 (S.D.N.Y. Aug. 11, 2021) ("In light of the extremely broad interpretation [of what qualifies as public interest] by New York courts," cases where "the subject matter was not a matter of legitimate public concern are extremely rare."). In particular, with the rise of the #MeToo movement and the public's growing awareness of and activism surrounding the topics of sexual misconduct, harassment, and abuse, the Court finds that the Article Statement—which addresses alleged accounts of sexual abuse being covered-up in an organized religion—an "issue of public interest." *See Watson v. NY Doe 1*, No. 19-CV-533, 2023 WL 6540662, at *3 (S.D.N.Y. Oct. 6, 2023) (finding that the anti-SLAPP statute applied to a lawsuit regarding online posts about statements that implicated the plaintiff in several acts of workplace sexual misconduct); *Coleman*, 523 F. Supp. 3d at 259 (concluding that "allegations of sexual impropriety and power dynamics in the music industry, as in others, were indisputably an issue of public interest"); *Goldman v. Reddington*, No. 18-CV-3662, 2021 WL 4099462, at *4 (E.D.N.Y. Sept. 9, 2021) (concluding that the defendant's online posts accusing [the plaintiff] of sexual assault" and "criticism of the law enforcement investigation of her sexual-assault complaint" amounted to an issue of public interest). The Court finds that the Article

15

**Appendix 1131**

Statement addresses an idea or topic that is a "matter of political, social, or other concern to the community." *Abbott v. Harris Publ'ns, Inc.*, No. 97-CV-7648, 2000 WL 913953, at \*7 (S.D.N.Y. July 7, 2000).

Because the Court concludes that New York's anti-SLAPP law is applicable, The Satanic Temple must demonstrate actual malice by clear and convincing evidence.[5]

> 2. *There Is Insufficient Evidence For A Reasonable Jury To Conclude That Newsweek Made The Article Statement With Actual Malice.*

"We have emphasized that the actual malice standard imposes on a plaintiff 'a heavy burden of proof, a burden that is designed to assure to the freedoms of speech and press that breathing space essential to their fruitful exercise.' " *Brimelow v. New York Times Co.*, No. 21-66-CV, 2021 WL 4901969, at \*2 (2d Cir. Oct. 21, 2021) (quoting *Contemp. Mission, Inc. v. N.Y. Times Co.*, 842 F.2d 612, 621 (2d Cir. 1988) (internal quotation marks and citation omitted). On summary judgment, the question for the Court is "whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Kipper v. NYP Holdings Co.*, 12 N.Y.3d 348, 354 912 N.E.2d 26 (2009) (quoting *Anderson*, 477 U.S. at 255–256).

To demonstrate actual malice a plaintiff must show that an allegedly defamatory "statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.' " *Palin*, 940 F.3d at 809 (quoting *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173–

---

[5] Because the Court determined that the actual malice standard applies to this action due to New York's anti-SLAPP law the Court need not determine if Plaintiff is a limited purpose public figure. And in any event, Defendant bears the burden of establishing that Plaintiff is a public figure, *Coleman*, 523 F. Supp. 3d at 255, and it fails to do so by merely asserting in a footnote that The Satanic Temple is a public figure and listing the elements required to establish a plaintiff as a limited purpose public figure. *See* Def. Mem. at 17, n.5. That is insufficient. *See Sulzer Mixpac AG v. A&N Trading Co.*, 988 F.3d 174, 182 n.5 (2d Cir. 2021) (issues raised in only a footnote are insufficient and generally deemed waived).

**Appendix 1132**

74 (2d Cir. 2001)). The standard is a subjective one, meaning that to satisfy this burden the plaintiff needs to allege that the defendant actually possessed knowledge that the statement was false or a "high degree of awareness of [the statement's] probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964); *see also Liberman v. Gelstein*, 80 N.Y.2d 429, 438, 605 N.E.2d 344 (1992) ("[T]here is a critical difference between not knowing whether something is true and being highly aware that it is probably false. Only the latter establishes reckless disregard in a defamation action.").

A defendant's subjective mental state "revolves around facts usually within the defendant's knowledge and control, and rarely is admitted." *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 927 (2d Cir. 1987). As such, "a court typically will infer actual malice from objective facts." *Celle*, 209 F.3d at 183. For instance, "[a]ctual malice can be established through the defendant's own actions or statements, the dubious nature of [its] sources, and the inherent improbability of the story among other circumstantial evidence." *Id.* (internal quotation marks omitted). In cases "involving the reporting of a third party's allegations, recklessness may be found where there are *obvious reasons* to doubt the veracity of the informant or the accuracy of his reports." *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989) (internal citations and quotations omitted) (emphasis in original).

Newsweek argues that there is insufficient evidence in the record from which a reasonable jury could find, by clear and convincing evidence, that Newsweek made the Article Statement with actual malice. Def. Mem. at 17; Def. Opp. at 19. The Satanic Temple asserts that there is sufficient evidence, viewed in the aggregate, to support the conclusion that Newsweek made the Article Statement with actual malice because the Article Statement was: (1) not specific or fact-checked;

17

**Appendix 1133**

(2) not responded to by The Satanic Temple; and (3) supplied by incredible sources, all of which are violations of Newsweek's own Editorial Guidelines.  Pl. Mem. at 18; Pl. Opp. 19.

> ### a. Newsweek's Alleged Failure To Follow Its Own Editorial Guidelines Is Insufficient To Support A Finding Of Actual Malice.

As an initial matter, The Satanic Temple's argument that this "case presents the need for only a single yardstick, the Editorial Guidelines because those establish . . . Newsweek's subjective standard of care" is mistaken.  Pl. Mem. at 18; Pl. Opp. at 18.  As the Court outlined above, actual malice is demonstrated when there is evidence that the Article Statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not."  *Palin*, 940 F.3d at 809.  Thus, evidence that Newsweek allegedly failed to follow its own internal Editorial Guidelines, without more, does not satisfy the actual malice requirement.  *See Harte-Hanks Commc'ns, Inc.*, 491 U.S. at 665 (holding that "an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers' cannot alone support a verdict in favor" of finding actual malice); *Khan v. New York Times Co.*, 269 A.D. 2d 74, 77, 710 N.Y.S.2d 41 (1st Dep't 2000) (A " 'reckless disregard' for the truth requires more than a departure from reasonably prudent conduct.").  The Satanic Temple simply pointing to alleged violations of the Newsweek Editorial Guidelines is insufficient evidence to support a finding of actual malice.  *See Brimelow*, No. 21-66-CV, 2021 WL 4901969, at *3 ("[n]or are we persuaded by [the plaintiff's] attempts to find additional support in the Complaint's references to the [defendant's] alleged departure from 'accepted newsgathering standards' and its 'own commitment to fairness and impartiality' ").

However, because "a court typically will infer actual malice from objective facts," including "defendant's own actions or statements, the dubious nature of [its] sources, and the

**Appendix 1134**

inherent improbability of the story among other circumstantial evidence," *Celle*, 209 F.3d at 183, the Court will analyze the conduct underlying each of the alleged Editorial Guideline violations to determine if they could amount to evidence sufficient for a reasonable jury to find, by clear and convincing evidence, that Newsweek made the Article Statement with actual malice.

> **b. Even In the Aggregate the Evidence is Insufficient For a Reasonable Jury to Conclude That Newsweek Published The Article Statement With Actual Malice.**

First, Newsweek argues that Cooper was reasonable in relying on Duin's good reputation, extensive experience, and representations that the Article, (including the Article Statement), was accurate and the Court should therefore not consider Duin's state of mind. Def. Mem. at 19; Def. Reply at 8–9; Def. Opp. at 20. The Satanic Temple argues that Newsweek cannot escape liability by simply stating that it relied on its reporter. Pl. Mem. at 21; Pl. Opp. at 25.

In support of its argument Newsweek first points to *Stern v. Crosby*, which granted a book publisher's motion for summary judgment when a plaintiff offered evidence only that the author of the book, but not the publisher, acted with actual malice. 645 F. Supp. 2d 258, 284–85 (S.D.N.Y. 2009). Next, Newsweek relies on *Tzougrakis v. Cyveillance, Inc.*, which granted a magazine publisher's motion for summary judgment because in the absence of "obvious reasons to doubt the truth of the article" it was not "grossly irresponsible" for a publisher to rely on "a trusted reporter's, representations without rechecking her assertations or retracing her sources." 145 F. Supp. 2d 325, 332 (S.D.N.Y. 2001). Finally, Newsweek points to *Chaiken v. VV Pub. Corp.*, which granted a newspaper's motion for summary judgment and concluded that it was not "grossly irresponsible" when it "relie[d] upon the integrity of a reputable author and ha[d] no serious reasons to question the accuracy of the information provided by that author." 119 F.3d 1018, 1032 (2d Cir. 1997).

**Appendix 1135**

However, since those cases were decided the Second Circuit has ruled that, "[w]hen actual malice in making a defamatory statement is at issue, the critical question is the state of mind of those responsible for the publication."  *Palin*, 940 F.3d 804 (concluding that the state of mind of the author of the relevant editorial was what was relevant to the actual malice determination). Moreover, the Second Circuit has held that "[w]hen there are multiple actors involved in an organizational defendant's publication of a defamatory statement, the plaintiff must identify the individual responsible for publication of a statement, and it is that individual the plaintiff must prove acted with actual malice." *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (2d Cir. 2013). Here, the Satanic Temple has identified Cooper, as the editor of the Article, and Duin, as the author of the Article, as the individuals responsible for publication of the Article Statement by Newsweek. Therefore, the Court will consider evidence of both Cooper's and Duin's states of mind in determining whether there is sufficient evidence for a  jury to find actual malice.

> i.   *The Evidence of Cooper' State of Mind Does Not Support a Finding of Actual Malice.*

The Satanic Temple argues, both in support of its own motion for summary judgment and in opposition to Newsweek's motion, that Cooper, as the editor of the Article, generally failed to follow the Editorial Guidelines of Newsweek and also had a personal bias against The Satanic Temple.  Pl. Mem. at 19, 24; Pl. Opp. at 24.  Newsweek argues that The Satanic Temple cannot point to any evidence that Cooper entertained serious doubts as to the truth of the Article Statement.  Def. Mem. at 19–20; Def. Opp. at 21.

The Satanic Temple cites to Cooper's deposition testimony where she admits that she does not know specifically who was sexually abused, what sexual abuse entailed, who engaged in the cover up, or what the cover up entails, Cooper Depo. Tr. at 207:12–25–208:1–5, and contends this

20

**Appendix 1136**

is evidence of her failing to follow Newsweek's Editorial Guidelines requiring specific and complete allegations of criminal wrongdoing. Pl. Mem. at 19. But this lack of knowledge about the underlying facts of the Article Statement does not amount to evidence of actual malice. *See Liberman*, 80 N.Y.2d at 438, ("[T]here is a critical difference between not knowing whether something is true and being highly aware that it is probably false. Only the latter establishes reckless disregard in a defamation action."); *see Contemp. Mission, Inc.*, 842 F.2d at 622–23 (plaintiffs "must come forward with sufficient facts to enable a jury to find by clear and convincing evidence that the [newspaper or the author] in particular, acted with malice in the constitutional sense, i.e., with knowledge that the statements made were false or with reckless disregard of the truth").

Cooper's alleged failure to further investigate the answers to these questions also does not amount to evidence of actual malice because there is no evidence that Cooper had any obvious reason to doubt the Article Statement. *See Dongguk Univ.*, 734 F.3d at 124 ("a publisher who does not already have obvious reasons to doubt the accuracy of a story is not required to initiate an investigation that might plant such doubt") (internal quotations and citation omitted); *see also Gertz,* 418 U.S. at 332 ("mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth"). On the contrary the only evidence in the record is that Cooper did not have a reason to doubt the sources on which Duin relied (Cooper Depo. Tr. at 155:1–10, 176:7–15–177:9–12, 206:8–9), she did not have a reason to doubt that Duin fully investigated the Article Statement (Cooper Depo. Tr. at 196: 4–7, 201:12–13, 203:11–13, 208: 15–23, 209:19–24), and she was confident that Duin fact-checked the Article Statement (Cooper Depo. Tr. at 140:21–24, 182:25–183:1–6, 183:13–17). None of the evidence put forward by The Satanic Temple shows—certainly not clearly and convincingly— that Cooper had subjective knowledge or a "high

**Appendix 1137**

degree of awareness of [the statement's] probable falsity," *Garrison*, 379 U.S. at 74 (1964), as required to create a genuine issue of material fact regarding actual malice.

The Satanic Temple claims also that Cooper was biased against The Satanic Temple, and that purported bias combined with her failure to investigate could support a jury's finding of actual malice.  The Court disagrees.  First, to support its claim that Cooper was biased, The Satanic Temple points to a single email chain between Duin and Cooper in which Cooper asks Duin, "[c]an you add a phrase about the abortion suit—that it's a piece of political theatre; they don't actually have an abortion ritual."  ECF No. 105–22.  In her deposition Cooper said, "I am assuming they don't actually have an abortion ritual, so, before we say that, let's make sure that either is the case or that it's a piece of political theater."  Cooper Depo. Tr. at 167:20–15.  The Court is entirely unconvinced that this single email posing a question to the Duin about The Satanic Temple amounts to evidence that Cooper was biased.  Bare assertions of bias are insufficient.  *See Contemp. Mission, Inc.*, 842 F.2d at 622–23 (assertions that the defendants "intentionally distorted and manipulated the truth in order to blacken [plaintiffs'] reputations" are insufficient because "bare assertions of ill will are not sufficient to establish a triable issue of actual malice.")

Even if this email were somehow illustrative of a personal bias that Cooper had against The Satanic Temple, without evidence to suggest that Cooper had serious reservations about the accuracy of the Article Statement or that she acted pursuant to that bias, this evidence is insufficient to create a triable issue of actual malice.  *See Palin*, 940 F.3d at 814 (requiring more than "sheer political bias" to establish actual malice); *see also Brimelow*, No. 21-66-CV, 2021 WL 4901969, at *3 ("referencing the alleged ill will toward [the plaintiff] harbored by the [defendant]" and allegations of failure to adhere to standards were insufficient when there was "no basis for plausibly inferring that the [the defendant] had any doubts about the truth of its statements").  There

**Appendix 1138**

is insufficient— and certainly not clear and convincing—evidence in the record for a reasonable jury to conclude that Cooper acted with actual malice when publishing the Article Statement.

> ii.   *Evidence of Duin's State of Mind*
> *Does Not Support a Finding of Actual Malice*

In support of its own motion, and in opposition to Newsweek's motion, The Satanic Temple argues that a reasonable jury could conclude that Newsweek made the Article Statement with actual malice based on the aggregate evidence that Duin: (1) did not fact check or properly investigate the Article Statement, (2) relied on incredible sources, and (3) had a personal bias against The Satanic Temple.  Pl. Mem. at 19; Pl. Opp. at 19.  Newsweek argues that the evidence The Satanic Temple cites to does not amount to actual malice.  Def. Mem at 20; Def. Opp. at 22.

The Satanic Temple contends that Duin failed to properly investigate and fact-check the Article Statement and this is evidence of actual malice.  In support, The Satanic Temple provides evidence that Duin did not ask Strange follow-up questions about who specifically was sexually abused or what he meant by "cover up," and evidence that she did not ask Graves or Dr. Laycock about the Article Statement.  *See* Duin Depo. Tr. at 99:3–17, 123:10–18, 123:24–124:5, 136:9–13. However, these facts without evidence that Duin harbored any serious doubts or had uncertainties as to the accuracy of the Article Statement do not constitute proof of actual malice.  *See Gertz,* 418 U.S. at 332 ("mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth"); *Dongguk Univ.*, 734 F.3d at 124 ("a publisher who does not already have obvious reasons to doubt the accuracy of a story is not required to initiate an investigation that might plant such doubt ") (internal quotations and citation omitted).

The record evidence demonstrates that Duin did not have any serious doubts about the truth of the Article Statement.  For example, Duin testified that she found the Article Statement "inherently plausible considering the account from the Seattle [members she interviewed], or the

<div align="center">23</div>

<div align="right">**Appendix 1139**</div>

interviews with the Seattle people . . . and the account from Scott . . . that what Jinx was saying was true." Duin Depo. Tr. at 121:23–35–122:1–4; 134:23–25. Furthermore, Duin testified that she looked into Strange's claims and "everything checked out." Duin Depo. Tr. at 122:19. She testified that there were many complaints about the alt-right figures, Duin Depo. Tr. at 122:11–23, and there were multiple people raising flags about The Satanic Temple's finances, including in Dr. Laycock's book. Duin Depo. Tr. at 123:1–4. Plus, Duin testified that she "found it plausible [Strange] was correct" because "there were plenty of people who were saying" the same or similar allegations, including in her "other interviews." Duin Depo. Tr. at 123:7–9; 165:1–5; 175:2–3; 185:2–3; 186:15–25–187:1–12. Therefore, The Satanic Temple merely pointing to potential negligent short comings in her research or investigation are insufficient to support a finding of actual malice. *See Kipper*, 12 N.Y.3d 348 at 355 ("plaintiff's reliance upon the [the defendant's] failure to employ fact-checkers, to attempt to verify the [challenged statement] . . . is misplaced . . . such proof of mere negligence does not suffice to establish actual malice by clear and convincing evidence") (internal quotations and original alterations omitted).

The Satanic Temple attempts to argue that Duin should have had obvious reasons to doubt the Article Statement because its source, Strange, was biased and semi-anonymous. Pl. Mem. at 22; Pl. Opp. at 21–22. This also does not satisfy the actual malice standard. While, relying on wholly anonymous sources can be circumstantial evidence of actual malice, the evidence here does not support that Duin relied wholly on anonymous sources. The evidence, as outlined above, shows that Duin relied on a whole multitude of sources before including the Article Statement. *See Biro*, 807 F.3d 546 (affirming a district court's conclusion that there was no evidence of actual malice because "none of the four sections of the Article containing the allegedly defamatory statements were based 'wholly' on information from unverified and anonymous sources"). While

24

**Appendix 1140**

it is true that the Article Statement was supplied to Duin by an individual who utilizes a pseudonym, the record evidence clearly demonstrates that Duin spoke with multiple other individuals, conducted her own research, including reviewing articles, books, and internet sources, and interviewed other individuals, including non-anonymous sources, which all supported her decision to include the Article Statement. *See* Duin. Depo. Tr. at 186:15–15; 188:1–6.

Furthermore, Duin relying on former members of The Satanic Temple whom she described as disgruntled, when there is no evidence that she had doubts about the truth of their statements, does not amount to evidence of actual malice. *See Sharon v. Time, Inc.*, 599 F. Supp. 538, 583 (S.D.N.Y. 1984) ("[B]ias on the part of sources does not necessarily create an issue of actual malice."); *see also Sweeney v. Prisoners' Legal Servs. of New York, Inc.* 84 N.Y.2d 786, 793–94, 647 N.E.2d 101 (1995) (The New York Court of Appeals held that a complaint from a "convicted felon who had been administratively disciplined . . . does not support the further inference that defendants were likely aware that [the felon's] allegations were probably false.").

The Satanic Temple further argues that Duin consciously avoided serious doubts by not asking Greaves about the Article Statement. Pl. Mem. at 20; Pl. Opp. at 21. However, this argument fails because, as the Court explained above, there is no evidence that Duin was faced with subjective doubts that would have required her to investigate further. *See Dongguk Univ.*, 734 F.3d at 124 ("a publisher who does not already have obvious reasons to doubt the accuracy of a story is not required to initiate an investigation that might plant such doubt "); *see also Sweeney*, 84 N.Y.2d at 793–94 ("Absent some direct evidence that defendants were aware of probable falsity, they cannot be found to have harbored an intent to avoid the truth."). The Satanic Temple has not pointed to, nor has the Court found, any evidence in the record that Duin had serious doubts as to the veracity of the Article Statement which would have required her to investigation further.

**Appendix 1141**

The Satanic Temple further argues that Duin's failure to investigate combined with her purported bias and "pattern of spreading rumors about sexual abuse and cover up" is sufficient evidence to support a finding of actual malice. Pl. Mem. at 23; Pl. Opp. 23. The Satanic Temple points to four prior articles Duin previously wrote as evidence of her bias against The Satanic Temple. ECF No. 105–9. However, a review of these articles cannot support the conclusion that Duin was biased against The Satanic Temple. To begin, none of the articles even discuss The Satanic Temple. *See generally* ECF No. 105–9. Additionally, the quotes to which The Satanic Temple points as evidence of Duin's supposed biased towards satanism more generally, *see Pl.* Mem. at 23; Pl. Opp. at 23, are explaining the various topics covered in a book, not Duin's thoughts, opinions, or views. *See* ECF No. 105–9 at 13. These articles are not probative evidence of Duin's purported bias against The Satanic Temple and do not support a finding of actual malice.

Similarly, the Court is also unpersuaded that the two articles Duin wrote that do mention The Satanic Temple, *see* ECF Nos. 105–10, 105–12, show any evidence that Duin was biased against The Satanic Temple because in these articles Duin is critiquing that state of journalism and only tangentially mentions The Satanic Temple. *See* ECF Nos. 105–10, 105–12. Finally, an email Duin sent to Cooper, dated October 28, 2021, ECF No. 101–14, on which The Satanic Temple relies for evidence of actual malice says, "TST is a religion (sounds cray, I know..)." ECF No. 101–14. Drawing all inferences in the favor of the non-moving party, the Court acknowledges that a jury could find this email to be evidence of some bias Duin may have had against The Satanic Temple. However, as explained already, evidence of bias is insufficient to support actual malice. *See Palin*, 940 F.3d at 814 (requiring more than "sheer political bias" to establish actual malice).

Viewing in the aggregate the evidence marshalled by The Satanic Temple there is not sufficient evidence in the record to support a finding that Newsweek made the Article Statement

**Appendix 1142**

with actual malice.  The Second Circuit's opinion in *Brimelow*, 2021 WL 4901969, at *3, is illustrative of the Court's conclusion.  In *Brimelow*, the Second Circuit clarified that although the Supreme Court in *Harte-Hanks* acknowledged that evidence of ill will and a newspaper's departure from accepted standards of reporting could be used as circumstantial evidence to support actual malice, it also "cautioned that courts must be careful not to place too must reliance on such factors."  2021 WL 4901969, at *3 (quoting *Harte-Hanks*, 491 U.S. at 667–68).  The Second Circuit went on to highlight that in *Harte-Hanks* the evidence of the newspaper's departure and motive were "supported by a host of other evidence" that the newspaper did in fact have serious doubts as to the truth of the challenged statement.  *Id.*  This evidence included the fact that the plaintiff and five other witnesses had denied the truth of the challenged statements directly to the newspaper.  *Id.*  Here, similar to *Brimelow* and unlike the record in *Harte-Hanks*, there is limited evidence of potential departures from professional standards, sparse evidence of bias, and a total lack of any evidence that Duin harbored any serious uncertainties or had any obvious reasons to doubt the truth of the Article Statement.  Based on the record before the Court, a reasonable jury could not conclude by clear and convincing evidence that Newsweek, through Cooper or Duin, made the Article Statement with actual malice.

## CONCLUSION

For the reasons described above, Defendant's motion for summary judgment is GRANTED and Plaintiff's motion for summary judgment is DENIED.  The Clerk of Court respectfully is requested to terminate the motions pending at ECF Nos. 98 and 109 and to close this case.

**SO ORDERED.**

**Date:  March 26, 2025**
**New York, NY**

                                          **MARY KAY VYSKOCIL**
                                        **United States District Judge**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

THE SATANIC TEMPLE, INC.,

                         Plaintiff,                        22 **CIVIL** 1343 (MKV)

         -against-                            **JUDGMENT**

NEWSWEEK MAGAZINE LLC,

                         Defendant.

-------------------------------------------------------------------X

It is hereby **ORDERED, ADJUDGED AND DECREED:**   That for the reasons set forth in the Court's Opinion and Order dated March 26, 2025, Defendant's motion for summary judgment is GRANTED and Plaintiff's motion for summary judgment is DENIED; accordingly, this case is closed.

**Dated:**  New York, New York
       March 27, 2025

 

                                       **TAMMI M. HELLWIG**
                                  ——————————————————
                                      **Clerk of Court**

**BY:**           K. Mango

                                    ——————————————————
                                     **Deputy Clerk**

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| The Satanic Temple, Inc. | 1:22-cv-1343 (MKV) |
| *Plaintiff-Appellant.* | |
| *vs.* | **NOTICE OF APPEAL** |
| Newsweek Digital LLC | |
| *Defendant-Appellee.* | |

**PLEASE TAKE NOTICE** that Plaintiff-Appellant The Satanic Temple, Inc. respectfully appeals to the United States Court of Appeals for the Second Circuit from the following orders:

- The final order, granting Newsweek summary judgment (ECF No. 134, dated March 26, 2025) and its related judgment (ECF No. 135, dated March 27, 2025); and

- The order granting Newsweek's motion to dismiss for failure to state a claim, in part, and dismissing Julia Duin for lack of personal jurisdiction (ECF No. 27, dated March 8, 2023).

There being a final judgment, appellate jurisdiction is based on 28 USC § 1291.

– 1 –

**Appendix 1145**

Respectfully submitted on April 7, 2025,

By:  */s/ Matt Kezhaya*

Matt Kezhaya (# 0402193)
KEZHAYA LAW PLC
150 S. Fifth St., Suite 1850
Minneapolis, MN 55402
phone:  (612) 276-2216
email:  matt@kezhaya.law

## CERTIFICATE OF SERVICE

**NOTICE IS GIVEN** that I, Matt Kezhaya, efiled the foregoing document by uploading it to the Court's CM/ECF system on April 7, 2025, which sends service to registered users, including all other counsel of record in this cause. *s/ Matt Kezhaya*

# N.Y. Civ. Rights Law § 76-a(1), (2)

## Actions involving public petition and participation; when actual malice to be proven

1. For purposes of this section:

(a) An "action involving public petition and participation" is a claim based upon:

(1) any communication in a place open to the public or a public forum in connection with an issue of public interest; or

(2) any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition.

(b) "Claim" includes any lawsuit, cause of action, cross-claim, counterclaim, or other judicial pleading or filing requesting relief.

(c) "Communication" shall mean any statement, claim, allegation in a proceeding, decision, protest, writing, argument, contention or other expression.

(d) "Public interest" shall be construed broadly, and shall mean any subject other than a purely private matter.

2. In an action involving public petition and participation, damages may only be recovered if the plaintiff, in addition to all other necessary elements, shall have established by clear and convincing evidence that any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false, where the truth or falsity of such communication is material to the cause of action at issue.

# CPLR § 302(a)(1)

## Personal jurisdiction by acts of non-domiciliaries

(a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or